**SUMMONS IN A CIVIL ACTION      COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**

CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV22958137 | D7 CM | 46444416 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

| | |
|---|---|
| RANIA ASSILY | **PLAINTIFF** |
| **VS** | |
| CUYAHOGA COMMUNITY COLLEGE DISTRICT ET AL | **DEFENDANT** |

**SUMMONS**

```
BENJAMIN SMITH
C/O FREEDOM PRE HIGH SCHOOL
BROWNLEE CAMPUS
817 BROWNLEE ROAD

MEMPHIS TN 38116-0000
```

You have been named defendant in a sums complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

**Said answer is required to be served on:**



You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

**Plaintiff's Attorney**

```
JOSEPH BANCSI
SUBURBAN WEST OFFICE BUILDING

20800 CENTER RIDGE ROAD SUITE 400
CLEVELAND, OH 44116
```

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

**Case has been assigned to Judge:**

```
STEVEN E GALL
Do not contact judge. Judge's name is given for
attorney's reference only.
```

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|---|
| Jan 11, 2022 |

By _____
Deputy

COMPLAINT FILED   01/11/2022



CMSN130

Exhibit A

**SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**

**CLEVELAND, OHIO 44113**

| CASE NO.<br>CV22958137 | D6 CM | SUMMONS NO.<br>46444415 |
|---|---|---|

Rule 4 (B) Ohio

Rules of Civil
Procedure

RANIA ASSILY      **PLAINTIFF**
**VS**
CUYAHOGA COMMUNITY COLLEGE DISTRICT    **DEFENDANT**
ET AL

# SUMMONS

```
MEGAN ESTES
INDIVIDUALLY AND AS EMPLOYEE OF
CUYAHOGA COMMUNITY COLLEGE DISTRICT
AS DIRERCTOR OF EQUITY COMPLIANCE,
TITLE IX
DISTRICT ADMINISTRATIVE OFFICES
700 CARNEGIE AVENUE
CLEVELAND OH 44115-0000
```

You have been named defendant in a sums complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

**Said answer is required to be served on:**



**Plaintiff's Attorney**

```
JOSEPH BANCSI
SUBURBAN WEST OFFICE BUILDING

20800 CENTER RIDGE ROAD SUITE 400
CLEVELAND, OH 44116
```

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

**Case has been assigned to Judge:**

```
STEVEN E GALL
Do not contact judge. Judge's name is given for
attorney's reference only.
```

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT<br>Jan 11, 2022 |
|---|

By _____
       Deputy

COMPLAINT FILED   01/11/2022



CMSN130

Exhibit A

**SUMMONS IN A CIVIL ACTION     COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**

**CLEVELAND, OHIO 44113**

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV22958137 | D5 CM | 46444414 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

RANIA ASSILY
**VS**
CUYAHOGA COMMUNITY COLLEGE DISTRICT
ET AL

**PLAINTIFF**

**DEFENDANT**

# SUMMONS

DERRICK WILLIAMS
INDIVIDUALLY AND AS EMPLOYEE OF
CUYAHOGA COMMUINITY COLLEGE
DISTRICT AS PROFESSOR OF SPEECH
COMMUNICATION
METRO CAMPUS
2900 COMMUNITY COLLEGE AVENUE
CLEVELAND OH 44115-0000

You have been named defendant in a sums
complaint (copy attached hereto) filed in Cuyahoga
County Court of Common Pleas, Cuyahoga County
Justice Center, Cleveland, Ohio 44113, by the
plaintiff named herein.

You are hereby summoned and required to answer
the complaint within 28 days after service of this
summons upon you, exclusive of the day of service.

**Said answer is required to be served on:**



**Plaintiff's Attorney**

JOSEPH BANCSI
SUBURBAN WEST OFFICE BUILDING

20800 CENTER RIDGE ROAD SUITE 400
CLEVELAND, OH 44116

Said answer is required to be served on Plaintiff's
Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.

If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.

**Case has been assigned to Judge:**

STEVEN E GALL
**Do not contact judge. Judge's name is given for
attorney's reference only.**

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

By_____
Deputy

| DATE SENT |
|---|
| Jan 11, 2022 |

COMPLAINT FILED   01/11/2022



CMSN130

Exhibit A

SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER
CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV22958137 | D4 CM | 46444413 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

RANIA ASSILY
**VS**
CUYAHOGA COMMUNITY COLLEGE DISTRICT
ET AL

**PLAINTIFF**

**DEFENDANT**

## SUMMONS

VINCENT BRILEY
INDIVIDUALLY AND AS EMPLOYEE OF
CUYAHOGA COMMUNITY COLLEGE DISTRICT
AS ASSISTANT DEAN OF LEARNING AND
ENGAGEMENT
METRO CAMPUS
2900 COMMUNITY COLLEGE AVENUE
CLEVELAND OH 44115-0000

You have been named defendant in a sums
complaint (copy attached hereto) filed in Cuyahoga
County Court of Common Pleas, Cuyahoga County
Justice Center, Cleveland, Ohio 44113, by the
plaintiff named herein.

You are hereby summoned and required to answer
the complaint within 28 days after service of this
summons upon you, exclusive of the day of service.

**Said answer is required to be served on:**



Plaintiff's Attorney

Said answer is required to be served on Plaintiff's
Attorney (Address denoted by arrow at left.)

JOSEPH BANCSI
SUBURBAN WEST OFFICE BUILDING

20800 CENTER RIDGE ROAD SUITE 400
CLEVELAND, OH 44116

Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.

If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.

**Case has been assigned to Judge:**

STEVEN E GALL
**Do not contact judge. Judge's name is given for
attorney's reference only.**

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

By_____
Deputy

| DATE SENT |
|---|
| Jan 11, 2022 |

COMPLAINT FILED   01/11/2022



CMSN130

Exhibit A

**SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**
**CLEVELAND, OHIO 44113**

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV22958137 | D3 CM | 46444412 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

RANIA ASSILY
**VS**
CUYAHOGA COMMUNITY COLLEGE DISTRICT
ET AL

**PLAINTIFF**

**DEFENDANT**

# SUMMONS

KIMBERLY JOHNSON
INDIVIDUALLY AND AS EMPLOYEE OF
CUYAHOGA COMMUNITY COLLEGE DISTRICT
AS ASSISTANT DEAN OF ACADEMIC
AFFAIRS AND ASS. DEAN OF LEARNING
AND ENGAGEMENT
EASTERN CAMPUS
4250 RICHMOND ROAD
CLEVELAND OH 44122-0000

You have been named defendant in a sums complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

**Said answer is required to be served on:**



Plantiff's Attorney

JOSEPH BANCSI
SUBURBAN WEST OFFICE BUILDING

20800 CENTER RIDGE ROAD SUITE 400
CLEVELAND, OH 44116

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

**Case has been assigned to Judge:**

STEVEN E GALL
**Do not contact judge. Judge's name is given for attorney's reference only.**

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

By_____
Deputy

| DATE SENT |
|---|
| Jan 11, 2022 |

COMPLAINT FILED   01/11/2022



CMSN130

Exhibit A

**SUMMONS IN A CIVIL ACTION     COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**

**CLEVELAND, OHIO 44113**

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV22958137 | D2 CM | 46444411 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

RANIA ASSILY
**VS**
CUYAHOGA COMMUNITY COLLEGE DISTRICT
ET AL

**PLAINTIFF**

**DEFENDANT**

**SUMMONS**

ALEXANDER JOHNSON
INDIVIDUALLY AND AS AN EMPLOYEE OF
CUYAHOGA COMMUNITY COLLEGE DISTRICT.
DISTRICT ADMINISTRATIVE OFFICES
700 CARNEGIE AVENUE
CLEVELAND OH 44115-0000

You have been named defendant in a sums complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

**Said answer is required to be served on:**



**Plaintiff's Attorney**

JOSEPH BANCSI
SUBURBAN WEST OFFICE BUILDING

20800 CENTER RIDGE ROAD SUITE 400
CLEVELAND, OH 44116

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

**Case has been assigned to Judge:**

STEVEN E GALL
**Do not contact judge. Judge's name is given for attorney's reference only.**

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

By _____
Deputy

| DATE SENT |
|---|
| Jan 11, 2022 |

COMPLAINT FILED   01/11/2022



CMSN130

Exhibit A

**SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**

CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV22958137 | D1 CM | 46444410 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

|  |  |
|---|---|
| RANIA ASSILY | **PLAINTIFF** |
| **VS** | |
| CUYAHOGA COMMUNITY COLLEGE DISTRICT ET AL | **DEFENDANT** |

**SUMMONS**

```
CUYAHOGA COMMUNITY COLLEGE DISTR ICT
C/O ALEXANDER JOHNSON, PRESIDENT
DISTRICT ADMININSTRATIVE OFFICES
700 CARNEGIE AVENUE

CLEVELAND OH 44115-0000
```

You have been named defendant in a sums complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

**Said answer is required to be served on:**



You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

**Plaintiff's Attorney**

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

```
JOSEPH BANCSI
SUBURBAN WEST OFFICE BUILDING

20800 CENTER RIDGE ROAD SUITE 400
CLEVELAND, OH 44116
```

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

**Case has been assigned to Judge:**

```
STEVEN E GALL
Do not contact judge. Judge's name is given for
attorney's reference only.
```

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|---|
| Jan 11, 2022 |

By _____

Deputy

COMPLAINT FILED   01/11/2022



CMSN130

Exhibit A

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

**RANIA ASSILY**
c/o Joseph Bancsi, Esq.
The Suburban West Office Building
20800 Center Ridge Road
Rocky River, Ohio 44116

      Plaintiff,

    vs.

**CUYAHOGA COMMUNITY COLLEGE DISTRICT**
C/O Alexander Johnson, President
District Administrative Offices
700 Carnegie Avenue
Cleveland, Ohio 44115,

    And

**ALEXANDER JOHNSON**
Individually and as an employee
Of Cuyahoga Community College District
District Administrative Offices
700 Carnegie Avenue
Cleveland, Ohio 44115

    and

**KIMBERLY JOHNSON,**
Individually, and as Employee Of
Cuyahoga Community College District
As Assistant Dean of Academic Affairs
And Assistant Dean Of Learning and Engagement
Eastern Campus
4250 Richmond Road
Highland Hills, Ohio 44122,
    and

CASE NO. STEVEN E GALL
CV 22 958137

JUDGE

Complaint

**COMPLAINT**

**(With Jury Demand)**

CLERK OF COURTS
CUYAHOGA COUNTY

CV22958137             120523539

1

Exhibit A

**VINCENT BRILEY**
Individually, and as Employee Of
Cuyahoga Community College District
As Assistant Dean of Learning and Engagement
Metro Campus
2900 Community College Avenue
Cleveland, Ohio 44115,

    and

**DERRICK WILLIAMS**
Individually and As Employee Of
Cuyahoga Community College District
As Professor of Speech Communication
Metro Campus
2900 Community College Avenue
Cleveland, Ohio 44115,

    and

**MEGAN ESTES**
Individually and As Employee of
Cuyahoga Community College District
As Direrctor of Equity Compliance, Title IX
District Administrative Offices
700 Carnegie Avenue
Cleveland, Ohio 44115,

    and

**BENJAMIN SMITH**
c/o Freedom Prep High School
Brownlee Campus
817 Brownlee Road
Memphis, Tennessee 38116,

           Defendants.

Exhibit A

## COMPLAINT FOR BREACH OF CONTRACT, VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION, DAMAGES, INJUNCTIVE, AND OTHER RELIEF

### WITH JURY TRIAL DEMAND

### Jurisdiction and Venue

1.      The actions of Defendants, subject of the claims of Plaintiff, Rania Assily, took place in the State of Ohio, in the County of Cuyahoga, and across the United States utilizing the world internet and cyber communication media, all causing the alleged injuries and damage to Plaintiff, Rania Assily, and subject them to the jurisdiction and venue of the Cuyahoga County Court of Common Pleas, Ohio.

2.      The actions of Defendant, Benjamin Smith, who is believed to be a resident of the State of Tennessee, and the subject of the claims of Plaintiff, Rania Assily, against him, subject him to the jurisdiction and venue of the Court of Common Pleas of Cuyahoga County, Ohio, for his utilization of the world wide web and cyber communication medias and social platforms, to disseminate and publish throughout the United States, including in the State Of Ohio, and Cuyahoga County,  libelous and defamatory material causing injury and damage to Plaintiff, Rania Assily, in the State Of Ohio and Cuyahoga County, pursuant to the provisions of Ohio Revised Code, Sections 2307.382(A)(1)(4) and (6).

3

Exhibit A

## The Parties

### Plaintiff, Professor Rania Assily

3.      Plaintiff, Rania Assily, is an Arab-American woman of Palestinian ethnicity and descent, a citizen of the State Of Ohio, and an owner of real property in  Cuyahoga County, Ohio.

4.      Plaintiff, Rania Assily, (herein after referred to as "Professor Assily") at all times relevant hereto was Assistant Professor of History, at the Westshore Campus of Defendant, Cuyahoga Community College District, pursuant to written contract, a copy of which is attached hereto as **Exhibit A,** which incorporated the Policies of Defendant, Cuyahoga community College District, certain portions  of same are attached as **Exhibit B**, and the collective Bargaining Agreement between Defendant, Cuyahoga Community College District, and The American Association of University Professors (AAUP) Cuyahoga Community Chapter, a copy of which is attached hereto as **Exhibit C**, all of which constituted the contract of employment between Professor Assily and Defendant, Cuyahoga Community College District.

5.      In addition, Professor Assily was the Faculty Coordinator of History, Political Science, World Geography, and Urban Studies, at the Tri-C Westshore Campus.

6.      Professor Assily has been a professor at Defendant Tri-C for the past 5 years and has performed her duties at Tri-C without any blemish upon, or complaint from anyone, on her record, until January 12, 2021, when, without cause, her reputation was besmirched and her academic freedom of speech was denied and became subject of

4

punishment, and her employment at TRI-C was attacked by Defendant, Kimberly Johnson, daughter of Defendant, Alexander Johnson, and others as set forth herein.

7.      Professor Assily has been nominated for The Ralph M. Besse Excellence In Teaching Award by her students for each  three years in a row.

8.      The Ralph M. Besse Excellence In Teaching Award is presented annually for up to four full time faculty members selected for exceptional professional competence and commitment to helping students to succeed.

9.      Professor Assily has been well received by the student body which is composed of all races, religious creeds, ethnicity, and gender. She has received laudatory notes and praises from her students and former students, including, as an example, the most recent ones:

3/12/ 2021 8:14 P.M.

   "I want to Thank you for all that you have done for me in these past 8 weeks. You are a Joy to listen to. You have a wonderful spirit, and you really care about your students. You have even taken time out of your days to talk with your students, make us feel confortable and give us words of encouragements. I will truly miss having a Professor like you. I will absolutely miss you. I don't usually send emails to my Professors like this, but I felt the need to tell you what you mean to me. Thank you much and hopefully this isn't goodbye☺ Be blessed!"


3/15/2021 9:14 AM

"Very interested class, I really enjoyed it you are a great professor, you were always there when I needed help Thanks so much!!!!"

5/25/2021 8:23 PM

"I just wanted to say thank you. I absolutely loved this history class! I chose this course because I really enjoyed your History of Civilization class in 2019 that you

5

taught as well. You are very professional and made the course enjoyable. And that is why I took another course that you taught.

"This was my final semester at Tri-C. I will have my Associates in Liberal Arts and will graduate this month. But I did want to just say thank you again for all that you did. Being in my 30's and going to college wasn't ideal, but instructors like you made it easy and enjoyable to learn. I HATED history in high school and had no interest in it. But you changed that opinion and now I LOVE history!

Again, thank you so much. I will remember you!"

May 25, 2021, at 10:13 AM to Claire McMahon, Robert Searson, Terri Pope (Excerpts)

"I commend Professor Assily for her ability to maximize the learning process while at the same time fully engaging her student through interaction, questioning and encouraging respectful open discussion. Even as an older student, Professor Assily made me feel fully accepted and respected, as she did with all of the students.

I found Professor Assily"s teaching style to be professional and yet personal as if we were learning from a friend.

This Professor is a credit to CCC in all ways. She is bright, personable, respectful, and has the ability to relate to younger and older students. I would highly recommend any of her classes to any age group…Please convey my appreciation to Professor Assily and exgtend to her my sincere gratitude for a job very well done."

10/4/21, at 6:07 PM

"Good evening. Loved your Hist1010 class, your teaching is awesome. You do a great job telling stories and elaborating on the nuances of the course material. The course was most intriguing, I read and wathc everything I could to the best of my abilities.

Be well and thank you so much for a great experience at Tri-C!"

12/6/21, at 11:53 AM

"I wanted to thank you for making this class as interactive and engaging as possible. I know you were/are worried that being virtual does not match and have the same energy as in person but I think you did a great job making in (it) collaborative. So, I thank you for that !"

10.    Professor Assily during her academic tenure has served in multitude of capacities-

as instructor and coordinator of History, Political Science, Geography, and Urban Studies

and taught courses, including but not limited to the following: U.S. History-New World

6

Exhibit A

to The Civil War; U.S. History-Reconstruction to The Present; World Civilization-From Beginning of Civilization to 1,500 A.D.; Islam and Modern Middle East; American National Government.

**11.**    At other teaching positions at Notre Dame College and Lorain community College, Professor Assily taught courses in: African American Heritage; History of India; Western Civilization;  Islam to Nationalism; U.S. History I and II, World civilizations I and II.

**12.**    Professor Assily has been a presenter for community lectures and panel discussions and debates on a variety of public educational and other topics of public concerns, such as:

-    Web Ex presentation: "A conversation with Honest Abe", TRI-C, September, 2020;

-    Lecture at TRI-C; "Constitution for Constitutional Day", September 19, 2019.

-    Hosted "Exploring The Syrian Refugee Crisis....October 23, 2019;

-    Hosted "Raymond Towler, A Story of Wrongful Conviction...." October 10, 2017.

-    Most recently, Professor Assily will participate in a two day upcoming program, in Cleveland entitled "Frederick Douglass Speaks On Democracy".

**13.**    Professor Assily actively searched out and provided oral history for her students including working with The Cleveland Municipal Court Veterans Treatment Docket and

7

Exhibit A

Program to have our veterans relate their stories, traumas, and experiences throughout the past historic decades.

14.    Professor Assily at TRI-C has implemented academic course lectures and learning outcomes for both domestic and international students in her world history courses to ensure academic retention of students.

15.    Professor Assily has worked, and is working, tirelessly for all her students, teaching them to think critically about various topics of World History and American History, and to become well educated model citizens in their future life and to achieve their life goals.

16.    Professor Assily has always taught with integrity, passion, and purpose, with all-consuming drive and belief that a sound education for her students is a pathway to success and a key for them to obtain their life goals and aspirations.

17.    Professor Assily, as an Arab-American woman, who experienced discrimination and hateful treatment, is an ardent believer in the American legal system and the protections it provides for all person, including the protection provided by the United States Constitution and its Amendments, and the protection provided by The First Amendment and  of academic freedom in her chosen field and life work as an educator and as a Professor at The Cuyahoga Community College District, an Ohio State public institution of higher learning.

18.    Professor Assily's professional exemplary career came to a screeching halt on January 12, 2021, by the conduct of Defendants, who attacked, slandered, libeled, marginalized, isolated, shunned, and  minimized,  her on campus, and sought her removal

8

from TRI-C, and through systemic racism denied her First Amendment Constitutional Right to academic freedom of speech, as more fully set forth herein.

**The Defendant, Cuyahoga Community College District, a.k.a. TRI-C**

19. Defendant, Cuyahoga Community College District, also known as TRI-C, herein after be referred to as "TRI-C", is an Ohio governmental body and state actor, providing public post-secondary college education and is public educational institution.

20. TRI-C is predominantly funded by Ohio State taxes and funds, including property taxes paid by property owners of Cuyahoga County, and Federal funding such as the recent $41,645,625.00 Stimulus payment it received, which is providing to all, regardless of race, sex, ethnicity and gender, a public college education, having been established as an Ohio Non-Profit Corporation, Incorporated on November 3, 1961, Charter No. 15883, by the resolution of the Cuyahoga County Board of Commissioners, a copy is attached as **Exhibit D.**

21. Defendant, TRI-C, and its state governmental employees, as set forth herein, have a duty to Plaintiff, Professor Assily, to protect and not to attack and destroy Professor Assily's First Amendment right to free speech and to academic freedom.

22. Defendant, TRI-C, and its employees have a duty to be beacons of intellectual diversity and academic freedom, to be a forum where controversial ideas are discussed and debated, and not to stifle debate by picking sides, not to create a culture that mandates adherence to a specific or limited ideology or thought.

23. Defendant, TRI-C, has a public and state interest and mission to create and protect an atmosphere of higher education, an intellectual marketplace where unpopular,

9

controversial, and at times, even offensive speech can be expressed, with wide exposure to the robust exchange of ideas which discovers the truth out of multitude of tongues from members of multitude different races, creeds, and ethnicities, and persons of gender; where the professors, members of a learned profession can speak and write of all sorts of topics and in all source of settings, be free from authoritarian selection and institutional censorship or discipline.

24.    Defendant, TRI-C, as a governmental institution has a high duty to protect the individual professors to be free from state conduct encroaching upon their protected rights by the First Amendment of the United States Constitution, and applied by the Fourteenth Amendment and the protected rights contracted by the professors with Defendant, TRI-C.

25.    Defendant, TRI-C, and its administrative employees and others representing it, have the duty and responsibility to respect and seek to understand the viewpoints of others, though they may not be their own, or may conflict with their core values.

26.    Plaintiff avers, as more fully set forth herein, that Defendant, TRI-C, through its administrative, managerial, and teaching employee Defendants, breach its duties, and their duties, and it and they are liable to Plaintiff, through their actions which are exceptions to their governmental immunity and protection.

27.    Defendant, Tri-C, and its employees, as an academic institution of higher learning is vested with the duty to create an academic space and forum where different ideas could compete in an atmosphere of spirited tolerance, curiosity, and open mindedness

10

where students are exposed to competing points of view, free from social conformism and censorship.

**28.** Defendant, Tri-C, and its employees, are vested, by contract and constitutional principles, to protect and safeguard the First Amendment rights of its faculty staff to academic freedom of speech in an atmosphere which fosters a robust debate of issues of public concerns.

### Defendant, Alexander Johnson

**29.** Defendant, Alexander Johnson, is the President and the highest ranking state employee, and administrative Officer of Defendant, Cuyahoga Community College District, who is charged with the highest duty and responsibility of and to foster and protect a culture in conformity with the forgoing principles and the protection of robust debate of issues of public concern.

**30.** Plaintiff avers and believes that Defendant, Alexander Johnson, an African-American, during his tenure as President has created, sponsored, promoted, and sanctioned an underlying culture at TRI-C which is an antithesis of the duty of Defendant, TRI-C, to protect academic freedom and the First Amendment rights to free speech, and thereby, thru and with the active support and participation of state employees as set forth herein, including, Defendants, Kimberly Johnson, Vincent Briley, Derrick Williams, Meghan Estes, and others has violated the rights of Plaintiff, Professor Assily, and caused damages to Plaintiff, as more specifically set forth herein.

**31.** Culture of TRI-C during Defendant, Alexander Johnson's, leadership, with his governmental imprimatur, created and fostered a culture and academic atmosphere at

11

Exhibit A

TRI-C which espoused, promoted and sanctioned only a one sided, biased and prejudicial point of view on issues of great public concern and debate, without opportunity to discuss and debate which created and picked sides, as either you are with us and our thinking, or if you express speech with which we do not agree with, or we claim is offensive, you don't belong at TRI-C, have no place at TRI-C and should be silenced at and/or banished from TRI-C.

**32.** This culture of TRI-C was aggressively advocated by Defendant, Kimberly Johnson, whose desire was to banish Professor Assily from TRI-C, as set forth herein.

**33.** The current culture of Defendant, TRI-C, created a class which is now akin to what is described as the "New Puritans" (**Exhibit E**) with their biased thinking and censorship, with the attending and consequential damage to members of academia, including to Professor Assily.

**34.** The current culture, specifically espoused, by the state employees of TRI-C, with the *imprimatur* of Defendant, Alexander Johnson, as more specifically set forth herein, that systemic, structural, or institutional racism, accounts for almost all disparities between races, whether in education achievement, employment rates, income gaps, crime rates and health. Individual behavior, family structure, perverse governmental policies and culture have little or nothing to do with such disparities….and to contend otherwise is itself a manifestation of systemic racism.

**35.** As a consequence, few are willing or dare to speak out or to write an alternate or qualified view or nuance "for fear of being labeled racists, getting canceled and/or becoming unemployed." *Peter N. Kirsanow,* an African-American, Commissioner of The

12

United States Commission on Civil Rights, and Member of the National Labor Relations Board.

**36.**     As it will be set forth herein, Professor Assily dared to speak out and write a nuance or view otherwise, in the protected environment of academic freedom upon an issue a great public interest and concern.

**37.**     The view expressed by Professor Assily, as will be set forth herein, is shared by President Barak Obama, and including Defendant, Derrick Williams, and other African-Americans.

**38.**     Defendant, Alexander Johnson, violated and failed to carry out a known clear duty to its faculty member, Professor Assily, and violated his duty to protect the academic freedom of speech and expression guaranteed by the First Amendment of the United States Constitution as applied to state and governmental action by the Fourteenth Amendment to the United States Constitution.

### Defendant, Kimberly Johnson

**39.**     Defendant, Kimberly Johnson, is joined individually, and as a governmental state employee and an administrative officer of TRI-C, as an Interim Assistant Dean of Learning and Engagement, Eastern Campus of Defendant College,  and  in April 2021, promoted to Interim Assistant Dean of Academic Affairs, Eastern Campus of TRI-C.

**40.**     Defendant, Kimberly Johnson, is an administrative state employee, and  does not hold any academic teaching position with Defendant, TRI-C, or as a faculty member, and does not enjoy the protections afforded by  contractual Agreements of Professor Assily

13

with TRI-C and the academic freedom of speech protections of the First Amendments of the United States Constitution.

**41.**     Defendant, Kimberly Johnson is an African-American.

**42.**     Defendant, Kimberly Johnson, together with Defendant, Alexander Johnson, and other state employees, has violated a known clear duty owing to Professor Assily by TRI-C, as aforesaid.

**43.**     Defendant, Kimberly Johnson, is the daughter of Defendant, Alexander Johnson, an employee and President and Chief Reporting Officer of Defendant, TRI-C.

**44.**     Plaintiff avers that Defendant, Kimberly Johnson, has acted (1) with intentional deviation from her clear duty and purposefully did and doing acts with knowledge and appreciation that they would likely result in injury to Professor Assily, and with failure to exercise any care toward Professor Assily which resulted in harm to Professor Assily, making Defendant, TRI-C liable for her actions, and (2) acted with malice, malicious purpose, in bad faith, motivated by malice, and harboring ill will toward Professor Assily disseminated and published libelous and defamatory information to members of the academic community of TRI-C, and others, to do harm and injury to Professor Assily, making her liable individually and personally, for compensatory and punitive damages..

### Defendant, Vincent Briley

**45.**     Defendant, Vincent Briley, is joined individually and as an administrative state employee of Defendant TRI-C, as Assistant Dean of Learning and Engagement, Metro Campus, of TRI-C.

**46.**     Defendant, Vincent Briley, is an African-American.

14

**47.**     Defendant, Vincent Briley did not hold a  position with Defendant, TRI-C, as a faculty member, with any of the protections of the contractual Agreements as between Professor Assily and Defendant, TRI-C, and right of academic freedom afforded by the First Amendment of The United States Constitution.

**48.**     Defendant, Vincent Briley, had the duty to protect the First Amendment academic freedom of speech rights of Professor Assily, rather than attack Professor Assily, as set forth herein..

**49.**     Defendant, Vincent Briley, is believed to be also a relative or family member of Defendants, Alexander Johnson and Kimberly Johnson, and was the first attacker of Professor Assily on January 12, 2021, and the "first cause" of the continuous attacks to silence and to censor Professor Assily.

**50.**     Defendant, Vincent Briley, did not co-operate with the investigators hired by Defendant, TRI-C, and the investigators did not require his co-operation and did not investigate is conduct, as more specifically set forth herein.

**<u>Defendant, Benjamin Smith</u>**

**51.**     Defendant, Benjamin Smith, was an external visitor and a business invitee of Defendant TRI-C, on January 12, 2021, by employee, Defendant, Derrick Williams.

**52.**     At all times relevant hereto Defendant, Benjamin Smith, was an employee of the KIPP Memphis Collegiate High School, as Dean Of culture, a secondary educational institution, in Memphis Tennessee, then later as Dean of Academics of Freedom Prep High School, Memphis, Tennessee, an African-American educational institution.

15

Exhibit A

53.     Defendant, Benjamin Smith, is African-American.

54.     Defendant, Benjamin Smith, was not a faculty member of TRI-C, and was not protected by the right of academic freedom of speech guaranteed by the First Amendment of the United States Constitution for his conduct as set forth herein.

55.     Defendant, TRI-C, is liable for all the wrongful acts of Defendant, Benjamin Smith, a business invitee, toward Professor Assily.

56.     Defendant, Benjamin Smith, is joined for causing injury and damage in the State of Ohio, and by cyberspace distribution and publication of defamatory matter through social media throughout the United States including the State of Ohio and Cuyahoga County, Ohio.

**Defendant, Derrick Williams**

57.     Defendant, Derrick Williams, is a professor of Speech Communications, on The Metro   Campus of TRI-C.

58.     Defendant, Derrick Williams, is African-American.

59.     Defendant, Derrick Williams, actively shared the views of Professor Assily that she expressed on January 12, 2021, which he hypocritically, denounced when spoken by Professor Assily, as more specifically set forth herein.

**Defendant, Meghan Estes**

60.     Defendant, Meghan Estes, at all times relevant hereto, was an employee of Defendant, TRI-C, in the Human Resource Department, as Director of Equity compliance, Title IX.

16

61.    Defendant, Meghan Estes,  violated her duties to Professor Assily, and failed to accord her access guaranteed by contractual and other rights to redress Professor's grievances with a full knowledge and understanding that her denial would cause injury and damage to Professor Assily, as more specifically set forth herein.

62.    Defendant, Meghan Estes, as more specifically set forth herein, has treated Professor Assily differently, then Defendant, Kimberly Johnson, the daughter of Defendant, Alexander Johnson, denied Professor Assily equal protection of the laws, and only advanced and  protected  the interests of Defendants, Kimberly Johnson and Derrick Williams.

## THE FACTS

63.    Defendant, Tri-C, through its employees, and staff, including but not limited to same, to employees  Defendants, Alexander Johnson, Kim Johnson,  Vincent Briley, Professor Derrick Williams, and his invitee, Defendant, Benjamin Smith, breached its duty to protect the academic freedom of speech of Plaintiff and maintain an environment for the free exchange of ideas, as aforesaid, and violated its contractual obligation to Plaintiff, Professor Assily, and  encouraged and actively thwarted and destroyed her constitutional rights, on and after January 12, 2021 to the present.

64.    Defendant, TRI-C, has  replaced its duty to protect free speech and academic freedom, fostered and is fostering a " cancel culture" and wokeism, a social culture that is spread throughout the academic community in the country, and seeps and flows like lava from an eruptive volcano of hate and anger covering the Tri-C community and destroying the constitutional rights of Professor Assily, and only protected the "comfort" and narrow

17

mindedness and bigotry of its employees, who hold a view that only an African-American can express any criticism of the "black culture" and predicament.

**65.**     On January 12, 2021, Defendant, TRI-C, conducted a College wide" Colloquium" via Web Seminar, as a government sponsored event,  and inviting members of the public and members of any and all academic communities.

**66.**     Attendance of the members of the faculty of TRI-C, including Professor Assily, was **compulsory** at said Colloquium.

**67.**     The medium of the Colloquium was an audio and video web seminar with a written chat-room. At the end of the audio and video presentation, a verbal audio answer and question period followed for the attendees.

**68.**     Plaintiff believes and therefore avers that The Colloquium and the question and answer verbal and audio portions were recorded in an audio version, by TRI-C, and TRI-C did possess or had available a video and audio recording.

**69.**     The protocol of the verbal Question and Answer portion was that "If you (members of the audience) have any questions during the presentation, please ask them here (chat room) and I will make our presenters aware of the question." Nancy Doherty, please see chat room Transcript. **Exhibit F**.

**70.**     One of the segments of the Colloquium was conducted by Defendant, Derrick Williams who as an employee of TR-C invited external persons, Defendant, Benjamin Smith, and Jovan Gatherings to speak with him as a co-presenter at said Colloquium.

18

71.    Plaintiff, Professor Assily attended the compulsory Colloquium, but did not have intentions of asking any questions or to speak up, but to listen attentively to what was being said.

72.    During a segment conducted by employee Defendant, Derrick Williams, and the two external presenters, Defendant, Benjamin Smith, and Jovan Gatherings, all African-American, said that **"they were not going to look at people as individuals, but rather as groups and that the intention was to explain how different groups experience life in America differently and that some groups are more privileged than others"**.

73.    Relevant to this topic and view, Professor Assily at about 11:28 AM, dared and raised a written comment in the "chat room" in compliance with the protocol set by Nancy Doherty, which was not audible to the presenters, and who were not aware of her written comment.

74.    Professor Assily typed in the written "Chat-Room" the following comment:

**"You mentioned we won't be looking at individuals. Once we take the individual out of the equation, we now blame society or the system which is always broken. The individual is the marker of American democracy as it enables individual choice making. What role do poor choices and poor decision making play in current economic problems. Perfect example, Clarence Thomas, who grew up in the segregated South and now is a Supreme Court justice."**

75.    After the Presenters brought up family dynamics, Professor Assily dared to suggest that focus should also be to:

**"...family dynamics. What role does the lack of father figure and role model play in family dynamics? Children need strong fathers in the family are proof of ensuring successful young men and women as fathers form and affirm the identity of young children. Why not focus on this psychological issue as well?"**

19

76.     Professor Assily dared to raise these issues regarding black culture which the employees and members of the TRI-C did not like to hear, believed such statements were taboo at the college, and not in line with their thinking and beliefs.

77.     Professor Assily dared to raise an issue of great public concern regarding an issue of the black family dynamics, an issue which has been expressed by none other than President Barack Obama.

78.     President Barack Obama in a Father's Day Speech, on June 15, 2008, said as follows:

   **"But if we are honest with ourselves, we'll admit that what too many fathers also are is missing-missing from too many lives and too may homes.  They have abandoned their responsibilities, acting like boys instead of men.   And the foundations of our families are weaker because of it.**

   **You and I know how true this is in the African-American community.  We know that more than half of all black children live in single-parent households, a number that has doubled-doubled-since we were children. We know the statistics-that children who grow up without a father are five times more likely to live in poverty and commit crime; nine times more likely to drop out of schools and 20 times more likely to end up in prison. They are more likely to have behavior problems, or run away from home or become teenage parents themselves. And the foundations of our community are weaker because of it."** (Emphasis added) (Full text attached as **Exhibit G**)

79.     President Obama was not labelled as **"racist"** or a **"white supremacist"** for expressing these concerns.

80.     Professor Assily dared to utter the very beliefs of Defendant, Derrick Williams, who worked in a mentoring program to address the number of absentee fathers in his

20

son's elementary school in Cleveland Heights, Ohio. A copy of the Cleveland Plain Dealer Article entitled *"Noble Gents to Gentlemen"*, is attached as **Exhibit H.**

**81.**   Defendant, Derrick Williams, hypocritically, did not call himself a **racist and a white supremacist.**

**82.**   Thereafter, in a the Chat-Room a written interchange ensued between Professor Assily and Defendant Kimberly Johnson, from 11:36 to 11:45 none of which was known to the presenters, and none of which was audible and did not interrupt the presentation.

**83.**   The audio presentation ended at 12:00 Noon, Thereafter, a verbal audio discussion followed.

**84.**   Defendant TRI-C claimed that no audio recording exists of the discussions after the presentation in the question and answer period.

**85.**   During this discussion period Defendant, Vincent Briley, suddenly appeared on video opened to the entire viewing audience and started to attack Professor Assily stating that her comments in the chat room were in line with **racism and white supremacy.** Defendant, Vincent Briley, believed to be a relative or family member of Defendants, Kimberly Johnson and Alexander Johnson.

**86.**   Plaintiff believes and therefore avers that after the conclusion of the Colloquium there was immediate verbal and other communication among employees of TRI-C and defendants branding her a Racists and White Supremacist which were derogatory and defamatory to Professor Assily.

**87.**   The gossip mill and the voices to silence and malign Professor Assily immediately started through electronic and social media platforms, throughout the college and beyond with the use of college and personal electronic devices, with emails,

21

Exhibit A

text and internet platform postings, by Defendants and others, as more fully set forth at
trial.

**88.**    Defendant, Benjamin Smith, during the afternoon of January 12, immediately,
authored and posted from Cuyahoga County, Ohio before returning to Tennessee, an
attack upon Professor Assily, by name and affiliation as a Professor at TRI-C, on his
open public Facebook Page, as well to his 1,300 hundred Facebook "Friends" publishing
same throughout the internet.

Defendant, Benjamin Smith, wrote that:

"....**in time where conservative white supremacist remained dormant; they**
**Are now finding the courage to be arrogantly overt about their beliefs. Rania**
**Assily , a TRI-C history professor, used our session as an opportunity to**
**reach  into the bag of already disproven conservative rhetoric in order to shift our**
**messaging to bend toward whiteness rather than injustice.**

It continued that Professor Assily's beliefs are **DANGEROUS AND SHOULD**
**NOT BE ALLOWED ON A COLLEGE CAMPUS.** (emphasis added)

Defendant, Benjamin Smith's FaceBook Page post is attached hereto as **Exhibit I.**

**89.**    Defendant, Benjamin Smith, thereafter, in his Facebook as Reply to a comment
wrote:  **"Come to find out I think the professor was at the insurrection last week**
**sooo".** (See  **Exhibit I**)

**90.**    Defendant, Benjamin Smith and Defendant, Kimberly Johnson, within an hour of
the Face Book posting, communicated, and Defendant,  Kimberly Johnson, composed
and sent an email at 5:41 P.M. attaching the post and the libel of Defendant, Benjamin

22

Exhibit A

Smith, to  Dean Robert Searson, Dean of Academic Affairs, Westshore Campus, with copies to  Terri Pope, President of the Westshore Campus, Lisa Williams, President of the Eastern Campus, and William Cunion, Dean of Learning And Engagement, Eastern Campus, which the recipients then may have forwarded to others further publishing and spreading it. (Attached hereto as **Exhibit J**)

91.    Defendant, Kimberly Johnson, in her email accused Professor Assily of:

-    "..making some comments that align with the rhetoric of those who believe that African Americans are fundamentally inferior"

-    that she also made some remarks over voice at the end of the session and engaged aggressively with the presenters. She said that African Americans underachieve because they aren't raised by "good people" and that she was presenting an "alternative viewpoint". She attributed the impacts of systemic racism to "poor choices" and "poor decision making".

92.    All while, as related to Defendant, Meghan Estes, as set forth herein, that **"she cried for hours"**, and repeated and disseminated the defamatory attacks of Defendant, Benjamin Smith, that Professor Assily's **"beliefs are dangerous and should not be allowed on a college campus", and** lauded the attacks as **ELOQUENT,** and her comments are **"not in line with the College's culture and values"**

93.    On January 12, 2021,  Defendant, Kimberly Johnson, also forwards to Defendant, Derrick Williams, her email to Dean Searson attaching a the copy of the Facebook post of Defendant, Benjamin Smith with the note that "I enjoyed your presentation today...I didn't appreciate Prof. Assily's remarks".

23

Exhibit A

**94.**     Then on January 13, 2021, defendant, Derrick Williams, forwarded Defendant, Kimberly Johnson's email to Magda Gomez, Director of Diversity and Inclusion. with copies to Defendant, Meghan Estes, and Shari Brazile, Manager of Labor and Employee Relations.

**95.**     On January 13, 2021, Magda Gomez, forwards the email of Defendant, Derrick Williams, to Meghan Estes, and Shari Brazile, Manager of Labor and Employee Relations, stating that "Bob Searson and others may have already approached our colleagues."

**96.**     Within 24 hours, Defendant, Kimberly Johnson, caused the dissemination of the defamatory remarks of Benjamin Smith and her own remarks to at least 10 high level administrators of TRI-C, and Plaintiff believes to dozens of unidentified members of the TRI-C Campuses, and other individuals, who may have also forwarded it to others.

**97.**     Defendant, Kimberly Johnson, and Defendant, Meghan Estes,  had immediate contact with each other on January 13, 2021, and had a discussion  and conversations on January 14, 2021, wherein Defendant, Kimberly Johnson related that she "cried for hours, couldn't concentrate and ruined her day" and her "emotional" version to the event of January 12.

**98.**     **No one** contacted, no one emailed, no one called, and no one reach out to Professor Assily, no member of the administration,  no faculty member, no deans, not Meghan Estes,  **no one**, regarding how she was feeling and how she was hurt by the vicious attacks and how her professional reputation was being maligned.

24

**99.** Defendants, Kimberly Johnson, immediately, on January 14, filed a formal complaint against Professor Assily, which was followed by Defendant, Derrick Williams' filing of a formal complaint on January 21.

**100.** Plaintiff believes and avers that Defendant, Kimberly Johnson, also had immediate accesses on January 12 to and did communicate with her father, Defendant, Alexander Johnson, President of TRI-C, verbally and electronically, regarding Professor Assily, and with her other family members and relatives, and that Defendant, Alexander Johnson, communicated with Defendant, Meghan Estes, and other employees of TRI-C, regarding her daughter's complaints.

**101.** Finally, the following afternoon at 2:45 PM, Professor Assily was able to speak with Assistant Dean Claire McMahon, and tell her how offended she was by the racist attacks and Dean Clair McMahon recommended that **her colleagues should reach out to** Professor Assily.

**102.** No one from the administration had reached out to Professor Assily to discuss the situation with her – including Meghan Estes, Magda Gomez, Shari Brazile, Terri Pope, Bob Searson, Lisa Williams, Bill Cunion, and the other Defendants herein, Alexander Johnson, Kimberly Johnson, Derrick Williams, and Vincent Briley.

**103.** Instead colleagues shied away from and avoided Professor Assily, and one colleague, on January 13, 2021, even rescinded her letter of support for Professor Assily's tenure application.

25

Exhibit A

**104.**    TRI-C, through Defendant, Megan Estes, immediately acted upon and pursued the complaints of Defendant, Kimberly Johnson, daughter of the President, and Defendant, Derrick Williams.

**105.**    Professor Assily, since the Colloquium, reached out several times to find out if there was a recording of the session.

**106.**    On January 13, at 8:12 P.M. Professor Assily emailed Gary Arnosk, Integration Technician At Westshore Campus, but has not received any response from him, and professor Assily believes that he was told not to respond.

**107.**    On February 1, Professor Assily again requested a copy of the recording of the Colloquium, from Kara DePaul, but has not received any response from her to this date.

**108.**    The treatment of Defendant, Kimberly Johnson, was different.

**109.**    Professor Assily, learned that on January 12, Defendant, Kimberly Johnson, reached out to Kara DePaul, for a recording of the session.  Karen DePaul immediately acted on her request.

**110.**    It was followed by an email by Defendant, Kimberly Johnson, sent to **all deans and presidents of TRI-C,** stating that "I asked Kara DePaul for a recording of the session, but it looks like it wasn't recorded. She said she can have ITS dig more deeply into it if someone indicates they wanted a recording or a transcript".

**111.**    No one at TRI-C, not Kara DePaul, not Gary Arnosk, not Defendant, Kimberly Johnson, not any of the deans, and not any of the presidents at TRI-C, shared this information with Professor Assily.

112.    According to TRI-C, Professor Assily was not "someone" who indicated they wanted a recording or a transcript.

113.    Isolation of Professor Assily on campus continued and  was continued to be attacked and called a holocaust denier a neo-nazi, neo-fascist, racist and white supremacist, and an as one  who does not belong at TRI-C.

114.    Long time colleagues stopped speaking to her and communicating with  her.

115.    Finally, on January 14, 2021, Professor Assily was able to speak with Dr. Terri Pope, President of the Westshore Campus who told her that: "**civil discourse and varying opinions are not always embraced at the college**", that the "**college's prevailing decision is that we would never say anything that would give the impression of intolerance**",  that **"people with conservative values need to 'quietly' demonstrate their values at the community college**", and that "**you are entitled to your own opinions, it is not the opinion of the college**".

116.    On January 15, 2021, Professor Assily had a telephone conversation with Robert Searson, Dean of Learning and Engagement, wherein professor Assily was told that **"it is hard to have  conversations with people who claim 'racism" and that as soon as they are able to tag you as a 'racist" or "white supremacist' they have given permission to the audience not to listen to you anymore"**, that "**he was upset that we didn't model what should happen in an educational institution-'having civil discussion'** that "**it is better to keep quite during the colloquium-have it on but do something else**" and that "**he acknowledged how the 'other' is silenced"**.

27

117.    On January 20, 2021, Professor Assily reached out to Meghan Whitmore, Leave Administrator, to speak to her about her concerns and desire to have an informal meeting and discussion about the January 12th event. Professor Assily left a voice mail to that effect. Later, Megan Whitmore and Professor Assily did speak, and Meghan Whitmore said that she would relay her request to Meghan Estes and Shari Brazile, Manager of Labor Relations.

118.    On January 21, 2021, at 10:56 A.M., Defendant, Meghan Estes, sent an email to Professor Assily, stating that "I was sent your voice mail from Megan Whitmore and wanted to follow up on concern you expressed to her about a situation that took place during faculty Colloquium. Can you let me know your availability to speak to me tomorrow (Friday/22) ?."

119.    On January 21, 2021, at 11:10 A.M. Defendant, Meghan Estes, sent an email to Professor Assily that 11:00 A.M. works.  I will set up a WebEx meeting if it works for you.

120.    On January 21, 2021, at  11:34 AM Defendant, Meghan Estes sent the WebEx invite  which was accepted by Professor Assily.

121.    On January 22, 2021, at 10:53 A.M. few minutes before the scheduled meeting Professor Assily received notifications cancelling the meeting.

122.    Professor Assily immediately inquired of Defendant, Meghan Estes, about the cancellation.

123.    At 10:57 A.M. Professor Assily received an email from Meghan Estes that meeting was cancelled as the college is engaging an external investigator.

28

Exhibit A

124.   After further inquiry by Professor Assily, finally, at 4:09 P.M. received an email

from Defendant, Meghan Estes, stating that "The Office of Institutional Equity has

opened an investigation regarding what occurred at Faculty colloquium last week. The

college has elected to engage an external investigator as part of the process. I do not have

any additional information that I can share with you at this time."

125.   On January 25, 2021, Professor Assily, then being faced with defending an

investigation and the attending legal costs, had a telephone conversation with Dean

Robert Searson about her predicament.  Dean Searson told Professor Assily to "**back

away, until her tenure was done WE DON'T WANT TO PUT KAREN MILLER

AND ALEX JOHNSON IN SUCH A POSITION WHERE THEY FEEL

PRESSURE FROM OTHERS THAT IT WEIGHS INTO THEIR DECISION.**"

(Emphasis added).

126.   Karen Miller was the Executive Vice-President of Access, Learning & Success,

and the person reviewing who submitted Professor Assily Tenure Portfolio to the Tenure

Portfolio Committee.

127.   Defendant, Meghan Estes, violated the TRI-C grievance process for Resolving

Allegations of Discrimination, Harrassment, Sexual Misconduct, Title IX and Retaliation,

Policy 3354: 1-60-01, mandating that:

> **The Director of Institutional Equity/Title IX Coordinator or**
> **Designee will attempt to contact the reporter to review the**
> **Privacy of the process, amnesty (if appropriate), accomodations,**
> **Supportive measures, optioned for informal resolution if appropriate,**
> **And the investigative and adjudicative process for informal reports**
> **And formal complaints."**

29

**129.**    Defendant, Meghan Estes, knew the foregoing provisions and that to ignore them would cause injury and damage to the rights of Professor Assily.

**130.**    Defendant, Meghan Estes, Meghan Whitmore, and Shari Brazile, cancelled the meeting sent up for January 22, to discuss with Professor Assily her reported  concerns pursuant to the aforesaid mandate, and simply followed  the wishes of the "College" and the wishes of whoever may have dictated them to them, by simply ignoring them.

**131.**    Defendant, TRI-C, immediately engaged the law firm of Bricker & Eckler, as an external investigator, at tax payers expense and public funds.

**132.**    The law firm of Bricker & Eckler, and its three investigators, were not independent and unbiased, but only concerned about the complaints of Defendants, Kimberly Johnson and Derrick Williams, not of any of the concerns of Professor Assily, as further set forth herein.

**133.**    Professor Assily had to hire legal counsel to defend herself and to protect herself from the willful and malicious racist attacks upon her by Defendants.

**134.**    In the midst of total silence by TRI-C, the absence of any discourse and discussion of the conduct of the Defendants toward Professor Assily, Defendant, Alexander Johnson, issued a "An Important Message", on February 1, 2021, which contained that "In recent weeks, we have witnessed-within our nation and our institution- the impact of  exercising rights without an equal measure of responsibility. Even as we champion freedom of speech, we cannot condone the perpetuation of stereotypes and misinformation or aggressive language that attacks or demeans others."

30

135.    The statement of Defendant, Alexander Johnson, apply describes the conduct of Defendant, Kimberly Johnson, who did not champion free speech, perpetuated as a stereotype, used aggressive language toward, attacked, and demeaned Professor Assily: that her beliefs are dangerous; they should not be allowed on a college campus; that they were not in line with the college' culture and values; that she didn't belong on campus; lauding as eloquent speech the condemning of Professor Assily as daring to "finding the courage to be arrogantly overt about their (her) beliefs"; didn't appreciate her remarks; as a "dean" of an academic institution crying for hours; and that she approved calling Professor Assily a racists and a white supremacists.

136.    Defendant, Kimberly Johnson's conduct was not examined by anyone at TRI-C, but, instead, Defendant, Kimberly Johnson, rewarded and promoted, and spotlighted as a "Famous Employee" on the TRI-C WebSite.

137.    Professor Assily incur and paid for her legal expenses, to date, in excess of $20,000 from her personal income, and not from the public funds and tax payer dollars, as TRI-C's expenses were paid for the prosecution of the charges and investigation.

138.    Right at the inception of the hiring of the law firm of Bricker & Eckler, the law firm's bias appeared.

139.    Professor Assily requested an informal meeting to discuss an informal resolution by a dialogue with both sides.

140.    February 25, Professor Assily, emailed attorney-investigator, Joshua Nolan that she retained counsel.

31

Exhibit A

**141.**  On March 28, 2021, Professor Assily received an email from attorney Joshua Nolan, stating that "Additionally, we have notified the complaints (sic) of your request to seek an informal resolution as permitted under the policy. It requires all parties to agree to an informal resolution. Here, not all of the parties would agree to the informal resolution process."

**142.**  Counsel for Professor Assily requested Joshua Nolan the list of the attendees at the Colloquium which was denied by TRI-C, yet made unsupported findings about them.

**143.**  Counsel for Professor Assily again repeated Professor Assily request for the video and audio recording of the Colloquium, and again denied by TRI-C.

**144.**  Counsel for Professor Assily continued to demand copies of the complaints and the transcript of the "chat room" from Defendant, Meghan Estes and attorney Nolan.

**145.**  On April 1, 2021, at 12:04 P.M. attorney Joshua Nolan sent an email to Professor Assily, and her counsel that "if he did not hear back to set up an interview and that if I do not hear from you by the close of business on Monday, I will assume you do not wish to be interviewed in the matter. We will move forward with our factual findings and report to the institution."

**146.**  At 2:14 P.M. counsel for Professor Assily by email responded to attorney Nolan's email stating that both Professor and he as her counsel will continue to cooperate with setting up an interview, but **"I must have a copy of the statements of the complainants and the transcript of the chat section of the conference. We already discussed this".**

**147.**  Attorney Nolan responded that they can provide "access" to the documents but they first need to schedule available times to meet the following week. "While we work

Exhibit A

on making those documents available electronically, please let us know what days would work for you both next week".

148.   Even though, documents can be sent in matter of minutes electronically, no documents were provided.

149.   On **April 5, at 10:55 A.M.** counsel for Professor Assily, sent an email to attorney Joshua Nolan, advising that due to a personal conflict and an extensive hearing made it impossible for him to meet for an interview that week, and again stated **"As I advised you last week my client will continue to cooperate with your investigation and meet for your interview. But as I requested several times before, you need to provide me with the transcript of the chat and copies of statements of the complainants BEFORE the meeting"**.

150.   Attorney Nolan responded: "I got your message you left with our office. As I've stated, we will provide you and Professor Assily with "access" to the documents before the meeting.......**We are being asked to complete this investigation as soon as possible and I need a set of proposed dates this week."** (Emphasis Added).   The identity of the person "asking to complete the investigation as soon as possible" and the reason for the haste was not disclosed.

151.   On April 6, 2021, counsel for Professor Assily emailed a formal letter to attorney Joshua Nolan that, *inter alia*, stated that:

" I don't know who is dictating that the meeting must occur this week or the sudden need to close it this week, **but it does not smack of fair play"**.....Your offer of an "access" to my client of documents before the meeting is not acceptable. She has the

33

right to have those documents and the time to evaluate them and to respond to them at the meeting with your team.....I am also preparing an extensive Pre-Hearing Statement which cannot be completed without the documents requested…It is less than a 5 minute flick of the wrist task for your associates or paralegal to send those to me electronically. I do not understand your client's reluctance to produce them."

**152.**   It took two days until April 8, at 1:11 P.M. to electronically receive some of the requested documents as an attachment in a format which "**Per TRI-C request, the documents are not able to be printed or downloaded"** !

**153.**   The investigators treated Defendant, Vincent Briley, believed to be a Johnson family member or relative, differently, by not insisting that TRI-C produce him for an interview when he did not cooperate, especially when he was the person who interrupted the presentation and called Professor Assily a "racist" and a "white supremacist", and by not demanding that the IT department of TRI-C produce the audio recording.

**154.**   April 15, 2021, an interview of Professor Assily lasting over 3 hours was had. During the interview counsel for Professor again requested a list of the attendees at the Colloquium which investigator Joshua Nolan said he will request it from TRI-C.

**155.**   No such list was provided by TRI-C.

**156.**   TRI-C, through Karen Miller, falsely asserted that Professor Assily was not cooperating with the investigation, as communications were held by Joshua Nolan and counsel for Professor Assily, and Karen Miller, **threatened retaliation to withdraw Professor's  the tenure portfolio and its review for consideration of tenure.**

34

157.    On May 18, 2021 Professor Assily filed her formal  Complaint submitted  to

Lillian Welch, Vice-President of Human Resources, against:

  Alexander  Johnson,  President,  Megan  Estes,Employee,  Human  Resource

Department, Benjamin Smith, External invitee, Kimberly Johnson, Employee, Vincent

Briley, Employee, and professor Derrick Williams.

  A copy of Professor Assily's Complaint is attached hereto as **Exhibit K**)

158.    To the date of the filing of this Complaint, Defendant, TRI-C, ignored Professor

Assily's Complaint, and has not conduct any investigation of same, in sharp contrary to

the speed with which   the complaints of Defendants, Kimberly Johnson and Derrick

Williams, were addressed.

159.    Bricker & Eckler, completed their "investigation" and issued its Report on July 2,

2021, which it submitted to Defendant, TRI-C, but not to Professor Assily.

160.    Professor Assily was notified by Defendant, Meghan Estes, on July 16, 2021, by

letter stating that

> **The investigators assigned to this case found that the allegations did not**
> **Support a finding by a preponderance of the evidence that you violated**
> **The College's policy 3354-1-42-01 on Affirmative Action, Equal Opportunity,**
> **Discrimination and Harassment and the allegations did not support a**
> **Finding that you violated the College's Employee Code of Conduct".**

161.    Defendant, Meghan Estes, did not provide Professor Assily with a copy of The

Report of the investigators.

162.    On August 19, 2021, counsel for Professor Assily emailed Defendant, Meghan

Estes, and requested that she provide Professor Assily and her counsel with "a copy of

35

Exhibit A

the full and complete findings, decisions, and conclusion of the investigation by Bricker & Eckler".

**163.**    Counsel for Professor Assily, immediately, received a reply from Jason Carter, one of the attorneys from the legal department TRI-C stating that "I have been contacted by Meghan Estes regarding the investigation involving your client Rania Assily. The documents you are requesting are **not provided in connection with an investigation but, are subject to a public records request. I will treat your request as such and will have our office provide the documents to you in due course."**

**164.**    On August 19, at 1:23 P.M., counsel for Professor Assily sent an email to attorney Jason Carter and educated him on who Professor Assily was and was not. "Since, Professor was the subject of the investigation and not a 'member of the public' she is entitled to a copy of the report....and that if you refuse to acknowledge Professor Assily's due process rights, the documents will be obtained not by a public records request but by a subpoena."

**165.**    The Report was immediate emailed to counsel for Professor Assily.

**166.**    After a full review of the Report which was entitled **"MEMORANDUM" TO:** Meghan Estes, Director Institutional Equity/Title IX Coordinator, **FROM:** Josh Nolan, Jeff Knight, and Kofi Semenya, all investigators, Bricker & Eckler, LLC, **DATE:** July, 2021, **RE:** *Dr. Derrick Williams (Complainant), Dr. Kim Johnson (Complainant) and Rania Assily (Respondent)*, it is clear that it was not related to the **Complaint of Professor Rania Assily Dated May 18, 2021, Against Defendants, Alexander**

36

Johnson, Kimberly Johnson, Derrick Williams, Vincent Briley, and Meghan Estes

which has been ignored by Defendant, TRI-C to the date of the filing of this Complaint.

167.    The "MEMORANDUM" was not a product of an impartial review of the matter, but a subjective conclusion dictated and controlled by the powers and decision makers, as indicated hereinabove and herein, and as it will be more fully addressed at the trial of this cause.

168.    The "MEMORANDUM" completely exonerated Professor Assily, but failed to protect her right of freedom of speech and academic freedom.

169.    The "MEMORANDUM" described the substance of Professor Assily's written comments, as "in many ways they were poorly worded, reflected a general 'naiveté" and in line with "ignorance". The same "poorly worded reflecting a general naivete and in line with ignorance" uttered by President Obama!.

170.    The "MEMORANDUM" then focused on the "tone" as interpreted by only four persons at the Colloquium, two of which were the external presenters, from a group of approximately 100 who attended, as "confrontational", "combative", "harmful and "uncomfortable", "seeming aggressive", "aggressive and rude", and "unprofessional, angry, and rude".

171.    Since TRI-C is denying that there was an audio recording of the session, the "tone" of Professor Assily's verbal remarks cannot be but a subjective feeling or impression of only two members of academic community of TRI-C, and how Defendant, Kimberly Johnson, "felt" and that she "cried".

37

Exhibit A

172.    The investigators and the members of TRI-C by focusing on the "tone" "stereotyped" and committed sexual discrimination and was prejudicial against Professor Assily by adopting the unfortunate and cruel stereo type of women in the business and academic world, whose speech is assertive, firm, and spoken with conviction, and the same prejudice is still preventing women from breaking the "glass ceiling".

173.    Contrarily, when a man spoke in a "tone" as ascribed to Professor Assily he would not be stereotyped as rude, argumentative, confrontational, or combative, but strong, assertive, and forceful, all positive traits.

174.    A faculty colleague, described Professor Assily's voice as "clear and loud".

175.    Human beings are given a variety of voices with different tones, force and volume: *mezzo soprano, basso, tenor, soprano, contra tenor, contra alto, baritone, basso profundo, and in the past, castrati*; and their First Amendment right of free speech and academic freedom, cannot be evaluated or limited by such subjective and discriminatory stereotype casting and sexual discrimination.

176.    The "MEMORANDUM" and the members of TRI-C have stereotyped Professor Assily and discriminated against Professor Assily because of her sex and her God given tone of voice.

177.    Even though, Professor Assily was completely exonerated in the "MEMORANDUM", the investigators, added the following conclusion, which plaintiff believes and therefore avers, was made to appease the "powers to be" at TRI-C", including Defendants, Alexander Johnson and Kimberly Johnson:

**"We recommend that she be provided with appropriate SUPERVISORY**

38

**SUPPORT to address the "lingering effects" (?) of this situation on the academic Community at the College".** (Emphasis Added).

178.   This nebulous recommendation is a continued violation of Professor Assily's First Amendment Right to Free Speech and academic freedom.

179.   In essence, this conclusion placed Professor Assily's rights in a Petri dish under a microscope to be subjected to subjective and discriminatory surveillance and censorship by those who want her silenced and removed from the College, as aforesaid.

180.   On September 20, 2021, Professor Assily presented a session entitled "The Constitution: Then and Now" with Sergeant Daniel Kalk,, J.D., for the Student Success Week at TRI-C, to which, unbeknown to professor Assily, Defendant, Kimberly Johnson, attended alongside of attendees.

181.   The purpose of the session with Sergeant Kalk, J.D. was to expose and give a preview to the student body to the Constitution of The United States and to help build enrollment for the Constitutional Law Class commencing on October 25, 2021.

182.   The start of the presentation was delayed for unknown reason, but prior to Professor Assily's video presentation went live, when the audio was live, one of the moderators stated **"And Nanche, we do have Kim Johnson joining us, she's in the main room"**.

183.   After the presentation, Professor Assily requested, several times, a complete copy of the entire audio recording of the event including the comment of the monitor regarding the presence of Kim Johnson.

39

**184.**    An audio version of the event was finally provided to Professor Assily, but was not shared with faculty and students college-wide as was the custom, and   the segment regarding Kim Johnson's presence was deleted from the copy provided Professor Assily.

**185.**    Defendant, Kimberly Johnson, who was personally upset with Professor Assily, and who harbors a personal animus against Professor Assily, as aforesaid, took upon herself to perform supervision and surveillance to monitor the First Amendment and academic freedom activity of Professor Assily at her presentation, in further violation of Professor Assily's academic freedom of speech.

**186.**    Defendant, Kimberly Johnson, was never disciplined or reprimanded regarding her conduct, but instead, was promoted from Assistant Dean of Learning and Engagement, Eastern Campus, the position she held on January 12, 2021, then later to Interim Assistant Dean of Academic Affairs, and then to Assistant Dean of Academic Affairs, Eastern Campus.

**187.**    In addition, Defendant, Kimberly Johnson, on September 28, 2021, was spotlighted as a "TRI-C Famous Employee" in the TRI-C By-Monthly Announcement upon the TR-C Website.

**188.**    TRI-C's Colloquium Committee commenced planning in the early fall of 2021 for its 18th Annual Faculty Colloquium, to be held on January 11, 2022.

**189.**    The eight Committee members were and are:

      -Michael Wilkins, Co-Chair, Associate Professor  Mathematics, Metro Campus

      -Kara DePaul, Co-Chair,Director, Academic Professional Development

      -Rebecca Carte, Assistant Professor, Spanish, Metropolitan Campus

40

-Mardy Chaplin, Assistant Professor, Paralegal Studies, Western Campus

-Sara Fuller, Assistant Professor, English Western Campus

-Brian Hall, Assistant Professor, Metropolitan Campus

-Delia Pfister, Associate Vice-President, Academic Professional Development,
    On Line Learning and Technology, Transfer and Articulation

-Stacey Souther, Professor, Psychology, Eastern Campus

190.    The topic of the Colloquium would be:

**"Critical Thinking:**      *Its Good For* **You**
                            *Its Good For* **Me**

191.    Committee announced that it *is pleased to share that the event will once again be*

*virtual, enabling us to invite faculty from higher ed (sic) institutions throughout Ohio*

*to submit a proposal,* which was due Wednesday, October 27, at Noon.

192.    The only direction provided by the Committee to proposed presenters was that

**Proposals will undergo a "blind" review by the Colloquium Committee
based upon the following criteria:**
**1.     Alignment and relevance to the theme.**
**2.     Clearly Stated outcomes and description.**

193.    Professor Assily   timely submitted her proposal entitled "De-coddling the

American Mind: How Taking Office, Call-Out Culture, and Emotional Reasoning is

harming Ourselves and Students" for this upcoming Colloquium, which session was

described as follows:

**Based on the book "The Coddling of the American Mind" by Greg**

**Lukianoff and Jonathan Haidt, Professor Assily will break down**

41

Point by point the Three Great Untruth: "What Doesn't Kill You

Makes Yoy Weaker", "Always Trust Your Feelings", and "Life is

A Battle Between good and Evil People".  She will offer approaches

Based on reliable data that will better equip faculty and students to

Respond to what they believe to be 'offensive' language, "micro-

Aggression, and a 'we-versus-them mentality' in and outside the

Classroom.  **Note: you do not have to read the book to understand

What being discussed**

This session will be key to addressing why our student and faculty

Suffer from anxiety, depression, and isolation now more than ever

Before. Without critical thinking and the ability to think deeply

And meaningfully about life and each other, there is little room for

Sound and productive dialogue, finding common ground, and gaining

Truth and wisdom.

1.      Disprove the Three Untruths in order to live a healthy and

        Stable life.

2.      Examine how anxiety and depression are positively correlated to our

        Response to life's discomfort and perceived threats.

3.      Determine ways to challenge coddling by seeking truth, gaining

        Wisdom, and facing our fears and offense with compassion and

        Humility.

42

194.    On Thursday, November 18, 2021, Co-Chair Michael Wilkins, notified Professor

Assily' that after the Committee conducted a "blind review" it was decided not to accept

her proposal, "either it did not meet the proposal criteria, or does not align itself with our

stated theme "Critical Thinking: It's Good For You, It's Good For Me."

195.    Professor Assily immediately responded, asking Professor Wilkins for specific

regarding  the committee's decision, and through a series of unsatisfactory answers and

emails, including the email, on November 29, 2021 from Professor Wilkins which

contained, *inter alia,* that:

"the committee created a "rubric" to evaluate each of the submitted proposals. We

then individually and collectively used that rubric to evaluate to conduct blind reviews on

each of the nearly 50 proposals received. By consistently employing the rubric, we

accepted over 30 proposals while rejecting 16 proposals. Your description, rationale, and

learning objectives **did not clearly or strongly align with our theme..", Your proposal

focused on mental health and communicating with others but did not focus on how

critical thinking is an essential and crucial skill in mitigating those issues.**

Additionally, **we felt that some of the words in the presentation description (e.g.,

offensive, microaggression) may be PERCEIVED BY SOME COLLOQUIUM

PARTICIPANTS AS POLARIZING AND INHIBITING.....it does not align itself

with our central theme..."**

196.    The action of the Committee was the continuation of the mission of Defendant,

TRI-C to silence, censor, isolate, deprive access to Professor Assily to the academic

process, and to destroy her right of academic freedom.

<center>43</center>

Exhibit A

197.    Professor Assily enquired how the so called "blind" review process work when her name was part and parcel of her proposal, but received no elucidation thereof.

198.    This 'Blind" review of the proposals, resulted in the Committee to accept the proposals of four of their very own members:  Co-Chair, Michael Wilkins, Professor of "Mathematics" (1), Mardy Chaplin, Assistant Professor of "Paralegal Studies" (2); Sara fuller Assistant Professor of "English", (1); Brian hall Associate Professor of "English" (2). A total of six participations.

199.    The **Call For Proposal** restricted the submission of proposals to only  **"faculty from higher ed institutions throughout Ohio"**, notwithstanding the Committee accepted  and/or permitted seven  "students", nine TRI-C "non-faculty staff", and seventeen external faculty to participate in the presentation of proposals, yet not accepting the proposal of a "Tenured" Professor at TRI-C, because "some words she used "may be perceived" by "some" participants as "polarizing" and "inhibiting" , whatever that means, while accepting six participation by their very own  Committee members in a so called "blind" review.

200.    In addition, the Committee rejected her proposal as "not being 'clearly' and 'strongly' aligned with their theme", a theme of "Critical Thinking" which Professor Assily's Proposal was  spot on.

201.    The suggestion of a nebulous, ambiguous, and cryptic reference and the non-disclosure of the protocol of the blind review provided members of the Committee, who not only "self- dealt", but  who may harbored prejudices and biases toward Professor Assily,  to subjectively and arbitrarily deny her Proposal and her voice and speech at the

44

Colloquium which was compulsory for all faculty to attend, for all to hear, and thereby censoring her and denying her First Amendment and academic freedom of speech.

**Damages of Plaintiff, Professor Assily**

202.    As a result of the foregoing conduct and actions of Defendants, Plaintiff, Professor Rania Assily suffered specific pecuniary damages for attorney fees and expenses, in excess of $20,000, and is continuing to suffer such pecuniary damages into the indefinite future, to defend and protect her First Amendment Right to freedom of speech, and to redress the breach of a clear duty by Defendants of her protected rights, by contract and otherwise to academic freedom of speech.

203.    As a result of the foregoing, Plaintiff suffered the destruction of her professional and academic reputation, the ability to fully exercise and work in her chosen professional field, and the advancement of her chosen career.

204.    As a result of the foregoing, Plaintiff suffered and is suffering the silencing of her speech and voice in academia and the right to speak in a publicly funded public and protected forum.

205.    As a result of the foregoing, Plaintiff suffered emotional and attending injuries due to the intentional infliction thereof.

206.    As a result of the foregoing, Plaintiff suffered and is suffering isolation, minimization, and shunning at TRI-C,  and is unable to function at TRI-C, and her intellectual and professional life at TRI-C, came to a halt, in the toxic and hostile academic world and environment TRI-C.

**CLAIM I.**

45

Exhibit A

**(Breach of Contract and Request For Mandatory Injunctive Relief)**

**207.** Plaintiff, Rania Assily, incorporates here in all of the allegations contained in the foregoing paragraphs 1-206, as if same were rewritten herein.

**208.** Defendant, TRI-C, through its employees and agents, including Defendant, Meghan Estes, breach its contract with Plaintiff, Rania Assily, as aforesaid, and failed to protect and accord to Plaintiff, Rania Assily, her contractual rights, including according to her the contractual protect conduct of academic freedom, and failing to comply with its contractual duty to address Plaintiff, Rania Assily's Complaint filed on May 18, 2021 with Defendant, TRI-C.

**209.** As a result of the foregoing, Plaintiff, Rania Assily, suffered damages and injuries as set forth above, as is entitled to a judgment for compensatory damages, and injunctive relief as set forth herein.

**210.** Plaintiff, Rania Assily, hereby request the issuance of a permanent mandatory injunctive relief, ordering (1) Defendant, TRI-C, its Board of Directors, Agents and employees to forthwith commence the investigation of the Complaint of Plaintiff, Rania Assily, filed with Ms. Lillian Welch, Vice-President of Human Resources of TRI-C, on May 18, 2021, (attached hereto as Exhibit K) against Defendants, Alex Johnson, Megan Estes, Kimberly Johnson, Vincent Briley, Professor Derrick Williams, and Benjamin Smith; (2) ordering and appointing an independent panel of three investigators, one to be selected by Plaintiff, one to be selected by TRI-C, and the third to be a constitutional law professor appointed by the Court; (3) the protocol for the investigation to be as ordered by the Court according the contract of the parties and the Federal and Ohio state law

applicable thereto; and (4) that the fees and cost of the investigators and the attorney fees incurred by Plaintiff regarding it, be paid by Defendants, as allocated among the Defendants by the Court.

## CLAIM II.

### (Damages Against TRI-C For Intentional Deviation From A Clear Duty; For Voluntary and Intentional Disregard A Known Legal Duty)

**211.** Plaintiff incorporates herein by reference, each and every allegation contained in the foregoing Claim I. as if fully rewritten herein.

**212.** Defendant, TRI-C, through its Defendant employees, and others, intentionally deviated from and disregard it's know legal duty to protect the academic right of freedom of speech of Plaintiff, and purposefully and intentionally committed wrongful acts, including but not limited to the slander, libel and defamation to destroy the academic and professional reputation and the academic career, and advancement thereof, of Plaintiff, with knowledge and appreciation of the likelihood of resulting injury to Plaintiff.

**213.** That the conduct of the Defendant employees of Defendant, TRI-C, constituted slander and libel *Per Se*.

**214.** Therefore, Defendant, TRI-C, is liable for all damages to Plaintiff, including compensatory and punitive damages.

## CLAIM III.

### (Claim For Damages, individually and personally, Against Defendants, Kimberly Johnson, Vincent Briley, Derrick Williams, and Meghan Estes)

**215.** Plaintiff incorporates herein by reference each and every allegation contained in the foregoing Claims I and II, as if same were fully rewritten herein.

47

Exhibit A

216.    In addition to the allegation contained in Claim II, herein, the conduct and actions of said Defendants, toward Plaintiff, Rania Assily, severed her employment obligations and duties, and were personally and directly motivated toward Plaintiff, in bad faith, harboring ill will and enmity, to do harm and injury to Plaintiff.

217.    The conduct and actions of said Defendants were reckless, made with a conscious disregard of and indifference to known and obvious risk of harm to Plaintiff and Plaintiff's protected rights made under unreasonable circumstances and culture at TRI-C.

218.    The conduct of said Defendants, as aforesaid constituted slander, libel and defamation *Per Se* to destroy the academic and professional reputation, and academic career, and the advancement thereof, of Plaintiff.

219.    The conduct of said Defendants constituted an intentional infliction of emotional and other injuries to Plaintiff,

220.    As a result thereof Plaintiff suffered injury and damage, as stated above.

221.    As a result of said Defendants' conduct and action said Defendants are not protected by governmental immunity and making said Defendants personally liable for compensatory and punitive damages.

## CLAIM IV.

**(Slander, libel and Cyber Defamation Against Defendant, Benjamin Smith)**

222.    Plaintiff incorporates herein by reference each and every allegation contained in the foregoing paragraphs 1 through 206 as if they were rewritten herein.

223.    The foregoing conduct and actions of Defendant, Benjamin Smith, constituted libel, slander, and defamation *Per Se*, intentional publishing on the internet throughout

48

Exhibit A

the United States, to injure and damage Plaintiff as aforesaid and causing injury and damage to Plaintiff as set forth.

224.    Defendant, Benjamin Smith is liable for an award of compensatory and punitive damages and attorney fees to Plaintiff.

## CLAIM V.

**225.**    Plaintiff incorporates herein by reference each and every allegation contained in the foregoing Claim IV, as if they were fully rewritten herein.

**226.**    The foregoing conduct and actions of Defendant, Benjamin Smith, constituted intentional infliction of emotional distress and injury to Plaintiff, as aforesaid, and he is liable for an award of compensatory and punitive damages to Plaintiff, Rania Assily.

**WHEREFORE,** Plaintiff, Rania Assily, demands judgment as follows:

a.    Against Defendant, Cuyahoga Community College, in Claim I, for compensatory damages in excess of $25,000.00, and mandatory injunction as set forth in Claim I;

b.    Against Defendant, Cuyahoga Community College in Claim II, for compensatory demages, in excess of $25,000.00, and punitive damages as awarded at trial;

c.    Against Defendants, Kimberly Johnson, Alexander Johnson, Vincent Briley, and Derrick, jointly and severally, in Claim III for compensatory damage, in excess of $25,000.00 and punitive damages as awarded at trial;

d.    Against Defendant, Benjamin Smith, individually, in Claims IV and V, for compensatory damages in excess of $25, 000.00, and punitive damages as awarded at trial.

49

e.      For an award of attorney fees and litigations costs and expenses;

f.      The costs of this action; and

g.      such other and further relief which may be just in law and equity.

### JURY TRIAL DEMAND

Plaintiff, Rania Assily, demands a trial by jury of all issues triable of right by a jury.

Respectfully Submitted;

JOSEPH BANCSI (O.S.Ct. No. 0025450)
West Suburban Office Building, Suite 400
20800 Center Ridge Road
Rocky River, Ohio 44116
Tel:  (216) 406-8177
joseph.bancsi@gmail.com

Attorney for Plaintiff, Rania Assily

50

Exhibit A

# EXHIBIT A

# **Contract of Employment**

Cuyahoga Community College District (hereinafter referred to as the "College") and Ms Rania Assily (hereinafter referred to as the "Appointee") hereby agree as follows pursuant to Appendix D, Section 1 of the collective bargaining agreement between the College and the American Association of University Professors (AAUP), Cuyahoga Community College Chapter:

1. The College shall employ the Appointee as a full-time member of the faculty (Assistant Professor) for the period 08/18/2020 through 05/20/2021 at the salary of $62,388 (Grade C, Step 6.0) payable after services have been rendered -- payments will be issued in equal bi-weekly installments.

Salary:$62,388

Benefits (Estimated at 39% of salary):$24,331

Total Compensation:$86,719

2. The Appointee is non-tenured; consideration for tenure will be made in accordance with the Tenure Policy established by the Board of Trustees.

3. Appointee and this Employment Contract are subject to the policies, procedures, and standard practices of the College as they may be adopted and amended from time-to-time, but only to the extent that they are not inconsistent with the AAUP agreement or with the law.

Exhibit A

By clicking *Accept*, you have accepted the terms of the Contract of Employment provided above.

This document was acknowledged on 07/28/2020

Go to Tri-C HomePage Return to previous page

Exhibit A

 Spring Semester 2022 begins Jan. 18. View extended service hours here (../enrollment-center/index.html). Students, faculty, staff and visitors to all Tri-C campuses and facilities are required to wear masks indoors, regardless of their vaccination status. For the most up-to-date COVID-19 protocols visit www.tri-c.edu/coronavirus (http://www.tri-c.edu/coronavirus).



(https://www.tri-c.edu/)

👤 My Tri-C (https://my.tri-c.edu)

🔍 Search

☰ Menu

⌄ Expand page menu

**Tri-C Home (../index.html)** » Policies and Procedures

(https://www.addtoany.com/share#url=https%3A%2F%2Fwww.tri-c.edu%2Fpolicies-and-procedures%2Findex.html&title=Cuyahoga%20Community%20College%20Policies%20and%20Procedures)

(/#facebook)        (/#twitter)        (/#email)        (/#printfriendly)

# Cuyahoga Community College Policies and Procedures

*The following policies and procedures provide the operating principles for Cuyahoga Community College.*

## Board Governance Policies & Procedures ▽

3354:1-10-01 Trustee appointments, resignations policy (documents/3354-1-10-01-trustee-appointments-resignations-policy.pdf)
3354:1-10-02 Elections and duties policy (documents/3354-1-10-02-elections-and-duties-policy-effective-june-2017.pdf)
3354:1-10-03 Board of Trustees: Committees policy (documents/3354-1-10-03-board-of-trustees-committees.pdf)
3354:1-10-04 Board of trustee meetings: organization and conduct policy (documents/3354-1-10-04-trustee-meetings-organization-and-conduct-policy.pdf)
3354:1-10-05 Notification of meetings of the Board to the public policy (documents/notification-policy.pdf)
3354:1-11-01 Planning and achievement policy (documents/planning-and-achievement-policy.pdf)
3354:1-11-02 Rulemaking policy (documents/rulemaking-policy.pdf)
3354:1-11-02.1 Rulemaking procedure (documents/rulemaking-procedure.pdf)
3354:1-11-03 Communications and respect policy (documents/communications-and-respect-policy.pdf)
3354:1-11-04 Conflict of interest policy (documents/conflict-of-interest-policy.pdf)
3354:1-11-05 Naming policy (documents/naming-policy.pdf)
3354:1-11-05.1 Naming procedure (documents/naming-procedure.pdf)
3354:1-11-06 Public records policy (documents/public-records-policy.pdf)
3354:1-11-06.1 Public records procedure (documents/public-records-procedure.pdf)
3354:1-11-07 Honorary Degree Policy and Procedure (documents/3354-1-11-07-honoarary-degree-nomination-policy.pdf)
3354:1-11-07.1 Honorary Degree Nomination Procedure (documents/3354-1-11-07-1-honorary-degree-nomination-procedure.pdf)
3354:1-11-08 Emeritus policy (documents/3354-1-11-08-trustee-emeritus-policy.pdf)
3354:1-11-08.1 Trustee emeritus procedure (documents/3354-1-11-08-1-trustee-emeritus-procedure.pdf)
3354:1-11-08-2 President and Senior Administrator Emeritus Procedure (documents/3354-1-11-08-2-president-and-senior-administrator-emeritus-procedure.pdf)
3354:1-11-09 Policy on student success and completion (documents/3354-1-11-09-policy-on-student-success-and-completion.pdf)

## Finance & Business Services Policies & Procedures ▽

3354-1-20-01 Financial policy (documents/3354-1-20-01-financial-policy.pdf)
3354-1-20-02 Fees and refunds policy (documents/3354-1-20-02-fees-and-refunds-policy.pdf)
3354-1-20-03 Operations policy (documents/operations-policy.pdf)

Exhibit A

3354-1-20-03.1 Prohibited conduct procedure (documents/prohibited-conduct-procedure.pdf)
3354-1-20-03.2 Copyright procedure (documents/copyright-procedure.pdf)
3354-1-20-03.3 Parking procedure (documents/parking-procedure.pdf)
3354-1-20-04 Policy on health, safety, environment (documents/policy-on-health-safety-environment.pdf)
3354-1-20-04.1 Emergency response and closing procedure (documents/emergency-response-and-closing-procedure.pdf)
3354-1-20-05 Alcohol, drugs and tobacco policy (documents/3354-1-20-05-alcohol-drugs-and-tobacco-policy.pdf)
3354-1-20-05.1 Service and sale of alcohol procedure (documents/service-and-sale-of-alcohol-procedure.pdf)
3354-1-20-05.2 Tobacco Free Procedure (documents/3354-1-20-05-2-tobacco-free-procedure.pdf)
3354-1-20-06 Procurement policy (documents/procurement-policy.pdf)
3354-1-20-06.1 Procurement Procedure (documents/3354-1-20-06-1-procurement-procedure4.pdf)
3354-1-20-07 Investment policy (documents/3354-1-20-07-investment-policy.pdf)
3354-1-20-07.1 Tax-exempt debt compliance procedure (documents/tax-exempt-debt-compliance-procedure.pdf)
3354-1-20-08 Sustainability policy (documents/sustainability-policy.pdf)
3354-1-20-08.1 Sustainability procedure (documents/sustainability-procedure.pdf)
3354-1-20-09 Identity theft policy (documents/identity-theft-policy.pdf)
3354-1-20-10 Zero tolerance to violence on college property policy (documents/3354-1-20-10-zero-tolerance-for-violence-policy.pdf)
3354-1-20-11 Funding New Initiatives Policy (documents/3354-1-20-11-funding-new-initiatives-policy.pdf)
3354-1-20-12 Unrestricted Fund Reserve Policy (documents/3354-1-20-12-unrestricted-reserve-policy.pdf)
3354-1-20-13 Asset Management Policy (documents/3354-1-20-13-asset-management-policy.pdf)

## Access, Learning and Success Policies & Procedures

3354-1-30-01 Policy on developing and delivering high quality and relevant learning opportunities and services (documents/policy-on-dev-and-deliv-high-quality-and-relevant-learning-opps-and-svcs.pdf)
3354-1-30-01.1 Procedure on developing and delivering high quality and relevant learning opportunities and services (documents/3354-1-30-01-1-procedure-on-developing-and-delivering-high-quality-and-relevant-learning-opportunities-and-services.pdf)
3354-1-30-02 Policy on access to learning (documents/policy-on-access-to-learning.pdf)
3354-1-30-02.1 Procedure on access and success (documents/procedure-on-access-and-success.pdf)
3354-1-30-02.2 Procedure on student education records (documents/procedure-on-student-education-records.pdf)
3354-1-30-03 Policy on learning standards (documents/policy-on-learning-standards.pdf)
3354-1-30-03.1 Procedure for catalog in force (documents/3354-1-30-03-1-procedure-for-catalog-in-force.pdf)
3354-1-30-03.2 Procedure on grading and awarding of credit (documents/procedure-on-grading-and-awarding-of-credit.pdf)
3354-1-30-03.3 Procedure on Academic Status (documents/3354-1-30-03-3-procedure-on-academic-status.pdf)
3354:1-30-03.4 Procedure on student complaints (documents/3354-1-30-03-4-procedure-on-student-complaints.pdf)
3354-1-30-03.5 Student conduct code (documents/student-conduct-code.pdf)
3354-1-30-03.6 Student judicial system (documents/student-judicial-system.pdf)
3354-1-30-03.7 Procedure for Associate Degree Program standards and requirements for credentials awarded (documents/procedure-for-associate-degree-program-standards-and-requirements-for-credentials-awarded.pdf)
3354-1-30-03.8 Missing student procedure (documents/missing-student-procedure.pdf)
3354-1-30-03.9 Fresh start procedure (documents/fresh-start-procedure.pdf)
3354-1-30-03.10 Request for reinstatement and/or grades (documents/request-for-course-reinstatement-and-or-grade.pdf)
3354-1-30-03.11 Student Sexual Offense and Child Victim Admission Reporting Policy (documents/student-sexual-offense-and-child-victim-admission-reporting-policy.pdf)
3354-1-30-03.11.1 Sexual Offense Felony Admission Procedure (documents/3354-1-30-03-11-1-sexual-offense-felony-admission-procedure.pdf)
3354:1-30-03.12 Sexual Misconduct Policy (documents/sexual-misconduct-policy.pdf)
3354 1-30-03.12.1 Sexual Misconduct Procedure (documents/sexual-misconduct-procedure.pdf)
3354-1-30-03.13 Procedure on grade disputes (documents/procedure-on-student-complaint-and-grade-dispute.pdf)
3354-1-30:04 Board Student Scholar Policy (documents/3354-1-30-04-board-student-scholar-policy.pdf)
3354-1-30-05 Collegewide participatory governance policy (documents/collegewide-participatory-governance-policy.pdf)
3354-1-30-06 Policy on human subjects research (documents/policy-on-human-subjects-research.pdf)
3354-1-30-07 Tenure policy (documents/tenure-policy.pdf)
3354-1-30-07.1 Tenure procedure (documents/tenure-procedure.pdf)
3354:1-30-08 Policy on faculty evaluation (documents/policy-on-faculty-evaluation.pdf)
3354-1-30-08.1 Faculty evaluation procedure (documents/faculty-evaluation-procedure.pdf)
3354-1-30-02.3 Online accessibility procedure (documents/online-accessibility-procedure-final-approved.pdf)
3354-1-30.09 Suicide Prevention Program Policy (documents/3354-1-30-09-suicide-prevention-policy.pdf)

Exhibit A

## Human Resources Policies & Procedures

3354-1-40-01 Hiring policy (documents/hiring-policy.pdf)
3354-1-40-01.1 Recruitment and selection procedure (documents/3354-1-40-01-1-recruitment-and-selection-procedure.pdf)
3354-1-40-01.2 Adjunct Faculty Hiring and Employment Procedure (documents/3354-1-40-01-2-adjunct-faculty.pdf)
3354-1-40-01.3 Reemployment Procedure (documents/3354-1-40-01-3-reemployment-procedure.pdf)
3354:1-40-01.4 Faculty and Instructor Credential Qualifications Procedure (documents/3354-1-40-01-4-faculty-and-instructor-credential-qualifications-procedure.pdf)
3354-1-40-02 Employment of relatives policy (documents/employment-of-relatives-policy.pdf)
3354-1-41-01 Non-bargaining employee compensation policy (documents/3354-1-41-01-non-bargaining-employee-compensation-policy.pdf)
3354-1-41-01.1 Non-bargaining employee compensation procedure (documents/non-bargaining-employee-compensation-procedure.pdf)
3354-1-41-01.2 Overtime procedure (documents/3354-1-41-01-2-overtime-procedure1.pdf)
3354-1-41-02 Benefits Policy (documents/3354-1-41-02-benefits-policy.pdf)
3354-1-41-02.1 Tax sheltered annuity plans and deferred compensation programs procedure (documents/tax-sheltered-annuity-plans-and-deferred-compensation-programs-procedure.pdf)
3354-1-41-02.11 Flexible Work Schedule Procedure (documents/flexible-work-schedule-procedure.pdf)
3354-1-41-02.3 College holidays procedure (documents/college-holidays-procedure.pdf)
3354-1-41-02.2 Vacation time for full-time non-bargaining employees procedure (documents/3354-1-41-02-2-vacation-procedure.pdf)
3354-1-41-02.4 Remission of fees procedure (documents/3354-1-41-02-4-remission-of-fees-procedure.pdf)
3354-1-41-02.5 Personal and sick leave procedure for eligible full-time employees (documents/3354-1-41-02-5-personal-and-sick-leave-procedure-for-eligible-full-time-employees.pdf)
3354-1-41-02.6 FMLA and LOA procedure (documents/fmla-and-loa-procedure.pdf)
3354-1-41-02.8 Administrator and professional staff consulting procedure (documents/administrator-and-professional-staff-consulting-procedure.pdf)
3354-1-41-02.9 Leave time donation procedure (documents/3354-1-41-02-9-leave-time-donation-procedure1.pdf)
3354-1-41-02.10 Tuition Reimbursement procedure (documents/3354-1-41-02-10-tuition-reimbursement.pdf)
3354-1-42-01 College policy on affirmative action, inclusive excellence, and equal opportunity (documents/3354-1-42-01-College-policy-on-affirmative-action-inclusive-excellence-equal-opportunity.pdf)
3354-1-42-01.1 Affirmative action procedure (documents/affirmative-action-procedure.pdf)
3354-1-42-01.2 Discrimination and harassment complaint procedure (documents/Discrimination-Harassment-Procedure.pdf)
3354-1-42-01.3 Americans with Disabilities (ADA) reasonable accommodation procedure (documents/americans-with-disabilities-act-ada-reasonable-accommodation-procedure.pdf)
3354-1-43-01 Professional development and performance policy (documents/professional-development-performance-policy.pdf)
3354-1-43-02 Employee code of conduct policy (documents/employee-code-of-conduct-policy.pdf)
3354-1-43-03 Corrective action policy (documents/corrective-action-policy.pdf)
3354-1-43-03.1 Corrective action procedure (documents/corrective-action-procedure.pdf)
3354-1-43-04 Assignment and reduction in force of non-bargaining employees policy (documents/assignment-and-reduction-in-force-of-non-bargaining-employees-policy.pdf)
3354-1-43-04.1 Reduction in force procedure (documents/reduction-in-force-procedure.pdf)
3354-1-43-05 Personal information policy (documents/personal-information-policy.pdf)
3354-1-43-05.1 Personnel information records procedure (documents/personnel-information-records-procedure.pdf)
3354-1-44-01 Background check policy (documents/background-check-policy.pdf)
3354-1-44-01.1 Pre-employment background check and drug screening procedure (documents/pre-employment-background-check-and-drug-screening-procedure.pdf)

## Administration Policies & Procedures

3354-1-50-01 Health and wellness policy (documents/health-and-wellness-policy.pdf)
3354-1-50-02 Knowledge management policy (documents/knowledge-management-policy.pdf)
3354-1-50-03 Public affairs and information policy (documents/public-affairs-and-information-policy.pdf)
3354-1-50-04 Safety and security policy (documents/safety-and-security-policy.pdf)
3354-1-50-05 Technology resources policy (documents/technology-resources-policy.pdf)
3354-1-50-5.1 Technology resources procedure (documents/3354-1-50-05-1-technology-resources-procedure.pdf)
3354-1-50-06 Youth Protection Policy (documents/3354-1-50-06-youth-protection-policy.pdf)

## Office of Institutional Equity

Exhibit A

**3354: 1-60-01 College policy on discrimination, harassment, sexual misconduct, retaliation and Title IX (documents/3354-1-60-01-Policy-on-discrimination,-harassment,-secual-misconduct,-retaliation-and-Title-IX.pdf)**

**3354: 1-60-02 Discrimination, harassment, sexual misconduct, Title IX and retaliation complaint interim procedure (documents/3354-1-60-02-Discrimination-harassment-sexual-misconduct-retaliation-and-Title-IX-complaint-procedure.pdf)**


(https://www.tri-c.edu)

© 2021 Cuyahoga Community College
700 Carnegie Avenue
Cleveland, Ohio 44115

## Quick Links

Employment at Tri-C (../administrative-departments/human-resources/careers.html)

*my Tri-C space* (https://my.tri-c.edu)

Blackboard (https://bblearn.tri-c.edu)

Bookstore (../student-resources/bookstore.html)

Course Search (https://banxep.tri-c.edu/StudentRegistrationSsb/ssb/term/termSelection?mode=search)

College Catalog (../college-catalog/index.html)

Library (../learning-commons/library/index.html)

Technical Support (../administrative-departments/customer-service.html)

Transcripts (../transcripts/index.html)

## About Tri-C

About (../about/index.html)

President's Office (../administrative-departments/office-of-the-president.html)

Accreditation (../about/accreditation/index.html)

Administrative Departments (../administrative-departments/index.html)

Accessibility (../student-accessibility-services/index.html)

Board of Trustees (../administrative-departments/tri-c-board-of-trustees.html)

Diversity & Inclusion (../administrative-departments/diversity-and-inclusion/index.html)

Student Consumer Information (../about/student-consumer-information.html)

Title IX Equal Opportunity (../titleix/index.html)

Privacy Policy (../privacy.html)

## Campus Locations

Select Campus ▼

Map & Directions (https://map.concept3d.com/?id=404#!ct/12091)

Parking (../parking/index.html)

Campus Police (../administrative-departments/campus-police/index.html)

## Connect With Us

 (https://www.facebook.com/TriC.edu)   (https://twitter.com/tricedu)   (https://www.linkedin.com/school/cuyahoga-community-college/)   (https://www.instagram.com/tric_edu)  (https://www.youtube.com/user/CuyahogaCommCollege)

Visit Tri-C (../get-started/visit-tri-c.html)

Request Information (https://forms.tri-c.edu/Player/AskAQuestion)

Phone Directory (https://forms.tri-c.edu/PhoneDirectory)

Tri-C 24/7 (https://studentservices.tri-c.edu)

Ask Tri-C (http://tri-c.intelliresponse.com/)

Live Chat (https://messenger.providesupport.com/messenger/085ya61byqpbg1r3w6q89gptad.html)

Exhibit A

Tri-C      216-273-1075    (tel:2162731075)
Corporate  216-273-        (tel:2162731075)
College    1075

Select Language   Powered by Google Translate (https://translate.google.com)

**3354:1-42-01 College policy on affirmative action, inclusive excellence and equal opportunity**

(A)    Commitments

The College embraces human diversity and is committed to affirmative action, inclusive excellence, and equal opportunity.  The College is committed to eliminating discrimination and harassment in the workplace and academic environment.  These commitments are moral imperatives consistent with an intellectual community that celebrates individual differences, diversity, and meaningful individual freedom to pursue professional and educational goals.  In many circumstances, these commitments also represent legal requirements.

(B)    Affirmative action and diversity

The College is committed to maintaining a diverse workforce as it continues to pursue the highest quality employees.  It is the responsibility of every employee to foster a College environment that embraces human diversity and is committed to affirmative action and equal opportunity.

(C)    Inclusive excellence

The fundamental premise of inclusive excellence is the intentional integration of diversity into the core aspects of the institution, including academic priorities, leadership, decision-making, day-to-day operations, and organizational cultures.  The College is committed to diversity and inclusion and therefore seeks to focus on greater diversity, equity, inclusion, and accountability at every level.

(D)    Any managerial or supervisory level employee who learns of a violation of this policy must immediately report the violation to the Office of Employee Relations.

(E)    The College shall conduct regular training to encourage compliance with this policy.

(F)    The President or the President's designee is hereby directed to take all steps necessary and appropriate for the implementation of this policy.

Effective date:  January 28, 2021
Prior effective dates: December 15, 2005; June 20, 2008; July 8, 2011; March 30, 2017

Exhibit A

**3354: 1-60-01 College policy on discrimination, harassment, sexual misconduct, retaliation and Title IX.**

1. Cuyahoga Community College is committed to providing a workplace and educational environment, benefits, programs, and activities free from discrimination, harassment, sexual misconduct and retaliation based on an individual's federally protected status as it relates to race, sex, and gender. These commitments are moral imperatives consistent with an intellectual community, which celebrates individual differences, diversity, and meaningful individual freedom to pursue professional and educational goals. To ensure compliance with federal and state laws and regulatory bodies and to affirm its commitment to promoting the goals of fairness and equity in all aspects of the College community, the College has developed internal policies and procedures which will provide a prompt, fair, and impartial process for those involved in allegations of discrimination or harassment on the basis of a protected class status.

2. This Policy applies to all forms of prohibited conduct defined by any college policy, in compliance with Title IX of the Educational Amendments of 1972, and Title II and Title VII of the Civil Rights Act of 1964, as such laws may be amended. Discrimination may involve exclusion from activities, admission, athletics, or employment. Discrimination may take the form of harassment, or in the case of sex-based discrimination, may encompass sexual harassment, sexual assault, stalking, sexual exploitation, dating or domestic violence. When an alleged violation of this policy is reported, the allegations are subject to a prompt and equitable resolution, conducted by the Office of Institutional Equity. Procedures for conducting investigations and determining a resolution of complaints shall be set forth in the Procedure on Discrimination, Sexual Harassment and Title IX. The accused retains the presumption of innocence until determined otherwise by the Procedure outlined by the Office of Institutional Equity.

3. The Office of Institutional Equity shall oversee the implementation of this policy and shall be supervised by the Office of Legal Services. The Office of Institutional Equity has the primary responsibility for coordinating the College's efforts related to investigation, resolution, implementation of interim actions and/or supportive measures and monitoring to stop, prohibit, eliminate, remediate, and prevent discrimination, harassment, sexual misconduct, retaliation and violations of Title IX under this policy.

4. This policy applies to all students, employees, visitors and other individuals participating in a College activity, educational opportunity or program, admission or employment with the College. This policy covers conduct prohibited by Title IX of the Educational Amendments of 1972, and Title II and Title VII of the Civil Rights Act of 1964, as such laws may be amended which occurs on College property, off-campus during a College activity, or off-campus outside of a college activity when the conduct has continuing adverse effects on or creates a hostile environment for students, employees, visitors or other individuals participating in a College activity, subject to the jurisdictional limitations of Title IX.

5. The Office of Institutional Equity shall act with independence and authority free from bias and conflicts of interest. The Office of Institutional Equity shall oversee all resolutions under this policy and the related procedures. The Office of Institutional Equity shall at all times be staffed by a Title IX Coordinator and any other personnel as deemed appropriate by the College. The Assistant Deans of Student Affairs at each campus shall serve as Deputy Coordinators Institutional Equity/Title IX. All individuals involved in the resolution and appeals process shall be vetted and trained to ensure they are not biased against any party in a specific case, or for or against Complainants and/or Respondents, generally.

Exhibit A

6. To raise any concern involving bias or conflict of interest by an employee of the Office of Institutional Equity, contact the College's Office of Legal Services. Reports of misconduct or discrimination committed by any member of the Office of Institutional Equity should be reported to the Director of the Office of Institutional Equity, the Title IX Coordinator or the next highest-ranking employee not involved in the misconduct or discrimination.

7. The Procedure on Discrimination, Sexual Harassment and Title IX sets forth the manner in which individuals can report or file a complaint of conduct prohibited by Title IX of the Educational Amendments of 1972, and Title II and Title VII of the Civil Rights Act of 1964, as such laws may be amended, as well as the grievance procedure that shall be used to provide for the prompt and equitable resolution of such reports or formal complaints.

8. For purposes of the College's process, the subject of the Prohibited Conduct is referred to as the Complainant, and the alleged perpetrator of the Prohibited Conduct is referred to as the Respondent. The Complainant may or may not be the reporter of the Prohibited Conduct. Both the Complainant and Respondent are referred to as the parties for purposes of this policy and related procedure. In certain circumstances, the College may serve as a Complainant in a formal complaint.

Allegations of violations of policy, or inquiries about or concerns regarding this policy and procedure, may be made internally to:

Office of Institutional Equity
Attention: Director Institutional Equity/Title IX Coordinator, Legal Services
District Administration
700 Carnegie Avenue, Cleveland Ohio 44115
216-987-3949

Complainants are not required to use the College's Formal Grievance process and thus a Complainant may, at any time, choose to file a complaint directly with the Department of Education, Office for Civil Rights. The Office for Civil Rights may be contacted as follows:

Office for Civil Rights, Cleveland
U.S. Department of Education
600 Superior Avenue East, Suite 750
Cleveland, OH 44114
Tel: (216) 552-4970 Fax: (216) 522-2573

A Complainant may also choose to file a complaint directly with the Ohio Civil Rights Commission. The Ohio Civil Rights Commission may be contacted as follows:
Ohio Civil Rights Commission
Cleveland Regional Office
615 W. Superior Avenue, Suite 885
Cleveland, OH 44113-1897
Tel: (216) 787-3150 Fax: (216) 787-3549

Complaints who are employees may also choose to file an action with the Equal Employment Opportunity Commission. The Equal Employment Opportunity Commission may be contacted as follows:
Equal Employment Opportunity Commission
Cleveland Field Office
Anthony J. Celebrezze Federal Building

Exhibit A

# EXHIBIT B

Exhibit A

1240 E. 9th Street, Suite 3001
Cleveland, OH 44199
Tel: (800) 669-4000 Fax (216) 522-7395
TTY: (800) 669-6820

Effective date: January 28, 2021

Exhibit A

3354: 1-60-02 Discrimination, Harassment, Sexual Misconduct, Title IX and Retaliation Complaint Procedure

<u>Table of Contents</u>

(A) Introduction .................................................................................................................................................2

(B) Jurisdiction ................................................................................................................................................3

(C) General Definitions......................................................................................................................................4
    Advisor, Confidentiality, Consent, Emergency Removal, Incapacitation Interim Actions, Mandatory Reporters ...........................4-6
    Minors, Preponderance of the Evidence, Privacy, Supportive Measures, Threat Assessment, Violence Risk Assessment ..................6-10

(D) Prohibited Conduct ....................................................................................................................................10
    Civil Rights Violations, Consensual Sexual Relationships Involving Faculty and Students ...............................................10-11
    Discrimination, Discriminatory Harassment, ...............................................................................................11-12
    Hostile Educational Environment, Hostile Employment Environment ...........................................................................12
    Non-Consensual Sexual Intercourse, Non-Consensual Sexual Contact, Quid Quo Pro Harassment ..............................................12-13
    Retaliation, Sexual Exploitation, Sexual Harassment (Title IX), Sexual Assault (Title IX) ...............................................13-15
    Sex Offenses (Title IX), Nonforcible ..........................................................................................................15
        Incest (Title IX), Statutory Rape (Title IX) ..........................................................................................15
    Dating Violence (Title IX), Domestic Violence (Title IX), Stalking (Title IX)............................................................15-16
    Sexual Harassment, Sexual Misconduct, Stalking ................................................................................................16-17

(E) Reporting Prohibited Conduct ........................................................................................................................17
    Options for Reporting, Making a Report to Law Enforcement, Making a Report to the College ...............................................17-19

(F) Grievance Process (Formal Investigation and Decision Making)........................................................................................19
    Overall Timeframe ..............................................................................................................................20
    Filing a Formal Complaint ......................................................................................................................20
        Formal Complaint, Informal Complaint ....................................................................................................20-22
    Informal Resolution (Non-Title IX), Informal Resolution (Title IX), Respondent Accepts Responsibility, Written Notice Informal Resolution ............22-23
    Notice of Investigation .......................................................................................................................23
    Initial Assessment /Investigation Process ......................................................................................................23-25
    Appeal of the Initial Assessment ..............................................................................................................25
    Role of Advisor (Title IX/Sex & Gender Discrimination) .........................................................................................25-26
    Role of Advisor (Non-Title IX and/or Sex & Gender Allegations) ................................................................................26
    Final Determination as to Hearing Eligibility-Title IX .........................................................................................26
    Final Determination as to Hearing Eligibility-Civil Rights .....................................................................................27
    Mandatory and Discretionary Dismissal (Title IX) ..............................................................................................27

1

Exhibit A

Hearing Resolution/Formal Grievance Process – Decision Maker ....................................................................................27
  Decision Maker Composition ........................................................................................................................................27
  Referral for Hearing ......................................................................................................................................................28
  Evidentiary Considerations in the Hearing for Title IX and/or Sex & Gender Discrimination ...................................28
  Evidentiary Considerations in the Hearing for all other Civil Rights Discrimination ............................................28-29
  Notice of Hearing .......................................................................................................................................................29-30
  Alternative Hearing Participation Options ................................................................................................................30-31
  Pre-Hearing Preparation ...........................................................................................................................................31-32
  Pre-Hearing Meetings ..................................................................................................................................................32
  Hearing Procedures ...................................................................................................................................................32-33
  Joint Hearings ...............................................................................................................................................................33
  The Order of the Hearing – Introductions and Explanation of Procedure ...................................................................34
  Investigator Presents the Final Investigation Report ...................................................................................................34
  Testimony and Questioning .......................................................................................................................................34-36
  Refusal to Submit to Cross Examination and Inferences ..........................................................................................36-37
  Recording Hearings .......................................................................................................................................................37
  Deliberation, Decision-Making, and Standard of Proof ............................................................................................37-38
  Written Determination by Decision Maker(s) ...........................................................................................................38-39
  Sanctions for Employees and Students .....................................................................................................................39-41
  Remedies ........................................................................................................................................................................41
  Withdrawal or Resignation While Charges Pending for Students and Employees ....................................................41-42
  Appeals, Appeal Officer, Appeal Grounds ...............................................................................................................43-45
  Record Retention ......................................................................................................................................................45-46
  Disabilities Accommodations in Formal Grievance Process ........................................................................................46

**3354 Cuyahoga Community College Grievance Process for Resolving Allegations of Discrimination, Harassment, Sexual Misconduct, Title IX and Retaliation**

(A) Introduction

(1) For purposes of the College's procedure, the subject of the Prohibited Conduct is referred to as the Complainant, and the alleged perpetrator of the Prohibited Conduct is referred to as the Respondent. The Complainant may or may not be the reporter of the Prohibited Conduct. Both the Complainant and the Respondent are referred to as the parties for purposes of this Procedure. In certain circumstances, the College may serve as the Complainant in a formal complaint.

(2) If Prohibited Conduct under policy 3354: 1-60-01 Cuyahoga Community College Grievance Process for Resolving Allegations of Discrimination, Harassment, Sexual Misconduct, Title IX and Retaliation is reported to the College through a non-confidential resource, the Director of

2

Exhibit A

Institutional Equity/Title IX Coordinator or designee will attempt to contact the reporter to review the Policy and discuss the privacy of the process, amnesty (if appropriate), accommodations, supportive measures, options for Informal Resolution if appropriate, and the investigation and adjudication process for informal reports and formal complaints.

(3) There is a presumption that a Respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process.

**(B) Jurisdiction**

(1) This policy applies to all students, employees, volunteers, vendors and visitors to the College.

(2) This policy applies to Prohibited Conduct that is reported to have occurred:

    (a) In connection with the College's program or activity; or

    (b) On property owned or controlled by the College; or

    (c) Using computer or internet networks, digital platforms, or computer hardware or software owned or operated by the College; or

    (d) Where the conduct is reported to have a continuing adverse effect on an educational program or activity of the College, regardless of where the conduct is reported to have occurred.

(3) The College's response to Prohibited Conduct depends in part on its control over the Respondent.

    (a) The policy applies when the Respondent is a member of the College community, or was a member of the College community at the time of the alleged incident and intends to participate in an education program or activity of the College.

    (b) If Prohibited Conduct is reported when the College does not have control over the Respondent, the College will still work with the Complainant regarding their options and appropriate supportive measures.

    (c) The College will also consider whether it is appropriate to take any other actions to protect the safety of the College community under these circumstances.

(4) The elements established in this policy have no effect and are not transferrable to any other policy or procedure of the College except as defined in this policy. This policy does not set a precedent for other policies, procedures, or processes of the College and may not be cited for or against any right or aspect of any other policy, procedure, or process.

**(C) Definitions**

(1) **Advisor** ~ Parties may have an Advisor of their choice present with them for all meetings and interviews within the resolution process, if they so choose. The parties may select whoever they wish to serve as their Advisor as long as the Advisor is eligible and available.

    (a) May be a friend, mentor, family member, attorney, or any other individual a party chooses to advise, support, and/or consult with them throughout the resolution process.

    (b) May choose an Advisor from inside or outside of the College community.

3

Exhibit A

      (c) Choosing an Advisor who is also a witness in the process may create potential for challenging the credibility of the witness/Advisor due to the witness/Advisor's presence during party interviews and cross examination.  A party who chooses an Advisor who is also a witness can anticipate credibility challenges may be explored by Decision Maker.

(2) **Confidentiality** – means that means that information will not be shared by the individual who receives the information except in limited circumstances, such as where there is an imminent threat of harm to the individual or to others, or where there is knowledge or suspicion of child abuse or neglect.

      (a) **Confidential Reporting (Employees)** – Complainants and third-party reporters who are employees wishing to report confidentially may contact the College's Employee Assistance Program (Impact Solutions).

      (b) **Confidential Reporting (Students)** - Complainants and third-party reporters who are students wishing to report confidentially may speak with Counselors in the Counseling Centers on Campus.

      (c) **Off-Campus Confidential Reporting** - Licensed professional counselors and other medical providers, local rape crisis centers, local domestic violence centers, local or state agencies, clergy/chaplains, and attorneys.

          (i) A list of campus and community resources, many of which provide confidentiality, is available at https://www.tri-c.edu/titleix/better-than-that/additional-resources.html.

      (d) The College is required by the Clery Act to keep certain publicly available records regarding crimes that are reported on or near campus property.  Such records do not include personal information regarding victims of such crimes, to the extent permissible by law.

(3) **Consent (Related Definition for Sex & Gender Discrimination/Title IX)** - Mutual knowing, voluntary, and clear permission by word or action to engage in sexual activity. Since individuals may experience the same interaction in different ways, it is the responsibility of each party to determine that the other has consented before engaging in the activity. If consent is not clearly provided prior to engaging in the activity, consent may be ratified by word or action at some point during the interaction or thereafter, but clear communication from the outset is strongly encouraged. For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct. Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on the College to determine whether its policy has been violated.

(4) **Emergency Removal** - The College may remove a Respondent from the College's education program or activity on an emergency basis, provided:

      (a) An individualized safety and risk analysis are conducted by the College;

      (b) There is an immediate threat to the physical health or safety of any student or other individual arising from the allegations of discrimination, harassment, sexual misconduct, retaliation and Title IX justify removal;

      (c) Provides the Respondent with notice of an opportunity to challenge the decision immediately following the removal.

          (i) **Students**

              i. Emergency Removal here has the same meaning as Interim Suspension found in (E)(11) – Suspension in the Student Code of Conduct.

4

Exhibit A

       ii.   Appeals/Challenges made to the decision will follow (H) Appeals in the Student Code of Conduct.

    (ii)**Employees**
       i.   **The Department of Human Resources shall evaluate the complaint and determine if it is appropriate to place the employee on administrative leave during the pendency of the investigation.**
       ii.   **Appeals will follow the union contract for non-exempt employees and the Employee Code of Conduct for exempt employees.**

  (d)  This does not preclude the College from placing an employee on administrative leave pending the outcome of the Formal Grievance process.

(5)  **Incapacitation (Related Definition for Sex & Gender Discrimination/Title IX)** - Engaging in sexual activity with someone known to be, or should have known to be incapacitated. Occurs when someone cannot make rational, reasonable decisions because they lack the capacity to give knowing/informed consent (e.g. to understand the "who, what, when, where, why, or how" of their sexual interaction).

  (a)  Determined through consideration of all relevant indicators of an individual's state and is typically assessed through consideration of behavior cues.

  (b)  Not the same as intoxication, impairment, blackout, and/or being drunk.  A person cannot consent if they are unable to understand what is happening or is disoriented, helpless, asleep, or unconscious for any reason, including by alcohol or other drugs.

  (c)  A person violates this policy if they engage in sexual activity with someone they know to be, or should know to be, physically or mentally incapacitated.

  (d)  The policy also covers a person whose incapacity results from a temporary or permanent physical or mental health condition, involuntary physical restraint, and/or the voluntary or involuntary consumption of incapacitating alcohol and/or drugs.

(6)  **Mandatory Reporters** – The College deems all faculty, staff, and agents of the College (i.e., contracted third parties) are mandatory reporters, unless the College has designated them to have confidential status (i.e., counselors).  Mandatory reporters must contact the OIE within 24 hours of becoming aware of a report or incident they believe may have violated a policy on Discrimination, Harassment, Sexual Misconduct, Retaliation, and/or Title IX.  Other members of the College community (i.e. students, volunteers, guests, or visitors may contact the OIE if they believe the policy on Discrimination, Harassment, Sexual Misconduct, Retaliation and Title IX may have been violated.

  (a)  If the conduct is criminal in nature, any member of the community, including guests and visitors, shall contact Campus Police and/or local police to make a report.

  (b)  It is also possible for employees to notify a supervisor, or for students to notify a Deputy Institutional Equity Coordinator or faculty member.

  (c)  These individuals will notify the OIE. Employees must promptly share all details of the reports they receive. The College website also includes a Reporting form at https://www.tri-c.edu/student-resources/student-complaints-and-concerns/index.html.

  (d)  Failure of a non-confidential employee, to report an incident of discrimination, harassment, sexual misconduct, retaliation and Title IX of which they become aware is a violation of the Policy and can be subject to disciplinary action for failure to comply.

  (e)  Nothing in this section or procedure shall create any liability which is not imposed by state or federal law

(7)  **Minors**

5

Exhibit A

(a) This procedure applies to all students at College, including minors and those participating in College Credit Plus and other similar programs.

(b) College will follow all laws, including mandatory reporting requirements found in the Ohio Revised Code, regarding minors who are Complainant's and Respondent's in matters of sexual misconduct.

(c) Under the Family Education Rights and Privacy Act (FERPA) minors have privacy rights; therefore, information is not disclosed to parents or guardians unless the minor student has signed a release of information or the information falls under an exception to FERPA.

(d) In the case of minor students involved in College Credit Plus and other similar programs, the College will work with secondary school officials as appropriate to address the incidents of sexual misconduct.

(8) **Preponderance of the Evidence** – Evidentiary standard used by the College to determine whether the Respondent more likely than not violated the policy.

(9) **Privacy** - means that information will be protected except to the extent it is necessary to disclose information in order to respond to a report, effectuate supportive measures, facilitate an informal resolution, administer a formal complaint under these procedures, provide remedies to those who experience Prohibited Conduct, and ensure the safety of individuals and the College community. The Director OIE/Title IX Coordinator and other College employees are expected to respect the privacy of the parties and witnesses to a report or formal complaint and share information only on a "need to know" basis.

(10) **Supportive Measures** - Non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent. May be offered before or after the filing of a formal complaint or where no formal complaint has been filed. Designed to restore or preserve equal access to the College's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the College's educational environment. May be offered before or after the filing of a formal complaint or where no formal complaint has been filed. Supportive Measures may include, but are not limited to:

(a) Counseling

(b) Extensions of deadlines or other course-related adjustments

(c) Modifications of work or class schedules

(d) Campus Police Escort services

(e) Mutual restrictions on contact between parties

(f) Changes in work locations

(g) Leaves of absence

(h) Increased security and monitoring of certain areas of the Campus

(i) Other measures as deemed appropriate by the OIE

(j) The College will implement the least restrictive supportive measures as possible in light of the circumstances, in addition to providing any Supportive Measures, defined above. Measures may include restrictions from classes and/or all other College

6

Exhibit A

activities or privileges for which the student might otherwise be eligible. Such measures may include but are not limited to:

    (i) Temporarily reassigning an employee;

    (ii) Restricting a student or employee's access to use of College facilities or equipment;

    (iii) Allowing a student to withdraw or take incompletes without financial penalty;

    (iv) Authorizing an administrative leave;

    (v) Suspending a student's participation in extracurricular activities, student organizational leadership or intercollegiate athletics;

    (vi) At the discretion of the Office of Institutional Equity, alternative coursework options may be pursued to ensure as minimal as possible an academic impact as possible on the reporting and Responding parties;

    (vii) The Office of Institutional Equity has sole discretion to implement or stay in an interim action/emergency removal and to determine conditions and duration.

    (viii)    Violation of an interim action under the policy will be grounds for discipline which may include expulsion or termination.

    (ix) During an interim action/suspension, a student or employee may be denied access to on or off campus College sponsored events

(11) **Threat Assessment** - is the process of evaluating the actionability of violence by an individual against another person or group following the issuance of a direct or conditional threat. A VRA is a broader term used to assess any potential violence or danger, regardless of the presence of a vague, conditional, or direct threat.

    (a) The OIE in conjunction with the Department of Human Resources (Employee); or the Office of Student Affairs (Student), shall engage in an initial determination evaluating the threat of harm posed by a student or employee where is it alleged or reasonably believed the individuals poses a threat or harm to persons or property.

    (b) Factors when assessing possible threats to the safety of the College community are:

        (i) A violence risk assessment indicates a compelling threat to health and/or safety;

        (ii) Preferences and concerns of the Complainant;

        (iii) Nature of the circumstances of the allegations in the report;

        (iv) Severity and impact of the reported conduct;

        (v) Whether there are multiple Complainants or Respondents;

        (vi) Whether the Respondent has threatened further Prohibited Conduct or violence against the Complainant or other;

        (vii) Whether the Respondent is an employee (Title IX only);

7

(viii)    Whether the College possesses independent means to obtain relevant evidence if the Complainant is not willing or able to participate.

(12) **Violence Risk Assessment (VRA)**

(a)  A VRA can aid in ten critical and/or required determinations, including:

(i) Emergency removal of a Respondent on the basis of immediate threat to physical health/safety;

(ii) Whether the Director OIE/Title IX Coordinator should pursue/sign a formal complaint absent a willing/able Complainant;

(iii) Whether to put the investigation on the footing of incident and/or pattern and/or climate;

(iv) To help identify potential predatory conduct;

(v) To help assess/identify grooming behaviors;

(vi) Whether it is reasonable to try to resolve a complaint through informal resolution, and what modality may be most successful;

(vii) Whether to permit a voluntary withdrawal by the Respondent;

(viii)    Whether to impose transcript notation or communicate with a transfer College about a Respondent;

(ix) Assessment of appropriate sanctions/remedies (to be applied post-hearing); and/or

(x) Whether a Clery Act Timely Warning and/or Persona-non-grata is needed.

(b) VRAs require specific training and are typically conducted by psychologists, clinical counselors, social workers, case managers, law enforcement officers, student conduct officers, or other BIT team members.

(c) A VRA authorized by the Director OIE/Title IX Coordinator should occur in collaboration with the BIT Team.

(i) Where a VRA is required by Director OIE/Title IX Coordinator, a Respondent refusing to cooperate may result in a charge of failure to comply within the appropriate student or employee conduct process.

(d) A VRA is not an evaluation for an involuntary behavioral health hospitalization, nor is it a psychological or mental health assessment. A VRA assesses the risk of actionable violence, often with a focus on targeted/predatory escalations, and is supported by research from the fields of law enforcement, criminology, human resources, and psychology.

**(D) Prohibited Conduct**

(l)  **Civil Rights Violations** – Conduct prohibited as forms of discrimination when the act is based upon the Complainant's actual or perceived membership in a protected class:

(a)  Threatening or causing physical harm;

(b)  Extreme verbal abuse;

8

(c) Other conduct which threatens or endangers the health or safety of any person;

(d) Discrimination, defined as actions that deprive, limit or deny other members of the community of educational or employment access, benefits or opportunities;

(e) Intimidation, defined as implied threats or acts that cause a reasonable fear of harm in another;

(f) Bullying (repeated and/or severe aggressive behavior likely to intimidate or intentionally hurt, control, or diminish another person, physically or mentally);

(g) Intimate partner violence (commonly referred to as dating, domestic or relationship violence) is verbal, physical or emotional violence, threat of violence, or abuse between those who are involved in, or have been involved in, an intimate interaction or relationship.

(2) **Consensual Sexual Relationships Involving Faculty and Students** – The College prohibits consensual sexual relationships between faculty or staff members and the students or student employees enrolled in a class or class sequence(s) taught, advised, counseled, coached or supervised by the faculty member, or over whom the faculty member has direct impact on the student or student employee's academic enrollment or success. Consensual sexual relationships in instances where a student is the lawful spouse of the faculty member, and was so prior to enrolling in the course taught by the faculty member, are permitted. If an employee or faculty member is found to be engaged in a consensual sexual relationship with a student that violates this policy, disciplinary action may be expedited.

(a) The College prohibits consensual sexual relationships between administrators, supervisors, deans, chairpersons or employees and the student or student employees who they advise, counsel, and coach or supervise, or over whom they have a direct impact on the student or student employee's academic enrollment or success. The College discourages all employees or faculty members from engaging in consensual sexual relationships with active status students.

(b) An employee or faculty member who is engaged in a consensual sexual relationship with another employee or faculty member in violation of this policy has the responsibility to notify his/her administrator, dean or chairperson, the Human Resources Office, or Employee and Labor Relations about the relationship. If possible, the employment of the parties involved in the consensual sexual relationship in which one person has authority over or influence upon the status of the other will be modified so that the authority or influence no longer exists. This shall occur by moving one of the persons to another position, department or supervisor. An employee or faculty member who does not notify his/her administrator, supervisor, dean or chairperson that he/she is involved in a consensual sexual relationship in violation of this policy shall be subject to disciplinary action, up to and including termination of employment.

(3) **Discrimination** – Occurs when an adverse employment or academic action is taken and the action is based on ones protected class status. The College prohibits discrimination against students, employees and others based on their protected class status.

(a) The College recognizes the following as protected class: race, color, religion, sex (including sexual harassment, sexual violence, sexual assault, sexual exploitation, relationship violence, domestic abuse, stalking), pregnancy, national origin, ancestry, physical or mental disability, age, marital status, veteran status, genetic information, participation in protected activity (retaliation), and/or any other statutes protected by state and federal law including Title II, Title VI, Title VII, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, rules and regulations.

(4) **Discriminatory Harassment** – Unwelcome, verbal or physical conduct that is based on an individual's protected class when one or more of the following conditions is present:

(a) Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, participation

9

Exhibit A

in a program or activity, or grade in a course or coursework;

(b) Submission to or rejection of such conduct by an individual is used as the basis for employment or educational decisions affecting an individual; or

(c) Such conduct is sufficiently severe or pervasive such that it unreasonably interferes with, denies or limits an individual's ability to participate in or benefit from the College's education and employment programs and activities; and/or

(d) Creating an intimidating, hostile or offensive educational or employment environment further defined below.

(e) Determination of whether an environment is "hostile" is based on the totality of the circumstances:

    (i) These circumstances may include the degree to which the conduct interfered with the Complainant's educational or work performance;

    (ii) The type, frequency, and duration of the conduct;

    (iii) The identity of and relationship between the Complainant and Respondent;

    (iv) The number of individuals involved;

    (v) The age and sex of the Complainant and Respondent;

    (vi) The location of the incident(s) and the context in which it occurred;

    (vii) The nature and severity of the conduct;

    (viii)    Whether the conduct was humiliating;

    (ix) The effect of the conduct on the Complainant's mental or physical state;

    (x) Whether the conduct arose in the context of other discriminatory conduct;

    (xi) Whether the speech or conduct deserves protections of academic freedom or the first amendment

(f) A single incident may create a hostile environment if the incident is sufficiently severe.

(5) **Hostile Educational Environment** – includes any situation in which there is harassing conduct that limits, interferes with, or denies educational benefits or opportunities, from both a subjective (the Complainant) and objective (reasonable person's) viewpoint, that is sufficiently severe, pervasive and objectively offensive.

(6) **Hostile Employment Environment** - Employment situation in which there is harassing conduct that is sufficiently severe, or pervasive such that it unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment.

(7) **Non-Consensual Sexual Intercourse** – Any sexual intercourse, however slight, with any object by another person upon another person that is without the consent and/or by force.

10

(a) Sexual intercourse includes vaginal or anal penetration by a penis, tongue, finger, or object, or oral copulation (mouth to genital contact), no matter how slight the penetration or contact.

(8) **Non-Consensual Sexual Contact** - Any intentional sexual touching, however slight with any object by a person upon another person that is without consent and/or by force.

  (a) Sexual touching includes:

  (i) Intentional contact with the breasts, groin, genitals, or mouth by touching another with any of these body parts, or;

  (ii) Making another touch you or themselves with or on any of these body parts, or;

  (iii) Any other intentional bodily contact in a sexual manner.

(9) **Quid Pro Quo Harassment**- Exists when there are unwelcome requests or demands based on a protected class and;

  (a) Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic status or;

  (b) Submission to or rejection of such conduct by an individual is used as the basis for employment or academic decisions adversely affecting such individual

(10) **Retaliation** - Any materially adverse action taken because of a person's participation in a protected activity, or action taken to impede an individual's participation in the process.

  (a) Protected activity includes:

  (i) reporting an incident that may implicate this policy,

  (ii) participating in the resolution process,

  (iii) supporting a reporting or Respondent, or;

  (iv) assisting in providing information relevant to an investigation

  (b) Acts alleged to be retaliation should be reported immediately to the Director OIE/Title IX Coordinator and will be promptly investigated. College is prepared to take appropriate steps to protect individuals who fear that they may be subjected to retaliation.

  (c) The exercise of rights protected under the First Amendment does not constitute retaliation.

  (d) Charging an individual with a code of conduct violation for making a materially false statement in bad faith in the course of a grievance proceeding under the policy and procedure does not constitute Retaliation. A determination regarding responsibility, alone, is not sufficient to conclude that any party made a materially false statement in bad faith.

(11) **Sexual Exploitation** - Occurs when an individual takes non-consensual, or abusive sexual advantage of another, for his/her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited and that behavior does not otherwise constitute non-consensual sexual contact, non-consensual sexual intercourse or sexual harassment.

11

Exhibit A

(a)  Examples of sexual exploitation includes, but is not limited to:

   (i)  Sexual voyeurism (such as watching a person undressing, using the bathroom or engaging in sexual acts without the consent of the person being observed);

   (ii) Invasion of sexual privacy, taking pictures, video, or audio recording of another in a sexual act, or in any other sexually related activity when there is reasonable expectation of privacy during the activity without the consent of all involved in the activity, or;

   (iii)  Exceeding the boundaries of consent (such as allowing another person to hide in a closet and observe sexual activity, or disseminating sexual pictures without the photographed person's consent), including making or posting of revenge pornography, prostitution or prostituting another, engaging in sexual activity with another person while knowingly infected with human immunodeficiency virus (HIV) or a sexually transmitted disease (STD) or infection (STI), without informing the other person of the infection, administering alcohol or drugs (such as "date rape" drugs) to another person without their knowledge or consent (assuming the act is not completed), exposing one's genitals in non-consensual circumstances, including unwelcome sexting.

(12) **Sexual Harassment (Title IX)** – means conduct on the basis of sex that satisfies one or more of the following:

   (a)  An employee of the College conditioning the provision of aid, benefit, or service of the College on an individual participation in unwelcome conduct;

   (b)  Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the College's education program or activity; or

   (c)  **Sexual Assault (Title IX)** as defined as:

      (i)  A forcible or non-forcible sex offense as defined by the Uniform Crime Reporting system used by the Federal Bureau of Investigation pursuant to 20 U.S.C. 1092(f)(6)(A)(v), including rape, sodomy, sexual assault with an object, fondling, incest, and statutory rape.  These definitions prohibit the following behaviors:

         i.  Vaginal, anal, or oral sexual intercourse with a person without their consent;

         ii.  Touching the private body parts of another person for the purpose of sexual gratification without their consent.

   (d)  **Sex Offenses (Title IX), Nonforcible** – Nonforcible sexual intercourse, defined as:

      (i)  **Incest (Title IX)** - Nonforcible sexual intercourse between persons with are related to each other within the degrees wherein marriage is prohibited by Ohio law.  In Ohio, Revised Code Section 3101.01(A) provides that individuals nearer of kin than second cousins may not marry.

      (ii) **Statutory Rape (Title IX)** – Nonforcible sexual intercourse with a person who is under the statutory age of consent. In Ohio Revised Code Section 2907.02(A)(1)(b) provides that no person may have sex with a child under the age of thirteen.  Ohio Revised Code Section 2907.04(A) provides that no person over the age of eighteen may have sex with a child under the age of sixteen.

   (e)  **Dating Violence (Title IX)** defined as:

12

(i) Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the Complainant. The existence of such a relationship shall be determined based on the Complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition:

    i. Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.

    ii. Dating violence does not include acts covered under the definition of domestic violence.

**(f) Domestic Violence (Title IX) as defined as:**

(i) A felony or misdemeanor crime of violence committed on the basis of sex:

    i. By a current or former spouse or intimate partner of the Complainant;

    ii. By a person with whom the Complainant shares a child in common;

    iii. By a person who is cohabitating with, or has cohabitated with, the Complainant as a spouse or intimate partner;

    iv. By a person similarly situated to a spouse of the Complainant under the domestic or family violence laws in Ohio;

    v. By any other person against an adult or youth Complainant who is protected from that person's acts under the domestic or family violence laws of Ohio;

    vi. To categorize an incident as Domestic Violence, the relationship between the Respondent and the Complainant must be more than just two people living together as roommates. The people cohabitating must be current or former spouses or have an intimate relationship.

**(g) Stalking (Title IX) as defined as:**

(i) Engaging in a course of conduct directed at a specific person, on the basis of sex, that would case a reasonable person to:

    i. Fear for the person's safety or the safety of others; or

    ii. Suffer substantial emotional distress

(ii) For the purposes of this definition:

    i. Course of conduct means two or more acts, including, but not limited to acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

    ii. Reasonable person means a reasonable person under similar circumstances and with similar identities to the Complainant.

    iii. Substantial emotional distress means significant mental suffering or anguish that may but does not necessarily require medical or other professional treatment or counseling.

13

Exhibit A

(13) **Sexual Harassment** - Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when:

    (a) Submission to or rejection of this conduct explicitly or implicitly affects an individual's employment or educational environment;

    (b) Unreasonably interferes with an individual's work performance or;

    (c) Creates an intimidating, hostile or offensive work or educational environment.

(14) **Sexual Misconduct** - State law defines various violent and/or non-consensual sexual acts as crimes. While some of the definitions below may have parallels in criminal law, the College has defined categories of sex/gender discrimination as forms of sexual misconduct for which disciplinary action under the policy may be imposed.

    (a) The College considers non-consensual sexual intercourse policy violations to be the most serious of these offenses, and therefore imposes the most severe sanctions, including suspension or expulsion for students and termination for employees.

    (b) The College reserves the right to impose any level of sanction, ranging from a reprimand up to and including suspension or expulsion/termination, for any act of sexual misconduct or other sex/gender-based offenses, including:

        (i) Intimate partner (dating and/or domestic) violence

        (ii) Non-consensual sexual contact, and/or

        (iii) Stalking

        (iv) Based on the facts and circumstances of the particular allegation.

        (v) Acts of sexual misconduct can occur if committed by any person upon any person, regardless of the sex, sexual orientation, and/or gender identity of those involved.

(15) **Stalking** - Repetitive and menacing (causing a reasonable person to be fearful) pursuit, following, harassing, and/or interfering with the peace and/or safety of another that is not on the basis of sex or gender.

**(E) Reporting Prohibited Conduct**

    (1) **Options for Reporting** - When an individual experiences Prohibited Conduct, they have a number of options that are available to them. These options, which can be explained in more detail by the Director OIE/Title IX Coordinator, include:

        (a) Anyone who feels they are in immediate danger are strongly encouraged to call 911. Those in immediate danger on campus may contact the Department of Campus Police & Security Services: Cuyahoga Community College Campus Police at 216-297-4911.

        (b) If the Prohibited Conduct constitutes a crime, the option to notify College law enforcement and/or local law enforcement, which the notification the College can help facilitate;

        (c) The option to seek a protection order and/or other legal orders, which will be enforced by the College as may be required by the order;

        (d) The option to seek medical attention, counseling services, or other confidential resources;

14

Exhibit A

(e)  The option to file a report with the Director of Institutional Equity/Title IX Coordinator and request appropriate supportive measures;

(f)  The option to report Prohibited Conduct to another employee of the College, who is required to file the information with the Director of Institutional Equity/Title IX Coordinator except where the disclosure is made in the context of a confidential relationship (e.g., counselor-patient, doctor-patient);

(g)  The option to file a formal complaint with the Director of Institutional Equity/Title IX Coordinator to pursue informal resolution or a formal investigation;

(h)  A Complainant may choose multiple options, and the options they choose may change over time.  For example, a complainant may choose initially to proceed with a criminal investigation, or this process, both, or neither.  Regardless of those choices, the complainant may seek a protection order, confidential resources, supportive measures, and/or or file a Formal Complaint.

(2)  **Making a Report to Law Enforcement**

(a)  Where an individual has been subjected to violence or other criminal acts, the College encourages such individuals to seek assistance from medical providers and/or law enforcement immediately after the incident, whether or not the complainant intends to pursue criminal charges.  This is to assist in the preservation of evidence and to begin a timely response by law enforcement.  Preserving evidence may later assist in proving that an alleged criminal offense occurred, or it may be helpful in obtaining a protection order if one is desired.

(b)  The Director OIE/Title IX Coordinator can assist in notifying law enforcement authorities if the complainant chooses.  Complainants may also decline to notify such authorities.

(3)  **Making a Report to the College**

(a)  The College strongly encourages individuals who have experienced or witnessed Prohibited Conduct to file a report with the Director OIE/Title IX Coordinator.  Making a report does not require further action on the part of the reporter.

(b)  When complaints involve students the Assistant Dean of Student Affairs at the East, Metro, West and Westshore Campus will serve as Deputy Institutional Equity/Title IX Coordinators (Deputy Coordinators). In addition, when a complaint involves an employee, the Employee and Labor Relations Manager in the Office of Human Resources will serve as Deputy Institutional Equity/Title IX Coordinator (Deputy Coordinator).

(c)  Employees of the College who become aware of behavior that may constitute Prohibited Conduct are required as Mandatory Reporters to report all information regarding such Prohibited Conduct to the Director OIE/Title IX Coordinator as soon as reasonably possible.

(d)  Any person may report Prohibited Conduct in person, by mail, by telephone, or by email, using the contact information listed for the Director OIE/Title IX Coordinator, or by any other means that results in the Director OIE/Title IX Coordinator receiving the person's verbal or written report.  Such reports may be made at any time, including during non-business hours.  Contact information for the Director OIE/Title IX Coordinator is found in (D)(3)(a) above and at: https://www.tri-c.edu/titleix/index.html.

(e)  Individuals may report to the Director Institutional Equity/Title IX Coordinator or Deputy Coordinators by mail, by telephone, or by electronic mail.

(f)  Anonymous reports may be made, but depending on the level of information included in the report, anonymous reporting may limit the College's ability to respond.  Employees who are required to make reports under these procedures are not permitted to make

15

Exhibit A

such reports anonymously.  If the anonymous report includes a crime, it will be counted in the College's crime statistics.

(g) Any student, employee, or third party who reports that they have experienced sexual assault, domestic violence, dating violence, or stalking on the basis of sex shall be provided with a written explanation of their rights, options, and available services.  These rights and options include the opportunity to access specific support services on campus and in the community, such as assistance with changing academic and working arrangements upon request.  Appropriate College officials will determine of the request is reasonable.  Such rights also apply to the Respondent.

(h) Deliberately false and/or malicious accusations under this policy, as opposed to allegations which, even if erroneous, are made in good faith, are a serious offense and will be subject to appropriate disciplinary action. Witnesses and parties providing knowingly false evidence or deliberately misleading an official conducting an investigation will be subject to discipline under the Policy.

(i) Where it is alleged that the Director OIE/Title IX Coordinator has engaged in Prohibited Conduct, such report may be directed Human Resources Director, who will designate an appropriate individual to act as the Director OIE/Title IX Coordinator for purposes of that report.

### (F) Grievance Process (Initial Assessment/Investigation and Decision-Making Process)

#### (1) Overall Timeframe

(a) The College will make a good faith effort to complete the resolution process within a sixty (60) to ninety (90) business day time period, including the appellant process.

(b) Time period may be extended as necessary for appropriate cause by the Director OIE/Title IX Coordinator, who will provide notice and rationale for any extensions or delays to the parties as appropriate, as well as an estimate of how much additional time will be needed to complete the process.

(c) The College may undertake a short delay in its investigation (several days to a few weeks) if circumstances require. Such circumstances include, but are not limited to: a request from law enforcement to temporarily delay the investigation, the need for language assistance, the absence of parties and/or witnesses, and/or accommodations for disabilities or health conditions. During such a delay, the College will implement supportive measures as deemed appropriate.

(d) College action(s) are not typically altered or precluded on the grounds that civil or criminal charges involving the underlying incident(s) have been filed or that criminal charges have been dismissed or reduced.

#### (2) Filing a Formal Complaint

##### (a) Formal Complaint

(i) A statement or summary received by the Director of OIE/Title IX Coordinator from the Complainant or a Complaint signed by the Director OIE/Title IX Coordinator alleging harassment or discrimination based on a protected class or retaliation for engaging in a protected activity against a Respondent and requesting that the College investigate the allegation.

(ii) Complaints may be filed in person, by mail, by electronic mail, or through the College's online system for making such reports.

(iii) If a Complainant is not 18 years of age and is not enrolled in the College, the College must obtain the voluntary, written consent of a natural parent, guardian, or an individual acting as a parent in the absence of a parent or guardian before

16

Exhibit A

proceeding with an investigation.

(iv) If a Formal Complaint is received, the Director OIE/Title IX Coordinator assesses its sufficiency and works with the Complainant to make sure it is correctly completed and the Initial Assessment begins.

(v) The Director OIE/Title IX Coordinator may consolidate Formal Complaints alleging Prohibited Conduct against more than one Respondent, or by more than one Complainant against one or more Respondents, or by one party against another party, where the allegations of Prohibited Conduct arise out of the same facts or circumstances.

(vi) The Director OIE/Title IX Coordinator may, in their sole discretion, dismiss a Complaint or any of the allegations therein if at any time during the investigation or decision-making process:

    i. A Complainant notifies the Director OIE/Title IX Coordinator in writing that the Complainant would like to withdraw the Complaint or any allegations therein;

    ii. The Respondent is no longer enrolled in or employed by the College; or

    iii. Specific circumstances prevent the College from gathering evidence sufficient to reach a determination as to the Complaint or allegations therein;

    iv. If a Complaint is dismissed, the College will promptly send written notice of the dismissal and the reasons for the dismissal simultaneously to the parties. Where a Complaint is dismissed, the College may take action under another provision of its polices and/or codes of conduct.

(vii) If the Complainant expresses in writing a desire not to proceed with the Initial Investigation and a Supportive Measure is preferred and appropriate the Director OIE/Title IX Coordinator shall work with the Complainant to identify their wishes and then seeks to facilitate implementation. No Formal Grievance Process is initiated, though the Complainant can elect to initiate one later, if desired.

(viii)    If an Informal Resolution option is preferred, and the Respondent has been placed on notice of the Initial Investigation the Director OIE/Title IX Coordinator shall seek to determine if the Respondent is also willing to engage in Informal Resolution before seeking the parties' written, voluntary consent.

(ix) If a Formal Grievance Process is requested by the Complainant or the Respondent, the Director OIE/Title IX Coordinator will proceed with the Initial Investigation and Formal Grievance process, continuing the investigation to address:

    i. an incident, and/or

    ii. a pattern of alleged misconduct, and/or a culture/climate issue, based on the nature of the complaint

  (b)  **Informal Report**

(i) A statement or summary received by the Director of OIE/Title IX Coordinator from a third-party or a Complaint signed by the Director OIE/Title IX Coordinator alleging harassment or discrimination based on a protected class or retaliation for engaging in a protected activity against a Respondent and requesting that the College investigate the allegation.

(3) **Informal Resolution (Non-Title IX)** - May be used at any point prior to reaching a determination of responsibility as long as an Informal

17

Report or Formal Complaint has been received by the OIE. All parties must provide voluntary, written consent to engage in an Informal Resolution process. OIE maintains records of any resolution that is reached, and failure to abide by the accord may result in appropriate responsive/disciplinary actions. Informal resolution can occur:

    (a) When the parties agree to resolve the matter through an alternate resolution mechanism (i.e. mediation, restorative practices etc.)
    (b) When the Director OIE/Title IX Coordinator can resolve the matter informally by providing supportive measures to remedy the situation.

(4) **Informal Resolution (Title IX)** - May be used at any point after a final determination as to formal grievance eligibility (see 12 below). All parties must provide voluntary, written consent to engage in an Informal Resolution process. OIE maintains records of any resolution that is reached, and failure to abide by the accord may result in appropriate responsive/disciplinary actions. Federal Title IX Regulations prohibit informal resolution in the case of reports of Sexual Harassment (Title IX) defined above brought by a student against a College employee. Informal resolution can occur:

    (a) When the parties agree to resolve the matter through an alternate resolution mechanism (i.e. mediation, restorative practices etc.)

(5) **Respondent accepts responsibility for violating policy, and desires to accept a sanction and end the resolution process.**

    (a) If the Respondent admits responsibility for all alleged misconduct, the matter is referred to the Decision Maker who will determine appropriate sanctions and/or responsive actions in coordination with other appropriate administrator(s).

    (b) Appropriate sanction or responsive actions are promptly implemented in order to effectively stop the harassment or discrimination, prevent its recurrence, and remedy the effects of the discriminatory conduct, both on the Complainant and the community.

    (c) If the Respondent only admits to part of the alleged policy violations, then the contested allegations will be resolved using the Formal Grievance process and the Decision Maker will determine appropriate sanctions for all admitted violations and findings of violation.

    (d) Any applicable sanctions will be issued upon completion of the Formal Grievance Process.

(6) **The Director OIE/Title IX will provide the parties in Non-Title IX and Title IX cases with written notice for Informal Resolution which will include the following:**

    (a) Allegations;

    (b) Requirements of the Informal Resolution process including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations;

    (c) Right of any party at any time prior to agreeing to a resolution to withdraw from the Informal Resolution process and resume the Formal Grievance process with respect to the Formal Complaint

    (d) Right of any party at any time prior to agreeing to a resolution to withdraw from the Informal Resolution process and resume the Formal Grievance process with respect to the formal complaint and;

    (e) Any consequences resulting from participating in the Informal Resolution process, including the records that will be maintained or could be shared.

        (i) Resolution proceedings are private. All persons present at any time during the resolution process are expected to maintain the privacy of the proceedings in accordance with College policy. While there is an expectation of privacy around what Investigators share with parties during interviews, the parties have discretion to share their own knowledge and evidence with others if they so choose. College encourages parties to discuss this with their Advisors (if applicable) before doing so.

18

(7)  **Notice of Investigation**

(a)  Upon receipt of a Formal Complaint or Informal Report, the Director of OIE/Title IX Coordinator or a designee shall send the Complainant formal Notice of Investigation providing the next steps in the Initial Assessment process.

(b)  If it is determined during the Initial Assessment, the Complaint alleges facts related to discrimination based on protected class status, the Director of OIE/Title IX shall send a Notice of Investigation to the Respondent and continue the Initial Investigation process.

(8)  **Initial Assessment/Investigation Process** - For purposes of this procedure the Initial Assessment is part of the Investigation process. The steps in an Initial Assessment/Investigation can include: Threat Assessments, Supportive Measures, Informal Resolutions, and Formal Grievance.

(a)  If a complaint contains facts sufficient to support an allegation of discrimination based on a protected class status, the Director of OIE/Title IX shall send Initial Investigation Letters to both Complainant and Respondent.  Written notice may be delivered in person, mailed to the local or permanent addresses of the parties as indicated in official College records, or e-mailed to the parties College-issued email accounts. Once mailed, e-mailed, and/or received in person, notice will be presumptively delivered. Written Notice may include the following:

(i)  A summary of the allegations including (if known) the identity of the parties involved;

(ii) The precise misconduct being alleged;

(iii)  The date and location (if known) of the alleged incident(s);

(iv)  The specific policies implicated, and a description of the applicable procedures;

(v) A statement of the potential sanctions/responsive actions that could result;

(vi)  A statement that the College presumes the Respondent is not responsible for the reported misconduct unless and until the evidence supports a different determination under the preponderance of the evidence standard;

(vii) A statement that determinations of responsibility are made at the conclusion of the process;

(viii)    A statement that a party may have an advisor of choice and, in the event of a live cross-examination hearing, they must have an advisor of their choice or one appointed for them by the College;

(ix)  A statement about the College's policy on retaliation;

(x) Information about the privacy of the process

(xi)  Detail on how the party may request disability accommodations during the interview process;

(xii) The name of the investigator(s) along with a process to identify, in advance of the interview process, to the Title IX Coordinator any conflict of interest that the investigators may have;

(xiii)    A statement that parties may request to inspect and review evidence obtained, so that each party can respond to it prior to the close of the investigation; and;

19

Exhibit A

(xiv)   A statement informing the parties of any provision in the College policy/code of conduct/etc., that prohibits knowingly making false statements, including knowingly submitting false information during the resolution process, and;

(xv) An instruction to preserve any evidence that is directly related to the allegations.

(b) The Director OIE/Title IX Coordinator or designee will conduct an Initial Investigation which includes interviews with the Complainant. The Director OIE/Title IX Coordinator will review any evidence collected including but not limited to the interview with the Complainant and other appropriate parties and will make a threshold assessment of whether the allegation meets the elements of discrimination based on a protected class status.

(c) At any time during the Initial Assessment if the Director of OIE/Title IX concludes the entire Complaint or any portion does not qualify as an allegation of discrimination based on a protected class status or Title IX, the Director of OIE/Title IX shall close the Complaint with written notice to the parties and refer the Complaint, when appropriate, to the appropriate college department for resolution.

(d) If the initial evidence would support further investigation into the allegations set forth in the Complaint of discrimination based on a protected class status, the Director of OIE/Title IX shall send a formal Initial Assessment Letter to both the Complainant and Respondent outlining the entire investigation and decision-making process. The Director of OIE/Title IX or a designee shall also send formal Notice of Investigation Letters.

(e) The Director of OIE/Title IX shall also evaluate allegations involving violence, threat, pattern, predation, minors, and/or the use of a weapon, and whether a more restrictive and immediate action is necessary such as Emergency Removal. The OIE shall also determine if it is necessary based on the totality of the circumstances to impose other Interim Actions.

(9) **Appeal of the Initial Assessment**

(a) The Complainant and Respondent may appeal the decision of the Initial Assessment to the Decision Maker within five (5) business days of receipt of the decision.

(b) The Decision Maker shall review the Probable Cause determination and may request that the Director OIE/Title IX Coordinator review the probable cause determination and/or reopen the investigation.

(10) **Role of Advisor (Title IX/Sex & Gender Discrimination)**

(a) Parties are required to have an Advisor present for the Formal Grievance Hearing.

(b) The Director OIE/Title IX will also offer to assign a trained Advisor for the hearing if any party if the party does not have one.

(c) Under U.S. Department of Education regulations applicable to Title IX, cross-examination is required during the hearing, but must be conducted by the parties' Advisors.

(i) Parties may be accompanied by their Advisor in all meetings and interviews at which the party is expected to be present, including intake and interviews.

(ii) Advisors should help the parties prepare for each meeting and are expected to advice ethically, with integrity and good faith.

(iii) A party may not proceed in the Hearing without an Advisor.

20

Exhibit A

(iv) The parties are not permitted to directly cross-examine each other or any witnesses.

(v) If a party does not have an Advisor for a hearing, the College will appoint a trained Advisor for the limited purpose of conducting any cross-examination.

(vi) The College does not guarantee equity of advisors.  For example, if one party pays for their own attorney-advisor and the other party requests an advisor from the College, the College is not obligated to provide an attorney to the other party.

**(11) Role of Advisor (Non-Title IX and/or Sex and Gender Allegations)**

(a) An advisor cannot actively participate in the process, but can attend all meetings/hearings as a silent support person.

**(12) Final Determination as to Formal Grievance Eligibility – Title IX**

(a) The investigative report will include an assessment as to whether the reported conduct is eligible for a hearing pursuant to the factors in (8)(a). The Director OIE/Title IX Coordinator will review the assessment and determine whether the Director OIE/Title IX concurs with the assessment of the Investigator and whether a hearing will be held.

(b) Cases subject to Mandatory and Discretionary Dismissal under Title IX and may be subject to hearing eligibility under the College's policy against sexual misconduct.

(c) If the Director OIE determines that the case is eligible for a hearing, the case shall proceed to a Hearing pursuant to (15)

**(13) Final Determination as to Hearing Eligibility for Civil Rights**

(a) The investigative report will include an assessment as to whether the reported conduct is eligible for a hearing pursuant to the factors in (8)(a). The Director OIE/Title IX Coordinator will review the assessment and determine whether the Director OIE/Title IX Coordinator concurs with the assessment of the investigator and whether a hearing will be held.

(b) If the Director OIE/Title IX Coordinator determines the case is eligible for a hearing, the case shall proceed to a Hearing pursuant to (15)

**(14) Mandatory and Discretionary Dismissal (Title IX)**

(a) The College must dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing, it is determined that:

(i) The conduct alleged in the formal complaint would not constitute sexual harassment as defined by Title IX hereinabove, even if proved; and/or;

(ii) The conduct did not occur in an educational program or activity controlled by the College (including buildings or property controlled by recognized student organizations), and/or the College does not have control of the Respondent; and/or;

(iii) The conduct did not occur against a person in the United States; and/or;

(iv) At the time of filing a formal complaint, a complainant is not participating in or attempting to participate in the education

21

Exhibit A

program or activity of the College.

**(15) Hearing Resolution/Formal Grievance Process – Decision Maker (Non-Title IX & Non-Sex and Gender)**

    (a) **Decision-Maker Composition**

        (i) The Decision-Maker will not have had any previous involvement with the investigation.

        (ii) The Decision-Maker renders the final determination responsibility, based on the Preponderance of the Evidence.

        (iii) Civil Rights – Decision Maker Non-Title IX and Non-Sex and Gender

            i. Shall be a three-member panel, including Chair, comprised of Deans of Student Affairs, excluding the Dean of the Campus in which the allegation is alleged to have occurred to hear all other Civil Rights complaints.

            ii. In the event the allegation involves multiple campuses, the panel shall include the Director of the Brunswick Campus, Workforce or Corporate College.

        (iv) Title IX/Sex & Gender – Decision Maker Title IX

            i. Shall be outside counsel appointed to hear and decide Title IX and/or sex/gender allegations.

    (b) **Referral for Hearing**

        (i) Provided that the complaint is not resolved through Informal Resolution, once the final investigation report is shared with the parties, the Director OIE/Title IX will refer the matter for a hearing.

        (ii) The hearing cannot be less than ten (10) business days from the conclusion of the investigation –when the final investigation report is transmitted to the parties and the Decision Maker.

        (iii) The Director OIE/Title IX will select an appropriate Decision Maker(s) depending on whether the allegation is based on sexual harassment/Title IX or non-sexual harassment and non-title IX.

        (iv) The College may use an internal or external Decision Maker at its discretion.

    (c) **Evidentiary Considerations in the Hearing for Title IX and/or Sex & Gender Discrimination**

        (i) The Decision Maker determines the relevancy of each question at live cross-examination hearing and assigns weight and credibility to the evidence only after the hearing when writing the written determination.

        (ii) Previous disciplinary action of any kind involving the Respondent may be considered in determining an appropriate sanction upon a determination of responsibility, assuming the College uses a progressive discipline system. This information is only considered at the sanction stage of the process.

        (iii) The parties may each submit a written impact statement prior to the Decision Maker Chair for the consideration at the sanction stage of the process after a determination of responsibility is reached.

        (iv) After post-hearing deliberation, the Decision Maker renders a written determination based the preponderance of the evidence; whether it is more likely than not that the Respondent violated the Policy as alleged.

22

Exhibit A

(d) **Evidentiary Considerations in the Hearing for all other Civil Rights Discrimination**

    (i) The Decision Maker can consider the report from the Office of Institutional Equity.

    (ii) The Decision Maker can consider live testimony from both the Complainant and Respondent, including a rebuttal for both parties after the initial position statement.

    (iii) Previous disciplinary action of any kind involving the Respondent may be considered in determining an appropriate sanction upon a determination of responsibility, assuming the College uses a progressive discipline system. This information is only considered at the sanction stage of the process.

    (iv) The parties may each submit a written impact statement prior to the Decision Maker Chair for the consideration at the sanction state of the process after a determination of responsibility is reached.

(e) **Notice of Hearing**

    (i) No less than ten (10) business days prior to the hearing, the Director OIE/Title IX Coordinator or the Chair will send notice of the hearing to the parties. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

    (ii) The notice will contain:

        i. A description of the alleged violation(s), a list of all policies allegedly violated, a description of the applicable procedures, and a statement of the potential sanctions/responsive actions that could result.

        ii. The time, date, and location of the hearing and a reminder that attendance is mandatory (for non-TIX matters only), superseding all other campus activities.

        iii. Any technology that will be used to facilitate the hearing.

        iv. Information about the option for the live hearing to occur with the parties located in separate rooms using technology that enables the Decision Maker(s) and parties to see and hear a party or witness answering questions. Such a request must be raised with the Director OIE/Title IX Coordinator at least five (5) business days prior to the hearing.

        v. A list of all those who will attend the hearing, along with an invitation to object to any Decision Maker member on the basis of demonstrated bias. This must be raised with the Director OIE/ Title IX Coordinator at least two (2) business days prior to the hearing.

        vi. Information on how the hearing will be recorded and on access to the recording for the parties after the hearing.

        vii. A statement that if any party or witness does not appear at the scheduled hearing, the hearing may be held in their absence, and the party's or witness's testimony and any statements given prior to the hearing will not be considered by the Decision Maker.  For compelling reasons, the Decision Maker Chair may reschedule the hearing.

        viii.    Notification that the parties may have the assistance of an Advisor of their choosing at the hearing and will be required to have one present for any questions they may desire to ask. The party must notify the Director

23

OIE/Title IX Coordinator if they do not have an Advisor, and the College will appoint one. Each party must have an Advisor present. There are no exceptions.

ix. A copy of all the materials provided to the Decision Maker about the matter, unless they have been provided already.

x. An invitation to each party to submit to the Decision Maker Chair an impact statement pre-hearing that the Decision Maker will review during any sanction determination.

xi. An invitation to contact the Director OIE/Title IX Coordinator to arrange any disability accommodations, language assistance, and/or interpretation services that may be needed at the hearing, at least seven (7) business days prior to the hearing.

xii. Whether parties can/cannot bring mobile phones/devices into the hearing.

(iii) Hearings for possible violations that occur near or after the end of an academic term (assuming the Respondent is still subject to this Policy) and are unable to be resolved prior to the end of term will typically be held immediately after the end of the term or during the summer, as needed, to meet the resolution timeline followed by the College and remain within the 60-90 business day goal for resolution.

(f) **Alternative Hearing Participation Options**

(i) If a party or parties prefer not to attend or cannot attend the hearing in person, the party should request alternative arrangements from the Director OIE/Title IX Coordinator or the Chair at least five (5) business days prior to the hearing.

(ii) The Director OIE/Title IX Coordinator or the Chair can arrange to use technology to allow remote testimony without compromising the fairness of the hearing. Remote options may also be needed for witnesses who cannot appear in person. Any witness who cannot attend in person should let the Director OIE/Title IX Coordinator or the Chair know at least five (5) business days prior to the hearing so that appropriate arrangements can be made.

(g) **Pre-Hearing Preparation**

(i) The Chair, after any necessary consultation with the parties, Investigator(s) and/or Director OIE/Title IX Coordinator, will provide the names of persons who will be participating in the hearing, all pertinent documentary evidence, and the final investigation report to the parties at least ten (10) business days prior to the hearing.

(ii) Any witness scheduled to participate in the hearing must have been first interviewed by the Investigator(s) or have proffered a written statement or answered written question, unless all parties assent to the witness' participation in the hearing. The Decision Maker Chair holds the discretion to return the matter to the Investigator to reopen the investigation on the limited purpose of the information provided by the new witness.

(iii) For any new evidence submitted or raised for the first time at the hearing, the Decision Maker Chair retains the discretion to return the matter to the investigator to reopen the investigation on the limited purpose of following up on the new evidence and providing the parties the same opportunity to review and respond to the new evidence before investigation report and hearing.

(iv) The parties will be given the name of the Decision Maker or a list of the names of the Decision Maker at least five (5) business days in advance of the hearing.

24

Exhibit A

       i.   All objections to the Decision Maker or any member of the Decision Maker must be raised in writing, detailing the rationale for the objection, and must be submitted to the Director OIE/Title IX Coordinator as soon as possible and no later than one day prior to the hearing.

      ii.   The Decision Maker members will only be removed if the Director OIE/Title IX Coordinator concludes that their bias or conflict of interest precludes an impartial hearing of the allegation(s).

(v) The Director OIE/Title IX Coordinator will give the Decision Maker a list of the names of all parties, witnesses, and Advisors at least five (5) business days in advance of the hearing.

(vi) Any Decision Maker member who cannot make an objective determination must recuse themselves from the proceedings when notified of the identity of the parties, witnesses, and Advisors in advance of the hearing.

       i.   If a Decision Maker member is unsure of whether a bias or conflict of interest exists, they must raise the concern to the Director OIE/Title IX Coordinator as soon as possible.

(vii) During the ten (10) business day period prior to the hearing, the parties have the opportunity for continued review and comment on the final investigation report and available evidence. That review and comment can be shared with the Decision Maker Chair at the pre-hearing meeting or at the hearing and will be exchanged between each party by the Decision Maker Chair.

### (h)  Pre-Hearing Meetings

(i) The Decision Maker may convene a pre-hearing meeting(s) with the parties and/or their Advisors to invite them to submit the questions or topics they (the parties and/or their Advisors) wish to ask or discuss at the hearing, so that the Decision Maker Chair can rule on their relevance (Title IX only) ahead of time to avoid any improper evidentiary introduction in the hearing or provide recommendations for more appropriate phrasing.

       i.   However, this advance review opportunity does not preclude the Advisors from asking at the hearing for a reconsideration based on any new information or testimony offered at the hearing.

      ii.   The Decision Maker Chair must document and share their rationale for any exclusion or inclusion at this pre-hearing meeting.

(ii) At each pre-hearing meeting with a party and their Advisor, the Decision Maker Chair will consider arguments that evidence identified in the final investigation report as relevant is, in fact, not relevant. Similarly, evidence identified as directly related but not relevant by the Investigator(s) may be argued to be relevant.

(iii)  The Decision Maker Chair may rule on these arguments pre-hearing and will exchange those rulings between the parties prior to the hearing to assist in preparation for the hearing. The Decision Maker Chair may consult with legal counsel and/or the Director OIE/Title IX Coordinator, or ask either or both to attend pre-hearing meetings.

(iv) The pre-hearing meeting(s) will be recorded by the College only.

### (i)  Hearing Procedures

(i) At the hearing, the Decision Maker has the authority to hear and make determinations on all allegations of discrimination, harassment, and/or retaliation and may also hear and make determinations on any additional alleged policy violations

25

that have occurred in concert with the discrimination, harassment, and/or retaliation, even though those collateral allegations may not specifically fall within the policy on Discrimination, Harassment, Sexual Misconduct, Title IX and Retaliation.

(ii) Participants at the hearing will include:

    i.  the Chair or;

    ii.  the Decision Maker, and

    iii.  the hearing facilitator;

    iv.  the Director OIE/Title IX Coordinator and any other Investigator(s) who conducted the investigation

    v.  the parties (or three (3) organizational representatives when an organization is the Respondent)

    vi.  Advisors to the parties

    vii. Any called witnesses

    viii.   Anyone providing authorized accommodations or assistive services or otherwise required by law.

(iii) The Decision Maker Chair, or hearing facilitator will answer all questions of procedure. Anyone appearing at the hearing to provide information will respond to questions on their own behalf.

(iv) The Decision Maker Chair will allow witnesses who have relevant information to appear at a portion of the hearing in order to respond to specific questions from the Decision Maker(s) and the parties and will then be excused.

**(j)  Joint Hearings**

(i) In hearings involving more than one Respondent or in which two (2) or more Complainants have accused the same individual of substantially similar conduct, the default procedure will be to hear the allegations jointly.

(ii) The Director OIE/Title IX Coordinator may permit the investigation and/or hearings pertinent to each Respondent to be conducted separately if there is a compelling reason to do so. In joint hearings, separate determinations of responsibility will be made for each Respondent with respect to each alleged policy violation.

**(k)  The Order of the Hearing – Introductions and Explanation of Procedure**

(i) The Decision Maker Chair, or hearing facilitator explains the procedures and introduces the participants.

    i.  This may include a final opportunity for challenge or recusal of the Decision Maker on the basis of bias or conflict of interest.

    ii.  If the hearing is run by a Chair and Decision Maker, the Chair will rule on any such challenge unless the Chair is the individual who is the subject of the challenge, in which case the Director OIE/Title IX Coordinator will review and decide the challenge.

26

(ii) The Decision Maker Chair conducts the hearing according to the hearing script.

(iii) At the hearing, recording, witness logistics, party logistics, curation of documents, separation of the parties, and other administrative elements of the hearing process are managed by a non-voting hearing facilitator appointed by the Director OIE/Title IX Coordinator.

    i.   The hearing facilitator may attend to: logistics of rooms for various parties/witnesses as they wait; flow of parties/witnesses in and out of the hearing space; ensuring recording and/or virtual conferencing technology is working as intended; copying and distributing materials to participants, as appropriate, etc.

(l)   **Investigator Presents the Final Investigation Report**

(i) The Investigator(s) will then present a summary of the final investigation report, including items that are contested and those that are not, and will be subject to questioning by the Decision Maker and the parties (through their Advisors for Title IX matters).

(ii) The Investigator(s) will be present during the entire hearing process, but not during deliberations.

(iii) None of the parties or Decision Maker may ask the Investigator(s) their opinions on credibility, recommended findings, or determinations, and the Investigators, Advisors, and parties will refrain from discussion of or questions about these assessments. If such information is introduced, the Decision Maker Chair will direct that it be disregarded.

(m) **Testimony and Questioning**

(i) Once the Investigator(s) present their report and are questioned, the parties and witnesses may provide relevant information in turn, beginning with the Complainant, and then in the order determined by the Decision Maker or the Chair.

(ii) The parties/witnesses will submit to questioning by the Decision Maker and then by the parties themselves (Civil Rights) or through their Advisors (Title IX and/or Sex & Gender Discrimination) ("cross-examination").

    i.   Advisors must conduct the cross examination for all Title IX hearings only.

    ii.   If a party does not have an Advisor, the College will provide them one of the College's choosing. However, the Advisor provided by the College need not be an attorney, even where the other party is represented by an attorney.

    iii.   For non-Title IX related matters, Advisors may attend, but cannot participate.

(iii) The parties/witnesses will submit to questioning by the Decision Maker and then by the parties themselves ("cross examination") for non-Title IX matters.

(iv) All questions are subject to a relevance determination by the Decision Maker (Title IX only).

    i.   The Advisor, who will remain seated during questioning, will pose the proposed question orally (required in TIX process), electronically, or in writing (orally is the default, but other means of submission may be permitted by the Decision Maker upon request or agreed to by the parties and the Decision Maker ;

27

Exhibit A

       ii.   The proceeding will pause to allow the Decision Maker or the Chair to consider it;

       iii.   The Decision Maker or the Chair will determine whether the question is relevant.

(v) The Decision Maker or the Chair retains the discretion to explore arguments regarding relevance with the Advisors (Title IX) or the parties themselves.

(vi) The Decision Maker or the Chair will then state their decision on the question for the record and advise the party/witness to whom the question was directed, accordingly.

(vii) The Decision Maker or the chair will explain any decision to exclude a question as not relevant, or to reframe it for relevance (Title IX).

       i.   The Decision Maker or the Chair will limit or disallow questions on the basis that they are irrelevant, unduly repetitious (and thus irrelevant), or abusive.

       ii.   The Decision Maker or the Chair has final say on all questions and determinations of relevance, subject to any appeal. The Decision Maker or the Chair may consult with legal counsel on any questions of admissibility.

       iii.   The Decision Maker or the Chair may ask advisors to frame why a question is or is not relevant from their perspective but will not entertain argument from the advisors on relevance once the Decision Maker or the Chair has ruled on a question.

(viii)     If the parties raise an issue of bias or conflict of interest of an Investigator or Decision Maker member at the hearing, the Decision Maker or Chair may elect to address those issues, consult with legal counsel, and/or refer them to the Director OIE/Title IX Coordinator, and/or preserve them for appeal.

       i.   If bias is not in issue at the hearing, the Decision Maker or the Chair should not permit irrelevant questions that probe for bias.

**(n)   Refusal to Submit to Cross-Examination and Inferences**

(i) If a party or witness chooses not to submit to cross-examination at the hearing, either because they do not attend the meeting, or they attend but refuse to participate in questioning, then the Decision Maker may not rely on any prior statement made by that party or witness that has not been tested on cross-examination at the hearing (including those contained in the investigation report) in the ultimate determination of responsibility.

       i.   The Decision Maker(s) must disregard any prior statement made by a party or witness who fails to attend or refuses to participate in cross examination.

       ii.   Evidence provided that is something other than a statement by the party or witness may be considered.

(ii) Only statements subjected to cross-examination will be considered by the Decision Maker(s) when writing the written determination. However, where the statement itself is the sexual harassment, that statement does not have to be subjected to cross-examination to be considered by the Decision Maker(s).

(iii) The Decision Maker(s) may not draw any inference solely from a party's or witness's absence from the hearing or refusal to answer cross-examination or other questions.

28

(iv) If charges of policy violations other than sexual harassment are considered at the same hearing, the Decision Maker(s) may:

    i.   consider all evidence it deems relevant

    ii.  may rely on any relevant statement as long as the opportunity for cross-examination is afforded to all parties through their Advisors, and

    iii.  may draw reasonable inferences from any decision by any party or witness not to participate or respond to questions.

(v) If a party's Advisor of choice refuses to comply with the College's established rules of decorum for the hearing, the College may require the party to use a different Advisor. If a College-provided Advisor refuses to comply with the rules of decorum, the College may provide that party with a different Advisor to conduct cross-examination on behalf of that party.

(o) **Recording Hearings**

(i) Hearings (but not deliberations) are recorded by the College for purposes of review in the event of an appeal. The College does not record conversations that occur between the parties and their Advisors on breaks. The parties may not record the proceedings and no other unauthorized recordings are permitted.

(ii) The Decision Maker(s), the parties, their Advisors, and appropriate administrators of the College will be permitted to listen to the recording in a controlled environment determined by the Director OIE/Title IX Coordinator.

(iii) No person will be given or be allowed to make a copy of the recording without permission of the Director OIE/Title IX Coordinator

(p) **Deliberation, Decision-Making, and Standard of Proof**

(i) The Decision Maker(s) will deliberate in closed session to determine whether the Respondent is responsible or not responsible for the policy violation(s) in question. If a panel is used, a simple majority vote is required to determine the finding.

(ii) The preponderance of the evidence standard of proof is used

(iii) The Decision Maker or the Chair will ensure that each of the parties has an opportunity to review any impact statement submitted by the other party(ies).

    i.   The Decision Maker(s) – at their discretion – consider the statements, but they are not binding.

    ii.  The Decision Maker(s) will review the statements and any pertinent conduct history provided by the appropriate administrator and will determine the appropriate sanction(s) in consultation with other appropriate administrators as required.

(q) **Written Determination by Decision Maker(s)**

(i) The Decision Maker or the Chair will deliberate in private and write a written determination regarding responsibility

29

Exhibit A

and, if applicable, sanction.

(ii) The Decision Maker(s) will then share the letter, including the final determination, rationale, and any applicable sanction(s) with the parties and their Advisors within 20 business days of receiving the Decision Makers deliberation statement.

(iii) The written determination must include:

    i.  Identification of the allegations potentially constituting discrimination, harassment, sexual misconduct or Title IX.

    ii.  A description of the procedural steps taken from the receipt of the formal complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence; and hearings held;

    iii.  A statement of, and rationale for, the result of each allegation, including determination regarding responsibility to the extent the College is permitted to share such information under state or federal law;

    iv.  any sanctions issued which the College is permitted to share according to state or federal law; and

    v.  any remedies provided to the Complainant designed to ensure access to the College's educational or employment program or activity, to the extent the College is permitted to share such information under state or federal law (this detail is not typically shared with the Respondent unless the remedy directly relates to the Respondent).

(iv) The written determination will then be shared with the parties simultaneously. Notification will be made in writing and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official College records, or emailed to the parties' College-issued email or otherwise approved account. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

(v) The written determination of the Decision Maker(s) may be appealed by any party for the basis in the Appeal Grounds.

(r)  **Sanctions**

(i) Factors considered when determining a sanction/responsive action may include, but are not limited to:

    i.  The nature, severity of, and circumstances surrounding the violation;

    ii.  The Respondent's disciplinary history;

    iii.  Previous allegations or allegations involving similar conduct;

    iv.  No other information deemed relevant by the Panel;

    v.  The need for sanctions/responsive actions to bring an end to the discrimination, harassment or sexual misconduct;

    vi.  the need for sanctions/responsive actions to prevent the future recurrence of discrimination, harassment and/or retaliation;

30

Exhibit A

vii. The need to remedy the effects of the discrimination, harassment, and/or retaliation on the Complainant and the community;

viii.      The impact on the parties.

(ii) Sanctions will be implemented as soon as is feasible.

(iii) **Employee Sanctions**

    i.   Warning (verbal or written),

    ii.  Performance improvement/management process,

    iii.  Required counseling,

    iv.  Required training or education,

    v.  Probation,

    vi.  Loss of annual pay increase,

    vii. Loss of oversight or supervisory responsibility,

    viii.    Demotion,

    ix.  Suspension with or without pay,

    x.   Termination,

    xi.  In addition to or in place of the above sanctions, the College may assign any other sanctions as deemed appropriate.

(iv) **Student Sanctions**

    i.   **Warning**- a formal statement that the conduct was unacceptable and a warning that further violation of any College policy, procedure, or directive will result in more severe sanctions/responsive actions

    ii.  **Required Counseling** - a mandate to meet with and engage in either College- sponsored or external counseling to better comprehend the misconduct and its effects.

    iii.  **Probation** - a written reprimand for violation of College policy, providing for more severe disciplinary sanctions in the event that the student or organization is found in violation of any College policy, procedure, or directive within a specified period of time. Terms of the probation will be articulated and may include denial of specified social privileges, exclusion from co-curricular activities, no-contact orders, and/or other measures deemed appropriate.

    iv.  **Suspension** - Termination of student status for a definite period of time not to exceed two years/and or until specific criteria are met. Students who return from suspension are automatically placed on probation through the remainder of their tenure as student at the College. At the discretion of the Director OIE/Title IX Coordinator, this sanction may be noted as a Disciplinary Suspension on the student's official transcript during the period of suspension

31

Exhibit A

v. **Expulsion** - Permanent termination of student status and revocation of rights to be on campus for any reason or to attend the College-sponsored events. This sanction will be noted permanently as a Conduct Expulsion on the student's official transcript subject to any applicable expungement policies.

vi. **Withholding Diploma** - The College may withhold a student's diploma for a specified period of time and/or deny a student participation in commencement activities if the student has an allegation pending or as a sanction if the student is found responsible for an alleged violation.

vii. **Revocation of Degree** - the College reserves the right to revoke a degree previously awarded from the College for fraud, misrepresentation, or other violation of College policies, procedures, or directives in obtaining the degree, or for other serious violations committed by a student prior to graduation.

viii. **Organizational Sanctions** - deactivation, loss of recognition, loss of some or all privileges (including College registration) for a specified period of time.

ix. In addition to or in place of the above sanctions, the College may assign any other sanctions as deemed appropriate

(s) **Remedies**

(i) Where a determination of responsibility for Prohibited Conduct is made, the College will provide remedies to a complainant designed to restore or preserve equal access to the College's education program or activity. Such remedies may include the same individualized services provided as supportive measures; however, remedies need not be non-disciplinary or non-punitive and need not avoid burdening the respondent. The Director of Institutional Equity is responsible for effective implementation of remedies.

(ii) Where the final determination has indicated that remedies will be provided, the complainant can then communicate separately with the Director of Institutional Equity or their designee to discuss what remedies are appropriately designed to preserve or restore the complainant's equal access to education. Remedies for a complainant which do not affect the respondent must not be disclosed to the respondent.

(t) **Withdrawal or Resignation While Charges Pending**

(i) Students

i. Should a student decide to not participate in the resolution process and/or withdraws from the College, the process proceeds absent their participation to a reasonable resolution.

ii. Should a student Respondent permanently withdraw from the College, the resolution process ends, as the College no longer has disciplinary jurisdiction over the withdrawn student. However, the College will continue to address and remedy any systemic issues, variables that have contributed to the alleged violation(s), and any ongoing effects of the alleged harassment or discrimination.

iii. During the resolution process, the College may put a hold on a Responding student's transcript or place a note on a Responding student's transcript or dean's disciplinary certification that a disciplinary matter is pending.

iv. A hold will be placed on their ability to be readmitted.

v. If the student only withdraws or take a leave for a specified period of time (e.g. one semester or term), the

32

    resolution process will continue and that student is not permitted to return to the College until they meet with the Office of Institutional Equity and/or Student Affairs or unless and until all sanctions have been satisfied.

(ii) **Employees**

i. Should an employee resign with unresolved allegations pending, the resolution process ends, as the College no longer has disciplinary jurisdiction over the resigned employee. However, the College will continue to address and remedy any systemic issues, variables that contributed to the alleged violation(s), and any ongoing effects of the alleged harassment or discrimination.

ii. The employee who resigns with unresolved allegations pending is not eligible for rehire with the College, and the records retained by the Director OIE/Title IX Coordinator will reflect that status.

iii. All College responses to future inquiries regarding employment references for that individual will include that the former employee resigned during a pending disciplinary matter.

iv. Should an employee resign with unresolved allegations pending, the resolution process ends, as the College no longer has disciplinary jurisdiction over the resigned employee. However, the College will continue to address and remedy any systemic issues, variables that contributed to the alleged violation(s), and any ongoing effects of the alleged harassment or discrimination.

v. The employee who resigns with unresolved allegations pending is not eligible for rehire with the College, and the records retained by the Director OIE/Title IX Coordinator will reflect that status.

vi. All College responses to future inquiries regarding employment references for that individual will include that the former employee resigned during a pending disciplinary matter.

(u) **Appeals**

(i) All requests for appeals of a written determination must be submitted in writing to the Director OIE/Title IX Coordinator within five (5) days of the issuance of the written determination to the parties.

(ii) Appeals are reviewed by the respective Appeals Officer.

(iii) The decision of the Appeals Officer is final.

(v) **Appeals Officer**

(i) For complaints of Prohibited Conduct (Title IX), the College shall appoint an independent outside jurist to serve as the Appeals Office.

(ii) For all other complaints, the Director of Compliance and Continuity shall serve as the Appeals Officer for all decisions involving allegations of students against students or students against employees; The Director of Human Resources will serve as the Appeals Officer for all decisions involving allegations of employee against employee.

(w) **Appeal Grounds**

(i) The Appeals Officer will review the appeal request(s) subject to the following grounds:

i. The Procedural error or omission occurred that impacted the outcome of the hearing (e.g. substantiated bias, material deviation from established procedures).

    ii. To consider new evidence unknown or unavailable during the investigation, that could impact the original finding or sanction. A summary of this new evidence and its potential impact must be included.

    iii. The Director OIE/Title IX Coordinator, Deputy Institutional Equity Coordinators, Investigators or Decision Maker had a conflict of interest or bias that affected the outcome of the matter.

(ii) The original finding and sanction/responsive actions will stand if the appeal is not timely or is not based on the grounds listed (above), and such a decision is final.

    i. The party requesting appeal must show that one or more of the appeal grounds has been met, and the other party or parties may, provide a rebuttal statement, or appeal request if there are sufficient grounds.

    ii. The original finding and sanction are presumed to have been decided reasonably and appropriately.

(iii) When any party requests an appeal, the Director OIE/Title IX Coordinator will share the appeal request with the other party(ies), who may file a response within three (3) days of receiving a copy of the appeal, and/or bring their own appeal on separate grounds within the original appeal timeframe.

    i. If new grounds are raised, the original appealing party will be permitted to submit a written response to these new grounds within three (3) days. Any response or appeal request will be shared with each party.

    ii. The Appeals Officer will review the appeals request within three (3) business days of completing the pre-appeal exchange of materials.

    iii. If the grounds do not satisfy the appeal requirements listed above in this section or the appeal is not timely, the Appeal Officer may dismiss the appeal.

(iv) When the Appeals Officer finds that at least one of the grounds is met by at least one party, additional principles governing the hearing of appeals will include the following:

    i. Decisions by the Decision Maker are to be deferential to the original decision, making changes to the finding only when there is clear error and to the sanction/responsive action only if there is a compelling justification to do so.

    ii. Appeals are not intended to provide for a full re-hearing (de novo) of the allegation(s). In most cases, appeals are confined to a review of the written documentation or record of the original hearing and pertinent documentation regarding the grounds for appeal.

    iii. An appeal is not an opportunity for Appeals Officer to substitute their judgment for that of the original Panel merely because they disagree with its finding and/or sanctions.

    iv. The Appeals Officer may consult with the Decision Maker Chair on questions of procedure or rationale for clarification, if needed.

    v. Appeals granted based on new evidence should normally be remanded to the Director OIE/Title IX Coordinator and/or Decision Maker for reconsideration.

34

Exhibit A

(v) The Director OIE/Title IX Coordinator will confer with the appeals panel/Chair, incorporate the results of any remanded grounds and the rationale for the decision, and render a written decision on the appeal to all parties within three (3) days from the hearing of the appeal or remand.

    i.   The letter of outcome for the appeal will be shared with the parties without significant time delay between notifications. Notification will be made in writing and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official College records, or emailed to the parties' College-issued email account.

    ii.   Once mailed, emailed and/or received in-person, notice will be presumptively delivered.

    iii.  The letter of outcome for the appeal will specify the finding on each alleged policy violation, any sanctions that may result which the College is permitted to share according to state or federal law, and the rationale supporting the essential findings to the extent the Collage is permitted to share under state or federal law.

    iv.  The letter will also include information that this is a final result.

    v.   Once an appeal is decided, the outcome is final: further appeals are not permitted, even if a decision or sanction is changed on remand (except in the case of a new hearing).

(vi) In rare cases where a procedural or substantive error cannot be cured by the original Panel, as in cases of bias, the appeals panel may recommend a new hearing with a new Panel.

    i.   The results of a remand to a Panel cannot be appealed.

    ii.   The results of a new hearing can be appealed, once, on any of the three available appeal grounds.

**(x)  Record Retention**

(i) College will maintain for a period of at least seven years records of:

    i.   Each discrimination/harassment/sexual misconduct/Title IX or retaliation investigation including any determination regarding responsibility and any audio or audiovisual recording or transcript required under federal regulation;

    ii.   Any disciplinary sanctions imposed on the Respondent;

    iii.  Any remedies provided to the Complainant designed to restore or preserve equal access to the College's education program or activity;

    iv.  Any appeal and the result therefrom;

    v.   Any Informal Resolution and the result therefrom;

    vi.  All materials used to train Title IX Coordinators, Investigators, Decision Maker, and any person who facilitates an Informal Resolution process. College will make these training materials publicly available on College's website. (Note: If the College does not maintain a website, the College must make these materials available upon request for inspection by members of the public.); and

35

vii. Any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment, including:

   1.  The basis for all conclusions that the response was not deliberately indifferent;

   2.  Any measures designed to restore or preserve equal access to the College's education program or activity; and

   3.  If no supportive measures were provided to the Complainant, document the reasons why such a response was not clearly unreasonable in light of the known circumstances.

viii.   College will also maintain any and all records in accordance with state and federal laws

**(y)  Disabilities Accommodations in Formal Grievance Process**

(i) The College is committed to providing reasonable accommodations and support to qualified students, employees, or others with disabilities to ensure equal access to the resolution process at the College.

(ii) Anyone needing such accommodations or support should contact the Student Accessibility Services Office (SAS) or appropriate Leave Coordinator in Human Resources, who will review the request and, in consultation with the person requesting the accommodation and the Director OIE/Title IX Coordinator, determine which accommodations are appropriate and necessary for full participation in the process.

Effective date: January 28, 2021

36

Exhibit A

# EXHIBIT C

Exhibit A

**AGREEMENT**

*BETWEEN*

**CUYAHOGA COMMUNITY COLLEGE**

*AND*

**THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS (AAUP),
CUYAHOGA COMMUNITY COLLEGE CHAPTER**

**Effective August 16, 2019 to August 15, 2022**

Exhibit A

## TABLE OF CONTENTS

| SUBJECT | ARTICLE | PAGE NO. |
|---|---|---|
| PURPOSE | ARTICLE 1 | 1 |
| RECOGNITION | ARTICLE 2 | 1 |
| MEMBERSHIP | ARTICLE 3 | 2 |
| CHECKOFF | ARTICLE 4 | 2 |
| STATEMENT OF BOARD RIGHTS AND RESPONSIBILITIES | ARTICLE 5 | 3 |
| CONDITIONS OF EMPLOYMENT AND PROFESSIONAL RESPONSIBILITIES OF FULL-TIME FACULTY | ARTICLE 6 | 4 |
| RETRENCHMENT: TENURED FACULTY | ARTICLE 7 | 12 |
| REDUCTION IN FORCE: TENURE-TRACK FACULTY | ARTICLE 8 | 13 |
| PERSONAL LEAVE | ARTICLE 9 | 14 |
| SICK LEAVE | ARTICLE 10 | 14 |
| PROFESSIONAL IMPROVEMENT LEAVE | ARTICLE 11 | 15 |
| MILITARY LEAVE OF ABSENCE | ARTICLE 12 | 16 |
| JURY DUTY | ARTICLE 13 | 16 |
| LEAVES OF ABSENCE WITHOUT PAY | ARTICLE 14 | 16 |
| PROFESSIONAL DEVELOPMENT AND TRAVEL | ARTICLE 15 | 16 |
| COMPENSATION | ARTICLE 16 | 17 |

i

Exhibit A

## TABLE OF CONTENTS

| SUBJECT | ARTICLE | PAGE NO. |
|---|---|---|
| LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE | ARTICLE 17 | 17 |
| HEALTH CARE | ARTICLE 18 | 18 |
| DISABILITY INSURANCE | ARTICLE 19 | 19 |
| HEALTH AND WELLNESS | ARTICLE 20 | 19 |
| SUMMER SCHOOL | ARTICLE 21 | 20 |
| RETIREMENT | ARTICLE 22 | 26 |
| FACULTY BENEFITS AND PRIVILEGES | ARTICLE 23 | 26 |
| PATENTS, COPYRIGHTS AND INTELLECTUAL PROPERTY | ARTICLE 24 | 27 |
| CCC-AAUP RIGHTS AND RESPONSIBILITIES | ARTICLE 25 | 28 |
| FACULTY EVALUATION PROCEDURE | ARTICLE 26 | 29 |
| ACADEMIC FREEDOM AND RESPONSIBILITY | ARTICLE 27 | 33 |
| TUITION REMISSION | ARTICLE 28 | 34 |
| PERSONNEL FILES | ARTICLE 29 | 35 |
| NON-DISCRIMINATION | ARTICLE 30 | 36 |
| COLLEGE GOVERNANCE | ARTICLE 31 | 36 |
| MEET AND CONFER | ARTICLE 32 | 37 |
| GRIEVANCE PROCEDURE | ARTICLE 33 | 38 |
| NO STRIKE/NO LOCKOUT | ARTICLE 34 | 40 |
| PROFESSIONAL ACTIVITIES OUTSIDE THE COLLEGE | ARTICLE 35 | 41 |

ii

Exhibit A

## TABLE OF CONTENTS

| SUBJECT | ARTICLE /APPENDIX | PAGE NO. |
|---|---|---|
| LEGALITY | ARTICLE 36 | 41 |
| TENURE POLICY | ARTICLE 37 | 41 |
| DISTANCE LEARNING | ARTICLE 38 | 42 |
| DURATION | ARTICLE 39 | 45 |
| EXECUTION | ARTICLE 40 | 46 |
| FACULTY SALARY SCHEDULE FOR 36 WEEKS OF SERVICE: ACADEMIC YEAR 2019-2020 | APPENDIX A | 47 |
| FACULTY SALARY SCHEDULE FOR 36 WEEKS OF SERVICE: ACADEMIC YEAR 2020-2021 | APPENDIX B | 48 |
| FACULTY SALARY SCHEDULE FOR 36 WEEKS OF SERVICE: ACADEMIC YEAR 2021-2022 | APPENDIX C | 49 |
| POSITION SPECIFICATION: INSTRUCTIONAL AND NON-INSTRUCTIONAL FACLUTY | APPENDIX D | 50 |
| ACADEMIC RANK POLICY | APPENDIX E | 52 |
| IMPLEMENTATION PROCEDURES ON ACADEMIC RANK | APPENDIX F | 55 |
| REIMBURSEMENT OF EXPENSES-COLLEGE MANDATED | APPENDIX G | 58 |
| COLLEGE CONTRIBUTIONS TO THE STATE TEACHER RETIREMENT SYSTEM FOR PERSONS TAKING PROFESSIONAL IMPROVEMENT LEAVE UNDER PLAN A | APPENDIX H | 59 |
| TAX-SHELTERED ANNUITY AND DEFERRED COMPENSATION PROGRAM | APPENDIX I | 60 |

iii

Exhibit A

## TABLE OF CONTENTS

| SUBJECT | APPENDIX/SIDE LETTER | PAGE NO. |
|---|---|---|
| HEALTH CARE ELECTIVES | APPENDIX J | 61 |
| FAMILY MEDICAL LEAVE ACT | APPENDIX K | 66 |
| GOVERNANCE | APPENDIX L | 71 |
| IBB CONSENSUS STATEMENT: FMLA AND SICK TIME | SL-1 | 77 |
| IBB CONSENSUS STATEMENT: SERVICE ACTIVITY CREDIT COMMITTEE | SL-2 | 78 |
| COLLEGE CREDIT PLUS (CCP) | SL-3 | 80 |
| LONG TERM DISABILITY INSURANCE (ARTICLE 19) | SL-4 | 82 |
| FACULTY EVALUATION PROCEDURE (ARTICLE 26) | SL-5 | 83 |
| COLLEGE-WIDE STAFFING DECISION | SL-6 | 84 |
| WORKPLACE CORE CURRICULA | SL-7 | 85 |
| COUNSELING FACULTY APPOINTMENT SCHEDULE MODIFICATION | SL-8 | 86 |
| DISTANCE LEARNING (ARTICLE 38) | SL-9 | 88 |
| PROFESSIONAL DEVELOPMENT AND TRAVEL (ARTICLE 15) | SL-10 | 89 |
| FMLA APPLICATION AND EXAMPLES | SL-11 | 90 |
| EMERGING TEACHING & LEARNING INNOVATIONS COMMITTEE | SL-12 | 93 |

Exhibit A

## TABLE OF CONTENTS

| SUBJECT | SIDE LETTER | PAGE NO. |
|---|---|---|
| FACULTY GRANTS ADVISORY COMMITTEE | SL13 | 95 |
| NON-CREDIT FACULTY TEACHING OPPORTUNITIES | SL14 | 96 |
| SALARY ADVANCEMENT | SL15 | 97 |
| YEAR LONG SCHEDULING PROJECT | SL16 | 98 |
| FACULTY ACCEPTING ADMINISTRATIVE ASSIGNMENTS | SL17 | 99 |
| FACULTY ROLL CLARIFICATION | SL18 | 100 |
| FACULTY ADVOCACY AND SECOND SEMESTER FIRST YEAR EXPERIENCE (FYE) | SL19 | 101 |

v

Exhibit A

## ALPHABETICAL TABLE OF CONTENTS

| SUBJECT | ARTICLE | PAGE NO. |
|---|---|---|
| ACADEMIC FREEDOM AND RESPONSIBILITY | ARTICLE 27 | 33 |
| CCC-AAUP RIGHTS AND RESPONSIBILITIES | ARTICLE 25 | 28 |
| COLLEGE GOVERNANCE | ARTICLE 31 | 36 |
| COMPENSATION | ARTICLE 16 | 17 |
| CONDITIONS OF EMPLOYMENT AND PROFESSIONAL RESPONSIBILITIES OF FULL-TIME FACULTY | ARTICLE 6 | 4 |
| DISABILITY INSURANCE | ARTICLE 19 | 19 |
| DISTANCE LEARNING | ARTICLE 38 | 42 |
| DURATION | ARTICLE 39 | 45 |
| EXECUTION | ARTICLE 40 | 46 |
| FACULTY BENEFITS AND PRIVILEGES | ARTICLE 23 | 26 |
| FACULTY EVALUATION PROCEDURE | ARTICLE 26 | 29 |
| GRIEVANCE PROCEDURE | ARTICLE 33 | 38 |
| HEALTH CARE | ARTICLE 18 | 18 |
| HEALTH AND WELLNESS | ARTICLE 20 | 19 |
| JURY DUTY | ARTICLE 13 | 16 |

Exhibit A

## ALPHABETICAL TABLE OF CONTENTS

| SUBJECT | ARTICLE | PAGE NO. |
|---|---|---|
| LEAVES OF ABSENCE WITHOUT PAY | ARTICLE 14 | 16 |
| LEGALITY | ARTICLE 36 | 41 |
| LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE | ARTICLE 17 | 17 |
| MEET AND CONFER | ARTICLE 32 | 37 |
| MEMBERSHIP | ARTICLE 3 | 2 |
| MILITARY LEAVE OF ABSENCE | ARTICLE 12 | 16 |
| NO STRIKE/NO LOCKOUT | ARTICLE 34 | 40 |
| NON-DISCRIMINATION | ARTICLE 30 | 36 |
| PATENTS, COPYRIGHTS AND INTELLECTUAL PROPERTY | ARTICLE 24 | 27 |
| PERSONAL LEAVE | ARTICLE 9 | 14 |
| PERSONNEL FILES | ARTICLE 29 | 35 |
| PROFESSIONAL ACTIVITIES OUTSIDE THE COLLEGE | ARTICLE 35 | 41 |
| PROFESSIONAL IMPROVEMENT LEAVE | ARTICLE 11 | 15 |
| PROFESSIONAL DEVELOPMENT AND TRAVEL | ARTICLE 15 | 16 |
| PURPOSE | ARTICLE 1 | 1 |
| RECOGNITION | ARTICLE 2 | 1 |
| REDUCTION IN FORCE: TENURE-TRACK FACULTY | ARTICLE 8 | 13 |
| RETIREMENT | ARTICLE 22 | 26 |
| RETRENCHMENT: TENURED FACULTY | ARTICLE 7 | 12 |

Exhibit A

## ALPHABETICAL TABLE OF CONTENTS

| SUBJECT | ARTICLE | PAGE NO. |
|---|---|---|
| SICK LEAVE | ARTICLE 10 | 14 |
| STATEMENT OF BOARD RIGHTS AND RESPONSIBILITIES | ARTICLE 5 | 3 |
| SUMMER SCHOOL | ARTICLE 21 | 20 |
| TENURE POLICY | ARTICLE 37 | 41 |
| TUITION REMISSION | ARTICLE 28 | 34 |

viii

Exhibit A

## ARTICLE 1
## PURPOSE

**Section 1.01.** This Memorandum of Agreement is entered into between the Cuyahoga Community College District (hereinafter referred to as the "College") and the American Association of University Professors, Cuyahoga Community College Chapter (hereinafter referred to as the "CCC-AAUP").

**Section 1.02.** This Memorandum of Agreement is designed to provide a fair and reasonable method by which faculty members covered by this Agreement can participate through their exclusive bargaining agent in the establishment of terms and conditions of their employment and to establish an orderly procedure for the resolution of differences between the College and the faculty who are members of the bargaining unit.

## ARTICLE 2
## RECOGNITION

**Section 2.01.** Pursuant to the certification by the American Arbitration Association of the results of the Representation Election conducted in accordance with the Conditions and Procedures established in the Pre-election Agreement as approved by the Cuyahoga Community College District Board on September 29, 1977, the College hereby recognizes the CCC-AAUP as the exclusive representative for the purpose of collective bargaining with respect to wages, hours and other terms and conditions of employment for all members of the bargaining unit described below.

**Section 2.02.** The members of such bargaining unit are full-time tenure and tenure-track faculty members, including instructional faculty, counselors and librarians.

**Section 2.03.** The following categories of employees are excluded from the bargaining unit:

A.   **All Supervisory Employees, including all Deans and Directors.**  "Supervisor" means any individual who has authority, in the interest of the public employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other public employees; or to responsibly direct them; or to adjust their grievances; or to effectively recommend such action, if the exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment.

B.   **All Confidential Employees.**  "Confidential Employees" means any employee whose functional responsibilities or knowledge in connection with the issues involved in dealings between the employer and its employees would make their membership in an employee organization incompatible with their official duties.

C.   **All Management Level Employees,** including all Deans and Directors except faculty coordinators who have more than fifty percent (50%) of their assignments in direct instruction of students. "Management Level Employees" means any individual who formulates policy on behalf of the public employer or who may reasonably be required on behalf of the public employer to assist in preparation for the conduct of collective negotiations, administer collectively negotiated agreements, or has a major role in personnel administration.

D.   All faculty members who are not hired as tenure-track, i.e., including those employed as full-time lecturers.

E.   All part-time faculty members.

1

F.   All instructional faculty, counselors, faculty coordinators, and librarians spending fifty percent (50%) or more of their assignment in supervisory and/or administrative activities.

G.   The faculty coordinator position is a non-management position. Duties and responsibilities are advisory and under the direction of a Dean/Director.

Section 2.04.   Where used in this Agreement, the term "faculty" includes all employees of the bargaining unit, except where otherwise specifically stated.

Section 2.05. Gender and Plural. Whenever the context so requires, the singular shall be construed to include the plural; and words in the plural the singular; and words whether in the masculine, feminine, or gender neutral shall be construed to include all of the aforementioned genders. By the use of either the masculine or feminine genders it is understood that use is for convenience purposes only and it not be interpreted to be discriminatory by reason of sex.

Section 2.06. Headings.   It is understood and agreed that the use of headings before Articles or Sections is for convenience only and that no headings shall be used in the interpretation of either Article or Section nor affect the interpretation of any Article or Section.

## ARTICLE 3
## MEMBERSHIP

Section 3.01.   Membership in the CCC-AAUP is not compulsory. Members of the bargaining unit have the right to join or not to join the CCC-AAUP as each may decide. Neither party shall coerce or discriminate against a faculty member in this regard. However, the parties recognize that as the exclusive bargaining agent and representative for all members of the bargaining unit, which includes both members and non-members of the CCC-AAUP, the CCC-AAUP performs an important service for members of the bargaining unit and contributes toward fulfillment of the mission of the institution.  Notwithstanding the foregoing, the CCC-AAUP and the College recognize and acknowledge that not all members of the bargaining unit necessarily agree with the CCC-AAUP's positions.

## ARTICLE 4
## CHECKOFF

Section 4.01.   The College will deduct any initiation fees and dues levied in accordance with the Constitution and Bylaws of the CCC-AAUP from the pay of members of the bargaining unit covered by this agreement upon receipt from the CCC-AAUP of individual signed authorization cards executed by the member for that purpose and bearing his signature.  Neither an agency fee nor any other payment to the CCC-AAUP may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, without the employee's clear and affirmative consent to said deduction(s). All authorized deductions will be made from the member's pay on a regular basis. All deductions shall be transmitted to the CCC-AAUP no later than the fifteenth (15th) day following the end of the month in which the deduction is made, together with a list of the members of the bargaining unit paying such dues by payroll deduction, and upon receipt, the CCC-AAUP shall assume full responsibility for the disposition of all funds deducted.

Section 4.02.  The College's obligation to make deductions shall terminate automatically upon receipt of revocation of authorization during the 15-day period commencing on June 1 and ending on June 15 of each year or upon the termination of employment or transfer to a job classification outside the bargaining unit.

2

Exhibit A

Section 4.03. The CCC-AAUP shall indemnify and hold the College and any of its agents harmless against any and all claims, demands, suits and other forms of liability that may arise out of, or by reason of action taken or not taken by the College for the purpose of complying with any of the provisions of this Article, or in reliance on any notice or authorization form furnished under any of the provisions of this Article.

Section 4.04. The College shall promptly furnish the CCC-AAUP with the names of all newly hired employees covered by this Agreement together with their addresses as they appear on the records of the College.

Section 4.05. Newly-hired employees in the bargaining unit will conform to job description requirements and receive all wages and benefits of this Agreement.

## ARTICLE 5
## STATEMENT OF BOARD RIGHTS AND RESPONSIBILITIES

Section 5.01. The Board of Trustees reserves and retains, solely and exclusively, all Board rights, powers and authority, including the right of the Board of Trustees, acting through the Administration, to determine and fulfill the mission of the College, determine staffing policy, and in all other respects to plan, manage, evaluate, administer, govern, control and direct its personnel and operations, except as specifically limited by explicit provisions of this Agreement, or other mutually agreed upon documents. Such exclusive Board rights include, but are not limited to, the following:

A.  Determine location of campuses, satellites and other facilities and equipment of the College;

B.  Establish, modify and enforce reasonable policies, rules, regulations and standards for faculty performance;

C.  Determine the financial policies and procedures of the College, including the exclusive right to allocate and expend all funds of the College;

D.  Determine position qualifications, recruit and appoint faculty;

E.  Assign work to faculty members;

F.  Evaluate and determine professional competence, grant tenure, promote, supervise, discipline for just cause, discharge for just cause and demote for just cause, lay off, transfer among campuses after consulting with the faculty, assign, schedule, and reappoint faculty;

G.  Establish, define, modify and abolish job classifications;

H.  Initiate, design, develop, adopt, modify and delete degree programs, certificate and award programs, credit courses and non-credit activities and approve and authorize the courses and programs to be offered by the College;

I.  Determine program and course curriculum content, objectives, grading standards and procedures; and

3

Exhibit A

J.  Do all things appropriate and incidental to any of its rights, powers, prerogatives, responsibilities and authority; and in all respects to carry out the ordinary and customary functions of the administration, subject only to the procedures and criteria governing the exercise of these rights as are expressly provided for in this Agreement.

## ARTICLE 6
## CONDITIONS OF EMPLOYMENT AND PROFESSIONAL
## RESPONSIBILITIES OF FULL-TIME FACULTY

Section 6.01. Each member of the instructional faculty will be responsible for teaching a standard of 30 ESU's per academic year with a minimum of 9 and a maximum of 18 ESU's per academic semester. Because of variations in enrollment patterns and course sequences, other instructional assignment arrangements shall be permissible so long as the total number of assigned equated semester units is maintained. The College administration may equalize individual faculty members' instructional assignments over a two-year period if deemed appropriate. A faculty member's ability to draw upon carryover ESU's will not supersede the administration's right to assign workload providing such assignment does not result in the faculty member having to accept part-time pay.

Section 6.02.  The ESU shall be the college-wide standard unit of measurement for calculating the direct instructional assignments of teacher/faculty members based on the standard of a lecture presentation, wherein one (1) lecture hour of class meeting per week equals one (1) ESU per standard academic semester, upon which all other instructional classification variations are based. Exceptions to this standard are English 1010 and 1020, which shall be assigned 1.2 ESU's for each lecture hour of class meeting per week. In this context, fifty (50) minutes (one laboratory hour) of presentation for all non-clinical laboratory sections (as defined in the official College catalog or otherwise approved by the Board of Trustees) per week for a standard academic semester shall be equated at .85 ESU's for each lecture hour of class meeting per week. Nursing clinical hours shall be equated at 1.0 ESU for each clinical hour per week.

Section 6.03. Professional Responsibilities.

A.  The avowed purpose of the College is to ensure excellence of instruction and student development.

1.  The Board of Trustees, the CCC-AAUP and the administration are all committed to these goals. Inherent elements in this commitment are the relationships between faculty workload, standards and performance, student learning and professional responsibilities of faculty. It is recognized that in application to dedicated professionals, it is not always possible to quantify all expected performance outcomes. It is essential, however, in the context of institutional responsibility to maintain standards of accountability with regard to professional services performed. For purposes of planning the human resource needs of the College in accordance with available fiscal resources, it is important that standards of performance for institutional employees be established and that such standards are communicated to all full-time contracted faculty.

2.  The purpose of this article is to set forth in concise manner basic College-wide standards related to full-time faculty workload and professional responsibilities.

B.  Bargaining Unit Members (tenure-track status: probationary or tenured) shall consist of the following categories of employee:

4

Exhibit A

1.    Instructional faculty
2.    Librarian faculty
3.    Counseling faculty

NOTE:  Those individuals who have a portion of their responsibilities devoted to academic area faculty coordination shall be considered bargaining unit members. The faculty coordination portion of their assignment shall be less than fifty percent (50%) of their equated semester unit (ESU) teaching load.

C.    All full-time contracted faculty of the College shall carry out professional duties in the College consistent with written position descriptions (included in Appendix D) which contain stated duties and responsibilities. Work or professional performance objectives have been developed upon which evaluations of faculty will be based. Evaluations of all faculty will be made according to Article 26. Such evaluations will become a part of the faculty member's personnel file.

D.    All bargaining unit members may be assigned after appropriate consultation, to one (1) or more campuses of the institution or other instructional sites subject to the program needs within the educational delivery system of the College. Such assignment may be adjusted each semester to achieve effective utilization of personnel resources. Assignments will be made during five (5) days of the standard academic week (Monday through Friday). Full-time contracted faculty may be assigned weekend or evening or off-campus credit responsibilities as part of their regular load. Campus Presidents/College Vice Presidents or their designees shall be responsible for determining faculty assignments within the total College.

E.    The standard contract year for full-time contracted faculty consists of 180 paid days between August 1st and the following May 31st beginning with the mutually agreed upon academic calendar for Fall 2019. These days are comprised of 155 days devoted to instruction, assessment/evaluation and five (5) holidays. The remaining contract time is comprised of six (6) mandatory days, and additional Faculty Service and Development which is the nominal equivalent of fourteen (14) days as described below. Mandatory days of service for instructional faculty shall commence no sooner than 10 days after the due date for grades at the completion of the final summer term.  For full-time teacher/faculty members, the standard contract year is normally subdivided as follows:

1.    Instruction/evaluation 31.0 weeks 155 days;

2.    Five (5) Holidays, which include Labor Day, Veteran's Day, Thanksgiving Day, day after Thanksgiving Day, and Martin Luther King Jr. Day;

3.    Six (6) mandatory days, as defined in section 6.10;

4.    Twenty-eight (28) Service Credits, which is the nominal equivalent of 14 days, as defined in section 6.11.

F.    The standard academic semester for full-time contracted faculty is normally sixteen (16) weeks or eighty (80) days (including instruction/evaluation/holidays).

5

Exhibit A

1. Consistent with the standards established by the Ohio Board of Regents, classroom instruction/evaluation activities are normally to be completed within the eighty (80) day instructional semester.

   a. Evaluation activities, including academic progress reports and final examinations for each instructional section, will be considered an integral part of the eighty (80) days of instruction/evaluation/holidays. All classes shall utilize an identifiable finals assessment period for an appropriate academic experience. A finals assessment week as scheduled by the College will occur during the last week of the regular eighty (80) day semester. Exceptions may be made for part-of-term and flexibly scheduled courses. Academic progress reports must be submitted during the assigned time period of the applicable term (full, part-of-term, or flexible). Any changes in current practice regarding academic progress reports must be made in consultation with the CCC-AAUP.

   b. Instructional time lost during a scheduled standard academic semester because of official College closings resulting from unanticipated factors will be made up by the addition of instructional days to the official standard academic semester, after negotiations with the CCC-AAUP with regard to the scheduling of make-up days.

G. The standard academic week for all full-time contracted faculty consists of a minimum of thirty-seven and one-half (37.5) hours of defined responsibility. Under ordinary circumstances, these hours will be divided equally Monday through Friday. In those situations where a portion of a faculty member's responsibilities is carried out on a sixth (6th) day in the standard academic week or in a combination of day and evening assignments, appropriate adjustments in the Monday through Friday schedule will be made. The impact of the minimum thirty-seven and one-half (37.5) hour standard academic week varies for the different categories of faculty covered by this Article.

1. Instructional faculty members will be responsible for specified duties and responsibilities assigned within the thirty-seven and one-half (37.5) hour standard academic week. Of the thirty-seven and one-half (37.5) hours, a minimum of thirty hours of professional responsibilities will be assigned and accounted for on campus or at other College-assigned locations where scheduled instructional or student contact activities are conducted. Other professional responsibilities that need to be discharged at off-campus locations are to be accounted for beyond the aforementioned thirty-hour minimum. Specific professional duties and responsibilities are included in the position descriptions for instructional/faculty members and are determined in conjunction with the appropriate administrator.

2. Full-time contracted counselor/faculty members and librarian/faculty members will be responsible for specified duties and responsibilities assigned within the thirty-seven and one-half (37.5) hour standard academic week. These professional duties and responsibilities will be discharged and accounted for on campus or at other College-assigned locations where scheduled activities are conducted. Specific duties and responsibilities are included in the position descriptions for these roles and are determined in conjunction with the appropriate administrator. Counseling faculty schedules will follow the "Counseling Faculty Appointment Schedule Modification" agreement between CCC and the CCC-AAUP dated October 1, 2009.

6

3.    Each full-time contracted instructional faculty is to be available in an assigned faculty office for scheduled and unscheduled student conferences as per Section 6.09 of this Article, at times posted and convenient both to students enrolled in the faculty member's classes and to prospective students seeking information. Other professional responsibilities such as class preparation and evaluation may be discharged during the specified office hours if student conferences are not taking place. Appropriate approved adjustments will be made for instructional faculty who have off-campus instructional assignments and/or assignments at more than one (1) site.

4.    Equated Semester Units (ESU's)

    a.    Determination as to lecture, laboratory or other instructional classification of a course shall be based upon the Board-approved course description contained in the official College catalog or otherwise officially approved by the Board.

H.    Full-time contracted faculty may, as time permits, request or be requested to assume an additional assignment for extra remuneration.

I.    Members of the full-time contracted faculty may be assigned committee responsibilities, departmental responsibilities, community service responsibilities, responsibilities relating to students (activity and educational advising) and other professional responsibilities consistent with the mission and role of the institution. Such assignments shall be undertaken by the faculty as a part of their professional assignment. These indirect workload assignments will be made on a rotating basis when feasible and will be accounted for within the established professional assignment system of the College.

1.    Teacher/faculty members employed during the summer session will be responsible for carrying out related professional responsibilities based on the number of ESU's taught for which compensation is being paid on the basis of a teacher/faculty member's total full-time professional assignment during the standard academic year.

2.    The Executive Vice President for Academic and Student Affairs and the Campus Presidents/College Vice Presidents have been named approving authorities within their designated areas of responsibility and are authorized to assign related professional responsibilities as described above. Such assignments are to be in writing.

3.    Indirect workload responsibilities and accomplishments are to be reported by each bargaining unit member to the appropriate administrator on forms which have been specifically developed for this purpose and in accordance with the established schedule.

J.    Essential to the implementation of College-wide policy standards is the maintenance of flexibility at the campus department level to plan appropriately to assure proper application of differing teaching-learning strategies and other variables related to instructional program delivery. To assure maximum flexibility within the policy standards established herein, campus departmental-level instructional and program planning should take into account the following strategies:

1.    Smaller classes could be merged into larger classes to increase the academic unit's student credit hour output yields.

7

Exhibit A

2.   Instructional faculty may be assigned to teach additional ESU's up to eighteen (18) ESU's per semester. This strategy should not be used arbitrarily and should be implemented only after other means for achieving the unit's student credit hour standard have been used. If faculty of the College teach within the regular thirty six (36) week standard academic year (of which 32 weeks are for instruction/evaluation/holidays), additional credit courses beyond thirty (30) ESU's, as part of the effort to achieve the Board policy standards measured in student credit hours, then such additional ESU's up to a limit of 3.00, may be carried forward to the succeeding academic semester/academic year or compensated at the applicable part-time faculty rate at the option of the teacher/faculty member. Should a teacher/faculty member teach beyond the 3.00 limit, then any additional ESU's beyond 3.00 will be compensated at the applicable part-time faculty rate, but, except under special circumstances, no bargaining unit member may accept an overage of more than 14 ESU's per academic year.

K.   Faculty will carry out workload duties in a professional manner. These include:

1.   Presence at contractual activities (e.g. mandatory day activities, office hours, final examinations);

2.   Timelines of contractual activities (e.g. first day syllabi, final grading reporting, academic progress reporting, never attending reporting, early alert leave reporting, responding to student inquiries);

3.   Clear communications (e.g. syllabi, changes in class activity or faculty schedule);

Faculty who repeatedly fail to fulfill the contractual professional responsibilities listed above may be subject to College disciplinary policy.

Section 6.04.  Lab-Lecture/English Composition Ratios and other Workload Provisions.

A.   All laboratory sections as defined in the official College catalog or otherwise approved by the Board of Trustees, will be equated on a .85:1 basis.  Nursing clinicals shall be equated at 1.0 ESU for each clinical hour per week.

B.   English 1010 and 1020 courses will be equated on a 1.2:1 basis.

C.   The College and the AAUP will monitor and evaluate the English Composition courses in the 090 series, as defined in the official College catalog or otherwise approved by the Board of Trustees, in order to ensure that the required workload of this series of English Composition courses remains fair, reasonable and equitable.

D.   Academic credit instruction offered at off-campus sites shall be made available to faculty to teach as part of their 30 ESU's provided the programmatic needs, as defined by the College, are met.

Section 6.05.  In addition to those ESU's reassigned for non-teaching responsibilities related to professional improvement leaves, CCC-AAUP leadership, Joint Faculty Senate Council participation, faculty coordination, and the reassignment of faculty to perform administration roles, the College also agrees to provide a minimum of 200 ESU's per fiscal year for those functions determined to further enhance the

8

Exhibit A

instructional/instructionally-related processes of the institution, with at least 20 of these to be applied to student success, innovations and initiatives. The intent is that all 200 ESU's be awarded each year.

A.  Those areas for which ESU's may be reassigned based on need are the following:

1.  Activities related to program or course development;

2.  Activities related to faculty professional development;

3.  Activities related to program accreditation/re-accreditation;

4.  Activities related to program and planning;

5.  Activities related to special projects having a direct relationship to instructional or instructionally-related programs; and

6.  Other activities determined to be of such scope and structure as to require the assignment of ESU's for those persons directly involved in the effort, with special consideration given to student success, innovations and initiatives or projects that align with College strategic goals.

B.  A joint administration CCC-AAUP committee will be maintained for the purpose of establishing standards and setting the criteria for the types of projects and activities for the granting of faculty members' requests for 200 reassigned ESU's and reviewing the actual reassignment of ESU's to faculty members. The 200 ESU Pool Committee will coordinate with the Executive Vice President of Academic and Student Affairs before requests for submission are sent to the faculty, in order to review the College strategic goals and focus the requests. The faculty member's Dean/Director is to be copied on all requests for such reassignments of ESU's and Dean/Director may provide comments to the 200 ESU Pool Committee as well as the faculty member.  The 200 ESU Pool Committee will advertise, solicit and evaluate projects to be funded, establishing a timeline for review at least once a semester for projects proposed to be undertaken the following semester. The 200 ESU Pool Committee will also meet as needed to address time-sensitive requests for student success initiatives that may fall outside the regular deadlines. The 200 ESU Pool Committee may identify qualifying projects that do not receive funding which may be wait-listed, with the expectation that they will receive priority funding in the next funding period. Unfunded but supported requests to the 200 ESU Pool may be eligible for Service Activity and Development Credits.

The 200 ESU Pool Committee shall provide the faculty member with a concise and informative explanation regarding any rejected proposal. The 200 ESU Pool Committee shall be composed of an equal number of representatives (1) from the administration; and (2) selected by the CCC-AAUP. In the event that a dispute develops regarding the reassignment of ESU's, then the matter may be submitted to advisory, non-binding arbitration by either the CCC-AAUP or the College. Article 33 of this Agreement shall govern the method of selection and the manner of payment of the arbitrator.

Section 6.06.  Faculty Class Scheduling.  The College will attempt to follow the principle of departmental rotation among qualified faculty where practical and feasible and after consulting with faculty in making multi-campus assignments. In addition, the College will attempt to avoid scheduling a faculty

9

Exhibit A

member to teach at more than one (1) campus on a single day if such is practical and feasible. Finally, the College will attempt to avoid assigning a faculty member to an early morning class following a late evening class where practical and feasible. The College will create an annual College-wide schedule that includes modalities of delivery.

Section 6.07. Large Group Instruction. Faculty members engaged in a lecture instructional delivery strategy shall receive additional ESU credit for each state-mandated census date enrollment range as follows:

| Number of Students | ESU Bases/Added |
|---|---|
| 1 to 50 | 1.0/0.0 |
| 51 to 85 | 1.0/0.2 |
| 86 to 120 | 1.0/0.4 |
| 121 to 155 | 1.0/0.6 |
| 156 or more | 1.0/0.80 |

Section 6.08.  Preparations.  Instructional faculty shall normally not be required to make more than three (3) different preparations per standard academic semester, nor more than five (5) per standard academic year. Exceptions to this standard may be necessary in certain subject areas and for certain instructional delivery systems. Such exceptions shall be documented by a written rationale prepared by the respective Deans, in consultation with the faculty member involved. This rationale must be approved by the appropriate Dean and, following approval, kept on file in the Dean's office. Abuses of the College's policy regarding preparations shall be grievable under Article 33 of this Agreement.

Section 6.09.  Office Hours.  Faculty members are to be available in an assigned faculty office for scheduled and unscheduled student conferences for a minimum of ten (10) hours per week at times convenient to both students enrolled in the faculty member's classes and to prospective students seeking information. A faculty member, with prior approval from his Dean (which shall not be unreasonably withheld), may fulfill the ten (10) hour per week requirement in four (4) days. Exceptions to this standard may be approved by the College.

Section 6.10.  Mandatory Days. Faculty's attendance is required on six (6) days, subject to terms of this contract governing faculty absence. These six (6) days are: two (2) convocation days, two (2) campus days, one (1) faculty colloquium day and one (1) commencement day. Each full time faculty member must provide a full day of professional service on the mandatory contract days.

Section 6.11.  Faculty Service and Development. Faculty Service and Development will not be measured as days present on campus, but will be measured in "credits," which reflect specific activities and outcomes. Credit activities can be performed at any time during the calendar year, and can occur either on or off campus. These activities will fall into broad categories which will be established by the Service Activity and Development Credits Committee.

A joint Service Activity and Development Credits Committee will be comprised of an equal number faculty and administration. An equal number of faculty members will be chosen by the AAUP and the Faculty Senate. The Committee will create a menu of service options with suggested credit values. Credits do not equate directly to time, but will reflect the relative value of that activity during that given year.  Due to institutional priorities, the value of some activities may change from year to year, as determined by the Service Activity and Development Credits Committee. Dean/Directors may add activities which are not on the main "menu" either on their own initiative, or as a result of a faculty request. Faculty requests for

10

changes in the menu must be approved in writing by a Dean/Director, who will communicate with the Service Activity and Development Credits Committee. The Service Activity and Development Credits Committee may also add activities to the menu during the year to respond to emergent needs and opportunities. The Committee may determine a minimum number of credits required in each category; however, in the first year of implementation, minimum credits per category will not apply.

The Service Activity and Development Credits menu guide will be made available online and in print to faculty and administration prior to the end of the Spring term and will govern the following academic year. Faculty may obtain approval from their Dean/Director to perform activities during the summer and apply those credits to the following academic year.

Each faculty member must meet with his Dean/Director within four (4) weeks of the start of the Fall term to review his planned activities. This review will align with the faculty member's Professional Development Plan. Changes to a faculty member's activity schedule may be made at any time with the approval of the Dean/Director, to take into account unforeseen circumstances, opportunities, and needs of the college.

The Administration will develop a tracking system which permits efficient submission, approval, monitoring, and modification of activity plans. Faculty will be responsible for the timely updating of activity status. This status report will include a brief summary of the outcome of each activity.

Each faculty member will be required to complete a minimum of 10 of their 28 credits prior to December 31, and must complete the full 28 credits prior to the first day of the summer term. Failure to earn 28 credits will result in a reduction in pay corresponding to ½ day (3.75 hours) for each credit short of the required 28. This reduction will occur in the first pay period of the following Fall term.

Because of the need for non-instructional faculty to maintain their traditional service to the College mission during non-instructional periods, non-instructional faculty will spend a minimum of 14 of their 28 total credits performing their regular duties.

Section 6.12. Work Week. Assignments for most full-time faculty will be made during the five (5) days of the regular academic week (Monday through Friday). The College may schedule faculty to work weekends and evenings in identified new market opportunities, provided that it meets with AAUP leadership in advance to share a rationale. These discussions shall be part of the Labor Management Committee communication. The Labor Management Committee shall consider the department size and needs as part of its deliberation on weekend scheduling. Should program needs so dictate, and following consultation with affected faculty, full-time faculty may be given responsibilities involving weekend or evening assignments as part of their regular load. For weekend work, the College will utilize a College-wide rotation system. Faculty will not be required to work weekends as part of their regular schedule during consecutive semesters. In those situations in which a portion of a faculty member's responsibility is carried out on a sixth (6th) day in the instructional week, or in a combination of day and evening assignments, an appropriate adjustment in the Monday through Friday span will be made.

Section 6.13. The College may offer courses at times other than as defined in the contract. The College shall provide a rationale for these courses to the faculty CCC-AAUP leadership in advance of the offerings. The faculty will be given first consideration for these courses. Faculty must be appropriately qualified to teach these courses. The College and faculty member will agree upon appropriate instructional load credit. If no agreement is reached, the College may exercise its right to offer these courses using non-bargaining unit faculty.

11

Exhibit A

## ARTICLE 7
## RETRENCHMENT: TENURED FACULTY

**Section 7.01.**  If, as a result of financial exigency determined in good faith by the CCC Board of Trustees, a material decrease in student enrollment, or a program reduction, consolidation or elimination, it becomes necessary to reduce the number of tenured faculty, tenured faculty may be laid off without pay.

The CCC Board of Trustees' good-faith determination of financial exigency, material decrease in student enrollment, or program reduction, consolidation or elimination requiring a layoff of tenured faculty will be subject to review under the grievance procedure and, in the event of an unresolved dispute, to final and binding arbitration.

To the extent practicable, as soon as the Administration has reason to believe that there is a serious likelihood that any of these conditions will occur, it will so notify the CCC-AAUP of the contingency and provide them with all available information. The CCC-AAUP will have a fair opportunity to evaluate the information and to develop and recommend alternative methods to deal with the problem.

**Section 7.02.**  Layoffs will be implemented on a College-wide basis in the case of financial exigency and within the affected instructional teaching department or equivalent non-instructional unit (considered on a College-wide basis) in the case of a material decrease in enrollment or program reduction, consolidation or elimination.

Except where otherwise required by considerations of program continuity, no tenured faculty member will be laid off in the case of financial exigency until all part-time lecturers, full-time lecturers and non-tenured faculty have been laid off within the instructional teaching department or equivalent non-instructional unit where the tenured faculty is to be laid off.

Except where otherwise required by consideration of program continuity, no tenured faculty member will be laid off in the case of material decreases in student enrollment or program reduction, consolidation or elimination until all part-time lecturers, full-time lecturers and non-tenured faculty within the affected instructional teaching department or equivalent non-instructional unit (considered on a College-wide basis) have been laid off.

**Section 7.03.**  Tenured faculty will be laid off on the basis of College-wide seniority (i.e., full-time service within the bargaining unit) subject to the requirement of possessing the necessary qualifications (1) to teach the courses to be offered, in the case of instructional faculty; or (2) to perform the available and required work, in the case of non-instructional faculty.

Tenured faculty members subject to layoff under these provisions will be given an opportunity to transfer to another instructional teaching department or equivalent non-instructional unit if they possess the necessary qualifications (1) to teach the courses to be offered for instructional faculty; or (2) to perform the available and required work for non-instructional faculty.

**Section 7.04.**  Laid off tenured faculty members will be offered, in accordance with their seniority, reinstatement if, within a period of five (5) years from the date of layoff, an appointment becomes available in the same instructional department or equivalent non-instructional unit to which they were assigned at the time they first became subject to layoff or to which they were subsequently transferred. Laid off tenured faculty members must notify the Administration within thirty (30) days of receiving a recall notice to an available appointment that they intend to accept the offer of reinstatement. The College agrees not to offer an appointment in any instructional department or equivalent non-instructional unit until all laid off tenured

12

faculty members fully qualified to teach therein (instructional faculty) or work therein (non-instructional faculty) have, in accordance with their seniority, been offered reinstatement.

Section 7.05.  Laid off tenured faculty members shall have the right to review, through the grievance procedure, subject to final and binding arbitration, the validity of their layoff under applicable criteria and procedure.

Section 7.06.  At least one (1) full academic year's notice will be given to a tenured faculty member subject to layoff hereunder, and layoff will become effective only at the end of the appropriate academic year.

## ARTICLE 8
## REDUCTION IN FORCE: TENURE-TRACK FACULTY

Section 8.01.  If, because of operational or financial reasons, it becomes necessary to reduce the number of tenure-track faculty at the college, the necessary number of such faculty can be placed on layoff status without pay, pursuant to the following procedure:

A.  Except where program continuity or limits established by Board staffing policy require otherwise, all full-time and part-time lecturers within the affected instructional department or equivalent non-instructional unit of the College shall be laid off first, before any tenure-track faculty member in the affected department or equivalent unit is laid off.

B.  Except where program continuity or limits established by Board staffing policy require otherwise, tenure-track faculty will be laid off in inverse order of seniority (i.e., full-time service) in the affected instructional department or equivalent non-instructional unit considered on a College-wide basis.

C.  In the event that a tenure-track appointment becomes available in the same instructional department or equivalent non-instructional unit of the College in which one (1) or more tenure-track faculty have been laid off, then, after all previously laid off tenured faculty eligible for appointment to such department or unit have been offered and refused such appointment, tenure-track faculty members shall be offered such position in accordance with their relative departmental or unit seniority determined pursuant to paragraph (B.) above, for a period of two (2) years from their respective dates of layoff. Laid off tenure-track faculty members must notify the Administration within thirty (30) days of receiving a recall notice to an available appointment that they intend to accept the offer of reinstatement.

D.  A tenure-track faculty member who disputes the validity of his layoff has the right to review, through the grievance procedure, whether the criteria and procedure set forth in this Article have been properly followed and applied in his case.

E.  Tenure-track faculty subject to layoff hereunder, will receive notice of such layoff in accordance with the following schedule:

1.  By April 1 of the academic year, at the conclusion of which it is proposed to lay off the faculty member, if the faculty member is in his first (1st) or second (2nd) year of full-time service at the College;

2.  By December 15 of the academic year, at the conclusion of which it is proposed to lay off the faculty member, if the faculty member is in his third (3rd) year of full-time service with the College;

13

3.    One (1) full academic year's notice will be given to tenure-track faculty members who are in their fourth (4th) or subsequent year of full-time service with the College.

F.    Layoff of tenure-track faculty will become effective only at the end of the appropriate academic year.

## ARTICLE 9
## PERSONAL LEAVE

**Section 9.01.**  All members of the bargaining unit may apply for personal leave with full pay up to a maximum of forty-five (45) hours during the academic year. Request for personal leave must be made with as much advance notification as is practical.

**Section 9.02.**    Personal leave shall be granted only for such matters as religious holidays, deaths of immediate family members, illness of immediate family members if the family member is confined to a hospital, or bona fide personal emergencies. Immediate family members shall include spouse, partner, child, parent, sister, brother, mother-in-law, father-in-law, grandparent or any other relative residing with the member. A member will not need to state the particular reason for seeking personal leave but will be required to certify that he or she is taking personal leave for one of the designated approved reasons.

## ARTICLE 10
## SICK LEAVE

**Section 10.01.**  All members of the bargaining unit will be entitled to one-hundred twelve and a half (112.5) hours of sick leave each academic year. Sick leave may be used by members who find it necessary to be absent for reasons of personal illness, personal injury, personal disability, maternity, as well as for medical, dental or optical examination or treatment, and absence for reasons of exposure to a communicable disease. In addition, sick leave may be utilized by members who find it necessary to be absent as a result of an illness of a spouse, parent, or child that resides with the faculty member. In order to qualify for sick leave compensation, a member must give notice of an impending absence at the earliest opportunity and submit a bi-weekly automated absence report. (The College is to provide ADA accommodations as needed). In addition, a faculty member who is absent from his assigned professional responsibilities due to illness for a period of five consecutive days or more must provide a physician's statement to continue any further sick leave as soon as possible after the fifth day of absence. Upon return to employment, a faculty member must provide a certifiable physician's statement indicating that he is capable of resuming his full-time responsibilities as a faculty member. All physicians' statements will be on standard forms provided by the College.

**Section 10.02.**   This sick leave shall be accumulated commencing with the effective date of employment and may be accumulated from academic year to academic year up to a maximum of one hundred eighty (180) days. A member of the bargaining unit who has ten (10) or more years of service with the College will, upon retirement, be paid for one quarter (1/4) of his unused sick leave days up to a maximum of forty-five (45) days. This payment shall be at the full-time rate the member was receiving during his final year of employment.

Faculty members who at the beginning of any academic year have accumulated the maximum of one hundred eighty (180) sick days will be entitled to draw upon the annual maximum allotment of one-hundred twelve and a half (112.5) hours of sick time without reducing the accumulated total of one hundred eighty (180) sick days. However, under no circumstances may a faculty member take more than a maximum of one

14

hundred eighty (180) sick days or convert more than the maximum of one-fourth (1/4) of one hundred eighty (180) sick days upon retirement.

Section 10.03.  Faculty members who find it necessary to be absent during the summer session for any of the reasons specified in Section 10.01 of this Article may utilize up to twenty-two and a half (22.5) hours of accrued sick leave. Sick leave shall be applied against all scheduled hours on campus.

Section 10.04.  Full salary and benefits shall continue to be paid to a member on sick leave until that member's current and accrued sick leave days are exhausted.

Section 10.05.  The College shall furnish each member with official notification of the number of sick leave days the member has accumulated.

Section 10.06.  In the event of the death of a bargaining unit member, the member's unused sick leave shall be paid to his estate. This payment shall be at the same rate and calculated in the same manner as that paid to a retiree in Section 10.01(A) or 10.02.

## ARTICLE 11
## PROFESSIONAL IMPROVEMENT LEAVE

A.   Professional Improvement Leaves will be made available to members of the bargaining unit to promote instructional excellence and professional development. Such leaves may be made available by the College's Board of Trustees each academic year for the purpose of additional education, research, or other such activities deemed of value to the educational mission of the College. At the discretion of the College, any or all of the professional improvement leaves may be designated to be used by individuals to prepare themselves in an additional field of teaching expertise, or for any other appropriate purpose.

B.   Members of the bargaining unit who have been contracted by the College as full-time faculty members for a minimum of seven (7) academic years of teaching service are eligible to apply for a professional improvement leave.  For the purposes of this policy, "academic years of teaching service" shall mean any nine-month period during which a full-time faculty member is under contract with the College.

C.   The number of professional improvement leaves granted by the College each academic year will be limited to five percent (5%) of the total number of full-time faculty members; however, the number of leaves available for each campus will be proportional to the total number of such bargaining unit members eligible for consideration for professional improvement leaves at each campus.

D.   The College will provide professional improvement leaves to a maximum of five percent (5%) of the full-time, tenure-track faculty as follows:

1.   Plan A - 2 semester absence at 50% annual salary.

2.   Plan B - 1 semester absence at 75% annual salary.

3.   Plan C - 2 semester absence at 100% annual salary (available to full-time faculty members after 14 years of teaching service with the College provided any such faculty member has not taken a professional improvement leave in the previous 14 years.

15

Exhibit A

Plan C shall be limited to eligible faculty up to 50% of the 5% maximum set forth in this article.

## ARTICLE 12
## MILITARY LEAVE OF ABSENCE

Section 12.01. Members of the bargaining unit who are members of the Ohio National Guard, the Ohio Military Reserve, the Ohio Naval Militia, or members of other reserve components of the United States Armed Forces are entitled to a paid leave of absence from their duties at the College for such time, not to exceed thirty-one (31) days in any one (1) calendar year, that they are required to be in military service (on field training or active duty). Such employees must notify the appropriate College administrator as soon as they are advised of when their military obligation shall commence.

## ARTICLE 13
## JURY DUTY

Section 13.01. The College recognizes the civic duty of faculty members to respond for service when called for jury duty. A faculty member called for jury duty shall be granted a leave of absence with pay for the duration of his jury duty service.

## ARTICLE 14
## LEAVES OF ABSENCE WITHOUT PAY

Section 14.01. A faculty member may, upon written request, be granted a leave of absence without pay for up to, but no more than, one (1) academic year for professional or personal reasons with the approval of the Vice President for Human Resources or his designee. Requests for such leaves, specifically stating the reasons, must be submitted in writing at least one (1) semester before the leave is requested to begin, unless impossible because of a bona fide personal emergency.

Except for unusual circumstances, leaves of absence without pay will not be granted to individuals prior to their completion of three (3) consecutive years of full-time tenure-track service to the College.

Section 14.02. A faculty member on leave of absence without pay must notify the Vice President for Human Resources or his designee in writing at least three (3) months prior to the expiration of the leave, or by March 1st if the expected date of return is the next academic year, whether or not he intends to return to the College upon the expiration of the unpaid leave of absence.

Section 14.03. Insurance benefits may be continued during a leave of absence without pay at the faculty member's expense.

Section 14.04. A faculty member on an approved leave of absence will return at his former rank, step, and grade.

## ARTICLE 15
## PROFESSIONAL DEVELOPMENT AND TRAVEL

Section 15.01. The Administration will provide funds for travel to professional meetings and other appropriate activities in the amount of two-thousand, five-hundred fifty dollars ($2,550.00) for each faculty member. Such funds may be utilized by faculty members to defer the cost of courses for professional development related to the faculty member's particular discipline and for other faculty professional development purposes. For faculty members hired in the second or third year of this Agreement, the

16

Exhibit A

Administration will provide two-thirds or one-third of the $2,550.00, as applicable. Notwithstanding the foregoing, the College shall be required to provide no more than one-third of the total amount on an aggregate bargaining unit-wide basis during the first year of this Agreement, no more than one-third of the total amount on an aggregate bargaining unit-wide basis during the second year of the Agreement, and the unspent remainder, without cap of the aggregate amount on a bargaining unit-wide basis, during the third year of the Agreement. Professional development and travel funding shall be provided on a first come, first serve basis, up to the overall bargaining unit cap in the first two years of the contract (and consistent with the unused amount allotted to each faculty member's account). Such funds may be utilized by faculty members to defer the cost of courses for professional development related to the faculty member's particular discipline.

Section 15.02. Unused funds will revert to the College at the end of the three (3) year contract period, to be used at the College's discretion. The College will designate a facilitator(s) at each campus to provide assistance with reimbursements.

Section 15.03. Faculty members who have received funds from the College to attend professional meetings shall report to their colleagues on the substance of the meetings. A written summary shall be filed with the appropriate Dean/Director and, where appropriate, shall be shared with the College community.

## ARTICLE 16
## COMPENSATION

### 2019-2020, 2020-2021, and 2021-2022 ACADEMIC YEAR SALARIES

Section 16.01. The salary schedules shall reflect the following increases for the applicable year of the Agreement: 2019-20, 1%; 2020-21, 1%; and 2021-22, 2%.

Section 16.02. For academic years 2019-20, 2020-21 and 2021-22, each faculty member will be compensated according to the salary schedule adopted for that year attached hereto as Appendices A, B and C respectively at the next highest ½ salary step, or next highest full step in those instances where there is no ½ salary step between two (2) full steps.

Section 16.03. Each faculty member who has completed three (3) academic years at step 13.5 or 14 of the faculty salary schedule will receive a salary increment in the amount of $1,000. Each faculty member who has completed five (5) years at step 13.5 or 14 will receive a salary increment in the amount of $1,500. Each faculty member who has completed seven (7) years at step 13.5 or 14 will receive a salary increment in the amount of $2,000. Each salary increment will be granted to the faculty member upon the tender and acceptance of his contract for the subsequent academic year.

Section 16.04. A joint administration / faculty committee will review each candidate's credentials and recommend who qualifies for a salary adjustment based upon additional education. To assist the Committee in its work, a Doctoral Criteria report (March 12, 2007), as revised by Side Letter 16, established guidelines, procedures, and criteria concerning the use of graduate education for salary advancement. The report and results of the Committee's deliberations are maintained by the Office of Academic and Student Affairs.

## ARTICLE 17
## LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE

Section 17.01. The College will provide life insurance benefits to members of the bargaining unit equal to 2-1/2 times their basic salary, rounded to the next lower $500, up to a maximum of $175,000, subject to the terms and conditions set forth in the insurance policy issued by the College's carrier.

<u>Section 17.02.</u>     The College will provide accidental death and dismemberment insurance benefits to members of the bargaining unit equal to 2-1/2 times their basic salary, rounded to the next lower $500, to a maximum of $175,000 and accidental dismemberment insurance benefits subject to the terms and conditions set forth in the insurance policy issued by the College's carrier.

<div align="center">

**ARTICLE 18**
**HEALTH CARE**

</div>

<u>Section 18.01.</u>     The College shall continue to provide an election of competitive medical plans that allows full-time employees flexibility in the type and level of benefits, consistent with those in effect as of January 1, 2007.  Bargaining unit members may also participate in an optional Dental Plan, the Medical Waiver option, and the optional FSA Account.

<u>Section 18.02.</u>     Effective August 16, 2019, through August 15, 2022, the College will pay 80% of the College's total healthcare premium costs.

<u>Section 18.03.</u>     Employees shall be ineligible to enroll in the Medical Mutual Professional Plan unless enrolled in prior to January 1, 2017.

<u>Section 18.04.</u>     Beginning January 1, 2018, the College will provide a new Medical plan, with an associated health savings account option, the Healthy Saver Plan.  The Healthy Saver Plan will provide employees with the option to obtain lower premiums in exchange for higher deductibles.  AAUP represented employees will have the option to select the Healthy Saver Plan, or remain with the existing health care options. The AAUP will be involved in the design of the HSA contributions and communications strategy of the Healthy Saver Plan.

<u>Section 18.05.</u>     Beginning January 1, 2020, spouses or domestic partners of newly hired employees who are eligible for healthcare coverage through his or her employer will not be eligible to obtain coverage under any College medical plan.

   a.  Should a spouse or domestic partner of an employee hired on or after January 1, 2020 experience a qualifying life event that causes them to lose coverage from their employer, the spouse or domestic partner can be covered by a College medical plan with appropriate documentation. If the College is notified within 30 days of this loss of coverage, the spouse or domestic partner will be eligible for coverage under a College medical plan at the earliest possible date.

   b.  Should a spouse or domestic partner of an employee hired on or after January 1, 2020 become employed and eligible for medical coverage from that employer, the employee will notify the College within 30 days. The spouse or domestic partner will then become ineligible for coverage under the College's medical plans as of the date their employer medical coverage is available.

   c.  Verification of eligibility for coverage for a spouse or domestic partner shall be conducted no more than once a calendar year in accordance with section 18.08 of the Agreement.

<div align="center">18</div>

Section 18.06 Effective January 1, 2018 when the Affordable Care Act (ACA) forty percent (40%) excise tax takes effect, any employee still in the Medical Mutual Professional Plan will have the excise tax built into the premium. When calculating College and employee contributions, the College eighty percent (80%) cost sharing will be determined excluding the forty percent (40%) excise tax. The employee will pay twenty percent (20%) of the cost of the premium, excluding the forty percent (40%) excise tax, in addition to the forty percent (40%) excise tax amount.

Section 18.07 College-wide Health Care Committee. The College-wide Health Care Committee shall have an equal number of representatives from the administration, the various collective bargaining units, and non-bargaining unit support staff. Each constituent group has two (2) representatives. The Committee will explore alternative health care cost containment possibilities.

Section 18.08    Effective January 1, 2019, the College will maintain a level of benefits equivalent to those as set forth in Appendix J, unless the parties mutually agree otherwise.

Section 18.09    The College will provide benefits for eligible children to the age specified by Federal or State law for the College's medical program.  The College will provide dental benefits for children up to the age of 26 years old.

Section 18.10. The College may conduct eligibility audits no more than once per calendar year.

## ARTICLE 19
## DISABILITY INSURANCE

Section 19.01. Short Term Disability. After all current and accumulated sick leave has expired, or after sixty (60) calendar days, whichever is greater, the College will provide a disabled member 70% of his basic salary up to a maximum of $3,000 per month, subject to the terms and conditions set forth in the Short Term Disability Summary Plan Description effective January 1, 2007.

Section 19.02.  Long Term Disability State Teachers Retirement System (STRS) Participants. Following the cessation of any short term disability period, the College will provide to employees who participate in the State Teachers Retirement System long term disability benefits in accordance with the Group Long Term Disability Certificate of Coverage in effect as of January 1, 2009.

Section 19.03. Long Term Disability Alternate Retirement Plan (ARP) Participants. Employees who elect to participate in the Alternative Retirement Plan (ARP) may choose to participate in a College sponsored group long term disability insurance plan at their own expense.

Section 19.04. Employee Status After Exhaustion of Short Term Disability. An employee who has exhausted the employee's short-term disability benefit shall be on inactive status. He shall be eligible for COBRA, but shall no longer be eligible for employer-sponsored benefits, other than Long Term Disability as set forth above. This section shall not affect the benefits to which the employee is entitled under STRS as of the date the employee is in an inactive status.

## ARTICLE 20
## HEALTH AND WELLNESS

Section 20.01.  The College may offer incentives to eligible bargaining unit participants who voluntarily participate in college-wide health and wellness programming. Such participants could receive incentives including but not limited to a discount in health care premium costs.

Exhibit A

## ARTICLE 21
## SUMMER SCHOOL

Section 21.01. Faculty members (including both instructional and non-instructional faculty) shall be offered summer school assignments under the following provisions: A minimum of 60% of base Summer School IFTE requirements will be filled by regular full-time faculty compensated on a pro-rata basis. Compensation for summer sessions will be based upon 30 ESU's. Both instructional and non-instructional faculty requirements will be based upon the previous summer for the purpose of determining the 60% minimum utilization of full-time faculty.

The College and the CCC-AAUP will create a joint committee to review and recommend guidelines relative to summer session staffing.

Section 21.02. Faculty Workload Assignments for Summer.

A.    Summer session staffing will be governed by all appropriate Board policies and the following procedure.

B.    This section pertains to the assignment of instructional faculty.

     1.    Because the principles pertaining to the selection of faculty members for summer session assignments as contained in the policy on full-time faculty workload and professional responsibilities are intended to emphasize that the faculty is an all-College faculty, and within the limits established in paragraph (F) of this procedure, any full-time faculty member of the College qualified under paragraph (H) who submits a timely, written request for a summer session teaching assignment, shall be given at least one (1) class assignment, if one is available at sufficient enrollment, before any other full-time faculty member is given a second (2nd) teaching assignment. Using the same principle, and within the limits established in paragraph (F) of this procedure, any full-time teaching faculty member who requests two (2) summer teaching assignments shall be given the second assignment, if a second assignment is available, before any other full-time faculty member is given a third teaching assignment. For purposes of this procedure, a "class assignment" is a section with a unique section number.

     2.    Summer assignments will be made College-wide under the direction of the Dean of the campus with communication and agreement of the Dean responsible for planning and budgeting in the academic area.

     3.    Class assignments will be initially made to full-time faculty up to the maximum ESU load (see paragraph F) without regard to pro-rata full-time faculty salary schedule rates. Where choices in assignments are possible, full-time faculty members shall receive first priority consideration for all classes offered.

     4.    In any case in which there are insufficient summer class assignments for full-time faculty, College-wide, requesting an assignment within a subject area, assignments will be made based upon a random selection from among those faculty members who have formally expressed a desire and who are qualified to teach the available class(es). In situations which require such a selection, records will be kept by appropriate personnel which will indicate for prior summer session those faculty who did not

20

Exhibit A

receive their assignment of choice during the random selection process. These records will be used so that such faculty will be accorded, during the current summer session assignment process, treatment which would reduce the chances of this situation occurring again.

5. Should a situation arise in which two (2) or more faculty members request the same course assignment, preference will be given to the faculty person who has requested a course on the campus which was his "home campus" during the preceding academic year, assuming this assignment was the faculty member's course of first choice. On second or subsequent choices, or in the event of two (2) faculty each requesting the same assignment on their "home campus," the random selection process described in paragraph (B) (4) will be utilized.

6. Faculty members who are chosen by appropriate administrators to prepare a particular course which requires unusual lead time for preparation will be assured of receiving the assignment for which they prepared (assuming that the class is actually offered). In order to be "guaranteed" these assignments, faculty must list such courses as their first choice. At this point, this category of courses includes only television courses. Additionally, faculty members developing new television courses will be guaranteed the opportunity to teach the new course for the first two (2) summers. After that time, any faculty member may request to teach it.

7. If necessary, adjunct faculty may be released from class assignments as late as the end of the first (1st) week of class to assure that the principles and priorities established in paragraph (B) are met.

8. After the tentative assignments of full-time faculty have been made initially, the pro rata ESU's available for payment of the assignments will be apportioned to all assigned full-time faculty. The apportionment will be determined by taking the total number of ESU's available and dividing by the number of faculty who wish to teach at pro-rata pay. The resulting number of pro-rata ESU's will be assigned to each faculty member's assigned load. Those faculty who teach at a load less than the ESU's available to them will have the pro-rata ESU's not used returned to a college-wide pool, where the number of faculty who have more ESU's than those originally available at pro-rata pay will be divided into this remaining pool of ESU's apportioned to them. After the second round of determining the number of ESU's available to each remaining faculty, that number will be assigned to those faculty.  If there are any remaining ESU's, they will again go into a pool which will be divided by the number of remaining faculty members and assigned. Those ESU's taught over and above the assigned pro-rata pay ESU's will be paid on a part-time basis.

9. Summer session salaries for persons employed as full-time faculty members during the standard academic year immediately preceding their summer session professional service to the College shall be paid on the basis of a proration of that standard academic year's salary. The salary figure to be used as the basis for the proration shall include the longevity salary increments for those full-time faculty members who received the increment(s) during the immediately preceding academic year. Pro-rated salaries shall be paid only for those ESU's which do not exceed the limits established in paragraph (F) of this procedure. Summer session salaries paid for ESU's which exceed the limits established in paragraph (F) of this procedure and/or which are paid

21

Exhibit A

to faculty assigned to sections budgeted totally or in combination at part-time rates, shall be paid at the applicable part-time lecturer salary rate.

C.   This section pertains to the assignment of non-instructional faculty (counselors and librarians).

1.   The procedure for assigning non-instructional faculty is intended to emphasize that the faculty is an all-College faculty. Separate College-wide pools of summer assignments will be created for counselors and librarians. The available assignments will be divided equitably among the full-time faculty qualified in their respective areas who have submitted a timely, written request for such assignments.

2.   Each full-time non-instructional faculty member who requests a summer assignment shall have one assignment unit before any other full-time non-instructional faculty member receives a second assignment unit, and each who wishes a second assignment unit shall have it before any other receives a third unit, etc. One (1) ESU for a full-time non-instructional faculty member is equal to six (6) days of summer employment at full-time pro-rata. The maximum number of full-time assignment units is seven (7) for forty-two (42) days at full-time pro-rata. This is not subject to any summer school pool calculation.

Half of the faculty member's selected pro rata days may be scheduled at the College's discretion. The other half of the faculty member's selected pro rata days may be scheduled at his discretion. Pro-rata summer days may only be taken during Summer semester, or on non-instructional days when the College is open between the day following the end of the Spring semester through the day before the start of the following Spring semester.

All assignments of pro rata, whether done at the College's discretion or the faculty member's discretion, shall be made in consultation between the Director of Counseling and the non-instructional faculty member before the decision is final. The scheduling process shall be completed no later than March 31.

3.   The portion of each full-time non-instructional faculty member's summer assignment to be paid at pro-rata full-time faculty salary schedule rates will be determined on an hourly basis. The number of pro-rata hours available will be apportioned among the full-time faculty who have summer assignments. Each full-time faculty member may be paid at pro-rata rates for the number of hours up to the maximum allowed as a fair share. All assignments for professional counselors and librarians will be included in the computation of the fair share of pro-rata pay. Non-instructional faculty members who accept instructional assignments during the summer session will be compensated at the applicable part-time lecturer salary rate.

D.   In addition to responsibilities enumerated in applicable Board policies and College-wide procedure, the faculty member who accepts a summer session appointment is required to fulfill completely all teaching and related professional responsibilities.

22

E.    Contract Dates

    1.    The contract for instructional faculty employed during either the early or the late five (5) week summer session will consist of a total of twenty-five contract days. There are twenty-five (25) days of class meetings.

    2.    The contract for instructional faculty employed during the eight-week summer session will consist of a total of forty (40) contract days. There are forty (40) days of class meetings.

    3.    The contract for instructional faculty employed during the ten-week summer session will consist of a total of fifty (50) contract days. There are fifty (50) days of class meetings.

    3.    The calendar for non-instructional faculty summer school contract assignments shall be made by March 1.

F.    Full-time and Part-time ESU Workload Assignments

    1.    In accordance with Article 6, the maximum load per full-time instructional faculty member at pro-rata full-time faculty salary schedule rates during the summer session will be on the basis of the equity system of distribution of pro-rata assignments, not to exceed the maximums specified in (F)(2) of this rule.

    2.    The maximum workload for full-time faculty members in terms of full-time pro-rata ESU's is seven (7) for a part of term summer session and seven (7) full-time pro-rata ESU's for a ten-week full term summer session. In those instances where a full-time faculty member teaches a combination of part of term and full term classes, the maximum load will be seven (7) full-time ESU's for the combined assignment. In those instances where a full-time faculty member teaches a different number of weeks (e.g., four), the maximum ESU's, number of days, and other associated responsibilities will be apportioned based upon the full term standard. In those instances where a faculty member teaches both 5 week summer terms, the maximum load will be 7.0 full time ESU's.

    3.    In order to maintain a certain degree of flexibility in developing class assignments for instructional faculty, a faculty member may teach an overall maximum of twelve (12) ESU's (the maximum under the equity pool system up to seven (7) full-time and five (5) part-time). The maximum may not be extended by "contributed" or "donated" services (without pay); although the College appreciates the intent of faculty members who would offer their services without pay.

    4.    Any assignments to a full-time faculty member, either instructional or non-instructional, will count toward the maximums stated in paragraph (F) of this rule. The total amount earned for summer assignments shall not exceed the total which would be paid for the equivalent of the ESU maximums stated in paragraph (F) of this rule.

23

5.      Non-instructional faculty members shall be subject to the dollar equivalent of the ESU limitations specified above, based on the following translation of potential maximum ESU earnings into non-instructional days.

Six (6) non-instructional days shall be the equivalent of one (1) ESU. Therefore, a non-instructional faculty member will be limited to a maximum of eighty-four (84) days (14 FT/PT ESU's x 6 days = 84 days maximum) for all summer pro-rata assignments. Non-instructional faculty members who accept any instructional assignment shall have that assignment(s) included as part of their maximum potential earnings on the basis of one (1) ESU = six non-instructional days.

6.      The system to provide an equitable distribution of assignments paid at pro-rata full-time faculty salary schedule rates does not apply to all assignments to faculty. College policy paraphrased above specifies the limits to the dollar equivalent of ESU's which can be earned during the summer session. These earnings may be earned under two (2) distinct types of assignments. The equity system of distribution of assignments at pro-rata full-time faculty salary schedule rates applies to credit instructional assignments and assignments to serve as a professional librarian or counselor.

Other assignments, not distributed under the equity system, may be taken by a full-time faculty member beyond the assignments made under the equity system of distribution of pro-rata assignments. However, the ESU maximums stated in paragraph (F) (2) must not be exceeded, unless written authorization to do so has been obtained from the Executive Vice President or designee. Such assignments are known as "special assignments." Special assignments require the written approval of the Executive Vice President or designee in respect to both work to be accomplished and amount of compensation. They would consist of such assignments as might be funded by "Title III" for non-instructional duties, for example. They cannot be funded out of summer instructional monies identified to pay the assignments at pro-rata full-time faculty salary schedule rates under the terms of the sixty (60%) percent minimum utilization specified herein.

G.    Non-instructional Assignment Pool

1.      All non-instructional faculty members shall be eligible for 42 pro-rata summer school assignments. One (1) ESU of instruction will equate to six (6) days of non-instructional work.

H.    Assigned Instructional Area

1.      An instructional faculty member for whom a summer session teaching assignment is available will be assigned only to specific courses which the faculty member has been teaching as part of his/her assignment during the three (3) academic years immediately preceding the summer session. When deemed necessary, campus president/college vice presidents are authorized to make exceptions to this provision and report to the Office of the Executive Vice President the reasons therefore in writing, with a copy to be placed in the faculty member's personnel file. However, a full-time faculty member who has not taught the specific course but is otherwise qualified will be given preference over a part-time lecturer.

24

I.      Faculty Absence

1.      Faculty members may take up to twenty-two and a half (22.5) hours of accrued sick leave during the Summer Session. Sick leave shall be applied against all scheduled hours on campus. Additional absences shall be without pay.

2.      Upon the death of a member of a bargaining unit member's immediate family, as defined in Article 9, the bargaining unit member may use the twenty-two and a half (22.5) hours of accrued sick leave as personal days with the approval of the appropriate administrator.

J.      Hours On-campus

1.      Instructional and non-instructional faculty members on pro-rata pay rates are to develop and submit to the designated administrator an appropriate schedule of hours on-campus and office hours. Faculty members will be available in their assigned faculty offices for a minimum of two (2) hours per day on days during which they have scheduled classes.

A faculty member's less-than-full-time summer session assignment on pro-rata full-time pay is considered as a proportion of a full workload and the hours on-campus and the days on-campus, will be proportioned accordingly. Ideally, hours on-campus will be apportioned about equally among the days on-campus.

2.      On-campus is defined in terms of the location of the faculty member's assignment and/or office. In some cases, faculty members may be assigned to a site located away from the campus on which they are based. Hours at this site are to be classified as on-campus for purposes of meeting the on-campus requirement.

3.      Office hours are to be classified as on-campus hours.

4.      First line administrators will keep readily available a schedule of hours on-campus and office hours by day of the week for each faculty member on pro-rata full-time pay. The total on-campus hour requirement for instructional faculty is illustrated by the following schedule. On-campus hour requirements for fractional ESU values which are not in the following schedule will be the nearest value in the schedule.

| Weekly Hours on Campus For Full-time Instructional Faculty | | |
|---|---|---|
| 10 week | 8 week | 5 week |
| 7 ESU's = 21 hours | 7 ESU's = 30 hours | 7 ESU's = 42 hours |
| 6 ESU's = 18 hours | 6 ESU's = 22.5 hours | 6 ESU's = 36 hours |
| 5 ESU's = 15 hours | 5 ESU's = 18.75 hours | 5 ESU's = 30 hours |
| 4 ESU's = 12 hours | 4 ESU's = 15 hours | 4 ESU's = 24 hours |
| 3 ESU's = 9 hours | 3 ESU's = 11.25 hours | 3 ESU's = 18 hours |
| 2 ESU's = 6 hours | 2 ESU's = 7.5 hours | 2 ESU's = 12 hours |
| 1 ESU   = 3 hours | 1 ESU    = 3.75 hours | 1 ESU    =  6 hours |

Exhibit A

## ARTICLE 22
## RETIREMENT

**Section 22.01.** All faculty members of the College come under the provision of the State Teachers Retirement System (STRS) or the Alternative Retirement Plan (ARP). The College will continue to provide retirement benefits in accordance with the Ohio Revised Code.

**Section 22.02.** The College agrees to continue the practice of STRS pick-up.

**Section 22.03.** Alternative Retirement Plan (ARP)

A.   The College offers an Alternative Retirement Plan (ARP) to eligible full-time employees who opt out of the applicable state retirement plan - Ohio Public Employees Retirement System (OPERS) and/or State Teachers Retirement System of Ohio (STRS) - and elect ARP. The ARP is a defined contribution plan. Contributions to the ARP are in accordance with the Ohio Revised Code and are mandatory for both the ARP participants and the College.

B.   Eligible full-time employees opting into ARP on or before December 31, 2016 shall be vested 100% in Employer contributions after one year of service.

C.   Eligible full-time employees opting into ARP on or after January 1, 2017 will follow a graduated five-year vesting schedule for the Employer's contributions:

| Total Service for Vesting | Vested Percentage of Employer Account |
|---|---|
| Less than one year | 0% |
| 1 year | 20% |
| 2 years | 40% |
| 3 years | 60% |
| 4 years | 80% |
| 5 or more years | 100% |

D.   This schedule aligns with the vesting schedule of the defined contribution plans of OPERS and STRS. All ARP participants through 12/31/2016 will continue to be vested 100% in employer contributions after one year of service.

## ARTICLE 23
## FACULTY BENEFITS AND PRIVILEGES

**Section 23.01.** Any benefits and/or status to which faculty members presently have vested rights will remain in effect.

**Section 23.02.** The CCC-AAUP will be notified before the College adopts any new policy which adversely affects members of the bargaining unit.

**Section 23.03.** Any mistaken overpayment in a bargaining unit member's salary, benefits, or other compensation may be recovered by being deducted from such member's compensation over the same period as the payments were made, except that if the member's employment terminates sooner than would permit

26

Exhibit A

full collection, such collection may be advanced. Such provisions of collection shall be outlined in the faculty member's individual contract.

## ARTICLE 24
## PATENTS, COPYRIGHTS AND INTELLECTUAL PROPERTY

Section 24.01. Faculty members shall have sole rights of ownership and disposition of copyrightable material, patents and intellectual property generated by their own individual initiative, provided there is not substantial use of College personnel, facilities or resources. However, supplementary course material prepared by a faculty member, even if copyrighted, which has no reasonable market potential outside the College will be made available without charge. Intellectual property is defined as any trademarkable, copyrightable, or patentable matter or any intellectually created tangible or digital (electronic) thing or matter including, but not limited to: books, texts, articles, monographs, glossaries, bibliographies, study guides, laboratory manuals, syllabi, tests and work papers; lectures, musical and/or dramatic compositions, unpublished scripts, films, filmstrips, charts, transparencies, other visual aids; video and audio tapes and cassettes; computer programs; live video and audio broadcasts; programmed instruction materials; drawings, paintings, sculptures, photographs and other works of art.

Section 24.02. Faculty members and the College shall share the ownership and disposition of copyrightable material, and patentable discoveries or inventions and intellectual property generated where there is a substantial use of College personnel or facilities not uniformly provided to other similarly-situated faculty members.
The "notification and intellectual property assessment process," established by the Intellectual Property Review Board (the IP Board), includes a definition of substantial use and process for faculty to follow when pursuing patents, copyrights, and intellectual property. Faculty shall inform the respective Dean/Director of intellectual property development projects when the faculty member is able to identify resources needed for the development of intellectual property. Thereafter, faculty shall provide the respective Dean/Director with periodic reports as agreed by the faculty member and Dean/Director, by at least once per academic term. College personnel or facilities include, but are not limited to, reassigned time, secretarial help, financial assistance (such as student aides) or College services, equipment or building. Division of royalties under these circumstances shall be 80% to the faculty member and 20% to the College unless other written arrangements are made prior to the initiation of the work.

Section 24.03. Copyrights, patents and intellectual property developed from projects undertaken by a faculty member pursuant to an agreement with the College whereby the College commits substantial resources to the project shall belong to the College together with all royalties or profits therefrom.

Section 24.04. Rights to copyrightable material, patents and intellectual property developed as a result of work supported partially or totally by an outside agency or sponsor through a contract or grant shall be disposed of in accordance with the terms of the contract or grant. Prior to the faculty member accepting sponsored research or developmental assignments, the College will be consulted and must approve the contract or grant and the details of the project, the division of any resulting copyrights, patents, or intellectual property and the division of royalties.

Section 24.05. Faculty members must provide any requested relevant material, including intellectual property of the faculty member, to the respective Dean to resolve any faculty-student dispute (e.g., grade disputes). Further, faculty members shall provide intellectual property upon request with reasonable business justification (e.g., accreditation) after notice, meeting, and conference with the affected faculty member. The material will be used only for the requested purpose. Any dispute under this provision shall be referred to the Intellectual Property Board for resolution.

27

Exhibit A

**Section 24.06.** The College and CCC-AAUP will maintain a Joint College-AAUP Intellectual Property Review Board (the "IP Board"). The College and the CCC-AAUP shall each appoint three members to the IP Board. At any time either party may enlist the resources of relevant experts upon notice to the other party. Initially, the IP Board will create a process and associated forms to be used in the course of individual faculty member's intellectual property development. Specifically, the IP Board is charged with developing a notification and intellectual property assessment process and providing guidelines for identifying and quantifying "substantial use" and "reasonable market value" as those terms are used in Article 24, as well as identifiable resources for the development of intellectual property and any other factors that may help avoid and/or resolve intellectual property disputes. The IP Board will manage the intellectual property notification and assessment process and compile intellectual property accomplishments for appropriate annual recognition.

**Section 24.07.** The IP Board will attempt to resolve intellectual property disputes. If the IP Board is unable to resolve the dispute within thirty (30) calendar days, either party may initiate final and binding expedited arbitration. A three (3) party panel shall be convened with the CCC-AAUP appointing one member, the College appointing one member, and the parties jointly appointing a third impartial member by agreement, or, if unable to agree, through the auspices of the Federal Mediation and Conciliation Service. A hearing shall be conducted and a decision rendered within sixty (60) calendar days. Timelines may be extended by written agreement.

## ARTICLE 25
## CCC-AAUP RIGHTS AND RESPONSIBILITIES

**Section 25.01.** The President of the CCC-AAUP shall be provided with a private faculty office.

**Section 25.02.** Bulletin boards for each campus will be designated for the use of the CCC-AAUP.

**Section 25.03.** The maximum aggregate for reassigned time shall be 60 (sixty) ESU's per year, provided that the CCC-AAUP submits to the College a list of specific acceptable union-related responsibilities that its officers will be involved in during such reassigned time. A maximum of five of the aggregate ESU's can be awarded for union related responsibilities during Summer. The President of the CCC-AAUP must teach, counsel, or function as a librarian a minimum of 10.05 ESUs per academic year unless waived by the College. Similarly, CCC-AAUP officers must teach, counsel or function as a librarian a minimum of 15.41 ESUs per academic year unless waived by the College. Additionally, the CCC-AAUP will be able to purchase space from the College up to 24.12 ESU's at the "part-time" rate during the spring and summer semesters immediately preceding the expiration date of this agreement.

**Section 25.04.** A variety of professional activities undertaken through or on behalf of the CCC-AAUP, including, but not limited to, negotiation of the Memorandum of Agreement, coordination of national or regional AAUP seminars and participation in governance and community affairs or appropriate committees as an AAUP representative, will be counted as professional service for the purpose of fulfilling the faculty obligations under the professional accountability system. If a faculty member intends to seek credit for activities other than those listed above, he should notify his Dean/Director prior to undertaking the activity and obtain approval.

**Section 25.05.** The CCC-AAUP, faculty members and the Administration recognize the professional rights and responsibilities for which professional faculty and administrators are responsible within an academic educational community.

28

Section 25.06. The CCC-AAUP will be permitted to use College classrooms and equipment for meetings subject to availability and prior administrative approval.

Section 25.07. The CCC-AAUP and the College will share equally in the cost of the preparation and printing of the collective bargaining agreement.

## ARTICLE 26
## FACULTY EVALUATION PROCEDURE

Section 26.01. Background. The purpose of evaluation is to document faculty effectiveness and to establish the basis for professional development. The process is objective in the intent and comprehensive in nature. The evaluation must focus on assessing professional responsibilities which broadly described include: instruction, facilitating and promoting student learning, college service, professional service including reassigned time.

Several approaches are to be used to collect information regarding these responsibilities: self-evaluation, peer evaluation, student/classroom evaluation and supervisor evaluation including outcomes assessment.

Faculty, in collaboration with the Dean/Director, will develop performance objectives annually. Once every three (3) years the faculty, in collaboration with the Dean/Director will develop a three (3) year professional development plan. These objectives and the professional plan must reflect the goals of the academic department, the campus and the College and must facilitate student learning under five categories of competency: content area, classroom performance, effective professional relations with students, academic and professional standards and professional development. Both documents must be approved by the appropriate Dean/Director.

Section 26.02. Categories of Faculty Performance. Faculty at Cuyahoga Community College may be assigned professional responsibilities in the areas listed below. Experience indicates, however, that all faculty do not perform the same tasks. Accordingly, the procedure for evaluation of faculty performance must, therefore, balance the institution's need for uniformity and fairness with the diversity and flexibility of professional responsibilities.

A. Teaching. Direct Instruction: this includes lecture, lab, clinical or instruction in other settings, including preparation, presentation, evaluation, out of class consultation and student orientation.

B. Student Learning: This includes assessment of student outcomes, student retention, and responsibility for assisting students to adequately prepare for additional related course work within their programs or in anticipation of further baccalaureate studies.

C. Counseling: this includes student advising, group and individual counseling, seminars, orientation of new students, liaison with other faculty and direct student instruction.

D. Library Services: this includes patron services, direct student instruction, reference seminars and liaison services with other faculty. Instructional faculty are responsible for reviewing the holdings with the librarian in order to ensure relevance and appropriateness.

E. College Service: includes participation in college governance, faculty development, general committee involvement, curriculum review, evaluation, revision, and development and mentoring of full-time and part-time faculty, and other reassigned time outlined in Article 6, section 6.05, or as otherwise approved by an authorized administrator.

29

Exhibit A

F.    Student Service: this includes admissions/recruiting, advising and placement of new students, student activities and athletics.

G.    Public Service: this includes participation in community services, programs, continuing education and public relations programs.

H.    Professional Service: this includes professional growth and development. Also includes active participation in professional organizations, through attendance, presentation, publications and holding offices at the local, state and national levels.

Section 26.03. Sources of Information. Standard evaluation instruments will be used College-wide to gather information from the following sources:

A.    Dean/Director: The Dean/Director will evaluate overall effectiveness and performance of the faculty member's teaching and other responsibilities based on visitation of classes and day-to-day interaction.

B.    Students: Students will be asked to evaluate the basic elements of a course, including tests, course content, method of instruction, materials, etc.

C.    Self: Self-evaluation may take the following forms: a rating form, video records, informal feedback or other methods. However, self-evaluation must include a description of progress made toward the achievement of annual objectives and the Professional Development Plan.

D.    Peers: Peer observation will review course materials such as outlines, syllabi, examinations, texts, to evaluate organization, methodology, currency of materials, appropriateness of course goals, content and grading procedures. Peer is defined as a faculty counterpart from another campus or as a faculty member in the same campus division. The Dean/Director and faculty member will agree upon the selection of a peer.

E.    Other: Clinical, practicum, field experience, cooperative education, directed practice and observation sites and reassigned time may also provide evaluation information on the faculty member's performance at the location.

These sources and instruments will be evaluated and updated on an annual basis by the policy-established Permanent Joint Committee on Faculty Evaluations.

Although each of the five (5) sources listed above can provide significant information, no one source can be expected to provide accurate and reliable assessments for all of the various kinds of faculty responsibilities. It is important, therefore, to clarify which sources will be used for each faculty role. Examples are displayed in the matrix below.

| Faculty Role By Source Matrix | | | | | |
|---|---|---|---|---|---|
| Source | | | | | |
| Role | Students | Self | Peers | Dean/Director | Other Sources* |
| Teaching | X | X | X | X | X |
| College Service | | X | X | X | |
| Student Service | X | X | X | X | X |

30

Exhibit A

| | | | | | |
|---|---|---|---|---|---|
| Public Service | X | X | X | | X |
| Professional Service | X | | X | | X |

*See Section 26.03, E.

Section 26.04.  Individualizing the Evaluation System.  The challenge of accounting for the different kinds of faculty assignments can be addressed by emphasizing the significance of each assignment or role. Each faculty member will come to an agreement with his Dean/Director on the combination of roles or activities comprising the contractual responsibilities for the academic year and consistent with teaching load responsibilities, as applicable, contained in the College's contract with the CCC-AAUP. Faculty will therefore, be evaluated on the basis of their individual contributions to the College instead of being forced into a particular role model. For tenured faculty this combination will include evaluation by the Dean/Director, the faculty member's students, and any other sources agreed upon by the faculty and Dean/Director. Tenure-track faculty should include in the combination the sources required for the academic rank and tenure procedures.

In the event that the contractual responsibilities should change substantially during the year, an adjustment in the agreement will be made by the Dean/Director in conjunction with the faculty member.

Section 26.05.  Faculty Evaluation Procedure.

A.    Faculty Evaluations by Dean/Director:

1.    Shall occur in each term for the first two (2) years of tenure-track;
2.    Shall occur in each year for remaining three (3) for years tenure track;
3.    Shall occur one every three (3) years for tenured faculty;
4.    Shall occur on one of two (2) possible days, which have previously been agreed to by both faculty and Dean/Director;
5.    Can take up to one (1) entire class session (for on-ground classes).

B.    During the Fall Semester, each full-time faculty member to be evaluated will meet and reach agreement with the Dean/Director on the semester to be evaluated, on the combination of roles and activities comprising the contractual responsibilities for the academic year and will review the evaluation forms.

C.    When peer evaluation is part of the process, during the Fall Semester the Dean/Director and the faculty member to be evaluated will agree upon a faculty colleague(s) to act as a source for peer review.

D.    Dean/Director Evaluation of Faculty.

1.    The Dean/Director will observe at least one (1) class of the faculty member being evaluated during the academic year. For counseling faculty, there will be an observation of at least one (1) but no more than three (3) student counseling or advising sessions, either in person or via recording. For librarian faculty, there will be an observation of at least one (1) but no more than three library instructions sessions, either in person or via recording. Prior to the observation, a conference will be held between the faculty member and the Dean/Director to schedule two (2) potential class sessions for the single observation and to discuss the course or counseling objectives.

31

Observations should span the breadth of the faculty member's assignment.   The number of the observations needed will vary according to the familiarity of the Dean/Director with the faculty member's work as well as the status of the faculty member's professional development plan. Multiple observations shall not be conducted in an arbitrary, capricious, or discriminatory way, but, rather, should be done in a manner consistent with the purposes of assisting the faculty member and/or implementing the faculty member's professional development plan.   Multiple observations shall occur only after prior consultation with the affected faculty member, where the Dean/Director and faculty member will meet to discuss the reason for additional observations.  Within one (1) week of the observation, the Classroom Visitation Report, Counseling Observation Report, or Librarian Instructional Observation Report will be prepared by the Dean/Director and submitted to the faculty member for discussion with the faculty member.  This report will also be kept by the Dean/Director for inclusion in the Summary Evaluation Report.

2.     The Dean/Director will complete and submit to the faculty member a Summary Evaluation Report. Included with the report will be all evaluation forms, materials and questionnaires that were used to compile the Summary Report. A conference between the Dean/Director and the faculty member will be scheduled to discuss this report. The report will be signed by the faculty member and submitted to the Dean/Director by the end of the spring semester. The report will provide for comments by the faculty member. The Dean/Director will forward the report to Human Resources and provide a copy of the report to the faculty member.

E.     Student Evaluation of Faculty.

1.     For instructional faculty, student evaluations will occur after two-thirds (2/3) of the course has been completed. These evaluations will occur in all courses, except courses during the summer.

2.     All data relating to student evaluation of faculty shall be seen by the faculty member only. The exception to this is the semester in which a faculty member is being evaluated by his Dean/Director. In this semester, the Dean/Director will review the previous semester's student evaluations for the faculty member.

3.     The student evaluation can be incorporated into the faculty member's self-evaluation, if desired.

4.     The student evaluation of faculty will be aggregated. This aggregate information will not have attribution to any individual faculty member. The data will be compiled on a discipline–wide basis for the purposes of institutional analysis by Planning and Institutional Effectiveness (PIE).

5.     For counseling faculty, the Student Evaluation Form will be obtained from a sample of at least twenty-five (25) students. The sample to be included will include students from each of the Fall and Spring semesters.   The faculty member and the Dean/Director will receive a copy of the tabulated results and will have access to the original questionnaires completed by the students.

32

6.    For librarian faculty, evaluations will be distributed to one (1) class of students who have had a formal orientation to the library and to a sample of those for whom the librarian has provided other direct service. Both will be completed during the Fall or Spring Semesters. The faculty member and the Dean/Director will receive a copy of the tabulated results and will have access to the original questionnaires completed by the students.

Section 26.06.   Self-Evaluation.   The faculty member will include a self-evaluation in the Dean/Director evaluation discussion. A self-evaluation report should include such documents as a completed Professional Development Plan, a completed self-evaluation form and copies of course syllabi, handouts, tests and any other relevant information.

Section 26.07.  Peer Observation. When Peer Observation is part of the process, the peer observation instrument will be submitted by the faculty member to the Dean/Director by the end of the fifth (5th) week of the appropriate Semester. Additional documents may be submitted (as agreed upon by the faculty member and the peer observer) which support the observation.

Section 26.08.  Professional Development Plan.  At the beginning of each three (3) year evaluation cycle, the faculty member will submit to the Dean/Director a Professional Development Plan (e.g., reading, professional literature, attending conferences, seminars, conventions, etc.), which will then be formally discussed and agreed upon by both parties for the next evaluation period. The responsibility for the completion of the plan is that of the faculty member and the Dean/Director. The individual plan will stay with the Dean/Director. The Dean/Director will meet annually with the faculty member to discuss progress.

Section 26.09.  In the event that a faculty member and Dean/Director cannot agree upon an aspect of the evaluation process or the faculty member may request a re-evaluation, the issue will be resolved according to the grievance policy described in the current agreement between the College and the CCC-AAUP.

Section 26.10. The Joint Committee on Faculty Evaluation. The Joint Committee on Faculty Evaluation, consisting of an equal number of CCC-AAUP and management representatives, will be responsible for monitoring the effectiveness of the policy and procedure and making appropriate recommendations for improvement of sources of information and instruments as deemed necessary. The Joint Committee on Faculty Evaluation will also identify items for the professional improvement plan and process, as part of the evaluation system, in cases where faculty are deemed not fully effective.

## ARTICLE 27
## ACADEMIC FREEDOM AND RESPONSIBILITY

Section 27.01.   Academic Freedom at Cuyahoga Community College is the right of a faculty member, in his capacity primarily as a teacher, to engage in the search for truth and its exposition within his academic discipline free from institutional censorship.

Section 27.02.  A faculty member is entitled to freedom in the classroom in discussing his subject but should be careful to present the various scholarly views related to the subject and to avoid introducing in his teaching, or intruding into the classroom setting, material, particularly controversial material, which has no relation to his subject.

Section 27.03.  A faculty member is entitled to full freedom in research and in the publication of the results, but this right is subject to the performance of his primary duties as a teacher at the College.

33

**Section 27.04.**  A faculty member is also entitled to speak or write free from institutional censorship or sanction, but his special position as a member of a learned profession and as a professional member of this educational institution imposes special obligations upon him. Because the public may judge the profession and the College by his utterances, a faculty member should at all times strive to be accurate, exercise appropriate restraint and show respect of the opinions of others. It is of special importance that in making such public utterances, a faculty member indicates that he is not a spokesman for the College.

**Section 27.05.**  The concept of academic freedom must be accompanied by an equally demanding concept of academic responsibility. The concern of the institution and its members regarding safeguards for academic freedom must extend equally to requiring responsible service, consistent with the mission, purpose, goals and objective of the College.

**Section 27.06.**  Prior to any change of grade, other than one made by a faculty member, the College shall notify the affected faculty member of any and all changes of grade for whatever reason. Moreover, the College agrees to abide by the established College procedure for the resolution of a contested grade.

## ARTICLE 28
## TUITION REMISSION

**Section 28.01.**  Members of the bargaining unit shall be permitted to take up to eight (8) hours of credit, audit, or non-credit courses each academic semester for which the instructional fee shall be waived. The general fee must be paid by the faculty member.

**Section 28.02.**  Members of the bargaining unit are expected to attend course(s) during their non-working hours.

**Section 28.03.**  In order to attend non-credit courses/workshops/ seminars that are conducted by the College, members of the bargaining unit may receive tuition remission each academic semester up to a maximum dollar value equal to eight (8) credit hours of in-county tuition.

**Section 28.04.**  Dependents of faculty members covered by this Agreement shall be permitted to take credit, audit, or non-credit courses up to an amount that is considered the status of full-time student for which the instructional fee shall be waived. The general fee and an additional fee of $5.00 per semester shall be paid by the students.

**Section 28.05.**  For the purpose of this Agreement, dependent means spouses and any dependent eligible for insurance under the College's flexible benefits program, up to age 23.

**Section 28.06.**  The foregoing benefit shall extend to the natural or legally adopted dependent unmarried children of deceased persons who, at the time of their death were members of the bargaining unit. However, the right to such benefit will terminate upon a dependent child's attainment of age twenty-three (23).

**Section 28.07.** Non-Credit Courses

A.  Non-Credit courses shall be covered in accordance with the procedure referenced below. Coverage cannot exceed the employee's and/or dependent's per-term, non-credit limit of a maximum dollar value equal to eight (8) credit hours as defined in this procedure.

34

Exhibit A

1.      Professional Development courses with CEU's, Fire Academy, Police Academy, and Private Security Training will be covered at one hundred percent (100%);

2.      Group lessons and summer camps will be covered at a maximum of fifty percent (50%);

3.      Private lessons are not covered.

<div align="center">

**ARTICLE 29**
**PERSONNEL FILES**

</div>

Section 29.01.  Faculty members will have access to their complete personnel file upon making a written request to the Vice President for Human Resources or designee two (2) work days in advance of the time they wish to inspect the file. However, letters of recommendation solicited with respect to initial employment or other letters of recommendation subsequently solicited with the consent of the faculty member will be excluded from inspection. Copies of any material placed in the personnel file other than written recommendations will be given to the faculty member. If any material is adverse, the faculty member will be given the opportunity to place an appropriate response stapled to the adverse material.

Section 29.02.  The personnel file will be located in the Human Resources Office, and is the only permanent file for each faculty member. It will contain:

A.      Annual contracts, personnel actions and assignment records;

B.      Performance evaluations/appraisals;

C.       Full and part-time proffers;

D.      Leave, tax and benefit records;

E.      Letter(s) of application;

F.      Professional credentials;

G.      Signed letters of commendation;

H.      Signed letters of complaint (and responses, if any).

While the above list is believed by the College to cover all categories of items, the College reserves the right to add additional materials as it deems appropriate. Such items will be made available to the affected faculty member and the CCC-AAUP in accordance with the current collective bargaining agreement.

It is further agreed that the College will not maintain any other personnel files on full-time faculty members except those needed by the appropriate administrators on a day-to-day basis. Such "working" files could include information related to a grievance file while it is still in the resolution process, faculty teaching schedules prior to their confirmation and emergency medical information, among other materials necessary to carry out the day-to-day administrative functions at the campus level. Again, as with the list of items contained in the centrally located personnel files, this list is not intended to be all-inclusive.

<div align="center">

35

</div>

Exhibit A

Further, because the "working" files are temporary in nature, and all lasting relevant materials will be transferred to the Human Resources Office on at least an annual basis, faculty members and the CCC-AAUP will not have access to the "working" files.

When it deems it necessary to do so, the College shall maintain personnel information by means of controlled, secure, electronic data storage with limited access.

## ARTICLE 30
## NON-DISCRIMINATION AND WORKPLACE POLICIES

Section 30.01. Both the College and the CCC-AAUP recognize their respective responsibilities under Federal and State civil rights laws, fair employment practice acts and other similar constitutional and statutory requirements. Therefore, both parties hereby reaffirm their commitments, legal and moral, not to discriminate in any manner relating to employment on the basis of race, color, religion (creed), gender, gender expression, age, national origin (ancestry), disability, marital status, sexual orientation, or military status, in any of its activities or operation. Furthermore, the College will not discriminate on the basis of handicap, provided the handicap does not substantially impair the person's ability to perform the work, and employing a handicapped person would not significantly increase the occupational hazards affecting either the handicapped person, other employees, the general public or the facilities in which the work is performed. The College and the CCC-AAUP will likewise not discriminate on the basis of disability. The College and CCC-AAUP agree to cooperate in efforts to comply with the Americans with Disabilities Act (ADA). Towards this end, the parties will use their best efforts to help place qualified individuals with disabilities in jobs, the essential functions of which the individual can perform without posing a direct threat to the health and/or safety of himself or others. Such determinations will be handled on an individual, case-by-case basis and will be non-precedent setting.

Section 30.02. Subject to the maintenance of membership obligations set out in Article 3, the College and the CCC-AAUP recognize the right of all faculty members and all applicants for employment to be free to join or not to join the CCC-AAUP and to participate or to refrain from participation in lawful concerted CCC-AAUP activities. Therefore, the College and the CCC-AAUP agree that there shall be no discrimination, interference, restraint, coercion or reprisal by the College or the CCC-AAUP against any faculty member or members or any applicant for employment because of CCC-AAUP membership or non-membership or because of any lawful activity in an official capacity on behalf of the CCC-AAUP.

Section 30.03. Workplace Harassment. The College and the CCC-AAUP hereby incorporate by reference as applicable the College policy effective July 8, 2011, on affirmative action, equal opportunity, discrimination, and harassment as set forth at College policy 3354:1-42-01.

## ARTICLE 31
## COLLEGE GOVERNANCE

Section 31.01. The principles and guidelines of the existing College-wide Governance System shall be updated to reflect the College-wide participative governance structure. The revised College Governance Structure shall be created in consultation with the CCC-AAUP. The updated governance structure shall be continued for the duration of this agreement, as outlined in Appendix L. No committee of the College-wide Governance System shall take action on any matter that affects wages, hours or terms and conditions of employment of the bargaining unit members.

36

Section 31.02. One-half (½) of the faculty representatives to each of the committees of the college-wide Governance System shall be appointed by the CCC-AAUP and one-half (½) shall be appointed by the Joint Faculty Senate Council. The right to appoint such committee representatives shall include the right to reappoint representatives to consecutive terms. In the event that the number of faculty representatives on any given committee is an odd number, the CCC-AAUP shall appoint the majority (e.g., if the number of faculty is 7, the CCC-AAUP shall appoint 4 and the Joint Faculty Senate Council shall appoint 3).

Section 31.03. The Advisory Budget Committee, composed of representatives appointed by the Administration and the CCC-AAUP, with equal administrative and faculty representation, shall be continued unless or until agreement is reached to incorporate the committee with additional representation from support staff and students into the College-wide Governance System.

A.    The committee will review campus and district budget proposals and relevant background materials at appropriate times in the budgetary process.

B.    The committee shall make reports and recommendations as it deems appropriate from time to time and such reports shall be submitted to the Vice President for Finance/Business Services, the Vice President for Human Resources, the President of the CCC-AAUP, and the Chairperson of the Joint Faculty Senate Council.

C.    The committee will be the vehicle through which the College, upon CCC-AAUP request, will provide the AAUP with data on information directly relevant to collective bargaining and contract administration.

D.    The College agrees to provide quarterly detailed consolidating financial statements with budget variances to the CCC-AAUP Advisory Budget Committee on a timely basis.

## ARTICLE 32
## MEET AND CONFER

Section 32.01. The leadership of the CCC-AAUP and the College shall meet periodically to discuss matters of mutual concern. Such meetings shall be scheduled by the President of the CCC-AAUP and the College upon request of either party. The requesting party will provide an agenda at least twenty-four (24) hours prior to the meeting.

Section 32.02. The College and the CCC-AAUP will maintain a College-Wide Labor-Management Committee comprised of six (6) members from the College and six (6) members from the CCC-AAUP to meet quarterly or more frequently on reasonable request in order to facilitate communication, promote understanding, advance discussion and solve problems. The College representatives on the Committee shall consist of the Executive Vice-President of Academic and Student Affairs, the Executive Vice-President of Administration and Finance, and each Campus President. The College may designate alternates to sit in place of the above-identified individuals upon notice to the CCC-AAUP. The CCC-AAUP representatives shall consist of the CCC-AAUP President, the four (4) CCC-AAUP Vice Presidents, and one member at large selected by the CCC-AAUP. Agendas for each meeting shall be exchanged at least one (1) week in advance of the scheduled meeting. To facilitate the utility of this Labor Management Committee, the College and CCC-AAUP agree to participate in training conducted by the Federal Mediation and Conciliation Service (FMCS) on the conduct of Labor Management Committees.

Section 32.03. The College and the CCC-AAUP will maintain Campus Labor-Management Committees. Each Campus Labor Management Committee shall be comprised of four (4) individuals: two

37

Exhibit A

(2) individuals representing the College and two (2) individuals representing the CCC-AAUP. One (1) of the individuals shall be the Campus President or designee who participates in the College-Wide Labor Management Committee set forth in Section 32.02, above. Similarly, one of the CCC-AAUP representatives on each Campus Labor Management Committee shall also be a member of the College-Wide Labor Management Committee set forth in Section 32.02, above.

The Campus Labor Management Committees shall meet quarterly or more frequently on reasonable request in order to facilitate communication, promote understanding, advance discussion and solve problems. Agendas for the meeting shall be exchanged at least one week in advance. To facilitate the utility of this Campus Labor Management Committee, the College and CCC-AAUP agree to participate in training conducted by the Federal Mediation and Conciliation Service (FMCS) on the conduct of Campus Labor Management Committees.

Section 32.04. The parties agree that the CCC-AAUP President, the Executive Vice President of the Academic and Student Affairs and the Executive Vice President of Administration and Finance shall meet monthly to discuss matters of interest. The Campus President or designee and the CCC-AAUP Vice President for the relevant Campus shall meet monthly to discuss matters of interest.

## ARTICLE 33
## GRIEVANCE PROCEDURE

Section 33.01. The CCC-AAUP and the College recognize that the prompt resolution of difficulties is essential to sound employer-employee relations. To this end, it is a declared objective of the CCC-AAUP and the College and/or its designated representatives to encourage the prompt and informal resolution of complaints by faculty members as they arise and to provide recourse to orderly procedures for the satisfactory adjustment of complaints.

All grievances concerning the interpretation and/or application of the provisions of this Agreement shall be settled in strict accordance with the procedure set forth in this Article, and except as otherwise specifically provided in this Agreement, this procedure is the sole and exclusive method of disposing of such grievances. It is mutually understood and agreed that the operation and recommendations of the Advisory Governance committees, as well as the decision of the College with respect to the granting of tenure or advancement in rank, are not subject to this grievance procedure or any other dispute resolution mechanism. The College agrees that in all cases of discipline, notification of such discipline will be simultaneously issued to both the affected faculty member and the CCC-AAUP.

Step 1.  The Informal Pre-grievance Consultation.  The College and the CCC-AAUP agree that a number of potential grievances may be avoided if the affected faculty member(s) and the appropriate College administrator (lowest level administration with the ability to resolve the grievance) are able to discuss and resolve problems by these means. These informal discussions may include a grievance advisor. If the potential grievance is not resolved by this informal procedure within fifteen (15) working days of the alleged violation of the Agreement, then a formal written grievance must be filed. Members of the bargaining unit are encouraged to work out grievances on an informal basis wherever possible.

Step 2.  Beginning of the Formal Process.  If the grievance is not resolved under the informal method set forth in Step 1, a written grievance must be filed with the designated Step Administrator at the site where the alleged grievance arose. Such written grievance must be filed within fifteen (15) working days following either the day that both parties reach impasse or following the fifteenth (15th)

38

day of Step 1, whichever comes first. Within ten (10) working days after the filing of the grievance, a meeting will be held among the designated administrator, the aggrieved faculty member(s), and if the faculty member(s) so elect(s) a representative of the CCC-AAUP. Following this meeting, the designated administrator shall issue a written answer to the grievance within seven (7) working days or the grievance moves automatically to Step 3.

Step 3. If the grievance is not satisfactorily settled in Step 2, the faculty member and/or the CCC-AAUP may appeal the Step 2 answer to the Campus President/College Vice President/Vice President of Academic Affairs within seven (7) working days after receipt of the Step 2 response. In the case of the Division of Workforce and Economic Development, the grievance shall be filed with the Executive Vice President of that Division. Such appeal shall be in writing and shall specify the reason why the grievant believes the Step 2 decision is in error. The Campus President/College Vice President/Vice President of Academic Affairs shall hold a grievance meeting with the faculty member(s) and if the faculty member(s) so elect(s), a representative of the CCC-AAUP, within ten (10) working days after receipt of the appeal and shall issue a written decision to the aggrieved faculty member within seven (7) working days after the close of the meeting or the grievance moves automatically to Step 4. If the issue could affect other members of the bargaining unit, the CCC-AAUP shall be notified of such meeting and have a right to be present and participate.

Step 4. If the grievance is not satisfactorily settled in Step 3, the aggrieved faculty member and/or the CCC-AAUP may file an appeal of the Step 3 answer to the Executive Vice President for Administration and Finance or designee within seven (7) working days after receipt of the Step 3 decision. Such appeal shall be in writing and shall specify the reason why the grievant believes the Step 3 decision is in error. The Executive Vice President for Administration and Finance or designee shall hold a grievance meeting with the faculty member(s) and/or a representative of the CCC-AAUP as outlined above within ten (10) working days after the receipt of the appeal and shall render a written response within seven (7) working days after the close of the meeting.

Step 5. If the CCC-AAUP is dissatisfied with the Step 4 response and the grievance does not involve the non-renewal of a faculty member's contract, the CCC-AAUP may refer the matter to binding arbitration within ten (10) working days after the issuance of the Step 4 decision or by agreement of the parties. Relatively uncomplicated grievances may be submitted to expedited arbitration or streamlined arbitration pursuant to the Rules of the Federal Mediation and Conciliation Service (FMCS). Notwithstanding anything to the contrary above, the parties may, by mutual written agreement, agree upon another expedited arbitration procedure.

Section 33.02. If, in the opinion of the College or the CCC-AAUP, an individual's grievance affects a substantial number of employees as it relates to a particular set of facts, circumstances or issues similar to other employees, or as it relates to certain provision of the Memorandum of Agreement, that grievance shall be converted to a policy grievance. Through the mechanism of the policy grievance, the related grievances of similarly-situated employees whether filed or not, will be consolidated into one (1) proceeding, the outcome of which will be binding on all parties, actual or potential. Once classified as a policy grievance, the dispute will be handled pursuant to the existing procedure culminating in limited jurisdiction binding arbitration.

Section 33.03. An individual grievance that is subsequently converted to a policy grievance will be advanced at the time of conversion to Step 4 of the grievance procedure.

Section 33.04. A grievance filed initially as a policy grievance must be filed directly with the Executive Vice-President for Administration and Finance and will be initiated at Step 4 of the grievance process.

Section 33.05. Upon written notice of the CCC-AAUP's intent to arbitrate a grievance, the College and CCC-AAUP shall request a list of arbitrators from Federal Mediation and Conciliation Service (FMCS) who are members of the National Academy of Arbitrators. The parties shall each designate a representative, and the two (2) representatives shall attempt to agree upon an impartial arbitrator from the list of arbitrators. If such Agreement is not made within ten (10) days, the parties shall meet to strike names alternately, the last remaining name shall be the arbitrator to hear the matter. If the list of arbitrators is not acceptable to both parties, the parties may request a new list of arbitrators.

Section 33.06. In the event the CCC-AAUP is dissatisfied with the Step 4 response of the Executive Vice President for Administration and Finance on a grievance involving non-renewal of a faculty member's contract, it may appeal the decision to advisory arbitration. The procedure for setting up such advisory arbitration shall be the same as the procedure set forth in Section 5. The findings and recommendation of the arbitrator under this procedure shall be issued to the College, the CCC-AAUP and the faculty member.

Section 33.07. In the event a grievance goes to arbitration, this Agreement shall be the basis on which the arbitrator's decision is rendered, and in reaching his decision, the arbitrator shall have no authority to amend, modify or in any way change its terms.

Section 33.08. Expenses and fees of the arbitrator shall be shared equally by the College and the CCC-AAUP.

Section 33.09. Decisions of arbitrators and settlements reached by the College and the CCC-AAUP in any step of the Grievance Procedure shall be final and binding on the CCC-AAUP, the College and the grievant.

Section 33.10. The time limits imposed by this Article shall, unless extended by mutual agreement, be considered as binding. A request to extend any of the time limits, except the initial filing period, shall not be unreasonably denied. All College responses shall be sent to the grievant by certified mail, return receipt requested. In the event the College fails to answer a grievance at Step 3 within the established time limit, the CCC-AAUP may give notice in writing to the Executive Vice President for Administration and Finance or his designee that the grievance will be considered granted unless the College answers the grievance within five (5) working days following receipt of the notice. Failure at any step of this procedure to appeal a grievance to the next step within the specified time limits will be considered to be acceptance of the decision rendered at that step. The time limits set forth in this article shall be suspended during the summer session or breaks upon good cause shown (e.g., grievant's absence from geographic area), if the said grievant makes a timely request in writing at any stage of the grievance procedure other than Steps 1 and 2.

## ARTICLE 34
## NO STRIKE/NO LOCKOUT

Section 34.01. The College and the CCC-AAUP subscribe to the principle that any and all differences arising under this Agreement should be resolved by peaceful and appropriate means without any interruption of the College programs and operations. Therefore, the CCC-AAUP agrees that during the term of this Agreement it shall not directly or indirectly call, authorize, instigate, engage in, support, encourage, ratify, assist in any way, or sanction any strike (including a sympathy strike), slowdown, work stoppage or any interruption or interference with the normal operations of the College. Further, the CCC-AAUP agrees that after the expiration of this Agreement it shall not directly or indirectly call, authorize, instigate, engage in, support, encourage, ratify, assist in any way or sanction any strike (including a sympathy strike), slowdown, work stoppage or any interruption or interference with the normal operations of the College, except as provided by and in conformance with the Ohio Public Sector Bargaining Act.

Exhibit A

Section 34.02. In addition, no faculty member shall instigate or participate, directly or indirectly, in any strike (including sympathy strike), slowdown work stoppage or any interruption or interference with the normal operations of the College. Provided, however, it shall not be a violation of this Agreement for a faculty member to refuse to cross a picket line where there is a real and bona fide concern for personal safety. Violation of this provision shall be proper cause for disciplinary action, including discharge at the College's sole discretion. The sole question of whether a faculty member has engaged in any conduct prohibited by this provision is reviewable through the grievance and arbitration process.

Section 34.03. The CCC-AAUP shall at all times cooperate with the College in continuing normal operations and shall actively discourage and endeavor to prevent or terminate any violation of this provision. In the event any violation of this provision occurs, the CCC-AAUP shall immediately notify all faculty members that the strike, slowdown, work stoppage or other interference with normal College operations is prohibited and is not in any way sanctioned or approved by the CCC-AAUP. Furthermore, the CCC-AAUP shall immediately advise members of the bargaining unit to return to their duties at once.

Section 34.04. The College agrees that during the term of this Agreement, it shall not lock out any faculty members covered by this Agreement.

## ARTICLE 35
## PROFESSIONAL ACTIVITIES OUTSIDE THE COLLEGE

Section 35.01. It is recognized that faculty members may engage in limited professional activities outside the College and for which compensation is not received through the College, provided such activities do not interfere with the individual's full-time responsibilities to the College. In those instances, when a faculty member has failed to perform one (1) or more of his contractual responsibilities with the College and there is sufficient reason to believe that such performance is due to interference from the faculty member's outside professional activities, the faculty member will, upon written request, provide to the appropriate academic administrator sufficient information in writing concerning his outside professional activities.

## ARTICLE 36
## LEGALITY

Section 36.01. It is the intent of the College and the CCC-AAUP that this Agreement comply in every respect with applicable statutes, constitutional requirements, affirmative action obligations and other governmental regulations, as well as judicial opinions. If any tribunal (including, but not limited to, a court of competent jurisdiction or any administrative agency or governmental body having jurisdiction) adjudges any article, section or clause in this Agreement to be in conflict with any law, regulation or affirmative action obligation, all the remaining articles, sections and clauses which are not rendered meaningless, inoperable or ambiguous as a result of the judgment shall remain in full force and effect for the duration of this Agreement. In the event any article, section or clause is adjudged to be unlawful, and if the CCC-AAUP so requests, the parties will meet and discuss a lawful alternative provision.

## ARTICLE 37
## TENURE POLICY

Section 37.01. Tenure is awarded in recognition of faculty competence to the College's instructional faculty, counselors and librarians. Tenure, by tradition, is evidence of an academic institution's support of academic freedom and the professional responsibility of the individual to whom tenure is awarded.

**Section 37.02.**

A.  Tenure, the continuous appointment to employment, awarded by the Board of Trustees in recognition of faculty competence, is the College's most effective means for establishing a climate of academic freedom and professional responsibility.

B.  All tenure-track faculty shall become eligible for tenure after five (5) years of service to the College during which they have served over 50% of their annual contractual time in a teaching capacity. Teaching capacity is defined by the College as: classroom instruction, college librarian or counseling. Additionally, in order to be granted tenure, tenure-track faculty must meet the criteria governing eligibility for the rank of assistant professor. Further, in order to be granted tenure, tenure-track faculty must have demonstrated teaching ability, creative achievement, academic integrity and professional service to the College. Once awarded, tenure shall be continuous until the retirement of the faculty member or the termination of the individual's contract.

C.  Should a faculty member be denied tenure at the time of eligibility, the College shall provide the member with written reasons for the denial.

D.  A tenured faculty member may be terminated due to retrenchment or just cause.

E.  The Executive Vice President for Academic and Student Affairs, using appropriate governance guidelines, is authorized to develop and implement procedures necessary to carry out this policy.

<h2 style="text-align:center">ARTICLE 38<br>DISTANCE LEARNING</h2>

**Section 38.01.  General Principles.**

A.  Faculty engaged in distance learning shall have the same academic freedom (see Article 27) as faculty have in the traditional learning environment.

B.  Methods of presentation (pedagogical, not technical) and course materials are to be under the control of the faculty member assigned to develop and/or teach the distance learning course.

C.  The mode of delivery does not change the meaning of "course" for purposes of the collective bargaining agreement.

D.  Distance learning courses will be assigned to an instructor in the same manner as traditional courses.

E.  Distance learning course will be offered to qualified faculty first. However, if insufficient qualified faculty volunteers, then the College may mandate qualified faculty to teach the distance learning course.

**Section 38.02.  College-wide Committee on Distance Learning.**  The College-wide Committee on Distance Learning comprised of representatives from the College, CCC-AAUP and Faculty Senate, along with subject matter experts as needed, will be responsible for investigating and providing guidelines as they

Exhibit A

relate to Distance Learning issues, including, without limitation, what constitutes "appropriate lead time" in the context of:

A.    A faculty member teaching a new distance learning course;

B.    A faculty member teaching a distance learning course for the first time;    or

C.    A faculty member converting a traditional course to a distance learning course. This committee shall make recommendations to the Administration, CCC-AAUP, and Faculty Senate. Those recommendations shall be implemented in whole, in part, not at all, or as modified, all by consensus.  To the extent these parties are unable to reach consensus, each party retains its respective rights.

Section 38.03.  Training/Qualifications.

A.    The College shall provide distance learning training to faculty members who wish to or do teach on-line.  All faculty teaching on-line must go through course management system training before offering course.

B.    All new faculty must go through course management system training.

C.    Faculty who teach on-line should maintain appropriate distance learning skills that they use in teaching.

D.    The College will provide technical support to those faculty teaching distance learning courses.

Section 38.04.  Evaluation.

A.    Deans/Directors evaluating distance learning courses must have received training and be up to date in course management systems.

B.    Distance learning "classroom observation" involves a Dean /Director logging in for a twenty-four (24) hour period of time.

C.    A faculty member who is teaching a fully on-line course for the first time may be evaluated by the Dean/Director, regardless of the evaluation cycle, for the purpose of evaluating the faculty member's criteria, (Dean/Director observations, peer observations, self-evaluation, and student evaluations).

43

Exhibit A

Section 38.05. Definitions of Delivery Modes at Tri-C.

| Delivery Modes | % time online | Description | Seat Time |
|---|---|---|---|
| Online | 90-100% | Course or program is delivered online. Participants can complete all course requirements without coming to Campus. Tests may be online or in a suitable proctored environment. | 0 to 10% seat time for testing only. Testing options must include locations close to participants |
| Blended | 30-89% | Course or program combines online and face-to-face learning. Characterized by a reduction in seat time, some on-ground, face-to-face sessions are replaced with online learning. Web-based activities and content in a blended course or program is in addition to classroom content. Both online and on-ground, face-to-face sessions are required elements of a blended course or program. | Split online learning with seat time (e.g., limited classroom sessions, exams, lab sessions, clinical) |
| Web-enhanced | 0-29% | Course is delivered in an on-ground, face-to-face environment, and augmented with a web-based course site. Content in a web-enhanced course supports or augments the classroom environment. | 100% seat time with a web-based course site |
| Classroom (traditional) | 0% | Course is delivered 100% in an on-ground, face-to-face environment. | 100% seat time |

Additional delivery modes include:

Cable College: A course where the live delivery of instruction occurs via television.

Interactive Video: A face-to-face course delivered simultaneously to multiple locations via video technology. Students and the faculty may be attending in different geological locations.

Section 38.06. Virtual Office Hours.

A.   Virtual office hours are an acceptable way to serve students in online courses. Virtual office hours can occur anywhere with appropriate, College-supported technology, including a faculty member's on-ground office.

B.   Virtual office hours are scheduled just like on-ground office hours. A faculty member's respective Dean/Director approves virtual office hours.

C.   The amount of virtual office hours should be in proportion to a faculty member's online course workload. However, all faculty members will have at least three (3) of their ten (10) office hours in their on-ground faculty office spread over at least two (2) workdays.

44

Exhibit A

Section 38.07. Online Course Caps.

A.    The first time a faculty member teaches a particular course online, the cap should not exceed fifteen (15).

B.    The maximum course cap in online courses is thirty (30), plus or minus three (3).

C.    Online course caps should be consistent per course within disciplines College-wide. Lower caps may be established for specific courses with the approval of the Dean.

## ARTICLE 39
## DURATION

**Section 39.01.** This Agreement represents a complete and final understanding on all bargainable issues between the College and the CCC-AAUP. This Agreement shall be effective August 16, 2019, and remain in full force and effect until August 15, 2022, and thereafter from year to year unless at least one hundred twenty (120) days prior to said expiration date or any anniversary thereof, either party gives timely written notice of an intention to reopen negotiations.

**Section 39.02.** The College shall have the right to reopen the contract on all economic subject matters based on the Board of Trustees' good faith determination of the existence of a "crisis" financial exigency.

**Section 39.03.** Such good-faith determination of "crisis" financial exigency will be subject to expedited review under the grievance/arbitration procedure. The Administration will endeavor to provide a sixty (60) day notice of its reason to believe that there is a pending "crisis" financial exigency to the CCC-AAUP and provide that organization with all available information. For the purpose of this section, "crisis" financial exigency shall be defined as follows: That current and projected revenues are so limited that the College can no longer continue to fulfill current and future financial obligations under the contract without disrupting the administration and program integrity of the College. During the pendency of such "crisis" financial exigency, Article 34, No Strike, No Lockout, shall be suspended.

45

Exhibit A

## ARTICLE 40
## EXECUTION

**Section 40.01.**  In witness whereof, the parties hereto have hereunto set their hands this month of August 2019 .

CUYAHOGA COMMUNITY COLLEGE
DISTRICT COMMUNITY COLLEGE

By: _____
Andrew Randall, Chairperson, Board

By: _____
Dr. Alex Johnson, President

By: _____
Mr. David Kuntz

By: _____
Dr. Karen Miller

By: _____
Ms. Lillian A. Welch

THE AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS (AAUP),
CUYAHOGA CHAPTER

By: _____
Mr. Jeffrey Tuma, President, CCC-AAUP

By: _____
Mr. David Bernatowicz

By: _____
Mr. Michael Boyko

By: _____
Dr. Edward Foley, CCC-AAUP
Immediate Past President

By: _____
Ms. Anna Lauer

By: _____
Mr. Bradley Lipinski

Date: _____8/16/2019_____

46

Exhibit A

## APPENDIX A
## FACULTY SALARY SCHEDULE FOR 36 WEEKS OF SERVICE
## CUYAHOGA COMMUNITY COLLEGE – CLEVELAND, OHIO
## ACADEMIC YEAR 2019-2020

| STEP | GRADE | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | A | B | C | D | E | F | G |
| 14.00 | | | $84,190 | $87,491 | $92,714 | $96,385 | $102,217 |
| 13.50 | $72,337 | $78,012 | $82,599 | $85,827 | $90,932 | $94,538 | $100,237 |
| 13.00 | $71,002 | $76,549 | $81,032 | $84,190 | $89,191 | $92,714 | $98,295 |
| 12.00 | $68,407 | $73,709 | $78,012 | $81,032 | $85,827 | $89,191 | $94,535 |
| 11.50 | $67,146 | $72,337 | $76,549 | $79,504 | $84,190 | $87,491 | $92,714 |
| 11.00 | $65,920 | $71,002 | $75,116 | $78,012 | $82,599 | $85,827 | $90,933 |
| 10.00 | $63,540 | $68,407 | $72,337 | $75,116 | $79,504 | $82,600 | $87,491 |
| 9.50 | $62,388 | $67,146 | $71,002 | $73,709 | $78,012 | $81,032 | $85,827 |
| 9.00 | $61,265 | $65,920 | $69,690 | $72,337 | $76,549 | $79,504 | $84,190 |
| 8.00 | $59,086 | $63,540 | $67,146 | $69,690 | $73,709 | $76,549 | $81,032 |
| 7.50 | $58,030 | $62,388 | $65,920 | $68,407 | $72,337 | $75,116 | $79,504 |
| 7.00 | $56,993 | $61,265 | $64,723 | $67,146 | $71,005 | $73,709 | $78,012 |
| 6.00 | $54,999 | $59,086 | $62,388 | $64,723 | $68,407 | $71,002 | $75,116 |
| 5.00 | $53,078 | $56,993 | $60,158 | $62,388 | $65,919 | $68,407 | $72,337 |
| 4.00 | $51,249 | $54,999 | $58,030 | $60,158 | $63,536 | $65,920 | $69,690 |
| 3.00 | $49,491 | $53,078 | $55,983 | $58,030 | $61,265 | $63,540 | $67,146 |
| 2.00 | $48,009 | $51,249 | $54,030 | $55,983 | $59,086 | $61,265 | $64,723 |
| 1.00 | $46,214 | $49,491 | $52,151 | $54,030 | $56,993 | $59,086 | $62,388 |

| | | |
| --- | --- | --- |
| A = B.A. or equivalent | D = M.A. + 15 Semester (22.5 quarter credits) | G = Doctorate |
| B = B.A. + 15 Semester (22.5 quarter credits) | E = M.A. + 30 Semester (45 quarter credits) | |
| C = B.A. + 30 Semester (45 quarter credits) or M.A. degree | F = M.A. + 45 Semester (67.5 quarter credits) | |

For guidelines, procedures and criteria concerning the use of graduate education for salary advancement please refer to Article 16, Compensation, Section 16.04.

47

Exhibit A

## APPENDIX B
## FACULTY SALARY SCHEDULE FOR 36 WEEKS OF SERVICE
## CUYAHOGA COMMUNITY COLLEGE – CLEVELAND, OHIO
## ACADEMIC YEAR 2020-2021

| STEP | GRADE | | | | | | |
|------|-------|-------|-------|-------|-------|-------|-------|
|       | A | B | C | D | E | F | G |
| 14.00 |          |          | $85,032 | $88,366 | $93,641 | $97,349 | $103,239 |
| 13.50 | $73,060 | $78,792 | $83,425 | $86,685 | $91,841 | $95,483 | $101,239 |
| 13.00 | $71,712 | $77,314 | $81,842 | $85,032 | $90,083 | $93,641 | $99,278 |
| 12.00 | $69,091 | $74,446 | $78,792 | $81,842 | $86,685 | $90,083 | $95,480 |
| 11.50 | $67,817 | $73,060 | $77,314 | $80,299 | $85,032 | $88,366 | $93,641 |
| 11.00 | $66,579 | $71,712 | $75,867 | $78,792 | $83,425 | $86,685 | $91,842 |
| 10.00 | $64,175 | $69,091 | $73,060 | $75,867 | $80,299 | $83,426 | $88,366 |
| 9.50 | $63,012 | $67,817 | $71,712 | $74,446 | $78,792 | $81,842 | $86,685 |
| 9.00 | $61,878 | $66,579 | $70,387 | $73,060 | $77,314 | $80,299 | $85,032 |
| 8.00 | $59,677 | $64,175 | $67,817 | $70,387 | $74,446 | $77,314 | $81,842 |
| 7.50 | $58,610 | $63,012 | $66,579 | $69,091 | $73,060 | $75,867 | $80,299 |
| 7.00 | $57,563 | $61,878 | $65,370 | $67,817 | $71,715 | $74,446 | $78,792 |
| 6.00 | $55,549 | $59,677 | $63,012 | $65,370 | $69,091 | $71,712 | $75,867 |
| 5.00 | $53,609 | $57,563 | $60,760 | $63,012 | $66,578 | $69,091 | $73,060 |
| 4.00 | $51,761 | $55,549 | $58,610 | $60,760 | $64,171 | $66,579 | $70,387 |
| 3.00 | $49,986 | $53,609 | $56,543 | $58,610 | $61,878 | $64,175 | $67,817 |
| 2.00 | $48,489 | $51,761 | $54,570 | $56,543 | $59,677 | $61,878 | $65,370 |
| 1.00 | $46,676 | $49,986 | $52,673 | $54,570 | $57,563 | $59,677 | $63,012 |

| | | |
|---|---|---|
| A = B.A. or equivalent | D = M.A. + 15 Semester (22.5 quarter credits) | G = Doctorate |
| B = B.A. + 15 Semester (22.5 quarter credits) | E = M.A. + 30 Semester (45 quarter credits) | |
| C = B.A. + 30 Semester (45 quarter credits) or M.A. degree | F = M.A. + 45 Semester (67.5 quarter credits) | |

For guidelines, procedures and criteria concerning the use of graduate education for salary advancement please refer to Article 16, Compensation, Section 16.04.

48

Exhibit A

## APPENDIX C
## FACULTY SALARY SCHEDULE FOR 36 WEEKS OF SERVICE
## CUYAHOGA COMMUNITY COLLEGE – CLEVELAND, OHIO
## ACADEMIC YEAR 2021-2022

| STEP | GRADE | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | A | B | C | D | E | F | G |
| 14.00 | | | $86,733 | $90,133 | $95,514 | $99,296 | $105,304 |
| 13.50 | $74,521 | $80,368 | $85,094 | $88,419 | $93,678 | $97,393 | $103,264 |
| 13.00 | $73,146 | $78,860 | $83,479 | $86,733 | $91,885 | $95,514 | $101,264 |
| 12.00 | $70,473 | $75,935 | $80,368 | $83,479 | $88,419 | $91,885 | $97,390 |
| 11.50 | $69,173 | $74,521 | $78,860 | $81,905 | $86,733 | $90,133 | $95,514 |
| 11.00 | $67,911 | $73,146 | $77,384 | $80,368 | $85,094 | $88,419 | $93,679 |
| 10.00 | $65,459 | $70,473 | $74,521 | $77,384 | $81,905 | $85,095 | $90,133 |
| 9.50 | $64,272 | $69,173 | $73,146 | $75,935 | $80,368 | $83,479 | $88,419 |
| 9.00 | $63,116 | $67,911 | $71,795 | $74,521 | $78,860 | $81,905 | $86,733 |
| 8.00 | $60,871 | $65,459 | $69,173 | $71,795 | $75,935 | $78,860 | $83,479 |
| 7.50 | $59,782 | $64,272 | $67,911 | $70,473 | $74,521 | $77,384 | $81,905 |
| 7.00 | $58,714 | $63,116 | $66,677 | $69,173 | $73,149 | $75,935 | $80,368 |
| 6.00 | $56,660 | $60,871 | $64,272 | $66,677 | $70,473 | $73,146 | $77,384 |
| 5.00 | $54,681 | $58,714 | $61,975 | $64,272 | $67,910 | $70,473 | $74,521 |
| 4.00 | $52,796 | $56,660 | $59,782 | $61,975 | $65,454 | $67,911 | $71,795 |
| 3.00 | $50,986 | $54,681 | $57,674 | $59,782 | $63,116 | $65,459 | $69,173 |
| 2.00 | $49,459 | $52,796 | $55,661 | $57,674 | $60,871 | $63,116 | $66,677 |
| 1.00 | $47,610 | $50,986 | $53,726 | $55,661 | $58,714 | $60,871 | $64,272 |

| | | |
| --- | --- | --- |
| A = B.A. or equivalent | D = M.A. + 15 Semester (22.5 quarter credits) | G = Doctorate |
| B = B.A. + 15 Semester (22.5 quarter credits) | E = M.A. + 30 Semester (45 quarter credits) | |
| C = B.A. + 30 Semester (45 quarter credits) or M.A. degree | F = M.A. + 45 Semester (67.5 quarter credits) | |

For guidelines, procedures and criteria concerning the use of graduate education for salary advancement please refer to Article 16, Compensation, Section 16.04.

Exhibit A

**APPENDIX D**
**POSITION SPECIFICATION: INSTRUCTIONAL AND**
**NON-INSTRUCTIONAL FACULTY**

Section 1. Description.  Each teacher, counselor and librarian is a College faculty member who is responsible to a designated campus or district office administrator for providing authorized professional instructional and instruction–related services to students in support of student success and completion. Each full-time bargaining unit member appointment is by individual contract at a rank of Assistant Professor, Associate Professor or Professor. All instructional and non-instructional bargaining unit members are subject to all policies, procedures and regulations of the College.

Section 2. Duties.  Specific duties within appropriate responsibility areas are assigned to each bargaining unit member by the administrator whom the Campus President or district administrator designates. Specific duties within direct and indirect responsibility areas will be assigned in relation to the expertise of the bargaining unit member and institutional priorities.

Section 3. Instructional Bargaining Unit Member Direct Responsibility Areas.

A.     Duties in the direct responsibility areas involve the delivery of instruction directly to students and/or activities in direct support of instruction.

B.     Instruction. Duties in this responsibility area pertain to instruction for credit classes. Duties include: preparation, presentation, student consultation and evaluation.

C.     Special ESU assignment. A special ESU assignment, in lieu of instruction, may be made for a semester OR for an academic year. Faculty coordination duties comprise the principal type of special assignment. Specific duties for other types of special ESU assignments which support instruction or academic administration may be assigned.

Section 4.  Instructional Bargaining Unit Member Indirect Responsibility Areas.

A.     Duties in the indirect responsibility areas involve professional service to the College, the community, students and the profession. Duties may relate to, but are not limited to, such non-instructional responsibility areas as:

1.     College Services
       a.     College Governance
       b.     Campus and district committees
       c.     Curriculum development
       d.     Special service

2.     Student Services
       a.     Admissions and Records
       b.     Advising--discipline expertise for academic plans
       c.     Student Activities

3.     Public Services
       a.     Community services
       b.     Continuing education
       c.     Public Relations

50

    4.    Professional Services
        a.    Instructional development
        b.    Professional growth
        c.    Technology training

**Section 5. Non-Instructional Bargaining Unit Member Direct Responsibility Areas.**

A.    Duties in the direct responsibility areas involve delivery of professional services directly to students and/or activities in direct support of such services.

B.    Counselors. Professional duties can include individual and group counseling, personal and career counseling, student orientation, assessment, guiding student development of an academic plan, verifying and assigning the academic plan, verifying transferability, and teaching classes.

C.    Librarians. Duties in this area of responsibility include providing effective professional services which enable students and other faculty members to access printed and non-printed resources. Such duties pertain to: acquisition, processing, reference and circulation of materials that are linked with curricular offerings of the campus as well as with special need of students and teachers. Duties also include facilitating and directing student career research, teaching information literacy skills, and teaching classes.

D.    Non-instructional faculty may teach, as assigned by their Dean/Director, up to a maximum of three (3) semester hours per term (Fall and Spring), as part of the normal workload within the 37.5 hour week. Additional courses taught beyond the three (3) semester hour limit would be paid at the adjunct faculty rate, and would occur outside of the scheduled 37.5 work week. Course assignments will be made by their Dean/Director as determined by campus and departmental needs.

E.    Non-instructional faculty are eligible to teach as adjuncts subject to established College guidelines. Instruction in credit bearing courses is not mandatory; therefore, non-instructional faculty are not required to teach for either advancement in rank or tenure.

**APPENDIX E**
**ACADEMIC RANK POLICY**

A.    The purpose of a system of academic rank at the College is to give recognition to bargaining unit members for excellence in performing their respective duties consistent with the aims and philosophy of the College as a teaching-learning institution. The policy requires academic preparation, professional accomplishment and meaningful service to students, peers, the College and the community at large. It is believed that these combined attributes characterize the model faculty member.

    1.    The system of professional rank established at the College consists of three (3) classifications as represented by the titles of Assistant Professor, Associate Professor, and Professor.

    2.    Professional rank shall have no relationship to the "Faculty Salary Schedule" nor will professional rank be a factor in the determination of full-time professional salary or compensation.

B.    A bargaining unit member is considered for initial rank placement under the policy which is in effect at the time of initial appointment. A bargaining unit member may be considered for promotion in rank under the policy in effect at the time he becomes eligible for promotional consideration.

    1.    Application for consideration for promotion in rank under this policy is voluntary.

    2.    Under circumstances deemed advisable by the Board of Trustees, any of the provisions or restrictions of this policy may be waived in a specific instance in the best interest of the College.

C.    All bargaining unit members employed on the "Faculty Salary Schedule" are entitled to the rank of Assistant Professor upon entry to full-time service at the College.

D.    The rank of Associate Professor may be granted to bargaining unit members who meet the following criteria and are recommended for such rank according to specified procedure:

    1.    If the candidate holds an earned doctorate in a field directly related to the professional assignment and which has been formally recognized by the Board of Trustees; or

    2.    If the candidate holds a master's degree, plus thirty (30) additional semester credits of graduate work. Of these graduate credits, at least twenty (20) shall be in the subject area of, or shall be directly related to, the major instructional or professional work assignment in the area in which the rank is to be granted; or

    3.    If the candidate holds a bachelor's degree and holds a valid legal or professional license in fields where the master's degree is normally not offered and which is formally accepted by the College as equivalent to a master's degree plus thirty (30) semester credits in the subject area or directly related subject area relevant to the major instructional or professional work assignment in the area in which the rank is to be granted; and

    4.    If the candidate has completed four (4) years of teaching experience in the area in which the rank is to be granted, at least three (3) years or which have been on the college level, or four (4) years of work-related experience in the area in which have been on or equivalent to college level experience; and

52

Exhibit A

5.     If the candidate has held the rank of Assistant Professor for at least two (2) years; and

6.     If addition to those qualifications listed above, the candidate shall have evidenced teaching excellence, or excellence in the professional and assignment in which the rank is the granted as judged by faculty, students and administration.

E.     The rank of Professor may be granted to bargaining unit members who meet the following criteria and are recommended for such rank according to specified procedure:

1.     If the candidate holds an earned doctorate in a field directly related to the professional assignment and which has been formally recognized by the Board of Trustees; or

2.     If the candidate holds a master's degree and at least forty-five (45) additional graduate semester credits. Of the total graduate credits, at least fifty (50) shall be in the subject area or shall be directly related to the major instructional or professional work assignment in the area in which the rank is to be granted; and

3.     If the candidate has completed seven (7) years of experience in the area in which the rank is to be granted, at least four (4) years of which have been on the college level, or work-related experience at the college level at least two (2) years of which must have been served as an Associate Professor at the College; and

4.     If the candidate to be awarded the status of Professor shall have evidenced teaching excellence, or excellence in the area in which the rank is to be granted, as judged by faculty, students and administration;

5.     If in addition to those qualifications listed above, the candidate to be awarded the status of Professor shall have evidenced outstanding achievement in at least three (3) of the following categories:

    a.     Service to the College through assistance to students outside the classroom, such as advising student groups;

    b.     Service to the College through published scholarly materials or unpublished materials for district-wide educational use;

    c.     Service to the College through significant participation in professional and educational organizations through active membership and/or service as an officer or leader in conferences, workshops and conventions;

    d.     Service to the College through significant participation on campus-wide or College-wide committees;

    e.     Service which reflects favorably upon the College through participation in the Greater Cleveland area as a speaker, advisor or as an active member in community groups.

F.     Instructional personnel who elect to participate in the rank advancement system shall be designated according to rank and discipline; e.g., Assistant Professor of Mathematics; non-instructional personnel such as counselors and librarians shall be designated according to the position description and rank: e.g., counselor, rank of Assistant Professor.

1.     The policy applies to all bargaining unit personnel;

<div align="center">53</div>

<div align="right">Exhibit A</div>

2. Bargaining unit members who revert to part-time teaching or retire will retain their highest rank;

3. Course work taken after initial appointment shall be part of a planned program of continuous professional growth in relation to the individual's primary assignment. This plan is to be approved by the administrator of the appropriate area and on file in the individual's personnel folder; and

4. All degrees and course work submitted shall have been earned from a regionally accredited institution of higher education, or recognized and certified occupational/technical training institution. Appropriate procedures will be used to certify work taken at institutions of higher learning outside the United States of America.

G. The President of the College is hereby authorized and directed to adopt and promulgate rules and regulations to effectuate the board policy as set forth herein to the extent that the same shall be consistent with this policy.

54

Exhibit A

## APPENDIX F
## IMPLEMENTATION PROCEDURES ON ACADEMIC RANK

Section 1.  Campus Committee on Academic Rank.

A.      Committee Function:

   1.      The Committee is to assist the Campus President/College Vice President or EVP for Workforce and Economic Development in establishing procedures and evaluating the qualifications of faculty for promotion in rank.

   2.      The Committee shall advise the Campus President/College Vice President or EVP for Workforce and Economic Development in establishing procedures to determine how students and administrative evaluation of classroom or other professional activities will be solicited and how they will be used in the evaluation process.

B.      Committee Formation and Composition:

   1.      The Committee shall be selected by established campus procedures with involvement of the Faculty Senate.

   2.      A majority of the Committee shall be tenured faculty.

   3.      The campus, through its established procedures, shall determine the maximum size and composition of the Committee.

   4.      It will be at the discretion of each campus whether the members of the Committee are required to be participants in the rank system.

   5.      Individuals being considered for promotion in rank are not eligible to serve on the Committee.

   6.      The Campus President/College Vice President or EVP for Workforce and Economic Development shall provide the Committee chairman and members of the Committee with a written statement of the Committee's purposes, responsibilities and procedures regarding the receipt and evaluation of applications.

Section 2.  Procedures for Candidates.

A.      Individuals eligible under the provisions of the College Policy on Academic Rank for promotion, and who wish to be considered for promotion, shall submit a statement and supporting materials requesting consideration to the Campus Committee by October 31 of each year.

   At this time, the candidate shall also send duplicate copies of his request and supporting materials to his Dean/Director and to his Dean/Director for their written recommendations to be submitted to the Committee by November 30.

B.   The candidate's request for consideration by the Campus committee, Dean/Director, and his Dean/Director, shall be accompanied by appropriate supporting material detailing academic credits, accomplishments and activities that the individual believes meet the criteria for that rank as outlined in Appendix E. These materials shall be organized in such fashion as to justify the individual's request for promotion.

The statement of accomplishments and activities, including supporting materials, is to be that of the individual and is not to include supporting statements from other members of the professional staff of Cuyahoga Community College or of students.

<u>Section 3.  Procedures for Evaluators.</u>

A.   Individual faculty members of each department shall be invited by the Dean/Director to submit directly to the Committee a signed statement concerning the qualifications of the candidate.

B.   Upon receipt of request and supporting materials of the candidate, the Dean/Director shall submit in writing his recommendation, with supporting rationale, to the Committee by November 30.

C.   Committee

1.   After evaluating the materials submitted by the candidate and the written recommendations of the Dean/Director, as well as any statements from the faculty, the Committee shall forward its written recommendation on each individual, including detailed supporting rationale, to the Campus President/College Vice President or EVP for Workforce and Economic Development by March 15. A minority view by members of the Committee may be included in the recommendation.

2.   If the Campus President/College Vice President or EVP for Workforce and Economic Development disagrees with the recommendation, he shall return the recommendation to the Committee with a written statement of detailed rationale. The Committee shall make a second evaluation. This reevaluation, with the statement of the Campus President/College Vice President or EVP for Workforce and Economic Development, shall be forwarded to the Campus President/College Vice President for transmittal to the President of the College or designee. Upon written request, the file, including the rationale and recommendations, will be made available to the candidate.

D.   President of the College

1.   The President of the College or designee shall inform the Campus President/College Vice President or EVP for Workforce and Economic Development of his decision by June 1, who shall then inform the candidate and the Committee.

2.   The President of the College or designee shall present his recommendations to the Board of Trustees for its consideration at its June meeting.

56

E.  Appeals

   1.  The first appeal of the decision shall go directly to the Campus President/College Vice President or EVP for Workforce and Economic Development.

   2.  Subsequent appeals, if necessary, shall go to the Executive Vice President for Academic and Student Affairs.

Exhibit A

## APPENDIX G
## REIMBURSEMENT OF EXPENSES - COLLEGE MANDATED

Section 1.  The College agrees to reimburse bargaining unit members for expenses they incur as a result of College mandated travel and/or entertainment.  Specifically, the College agrees to reimburse bargaining unit members for the following:

A.    Reasonable expenses incurred by bargaining unit members as a result of College mandated travel, including lodging, meals and related incidentals;

B.    Reasonable expenses incurred by bargaining unit members as a result of a College directive to entertain College guests and/or prospective employees. Such expenditures on behalf of guests and/or prospective employees may include necessary meals and incidental expenses of the bargaining unit member, however, such expenditures shall not be primarily for the bargaining unit members' social or personal purposes; and

C.    Reasonable expenses incurred by bargaining unit members as a result of organizing College mandated meetings, conferences or other gatherings.

Section 2.   The President of the College is authorized and directed to develop and promulgate procedures to effectuate this policy.

Exhibit A

## APPENDIX H
## COLLEGE CONTRIBUTIONS TO THE STATE TEACHER
## RETIREMENT SYSTEM FOR PERSONS TAKING PROFESSIONAL IMPROVEMENT
## LEAVE UNDER PLAN A

Section 1.  All faculty members who have taken professional improvement leave under Plan A will be notified by the College of the S.T.R.S. guidelines.

Section 2.  When requested by the employee, the College will contribute the employer contribution that is necessary for the member to buy in the additional one-half (½) year of credit.

Section 3.  The College President or his designee is authorized to do all things necessary and appropriate to implement this resolution.

59

Exhibit A

## APPENDIX I
## TAX-SHELTERED ANNUITY AND DEFERRED COMPENSATION PROGRAM

Section 1. The College shall offer one or more tax-sheltered annuity plans and one or more deferred compensation programs to all eligible employees.

Section 2. The College shall establish and manage its tax-sheltered annuity plans and deferred compensation programs in accordance with the applicable law, which includes without limitation sections 403 (b) and 457 (b) of the Internal Revenue Code.

Section 3. Before offering such a plan or program to College employees, the offering party must:

A.    Execute a hold harmless and indemnification agreement which protects the College from any liability attendant to procuring the annuity.

B.    Be selected by a number of employees equal to at least one percent of the College's full-time employees.

Section 4. The College President or his designee shall take all steps necessary and appropriate for the effective implementation of this procedure.

60

Exhibit A

| APPENDIX I<br>HEALTH CARE<br>ELECTIVES PROGRAM | | |
|---|---|---|
| | PPO | |
| **Service Provided** | **IN NETWORK** | **OUT OF NETWORK** |
| Plan Year | 1/1 – 12/31 | 1/1 – 12/31 |
| Deductible (Individual/Family) | $250/$500 | $500/$1000 |
| Coinsurance | 90%/10% [1] | 70%/30%[1] |
| Max out-of-pocket<br>(Individual/Family) | $2,000/$4,000 [2] | $3,000/$6,000[2] |
| | | |
| **Lifetime Max** | Unlimited | Unlimited |
| **Inpatient Hospital**<br>• S/P Room & Board [3]<br>• Medications<br>• Radiation & Chemo<br>• Hemodialysis<br>• Internal Prosthetics<br>• Physician Services<br>• Surgeon's Services<br>• Rehab Therapy<br>• Operating & Recovery<br>   Room [3] | Deductible and 90%/10%<br>Deductible and 90%/10%<br>Deductible and 90%/10%<br>Deductible and 90%/10%<br>Deductible and 90%/10%<br>Deductible and 90%/10%<br>Deductible and 90%/10%<br>Deductible and 90%/10%<br>Deductible and 90%/10% | Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C |
| **Outpatient Charges**<br>• Facility<br>• Surgeon's Services<br>• Treatments  like  radiation<br>   and chemo.<br>• Prof. Fees (Anesthesia, co-<br>   surgeons, Interpretations)<br>• X-ray & Lab Services | Deductible and 90%/10%<br>Deductible and 90%/10%<br>Deductible and 90%/10%<br><br>Deductible and 90%/10%<br><br>100% in doctor's office or<br>dedicated facility in hospital<br>or outpatient surgical facility | Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br><br>Deductible and 70%/30% of R&C<br><br>Deductible and 70%/30% of R&C |
| **Emergency Care**<br>• Doctor's Office<br>• Hospital<br>• Urgent Care Facility<br>• Ambulance | $20 PCP/$40 specialist copay<br>Deductible and 90%/10%<br>$20 PCP/$40 specialist copay<br>Deductible and 90%/10% | Deductible and 70%/30% of R&C<br>Deductible and 90%/10%<br>Deductible and 70%/30% of R&C<br>Deductible and 90%/10% |
| **Specialty Services**<br>• Home Healthcare<br><br><br>• Skilled Nursing,<br>   Extended Care<br><br>• Hospice | Deductible and 90%/10%. 40<br>visits per plan year combined in<br>and out of network.<br><br>Deductible and 90%/10%. 60<br>days max per plan year<br>combined in and out of network<br><br>Deductible and 90%/10% 60<br>days max per plan year<br>combined in and out of network | Deductible and 70%/30% of R&C; 40 visits per<br>plan year combined in and out of network.<br><br>Deductible and 70%/30% of R&C; 60 days<br>max per plan year combined in and out of<br>network<br><br>Deductible and 70%/30% of R&C;  60 days<br>max per plan year combined in and out of<br>network |

[1] Subject to deductible.
[2] Includes deductible.
[3] Inpatient hospital benefits for Medical Mutual Professional Plan are 90%/10% after deductible for in-network and out-of-network.
[4] 100 days/calendar year when arranged by a Plan physician.

61

Exhibit A

| APPENDIX J<br>HEALTH CARE<br>ELECTIVES PROGRAM | | |
|---|---|---|
| | **PPO** | |
| **Service Provided** | **IN NETWORK** | **OUT OF NETWORK** |
| **Family Planning**<br>• Vasectomy<br>• Tubal Ligation<br><br>• Infertility Service<br><br>• Office Visit<br>• Surgery | Deductible and 90%/10%<br>Deductible and 90%/10%<br><br>For testing & diagnosis only<br><br>$20 PCP/$40 specialist copay<br>Deductible and 90%/10% | Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C<br><br>For testing & diagnosis only<br><br>Deductible and 70%/30% of R&C<br>Deductible and 70%/30% of R&C |
| **Medical Supplies & Equipment**<br>• Durable Medical Equipment<br><br>• External Prosthetics | No Charge[1]<br><br>No Charge[1.] | Deductible and 70%/30% of R&C<br><br>Deductible and 70%/30% of R&C |
| **Mental Health**<br>• Inpatient<br><br>• Outpatient<br><br>• Group Therapy | Deductible and 90%/10%<br><br>$20 copay<br><br>$20 copay | Deductible and 70%/30% of R&C<br><br>Deductible and 70%/30% of R&C<br><br>Deductible and 70%/30% of R&C |
| **Substance Abuse**<br>• Inpatient<br><br><br><br>• Outpatient | Deductible and 90%/10%<br><br><br><br>$20 copay | Deductible and 70%/30% of R&C<br><br><br><br>Deductible and 70%/30% of R&C |
| **Primary Care Services**<br>• Preventive exam<br><br>• Immunizations/Injections<br><br>• Well Child Care<br><br>• Office Visit (Illness or Injury)<br><br>• Allergy Treatment | $0 copay<br><br>100%<br><br>$0 copay<br><br>$20 PCP/$40 specialist copay<br><br>$20 PCP/$40 specialist copay | Not covered<br><br>Deductible and 70%/30% of R&C<br><br>Not covered<br><br>Deductible and 70%/30% of R&C if due to illness or injury<br><br>Deductible and 70%/30% of R&C |

Exhibit A

| Service Provided | APPENDIX J<br>HEALTH CARE<br>ELECTIVES PROGRAM | |
|---|---|---|
| | PPO<br>IN NETWORK | OUT OF NETWORK |
| **Specialty Physician Services**<br>• Office Visits | $40 copay | Deductible and 70%/30% of R&C if due to illness or injury |
| • Referral physician services | $40 copay | Deductible and 70%/30% of R&C if due to illness or injury |
| **Prescription Drugs**<br>• Retail Service<br><br>• Mail order service | See attached detail | |
| **Non-Compliance**<br>**Penalties**<br>• Pre-certification – hospital in-patient and out-patient | Responsibility of network physician | Subject to medical necessity |
| Notes | A.  Out of Service Coverage:<br>Inpatient services not arranged/provided by the provider require Pre-admission Certification and Continued stay review otherwise reduction or denial of coverage may occur.<br><br>B.  R&C Reimbursement is based on the lesser of the Reasonable and Customary charge or the actual amount the member is required to pay for the service. | |

**Note:** The information provided here is intended only to show the highlights of the various medical plans and is not a complete description of the plans.  The plans are governed by the official plan documents and/or insurance contracts where applicable.  If there is a discrepancy between the information provided here and the plan documents, the official plan documents and/or insurance contracts shall prevail.

Exhibit A

## APPENDIX J
## HEALTH CARE ELECTIVES PROGRAM

### Cuyahoga Community College

Prescription Medication Coverage for PPO Enrollees Only
Plan Year 1/1-12/31

**Acute Prescription**    **Retail Card Plan**
**In-Network**

20% Copay
- Minimum of $20 for Non-Preferred Brand
- Minimum of $10 for Preferred Brand
- Minimum of $5 for Generic

Mandatory Generic Provision

No claim forms to file

No reimbursement from Medical Plan; reimbursement only from FSA account, if elected

**Out-of-Network**

50% reimbursement of covered expenses

Must file a claim form with prescription plan for reimbursement

No reimbursement from Medical Plan; reimbursement only from FSA account, if elected

64

Exhibit A

## APPENDIX J
## HEALTH CARE ELECTIVES PROGRAM

**Maintenance
Prescriptions**          **Mail Order**

Copay for 90 day supply:
- $15 for Generic
- $45 for Formulary
- $70 for Non-Formulary

Mandatory Generic Provision

No reimbursement from Medical Plan; reimbursement only from FSA account, if elected

Effective January 1, 2011, the following changes occurred regarding prescription drug coverage:

A.    Implement Specialty Guideline Management (SGM) program.   The SGM Program coordinates, between and among physicians, pharmacists and patients, the evaluation of appropriate drug therapies for specialty medications.   The Program is designed to ensure patient safety, efficacy and optimal therapeutic benefit and enables optimization of the most cost effective use of specialty medications.

B.    The following cost control programs offered by the Pharmacy Benefits Manager shall be implemented:

1.    Cosmetic products will no longer be covered, unless prescribed in connection with a medical condition.

2.    Erectile dysfunction medications will be covered in the following specific quantities: no more than 6 pills every 30 days and no more than 18 pills every 90 days.

3.    Acne medications will be covered only for patients age 25 or younger.

4.    Diet medications previously not covered, will be subject to coverage with appropriate physician prescriptions and prior authorization by the carrier.

5.    Influenza medications will be covered without prior authorization once every six months.   Greater frequency of doses will require prior authorization.

6.    Maximum dosage limits will be implemented for migraine medications in accordance with American Neurological Association and manufacturers' prescribing guidelines.

C.    The College and the Chapter shall establish a Labor/Management Committee to monitor and review implementation of the above programs.

Exhibit A

## APPENDIX K
## FAMILY AND MEDICAL LEAVE ACT

The College and the CCC-AAUP agree to incorporate the Family and Medical Leave Act (FMLA) into the collective bargaining agreement as this addendum. The FMLA does not invalidate any provision of the collective bargaining agreement. Below are outlined the major points of the FMLA, including the agreements between the College and the CCC-AAUP on any discretionary items in the FMLA.

A.  Types of FMLA Leave.

1.  Eligible bargaining unit employees so electing shall, upon written request or with verbal notification if written request is not practical, be granted an FMLA leave of absence without pay for up to, but no more than twelve (12) work weeks, for the following reasons:

a.  birth of a son or daughter and in order to care for such son or daughter within 12 months of birth (birth leave);

b.  the placement of a son or daughter for adoption or foster care within 12 months of placement (placement leave);

c.  care of a spouse, son, daughter, or parent, if such individual has a "serious health condition" (family health leave);

d.  the employee's own "serious health condition" which makes the employee unable to perform the functions of his/her position (employee health leave).

e.  a "qualifying exigency" arising out of the fact that the employee's spouse, son, daughter or parent is on active duty or call to active duty status as a member of the National Guard or Reserves in support of a contingency operation (military leave).

2.  Pursuant to FMLA, the College will grant an eligible employee, up to twenty-six (26) work weeks of unpaid leave, to care for a spouse, child, parent or next of kin (nearest blood relative) who is (a) an Armed Forces member (including the military reserves and National Guard) undergoing medical treatment, recuperation, or therapy, is otherwise in an outpatient status, or is otherwise on the temporary disability retired list—with a serious injury or illness incurred or aggravated in the line of duty while on active duty that may render the individual medically unfit to perform his or her military duties; or (b) a person who, during the five (5) years prior to the treatment necessitating the leave, served in the active military, Naval, or Air Service, and who was discharged or released therefrom under conditions other than dishonorable (a "veteran" as defined by the Department of Veteran Affairs) and who has a qualifying injury or illness incurred or aggravated in the line of duty while on active duty that manifested itself before or after the member became a veteran (Military Caregiver Leave).

3.  An eligible employee is entitled to a combined maximum of twenty-six (26) work weeks of FMLA leave in a single 12-month period.

66

B.     Definition of "serious health condition". Under FMLA, "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves either:

- Inpatient care (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical-care facility, including any period of incapacity (*i.e.*, inability to work, attend school, or perform other regular daily activities) or subsequent treatment in connection with such inpatient care; or

- Continuing treatment by a health care provider, which includes:

    1. A period of incapacity lasting more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition that also includes:

        - Treatment two or more times by or under the supervision of a health care provider (*i.e.*, in-person visits, the first within 7 days and both within 30 days of the first day of incapacity); or

        - One treatment by a health care provider (*i.e.*, an in-person visit within 7 days of the first day of incapacity) with a continuing regimen of treatment (*e.g.*, prescription medication, physical therapy); or

    2. Any period of incapacity related to pregnancy or for prenatal care. A visit to the health care provider is not necessary for each absence; or

    3. Any period of incapacity or treatment for a chronic serious health condition that continues over an extended period of time, requires periodic visits (at least twice a year) to a health care provider, and may involve occasional episodes of incapacity. A visit to a health care provider is not necessary for each absence; or

    4. A period of incapacity that is permanent or long-term due to a condition for which treatment may not be effective. Only supervision by a health care provider is required, rather than active treatment; or

    5. Any absences to receive multiple treatments for restorative surgery after accident or other qualifying injury or for a condition that would likely result in a period of incapacity of more than three consecutive days if not treated.

C.     Request for Leave. Request for such leave must be submitted in writing to the College's leave administrator at least thirty (30) days before the leave is scheduled to begin, or as soon as it is practicable if the need for leave is not foreseeable. The employee is required to provide:

1.     Medical certification supporting the need for leave due to a serious health condition affecting the employee or an immediate family member.

2.     Appropriate Armed Forces documentation supporting the need for a "qualifying exigency".

3.     Periodic reports, not more often than every 30 days, during FMLA leave regarding the employee's status and intent to return to work.

D.    Eligibility.  Bargaining unit members who have completed twelve (12) months of service with the College, which need not be consecutive, and have completed at least 1250 hours of service during the previous twelve (12) month period shall be eligible for FMLA leave.

E.    Designating FMLA Leave.  Employees requesting an FMLA leave must first use accrued paid leave benefits, if applicable, such as  sick leave,  and vacation (if applicable), and Employee may take personal leave at their own option. The accrued paid benefits will be deducted from the FMLA twelve-week entitlement. Only applicable sick leave of more than five (5) consecutive work days will be deducted from the twelve-week FMLA entitlement except in the case of an intermittent/reduced FMLA leave schedule. The unpaid FMLA leave will only become effective after all applicable paid benefits have been exhausted.

F.    Intermittent/Reduced Leave Schedule.  FMLA leave may be taken intermittently or on a reduced leave schedule under the following circumstances:

    1.    to care for a sick family member when medically necessary;

    2.    for an employee's own serious illness when medically necessary;

    3.    for a birth or placement of a child for adoption or foster care within twelve (12) months of birth or placement with the approval of the College.

    "Intermittent leave" is taken in separate blocks of time due to a single illness or injury (i.e., leave for medical appointments, physical therapy, chemotherapy, etc.) spread over a period of time. "Reduced leave schedule" is a leave schedule which reduces the usual number of hours per work week or hours per day worked by the employee.

    The College may temporarily transfer an employee on intermittent or reduced leave schedule to a vacant bargaining unit position for which the employee qualifies and at the equivalent pay, benefits, and terms and conditions of employment by mutual agreement of the College and the CCC-AAUP. Once the intermittent or reduced leave schedule has been completed, the employee must be transferred back to the same position that the employee held prior to taking the FMLA leave or to an equivalent position.

G.    Return to Work.  Any employee taking an unpaid FMLA leave shall, upon return from the leave, be restored to the position of employment held by the employee when the leave commenced; or to an equivalent bargaining unit position with the equivalent pay, benefits and other terms and conditions of employment. If the leave exceeds the maximum time allowed by the FMLA, an attempt will be made to place the employee in the same position, but where this is not possible or practical, the employee will be offered another position for which the employee is qualified as soon as one is available.

H.    Insurance.  For an employee on FMLA leave, the College will continue to pay its portion of the costs of health and life insurance benefits and the employee will continue to pay her/his portion. Arrangements will be made for the employee to pay his/her share of health insurance premiums while on leave.  After the expiration of the approved FMLA leave, if the employee remains on leave, which is unpaid and does not qualify under STD or other College approved sick leave, the employee is required to pay the full amount of the costs for continued coverage including the employee's share and the employer's share of the cost.  The College may recover premiums it paid during an employee's unpaid FMLA leave to maintain health coverage for

68

an employee who fails to return from FMLA leave, unless (i) the employee provides certification that he/she failed to return because of an occurrence that, but for the expiration of the employee's FMLA leave, would qualify for unpaid leave under FMLA; or (ii) the employee failed to return due to circumstances beyond his/her control.

I.      Certification.  The College will require written certification, on a form substantially the same as the applicable U.S. Department of Labor Forms, by a health care provider of the need and purpose of the leave for a FMLA family or employee health care leave. The College has the right to require the employee to obtain the opinion of a second health care provider designated or approved by the College in the event the College has reason to doubt the validity of the written certification provided by the employee. The College will pay the costs associated with obtaining the second opinion. In a case in which the second opinion differs from the opinion in the original written certification, the College has the right to require that the employee obtain the opinion of a third health care provider mutually designated or approved by the College and the employee. The College will pay the costs associated with obtaining the third opinion. In that case, the opinion of the third health care provider shall be considered final and binding.

J.      FMLA Period.  The 12-month leave period will begin on the date of the employee's first use of FMLA leave.  Successive 12-month periods commence on the date of the employee's first use of such leave after the preceding 12-month period has ended.

K.      Notice of Employee Rights.  When an employee gives notice of the need for FMLA leave, the College shall provide the employee with a notice substantially the same as U.S. Department of Labor Form W-H 381 containing at least the following specific information:

     1.      Whether the leave requested qualified as FMLA leave, including a statement similar to that appearing on Form W-H 381, regarding why leave does not qualify;

     2.      That the leave will be counted against the employee's annual FMLA leave entitlement;

     3.      Any requirement that the employee provide medical certification;

     4.      That the employee must use applicable substitute accrued paid leave and have it considered FMLA leave;

     5.      Whether the employee will be required to make premium payments, and, if so, how the payments must be made;

     6.      Whether the employee will be required to present a fitness-for-duty certificate in order to be restored to employment;

     7.      That the employee has the right to be restored to the same or an equivalent position upon return from FMLA leave;

     8.      The employee's potential liability for the payment of health premiums paid during the employee's FMLA leave if the employee does not return to work after taking FMLA leave; and

69

Exhibit A

9.    That the College may require employees on FMLA leave to report periodically, but not unreasonably, on their status and intent to return to work. If an employee provides an unequivocal notice of his/her intent not to return to work, the College's obligations under the FMLA to maintain health benefits (subject to COBRA requirements) and to restore the employee to his/her previous position cease.

L.   Restrictions on Leave Where Spouses are Employed by the College.  A husband and wife who are eligible for FMLA leave and are employed by the College are permitted to take only a combined total of twelve (12) work weeks of leave during any 12-month period if the leave is taken: (1) for birth of a son or daughter or to care for the child after birth; (2) for placement of a son or daughter for adoption or foster care, or to care for the child after placement; or (3) to care for a parent (but not a parent "in-law") with a serious health condition.   In addition, the spouses will be limited to a total of twenty-six (26) work weeks off between the two when the leave is for Military Caregiver Leave only or is for a combination of Military Caregiver Leave, Military Emergency Leave, leave for the birth and care of a newborn child, placement of a child for adoption or foster care, or to care for a parent who has a serious health condition.

M.   Absence Report.   Any absence approved for FMLA leave must be so indicated on the employee's absence report in the appropriate paid or unpaid column.

70

Exhibit A

## APPENDIX L
## GOVERNANCE

<u>Section 1. Purpose.</u>

The special competence and special interests of each constituency in contributing to governance are recognized and provided for in the structure and processes of the system, with the understanding that specific constituency interests are subordinated to common, single college interests.

The essence of participatory governance is the collective action of governance committees in gathering relevant information, deliberating issues in the light of that information, and reaching reasoned recommendations.

Participatory governance requires the engagement of all constituent groups. It also excludes specific matters covered in contracts with bargaining agents of classes of employees. While the system is included by reference in such contracts, it should exist independently of these contracts. No particular contract should include governance procedures that are specific to any single constituent body.

Committees of governance function in an environment of mutual respect, good faith and commitment to the common interests of the single college. Through the president, they advise the administration, which remains responsible and accountable for implementation. Committee development and focus will fluctuate based on a consensus of the current college needs to be addressed.

<u>Section 2. The Governance System.</u>

A.    General Structure

    1.    Board of Trustees

        The governance system recognizes the role and authority of the Board of Trustees to prescribe rules or policies regarding the effective management of the college, which policies shall guide the president of the college, who is responsible for establishing the regulations and procedures to carry out such policies. Recommendations for components for Board policy are sent to one of the three standing committees of the Board through the Office of the President.

        The Board standing committees -- Academic and Student Affairs, Management, and Community Affairs -- recommend policy actions to the full Board, whose ratification is mandatory before college policy is adopted.

    2.    Office of the President

        The governance system recognizes the role and authority of the president of the college as being the chief executive officer of Cuyahoga Community College and directly responsible to the Board of Trustees for the educational leadership and efficient management of the college's human, physical and fiscal resources. The president's chief executive role includes:

        a.    Representation of, and primary spokesman for, the college to various external organizations and agencies whose activities directly or indirectly affect the welfare of the college. Among these are federal, state and local government, national and regional educational associations, other higher education institutions, and various community associations.

<div align="center">71</div>

<div align="right">Exhibit A</div>

b. Articulation of education philosophy for the college within which its educational objectives are developed and implemented.

c. Formulation of strategic long and short-range plans for the college.

d. Provision of direction and guidance to the college's major operating units and to the individuals who report to the Office of the President.

e. Maintenance of a climate in the college conducive to productive learning and effective teaching.

3. Constituent Groups

a. AAUP
b. Administration
c. AFSCME
d. Joint Faculty Senate Council
e. Joint Student Council
f. SEIU District 1199
g. Professional/Technical
h. TS & CE

B. Committees of Governance

"Committees of Governance" includes the full committees outlined below and any ad hoc or subcommittees established by the full committees.

1. Committee on Curriculum and Degree Requirements (CADRE)

Purpose

a. To review and recommend new academic programs and additions and deletions to existing programs;

b. To recommend new courses and changes in course numbers, titles, descriptions, credit hours, and prerequisites;

c. To review and recommend policies and procedures for the development of degree requirements for all college credit programs;

d. To participate in a review of all courses in the college's master file and recommend to each affected academic division courses that should be considered for possible elimination from the course master file because of duplication with similar courses or because they are seldom offered; and

e. To establish appropriate subcommittees and/or other working groups to accommodate these operational tasks.

Membership: This Committee shall have 17 members.
Faculty: Three from each campus. Faculty chair the committee and serves as secretary
Administration: Four Staff: One from TS & CE and SEIU District 1199 combined

72

P/T: One
JSC: One
Administrative Officer:  Vice President for Academic Affairs or designee.

2.  Committee on Learning Outcomes Assessment (CLOA)

Purpose

a.    To support continuous improvement of teaching and learning by assisting faculty in the identification, development, and assessment of student learning outcomes at the general education, program, and course levels.

b.    To support faculty in providing evidence of student learning to the Higher Learning Commission (HLC) through the Academic Quality Improvement Program's (AQIP) Category One-Helping Students Learn.

c.    To review and recommend policies and procedures for the development and implementation of assessment plans and the reporting of assessment results for all college credit programs, courses, and developmental courses.

d.    To support faculty in the ongoing maintenance of assessment plans and reports in concert with the Office of Learning Outcomes Assessment.

e.    To establish appropriate subcommittees and/or other working groups to accommodate these operational tasks.

Membership: This Committee shall have 25 members.

Faculty: Twelve (12) members: Three (3) from each campus. A faculty member shall chair the committee and another serve as secretary.

Administration: Four (4) members. One (1) Dean from each campus. Deans shall serve as assessment liaisons to Deans' Council and promote faculty engagement in the assessment planning and reporting process. "Dean" means that Assistant, Associate, or Academic can serve in this role.

Staff: One (1) member. The staff person shall offer a perspective on continuous improvement, assessment, and program accreditation, if applicable.

(Accredited) Program Manager: One (1) member. A program member shall offer perspective of accredited programs (i.e. program review).

Professional/Technical: One (1) member. The professional/technical administrator shall serve as liaison between workforce and academic.

Student Council: Four (4) members. One (1) from each campus. Students shall represent the student body and student perspective on continuous improvement of teaching and learning.

Administrative Officers: Two (2) members. The District Director of Learning Outcomes Assessment and the District Director of Curriculum Development and Learning Outcomes Assessment.

*Documents creating the structure of CLOA on file at the AAUP office.*

73

3.  Committee on Enrollment Management

Purpose
This Committee will review and recommend plans and policies designed to strengthen enrollment at the college. Recruitment and retention issues and processes will be included in its review. Program development and service delivery issues will also be included.

Membership
Faculty: Three
Administration: Three, including one from Student Affairs
Staff:  One each from SEIU District 1199, AFSCME, TS & CE
P/T: One
JSC: One from each campus
Administrative Officer: Vice President, Enrollment Management and Student Affairs

4. Committee on Technology

Purpose
This Committee will review and recommend policies and procedures related to the deployment of administrative and academic technology. It will review the College's plans for such deployment and advise on improvements.

Membership
Faculty: Three
Administration:  One from A/SA, one from HR/BFS
Staff:  One each from SEIU District 1199, AFSCME, and TS & CE
P/T:  Two
JSC: One
Administrative Officer:  Vice President, Chief Information Officer.

5. Committee on Planning and Institutional Effectiveness

Purpose
The Committee will review and recommend policies and procedures related to assessing the quality of the college's programs and services. This Committee will conduct its business through two sub-committees consisting of members of the parent Committee.
a.  Sub-Committee on Learning and Student Success
b.  Sub-Committee on Communications and Organizational Effectiveness and CCC-AAUP.

Membership
Faculty: Three
Administration:  Three
Staff: One each from SEIU District 1199, AFSCME, and TS & CE
P/T: One
JSC: One
Administrative Officer:  Vice President, Planning and Institutional Effectiveness

Exhibit A

6. Committee on Human Resources and Policy

Purpose
The Committee will review and recommend policies and procedures related to rights and responsibilities, affirmative action, and due process. This Committee may conduct its business through three sub-committees consisting of members of the parent Committee, each sub-committee addressing one of the topics cited above.

Membership
Faculty: Three
Administration: Three
Staff: One each from SEIU District 1199, AFSCME, and TS & CE
P/T: One
JSC: One
Administrative Officer: Vice President, Human Resources

7. Committee on Governance Monitoring

Purpose
The Committee shall monitor and evaluate the effectiveness of the operations of the college-wide Governance System and make recommendations, as needed, with respect to the improvement thereof. Its recommendations shall be forwarded to the Executive Vice President for Academic and Student Affairs, the elected leadership of each constituency group, and the members of the College Forum. This Committee may conduct its business through sub-committees as deemed appropriate by the majority of the Parent Committee.

Membership
Faculty: Three
Administration: Three
Staff: One each from SEIU District 1199, AFSCME, and TS & CE
P/T: One
JSC: One
Administrative Officer: Executive Vice President, Academic and Student Affairs

8. Safety Committee

Purpose
The Committee will review and recommend policies and procedures related to College safety issues that have an impact on the College's campuses. Each Campus will have an active Safety Committee consisting of all constituency groups (e.g. AFSCME, SEIU District 1199, AAUP, etc.) to work on and communicate safety issues on their Campus. A College-wide Campus Safety Committee will be drawn, where feasible, from members of the four Campus Safety Committees. The College-wide Safety Committee may conduct its business through four sub-committees, each sub-committee addressing the safety issues on their specific Campus.

Membership
Faculty: One from each campus
Administration: Three including representatives from Public Safety and Security, and Plant Operations.
Staff: One each from SEIU District 1199, AFSCME, and TS & CE
P/T: One

75

Exhibit A

JSC: One
Administrative Officer: Executive Director, Business Continuity

C.  General Functioning of the Governance System

1.  Each committee will elect its own Chair and Secretary and will function as a committee for two years.

2.  Committees shall receive their charges for the year from the College President. Committees may also develop their own charges, subject to the approval of the College President. Committees may receive special charges from the President related to particular issues that need immediate and timely attention.

3.  Annual charges shall be received by Committees by the end of the first week of September each year.

4.  Recommendations may be made to the College President at any time.

5.  Committees shall receive responses to recommendations within three weeks of receipt. Responses can include acceptance, modification, request for further analysis or clarity, or denial. Committees shall receive reasons for each response.

6.  Committees shall complete their work in a timely fashion. On occasion, the President may request special attention to particular issues that need immediate action by certain deadlines. Committees will adjust their work to meet such priorities.

7.  All Committee reports will be made to the College President.

8.  Committees shall receive timely notification of the enacting of new policies and procedures resulting from their work. This shall be received within two weeks of the posting of the new policy or procedure.

9.  Each Committee will present an annual report of activities to the College President by the end of the second week of May of each year.

10.  A maximum 69 ESU's per academic year will be available to compensate faculty members who participate on governance committees, to be apportioned as agreed on by the College and CCC-AAUP.

Section 3. Improvements.

Improvements to the system will adapt the governance advisory committees so that they address the issues of current importance to the college and engage the special competencies of each constituent group fully and appropriately in all areas.

Improvements will continue to assure constituent engagement in an advisory capacity with the development of and continual improvement to policies and procedures affecting the implementation of the College's mission.

76

Exhibit A

## IBB CONSENSUS STATEMENT - SL-1
## FMLA AND SICK TIME

The CCC-AAUP and College Administration have jointly developed this consensus statement, which we intend to serve as a guide for the Committee on Human Resources & Policy.

We ask that the Committee on Human Resources & Policy investigate the ways and means by which FMLA and Sick Time benefits can be accessed by faculty during the summer term. We then ask that these options be shared with the CCC-AAUP and administration by means of an LMC for consideration.


CUYAHOGA COMMUNITY                              AMERICAN ASSOCIATION COLLEGE
                                                OF UNIVERSITY PROFESSORS

_____                 _____
Dr. Karen Miller                                Jeffrey Puma

Date Signed:_____8-16-19_____

## IBB CONSENSUS STATEMENT – SL-2
## SERVICE ACTIVITY AND DEVELOPMENT CREDITS COMMITTEE

The CCC-AAUP and College Administration have jointly developed this consensus statement, which we intend to serve as guide for the Service Activity and Development Credits Committee. We discussed four (4) broad categories pertaining to Section 6.11, Faculty Service and Development. These categories are:

1. Professional Development
2. General Service
3. Strategic Mission
4. Miscellaneous

The group also discussed a list of potential credits that includes:

1. Activities related to program development, update, or review;
2. Administering exams for credit or make-up exams;
3. Advising students related to faculty member's subject matter expertise;
4. Assistance to students with academic planning;
5. Assistance with student registration;
6. Attendance at a second Commencement;
7. Attendance at division/unit/counterparts meetings in addition to mandatory days;
8. Attendance/participation at local/regional discipline-specific events/workshops;
9. Conducting educational research;
10. Course prep which involves major changes/change of text;
11. Developing and implementing in-service training programs;
12. Developing or implementing programs to improve student retention;
13. Development of innovative technologies, pedagogies;
14. Development of new instructional materials or methods;
15. Development of program mapping or course outcomes;
16. Grade Dispute Panel;
17. Grading and evaluating student work on the day between the last day of exams and the day that final grades are due;
18. Guidance provided to student clubs and associations;
19. Investigation of best practices by the other professionals;
20. Mandatory contract training (core curriculum);
21. Membership on local/regional boards which advance your discipline or the college mission;
22. Mentoring a fellow faculty member, whether full-time or adjunct;
23. Mentoring an adjunct who is teaching a PSEOP high-school assignment;
24. Observation of adjunct faculty;
25. Other activities which are related to student success;
26. Participation at adjunct-appreciation events;
27. Participation in college planning activities;
28. Participation in college-sponsored initiatives/committees;
29. Participation in student orientation;
30. Participation on a panel discussions/presentation for students and/or faculty;
31. Performing regular counseling duties;
32. Performing regular librarian duties;
33. Placement of students within a discipline;
34. Preparation of new program materials;
35. Preparing grant proposal;
36. Presentation at Faculty Colloquium and/or other faculty development activities;

Exhibit A

37. SAC committee membership;
38. Service on Governance Committee (if not otherwise receiving ESU's);
39. Service on other committees referenced in this contract, ad hoc committees or task forces. Examples include, but are not limited to:
    a. Development Education Council
    b. Permanent Joint Committee on Faculty Evaluation
    c. Labor-Management Committee
    d. Intellectual Property Board
    e. Committee on Distance Learning
    f. Calendar/Schedule Committee
    g. College-wide Health-Care Committee
    h. Campus and/or College-wide Safety Committee
40. Structured (pre-planned) guidance to students, groups of students;
41. Tutoring or remediation work with students;
42. Updates of course curricula to meet OBOR, TAG, or similar requirements;
43. Updates of course descriptions to catalogue;
44. Volunteering at Commencement;
45. Working with Advisory Committees or external consultants.

CUYAHOGA COMMUNITY COLLEGE   AMERICAN ASSOCIATION
               OF UNIVERSITY PROFESSORS

Dr. Karen Miller          Jeffrey Tuma

Date Signed: 8-16-19

79

Exhibit A

## SIDE LETTER OF AGREEMENT - SL-3
## COLLEGE CREDIT PLUS ADVISORY COMMITTEE

Cuyahoga Community College is interested in the continued growth, development, and quality of the College Credit Plus (CCP) program in order to provide students with alternative methods of obtaining college credit to apply to their post-secondary degree. The College is also committed to ensuring that program offerings maintain high academic standards and the quality experiences consistent with the mission of the College and the laws applicable to College Credit Plus.

The AAUP and Cuyahoga Community College administration agree on the following parameters relating to college classes taught in secondary schools:

1.  Courses will be taught during the secondary school's hours of operation, within the secondary school scheduling framework, in accordance with Ohio Board of Regents guidelines, and may be flexibly scheduled.

2.  Courses must be taught in accordance with the official course outline that will be provided by the College. If the College's full-time faculty in a discipline have identified an appropriate textbook for a course, that textbook must be used. It is expected that College faculty will share textbook information as needed.

3.  Regardless of the origin of faculty when teaching in the secondary institution, the secondary school's student disciplinary conduct code and processes will be followed.

4.  Regardless of the origin of faculty, the College's student complaint and grade dispute policies will be followed.

5.  Regardless of the origin of the faculty, the College's policies and procedures regarding faculty evaluation and academic reporting will be followed. Final grades will be posted by the instructor.

6.  Consistent with the College's policy and practice, courses will be scheduled and qualified faculty assigned by the appropriate Dean/Director based on a recommendation from the full-time faculty discipline coordinator.

7.  The Director of Enrollment Management will serve as liaison to the secondary school's administration when a need for communication arises.

8.  The College, in conjunction with Faculty Senate and the CCC-AAUP, will develop a pool of qualified adjuncts to serve as substitutes should the need arise.

9.  The College will establish a College Credit Plus Advisory Committee to assist in ensuring the academic integrity of the offerings. The Committee will consist of a Campus President, a Dean of Student Affairs, a Dean of Academic Affairs, the District Director of Enrollment Outreach, a minimum of two instructional faculty members, and one Tri-C faculty counselor, chosen by AAUP and Faculty Senate.

10. Where feasible, considering staffing concerns of the College, the College faculty, and the secondary site at which the courses will be offered, qualified full-time College faculty will be offered the opportunity to teach College Credit Plus courses in area secondary schools. In addition, the following also applies:

80

a. Courses taught by qualified College faculty, will be considered part of their normal teaching load; therefore, faculty will not receive travel funds for travel to these sites.

b. If a College faculty member teaches a course in the secondary school, the course will be offered by that faculty member for the OBR suggested contact hours. Additional time that the course may be scheduled to run will be based on secondary school practices and will be the responsibility of school district personnel.

c. Office hours will be split to accommodate students at the off-site location; however, recognizing that it may not be feasible to hold office hours at the secondary school (due to lack of space and student schedule), online or phone office hours may be acceptable.

d. If a College faculty member teaches a course in the secondary school, he or she will be subject to all rules governing visitors to the site (check in, badges, etc.).

11. Secondary school teachers who are eligible may be hired as College adjuncts, as determined by our regular adjunct criteria. These individuals will go through the regular approval process for the hiring of adjuncts. Potential instructors must meet the qualifications as determined by the Higher Learning Commission's and OBR's guidelines. All communication, such as course offerings, syllabi, and assigned faculty, must be provided back to the College Credit Plus Advisory Committee. The Committee will also ensure alignment with the performance metrics set forth by the statewide College Credit Plus Advisory Committee.

12. Faculty coordinators will be notified at the time of scheduling of a CCP course.

13. The College Credit Plus Advisory Committee will:

a. Maintain the integrity of the Side Agreement, including developing policies and procedures to help ensure that high academic standards are upheld in our off-campus CCP offerings.

b. Assist in the development of performance metrics and the annual tracking of data related to the program in order to monitor the program's progress and quality.

c. Maintain the integrity of the Side Agreement,

14. The secondary school must have the necessary lab facilities, equipment and software for specific course offerings. The Associate Dean, in consultation with faculty coordinators or other College faculty, will be given access to the facilities in order to make those determinations. If appropriate facilities are not available, the course in question will not be offered at that site.

CUYAHOGA COMMUNITY COLLEGE

Dr. Karen Miller

Date Signed: 8-16-19

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS

Jeffrey Tuma

81

Exhibit A

## SIDE LETTER OF AGREEMENT- SL-4
## LONG TERM DISABILITY INSURANCE (ARTICLE 19)

The College agrees that current bargaining unit employees, who are participants in the Alternative Retirement Plan (ARP), shall be provided with the same group disability plan at no cost to the employee.

The following employees are current bargaining unit members in the Alternative Retirement Plan:

For reasons of privacy, names intentionally deleted in copy accompanying the published collective bargaining agreement. Affected individuals each received a copy of the signed, redacted letter including the individual's name only.

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

Dr. Karen Miller

Jeffrey Tuma

Date Signed: 8-16-19

82

Exhibit A

## SIDE LETTER OF AGREEMENT- SL-5
## FACULTY EVALUATION PROCEDURE (ARTICLE 26)

The Joint Committee on Faculty Evaluation in conjunction with the College-wide Committee on Distance Learning are jointly charged by the College and the CCC-AAUP with developing the process pursuant to Section 26.05 (E) by which students will evaluate the teaching of distance learning courses.

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

Dr. Karen Miller

Jeffrey Puma

Date Signed:  8-16-19

83

Exhibit A

## SIDE LETTER OF AGREEMENT- SL-6
## COLLEGE-WIDE STAFFING DECISION

1.  A system will be developed to analyze full-time CCC-AAUP faculty levels in each credit program to assist in prioritizing College-wide staffing decisions. This system will investigate the applicability of the Ohio Board of Regents (OBR) 60% full-time staffing guideline and other relevant full-time faculty staffing benchmarks to the College's full-time staffing needs subject to the College's available fiscal resources, programmatic needs, and ongoing enrollment projections.

2.  The College-wide Labor Management Committee (LMC) will discuss the faculty hiring process annually.

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

_____
Dr. Karen Miller

_____
Jeffrey Tuma

Date Signed:_____8-16-19_____

84

Exhibit A

## SIDE LETTER OF AGREEMENT- SL-7
## WORKPLACE CORE CURRICULA

To facilitate faculty professional development and faculty service to the College, there is an agreed upon workplace environment core curriculum. The workplace environment core curricula will consist of:

1. Legal issues for faculty, including harassment and discrimination;
2. Student Affairs Code of Conduct;
3. Civility;
4. Workplace Safety and Violence;
5. Student Success.

When training involves faculty only, faculty will be involved in the development of the training program. The College will provide faculty members with the calendar of training events. Faculty can use faculty service credits for core curricula. New faculty will complete the workplace environment core curricula within their first year with the College. All faculty will be up to date on the workplace environment core curricula during the time period of this contract. Training shall not exceed fifteen (15) hours per academic year, and will be offered during both instructional and non-instructional days. For faculty who have completed the Workplace Core Curricula in a previous contract, a three (3) hour refresher course will be available that includes updates in the entire core curricula. Every effort will be made to create online versions of core workplace curricula to be available by the second year of this contract.

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

_____

_____

Dr. Karen Miller

Jeffrey Tuma

Date Signed:_____8-16-19_____

85

Exhibit A

## SIDE LETTER OF AGREEMENT- SL-8
## COUNSELING FACULTY APPOINTMENT SCHEDULE MODIFICATION

1.   Peak Registration Period

a.   Peak registration periods are defined as the periods of counseling/advising activities between the 1st day of May through the end of the 2nd full week of the full (16 week) fall term and the 1st day of December through the end of the 2nd week of the full (16 week) spring term.

b.   The identified Peak Registration period:

(4.5 months) summer/fall – May 1 – end of the 2nd week full (16 week) fall term (1.5 months) fall/spring – Dec. 1 – end of 2nd week full (16 week) spring term scheduled appointments will be in ½ hour (30 minute) time periods – during the defined "peak registration periods" the basic tenets of the side letter (AAUP contract item signed 11-1-07) and subsequent meet and confer remain in effect.  Specifically, it was mutually agreed during Meet and Confer and later modified as the Counselors and Counseling Directors got a feel for the new situation (as instructed to do from Meet and Confer) that the following appointments are scheduled at minimum for 1 hour:

- Career Counseling (especially when test/inventory interpretation is involved)
- Personal Counseling
- Preparation of ATS Contract
- Graduation Audits
- Financial Aid Standards of Academic Progress (SAP) Maximum Credit Appeal – this Appeal is a form of the previously noted Graduation Audit
- Petition for Readmission
- Quarter to semester conversion review

2.   "Non-Peak: registration periods are defined as the periods of counseling/advising activity between the 1st day of the 3rd week of the full (16 week) fall term through November 30th and the 1st day of the 3rd week of the full (16 week) spring term through April 30th. During this period of non-peak registration, appointments will be scheduled in 45 minute time periods.

a.   The identified non-peak registration periods (2.5 month) 1st day of the 3rd week of the full (16 week) fall term through November 30 (3.5 month) 1st day of the 3rd week of the full (16 week) spring term through April 30.

b.   During this period with the approval of the Director of Counseling, Counselors have the option to increase the duration of the appointment for an emergency situation or on a case-by-case basis.

3.   The appointment system will be built and reviewed jointly by counselors and directors of counseling prior to implementation.

4.   During the non-peak (45 minute) periods, standard appointment prep, planning and follow-up time will be incorporated into the work day in 15 minute increments. One (1) fifteen minute period prior to the 1st appointment of the day, one (1) fifteen minute period following the last appointment prior to the lunch/dinner break and one (1) fifteen period prior to the 1st appointment following the

86

Exhibit A

lunch/dinner break. Any variation to the standard appointment, prep, planning and follow-up configuration must be approved by the Director of Counseling as determined by departmental coverage requirements.  Prep and planning allocations for teaching activities will remain the same total number of minutes as is currently allocated.

5.     Data developed on the effectiveness of the 30 minute vs. 45 minute time frames will be an inclusionary process involving counselors and the directors of counseling.

6.     Every effort will be made to operationalize the agreement no later than Spring 2010.


CUYAHOGA COMMUNITY COLLEGE                    AMERICAN ASSOCIATION OF
                                              UNIVERSITY PROFESSORS


_____                _____
Dr. Karen Miller                              Jeffrey Tuma


Date Signed:____8-16-19____

Exhibit A

## SIDE LETTER OF AGREEMENT- SL-9
## DISTANCE LEARNING (ARTICLE 38)

Pursuant to Article 38, Section 38.02 of the 2007-10 collective bargaining agreement between CCC and the CCC-AAUP, the College-wide Committee on Distance Learning made certain recommendations to the Administration, CCC-AAUP, and the Faculty Senate covering definitions, office hours, and course caps. Those recommendations were adopted by a consensus of the groups and are incorporated into this collective bargaining agreement as Sections 38.02, 38.05, 38.06, and 38.07.

However, a specific exception was adopted by a consensus of the groups in 2009 for math faculty regarding an existing practice of extended seat time for testing in online courses. This exception may continue pursuant to Sections 38.02 and 38.05.

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

Dr. Karen Miller

Jeffrey Tuma

Date Signed: 8-16-19

88

## SIDE LETTER OF AGREEMENT- SL-10
## PROFESSIONAL DEVELOPMENT AND TRAVEL

While not part of the contract, the Parties agree that the language in Sections 15.01 and 15.02 will be implemented as follows.  If the aggregate one-third cap is met in year one and a bargaining unit faculty member (BUF) had approved expenses that were not reimbursed in year one because the cap was met, that BUF can be reimbursed in year 2 for such year one expenses, and so also if the cap is met in year 2, that BUF can be reimbursed in year 3 for year 2 expenses; provided, however, the BUF adheres to the applicable travel policy and has timely submitted all applicable reports and/or documentation.


CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

_____
Dr. Karen Miller

_____
Jeffrey Tuma


Date Signed: ___8-16-19___

89

Exhibit A

## SIDE LETTER OF AGREEMENT- SL-11
## FMLA APPLICATION AND EXAMPLES

Questions arose during the parties' 2010 collective bargaining negotiations between the College and the AAUP-CCC regarding the College's application of the FMLA policy. As a result, the parties agreed that it would be beneficial for the College to provide the Union with examples demonstrating how the FMLA policy will be applied to its members.

As an initial matter, when calculating the total FMLA leave for a faculty member, the College only takes into consideration the actual working contract days. Therefore, non-contract days, such as days in the summer and winter breaks, do not count against the faculty member's FMLA leave. In addition, a faculty member can receive compensation during his/her FMLA leave, only if the faculty member has accumulated sick leave available to him/her, pursuant to Article 10 of the Collective Bargaining Agreement, and the approved FMLA leave is for the faculty member or immediate family member's medical recovery. With these understandings, the College provides the following examples:

1.  *The FMLA starts before and ends after a break*

A faculty member encounters a situation requiring him/her to take FMLA leave for nine (9) consecutive weeks. This event occurs in December, several weeks before the two (2) week winter break. When calculating the total FMLA leave taken by the faculty member, the College will not count the winter break time nor treat such break as turning the faculty member's FMLA leave into an intermittent leave. Thus, when the faculty member returns from the nine (9) week FMLA leave, the College will count only seven (7) of those weeks (subtracting two (2) weeks for winter break) as FMLA leave. Therefore, the faculty member would still have the remaining five (5) weeks (or nineteen (19) weeks if for military caregiver) of FMLA leave available to him/her for use during the remainder of the year should he/she encounter another event necessitating an FMLA leave. The same analysis equally applies if a faculty member's need for FMLA started before the summer break, continued throughout the summer break and into the fall session.

2.  *Paid and unpaid FMLA leave*

As discussed above, a faculty member will be paid during his/her FMLA leave only if the faculty member has accumulated applicable paid leave such as sick leave available to him/her, pursuant to Article 10 of the Collective Bargaining Agreement, and the approved FMLA leave is for the faculty member or immediate family member's medical recovery. The confusion over this issue commonly arises when dealing with maternity leave. Generally, the first six (6) weeks of a maternity leave for a female faculty member who delivers a child (which can be longer if there are complications) is for the faculty member's own medical recovery. Thus, under a typical situation, the first six (6) weeks of a faculty member's FMLA leave due to childbirth will be paid, so long as the faculty member has not exhausted her accumulated sick leave. However, after the initial six (6) weeks (assuming that there are no medical complications), if the faculty member elects to remain on FMLA leave to bond with her newborn child, the remaining six (6) weeks of such FMLA leave would be unpaid because the faculty member cannot use her accumulated sick leave for this purpose.

Thus, under the same example provided above, if a faculty member delivers a child three (3) weeks before the winter break, and elects to take the full twelve (12) weeks of the available FMLA leave starting at the time of delivery -- the calculation of her FMLA leave and compensation during this leave would be as follows:

90

    a.     First three (3) weeks: paid and counts toward FMLA leave, nine (9) weeks of FMLA leave remain available);

    b.     Next two (2) weeks (winter break): unpaid and does not count against FMLA leave, nine (9) weeks of FMLA leave remain available;

    c.     Following one (1) week: paid and counts towards FMLA leave, eight (8) weeks of FMLA remain available – this concludes the six (6) weeks necessary for the faculty member to medically recover from childbirth; and

    d.     Following eight (8) weeks: unpaid and counts toward FMLA leave - this portion of the leave is not for medical recovery.

Accordingly, under this example, because the winter break does not count in the calculation of the FMLA leave, the faculty member would actually be able to take a total of fourteen (14) consecutive weeks off.

This same analysis would apply with equal force if a faculty member delivered a child several weeks before the summer break. The faculty member would be compensated for up to six (6) weeks prior to the start of the summer break, so long as the faculty member has adequate sick leave available to her. The faculty member would not be compensated during the summer break, but such time would not count against the faculty member's FMLA leave. Upon the commencement of the fall session, the faculty member may elect to continue her available FMLA leave to bond with her child without pay.[4]

    3.    *Application of the FMLA leave during the summer if a faculty member committed to teach during the summer session*

If a faculty member has committed to teach during a summer session, the faculty member's FMLA qualifying leave during the summer session will count towards the faculty member's FMLA leave. In addition, if a faculty member's FMLA leave during the summer session is due to his/her own medical condition or an immediate family member's medical condition, the faculty member, pursuant to Article 10, Section 10.03 and Article 21, Section 21.02(I) of the Collective Bargaining Agreement, can only use three (3) of his/her accumulated sick days to be compensated during his/her FMLA leave period that falls during the summer session. Thus, as an example, with three (3) weeks remaining in a summer session, a faculty member who is teaching during the summer session encounters a situation necessitating nine (9) weeks of FMLA qualifying leave for the faculty member's own medical condition or an immediate family member's condition. The calculation of the faculty member's FMLA leave and compensation for this leave would be as follows:

    a.     First three (3) weeks: paid for only for three (3) days and all three (3) weeks counts towards FMLA leave;

    b.     Next three (3) weeks (break between summer session and start of fall session): unpaid and does not count towards FMLA leave; and

    c.     Next three (3) weeks (fall session starts): paid and counts towards FMLA leave.

---

[4] Starting July 1, 2011, the College's FMLA period became a rolling twelve (12) month period measured backwards from the date a faculty member uses any FMLA leave. Thus, the faculty member who delivers a child several weeks before the start of the summer break would have available to them their FMLA leave upon the commencement of the fall session equal to twelve (12) weeks minus the actual FMLA leave taken by that faculty member during the spring session (or the preceding twelve (12) month period).

91

Exhibit A

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

_____
Dr. Karen Miller

_____
Jeffrey Tuma

Date Signed: ___8-16-19___

Exhibit A

**SIDE LETTER OF AGREEMENT- SL-12**
**EMERGING TEACHING AND LEARNING INNOVATIONS COMMITTEE**

The College and CCC-AAUP acknowledge that the experimentation and use of emerging academic technologies is critical to the ability of the College to remain competitive and provide outstanding student service and support. Both parties agree that the College needs flexibility to innovate with emerging academic technologies and pedagogies. Both parties also agree that emerging technologies and pedagogies need a means to inform and review emerging activities to ensure that College academic standards and the terms of the CCC-AAUP labor contract are maintained. Both parties agree to create an Emerging Teaching and Learning Innovations Committee in order to fulfill this need.

Emerging Teaching & Learning Innovations Committee

A. Committee Purpose: To balance the needs of the College to move in an expeditious manner while also providing a forum to thoroughly review the implications of emerging technologies and pedagogies concerning the integrity and spirit of the CCC-AAUP labor contract.

B. Committee Charges:

1. To understand and support the College's need to respond quickly to innovative opportunities and emerging academic technologies in both teaching and academic support;

2. To inform the Committee when the College intends to experiment with or use an emerging academic technology, including grant opportunities;

3. To create an innovation or pilot period (up to one year) to experiment with each respective emerging academic technology;

4. To comprehensively review the impact of piloted academic technologies or pedagogies on the CCC-AAUP labor contract;

5. To use Interest-Based Bargaining (IBB) collaboration principles between the CCC-AAUP faculty and the College to review the impact of the respective emerging academic technology on the CCC-AAUP labor contract;

6. To provide a non-confrontational mechanism for modifying labor contract terms, if necessary, during the term of the current labor contract;

7. To meet all year, including during the summer, in order to be able to respond to opportunities with short time frames;

8. To form subcommittees as needed;

9. To use internal and external subject matter experts, as needed, to fulfill the Committee's purpose;

10. To make recommendations concerning the Committee's work based on consensus;

11. To send recommendations to the College Provost/EVP, CCC-AAUP President, and CCC Faculty Senate Chair;

12. To recognize that the Committee's recommendations may be implemented in whole, in part, not at all, or as modified;

13. To recognize that if there is no agreement on CCC-AAUP labor contract problems, CCC-AAUP retains its right to file a grievance or move the issue to an LMC meeting;

14. To recognize that if there is no agreement on CCC-AAUP labor contract problems, the College administration also retains the right to move any disputed labor contract issues to an LMC meeting;

93

Exhibit A

15.  To review non-contractual aspects of new technology implementations if it is mutually agreeable.

C. Committee Membership

Faculty: Four (4) members appointed by CCC-AAUP President.
Administration: Four (4) members appointed by EVP Academic & Student Affairs.
Leadership: The Committee is co-chaired by a CCC-AAUP and an administrative member.

CUYAHOGA COMMUNITY COLLEGE                 AMERICAN ASSOCIATION OF
                                           UNIVERSITY PROFESSORS


_____           _____
Dr. Karen Miller                           Jeffrey Tuma


Date Signed:_____8-16 19_____

94

Exhibit A

## SIDE LETTER OF AGREEMENT - SL-13
## FACULTY GRANTS ADVISORY COMMITTEE

Definition

Grant is defined as a funding award made on the basis of submitted proposals, usually in response to application guidelines, with specific terms and conditions (including reporting requirements) and defined goals and objectives that need to be met.

Purposes

1. To encourage faculty involvement in the grant process;
2. To meet and review grant opportunities on a timely and consistent basis;
3. To provide feedback on grant opportunities to faculty and other relevant parties;
4. To identify relevant and interested faculty to join the grant opportunity (if appropriate);
5. To disseminate potential grant funding opportunities to faculty to determine if there is interest in developing a proposal;
6. To have access to a tracking system for grant opportunities that will identify involved faculty and their roles, grant proposal pursuit status, grant award status, and awarded grant timelines; and
7. To have access to grant proposals and related budgets.

Membership

This Committee shall have nine (9) members and be co-chaired by CCC-AAUP and the administration.
Faculty: Six (6) faculty, three (3) from CCC-AAUP and three (3) from Joint Faculty Senate.
Administration: Three (3) administrative staff as needed by the committee
Administrative Officer: Vice President of Academic Affairs

Charges

1. To schedule regular meetings to review grant opportunities;
2. To communicate to faculty grant funding opportunities and status;
3. To encourage faculty involvement in the grant process;
4. To identify prospective faculty for involvement in grant opportunities;
5. To identify and ensure credit for faculty intellectual property included in grants; and
6. To provide a summary report of grant opportunities per academic year.

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

Dr. Karen Miller

Jeffrey Parpa

Date Signed: 8-16-19

95

Exhibit A

## SIDE LETTER OF AGREEMENT SL-14
## NON-CREDIT FACULTY TEACHING OPPORTUNITIES

Cuyahoga Community College (College) and the American Association of University Professors (AAUP) recognize the value in having bargaining unit faculty members teach in the College's non-credit program offerings. Bargaining unit faculty are uniquely positioned to seamlessly incorporate outcomes, objectives, assessment and processes in non-credit offerings that directly relate to credit courses and degrees. Currently no mechanism exists which provides faculty an opportunity to teach non-credit offerings and receive Equated Semester Unit (ESU) credit towards their contractual full-time teaching load.

1. Therefore, the College and the AAUP agree that, for bargaining unit faculty teaching courses as non-credit or non-credit courses that have been academically adjusted to be eligible for credit, the faculty member will receive one (1) ESU for each fifteen (15) contact hours of teaching.

2. For teaching courses as non-credit or non-credit courses that have been academically adjusted to be eligible for credit at less than fifteen (15) contact hours of teaching, ESU's will be prorated at the one (1) ESU per fifteen (15) contact hour rate, or .067 ESUs for each contact hour.


CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

Dr. Karen Miller

Jeffrey Puma

Date:  8-16-19

96

Exhibit A

## SIDE LETTER OF AGREEMENT - SL-15
## SALARY ADVANCEMENT

Cuyahoga Community College (the College) and the American Association of University Professors (AAUP) have agreed to a system of salary advancement for faculty who attain additional education. The procedure for advancement is contained in Section 16.04 and applied in Appendices A, B, and C of the Collective Bargaining Agreement between the College and the AAUP (the Agreement). This advancement structure, memorialized in a Doctoral Criteria Report (the Report) has been in place since 2007. In light of the parties recognizing changes have taken place in both higher education and subject disciplines since then. Specifically, the College and the AAUP have created a list of certifications in the field of Information Technology, and created an equivalent number of credit hours that can be applied under Section 16.04 and the Appendices for salary advancement.

1. Therefore, the College and the AAUP to amend Section 16.04 of the Agreement to incorporate a revised Doctoral Criteria Report that includes the list of eligible certificates (entitled IT Center of Excellence - Preferred Certifications and is on file at the AAUP office and at the Office of Academic and Student Affairs) and the equivalent amount of college credit hours for the discipline of Information Technology.

2. Within each of the eight (8) IT disciplines listed in the Attachment, a faculty member will earn the listed number of credit hours for each completed certificate. However, the College Credit hours are cumulative within each discipline.


CUYAHOGA COMMUNITY COLLEGE      AMERICAN ASSOCIATION OF
                                              UNIVERSITY PROFESSORS

_____      _____
Dr. Karen Miller                     Jeffrey Tuma

Date: ___8-16-19___

97

Exhibit A

## SIDE LETTER OF AGREEMENT- SL-16
## YEAR LONG SCHEDULING PROJECT

Cuyahoga Community College (College) and the American Association of University Professors, Cuyahoga College Chapter (CCC – AAUP) agree to work collaboratively and in partnership to create a comprehensive annual College-wide schedule including modalities of delivery which under no circumstances will be implemented, either in whole or in part, absent the mutual written consent of both the College and CCC – AAUP.

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

Dr. Karen Miller

Jeffrey Tuma

Date: 8-16-19

98

Exhibit A

## SIDE LETTER OF AGREEMENT - SL-17
## FACULTY ACCEPTING ADMINISTRATIVE ASSIGNMENTS

a. Any faculty member going into an administrative agreement will maintain their tenure/seniority.

b. The employee will pay into the retirement plan that represents the position into which they are going to assume; hence, the Administrative Assignments will then participate in the OPERS plan.

c. If the assignment is three (3) years in duration, the determination of whether to continue into the third year will be made after review of two (2) years of performance.

d. A Lecturer/Lectureship will be available to backfill for classroom/instructional responsibilities.

e. If the faculty member desires to go back to an instructional faculty member position (classroom) before the end of the "planned duration" the timing will be at the beginning of a semester.

f. Every effort will be made to return faculty to their home campus.

g. No AAUP dues will be withheld during the assignment; the AAUP will welcome the faculty member back upon completion of the administrative assignment.

h. Typical schedule for the administrative assignment will be 8:30a.m. – 5:00p.m., Monday through Friday.

i. Payroll for the administrative assignment will be spread over 26 pays.

j. Faculty member will be allowed to accrue and use vacation; however, the vacation will not be paid out or carried over if any is remaining at the end of the administrative assignment.

k. Assignments will be scheduled to end either in June or December.

l. The ability to teach one (1) class a semester as an adjunct faculty member will be available.

m. Upon completion of the assignment, individuals will be returned to where they would have been had they not assumed the assignment (i.e. time in assignment will count toward rank)

n. Every effort will be made to keep the faculty member whole.

o. Assignments can be extended as long as both parties mutually agree upon the terms and conditions for the extension.

p. Salaries for the assignments will be determined using the ranges for the grade upon which the job is set (i.e. Director assignments at grade 14, Executive Directors at grade 15).


CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS


Dr. Karen Miller

Jeffrey Tuma

Date: 8-16-19

99

Exhibit A

## SIDE LETTER OF AGREEMENT SL-18
## FACULTY ROLE CLARIFICATION

Cuyahoga Community College (the College) and the American Association of University Professors (AAUP) recognize the value the bargaining unit members provide in professional service activities, not only to their profession, but to the community and students as well. The Parties also recognize that the bargaining unit members have a long and entrenched tradition of providing students with guidance and advice, both formally and informally, which has greatly enhanced the student experience. The Parties also agree that each counselor, librarian and instructional faculty member has an essential yet distinct role in advising and counseling students, directly contributing to our students' academic success and completion.

1. Therefore, the College and the AAUP agree that counseling and advising responsibilities for instructional faculty, counselors, and librarians will be clarified and memorialized in the attached Appendix D – Position Specification: Instructional and Non-Instructional Faculty, which is incorporated herein.


CUYAHOGA COMMUNITY              AMERICAN ASSOCIATION
COLLEGE:                                        OF UNIVERSITY PROFESSORS:

Dr. Karen Miller                                Jeffrey Tuma


8-16-19

100

Exhibit A

## SIDE LETTER OF AGREEMENT - SL-19

## FACULTY ADVOCACY AND SECOND SEMESTER
## FIRST YEAR EXPERIENCE (FYE)

Cuyahoga Community College (the College) and the Cuyahoga Community College chapter of the American Association of University Professors (the AAUP) recognize the pivotal role that faculty have in ensuring our students achieve their academic goals. Additionally, the College understands that faculty desire to continue increasing their levels of leadership and participation in projects and strategies that increase student success and completion rates. This increased level of involvement is memorialized in updated Appendix D of the Collective Bargaining Agreement between the College and the AAUP, which clarifies and memorializes the scope of student advocacy activities for instructional, counseling and librarian faculty.

As part of this shared commitment to student success, the College and the AAUP have preliminarily developed a second semester cohort for first year students. The second semester cohort classes are designed to connect students with faculty in the student's academic pathway, and assist faculty in connecting students to career specific resources and activities as well as College based resources and support, such as care teams.

These cohort classes will be taught by faculty according to the following parameters:

1. The second semester cohort class will be a one (1) credit class for students.

2. Faculty teaching second semester cohort classes will receive one (1) ESU.

3. Participation in the second semester cohort program is encouraged for all full-time, instructional and non-instructional faculty.

4. Students in the First Year Experience (FYE) first semester classes will be assigned to a second semester cohort based on their declared major. Faculty choosing to participate in this strategic priority will teach second semester cohort classes based on their subject discipline and related pathway through the College's existing scheduling protocol.

5. Faculty teaching a second semester cohort class will be encouraged to serve as Faculty Advocates for the students after the conclusion of the class. Should a faculty member choose not to continue as a Faculty Advocate, other faculty (e.g. adjuncts, lecturers) may serve as Faculty Advocates for students in the particular cohort. The goal of the College and the AAUP is to have a Faculty Advocate assigned to each student completing a second semester cohort class.

6. For discipline specific discussions, Faculty Advocates will serve as primary points of contact for, and be available to, students throughout their course of study at the College and will be designated as an Advocate in OneRecord. Counselors will remain the student's primary point of contact for academic planning and adjustments, personal and career counseling, and transferability.

Exhibit A

7. Faculty members serving as Faculty Advocates will receive Service Credits for their service. The Service and Development Credit Committee will meet over summer of 2017 to define and incorporate the Faculty Advocate role as a part of the student success priority section in the Service and Development Credit Catalog.

8. The College and the AAUP will jointly staff a strategic scale up team during summer 2017 to finalize the details of this strategic priority, including but not limited to updating any administrative processes that may be needed, second semester cohort class outlines/objectives, a fall 2017 implementation plan, communication plans for faculty, staff and students, course caps and potential curriculum impacts. Faculty who serve on the strategic scale up team will receive ESUs for their participation.

9. The College and the AAUP recognize the importance of this student success strategy and its impact for both students and faculty, and are committed to using their best good faith effort to develop this program to be ready to be implemented for a limited amount of students in FYE for fall 2017.

10. The College and the AAUP also commit to working through the strategic scale up team to mutually agree on all decisions concerning this strategic priority. Should questions or issues arise that cannot be solved through the strategic scale up team, the College and the AAUP agree to call a Labor Management Committee meeting to come to a mutually acceptable resolution. Once the Faculty Advocate program described above is established and operational, the parties' strategic scale up team will remain in place to resolve issues in a mutually agreeable manner as they arise. The Labor Management Committee will continue to serve as an available resource to reach mutually acceptable resolutions.

CUYAHOGA COMMUNITY COLLEGE

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

Dr. Karen Miller

Jeffrey Tuma

Date: 8-16-19

102

Exhibit A

# EXHIBIT D

DOC ID ----> B234_0311

# B 234   310

## RECEIPT AND CERTIFICATE   № 15883

### CUYAHOGA COMMUNITY COLLEGE DISTRICT
NAME

30 5211
NUMBER

**DOMESTIC CORPORATIONS**

ARTICLES OF INCORPORATION
AMENDMENT
MERGER/CONSOLIDATION
DISSOLUTION
AGENT
RE-INSTATEMENT
CERTIFICATES OF CONTINUED
   EXISTENCE
MISCELLANEOUS

**FOREIGN CORPORATIONS**

LICENSE
AMENDMENT
SURRENDER OF LICENSE
APPOINTMENT OF AGENT
CHANGE OF ADDRESS OF AGENT
CHANGE OF PRINCIPAL OFFICE
RE-INSTATEMENT
FORM 7
PENALTY

**MISCELLANEOUS FILINGS**

ANNEXATION/INCORPORATION—CITY
   OR VILLAGE
RESERVATION OF CORPORATE NAMES
REGISTRATION OF NAME
REGISTRATION OF NAME RENEWALS
REGISTRATION OF NAME—CHANGE
   OF REGISTRANTS ADDRESS
TRADE MARK
TRADE MARK RENEWAL
SERVICE MARK
SERVICE MARK RENEWAL
MARK OF OWNERSHIP
MARK OF OWNERSHIP RENEWAL
EQUIPMENT CONTRACT/CHATTEL
   MORTGAGE
POWER OF ATTORNEY
SERVICE OF PROCESS
MISCELLANEOUS
ASSIGNMENT—TRADE MARK, MARK
   OF OWNERSHIP, SERVICE MARK,
   REGISTRATION OF NAME

I certify that the attached document was received and filed in the office of TED W. BROWN, Secretary of State, at Columbus, Ohio, on the __3rd__ day of _____November_____ A. D. 19 __61__, and recorded on Roll _B234_ at Frame _310_ of the RECORDS OF INCORPORATION and MISCELLANEOUS FILINGS.

*Ted W. Brown*
TED W. BROWN,
Secretary of State

Filed by and Returned To:_____Wm. F. Chinnock, Clerk_____

_____Board of County Commissioners_____

_____435 County Administration Bldg. Cleveland 13, Ohio__

FEE RECEIVED: $ _25.00_

NAME:_____CUYAHOGA COMMUNITY COLLEGE DISTRICT__

Exhibit A

DOC ID ----> B234_0311

# B 234 311
### 3 0 5 2 11



R E S O L U T I O N

Creating the Cuyahoga County Community
College District
- - - - - - - - - - - - - - - - - - - -

WHEREAS, the 104th General Assembly of the State of Ohio passed an act effective
October 20, 1961, entitled:  "An Act to enact Sections 3354.01 to 3354.24, inclusive, of
the Revised Code, to provide for the establishment of Community Colleges", pursuant to
which a board of county commissioners of any county, having a population of not less than
100,000, may create a community college district for the purpose of establishing, owning
and operating therein a public institution of education beyond the high school, called a
"Community College"; and

WHEREAS, the need for publicly supported institutions of higher education organized
for the principal purpose of providing for the people of this county instructional programs,
as defined in the said Act, in the "Arts and Sciences" and in "Adult Education" has been
demonstrated to the satisfaction of this Board at the public hearing held on this subject
on October 4, 1961, and by the surveys and studies filed with this Board by the Cleveland
Commission on Higher Education, The Ohio College Association, and the Interim Commission
on Education Beyond the High School; and

WHEREAS, Cuyahoga County has a total population of not less than 100,000 as
determined by the last federal decennial census; and

WHEREAS, this Board desires to create a community college district consisting of
the whole territory of Cuyahoga County.

NOW, THEREFORE, Be It Resolved by the Board of County Commissioners of Cuyahoga
County, Ohio:

Section 1:  That based upon the testimony of citizens appearing at the aforesaid
public hearing, the hereinbefore referred to surveys and studies now on file with this
Board, and other information available to it, this Board finds:

    (a)  The ever mounting demand of young people for additional higher
         educational services and the enormous post-war population surge
         requires additional educational facilities in Cuyahoga County
         beyond the high school.

    (b)  The rising costs of higher education tend to exclude qualified
         students from a college education and to limit their opportunity
         for personal advancement and accordingly to restrict their
         usefulness as productive members of this county.

    (c)  Existing institutions of higher education in Cuyahoga County do
         not have the facilities to supply all qualified students with
         high quality education beyond the high school at a cost within
         their means.

    (d)  Community colleges offering two-year higher educational programs
         in other communities in the United States have proved to be a
         most effective and economical method of extending education beyond
         the high school.

-1-

Exhibit A

DOC ID ----> B234_0311

# B 234   312

**Section 2:**  That the foregoing demonstrates to the satisfaction of this Board and this Board finds that the creation of a community college district for the purpose of establishing, owning and operating therein a community college is necessary and will be conducive to the public convenience and welfare.

**Section 3:**  That pursuant to the aforesaid Act (Sections 3354.01 to 3354.24, inclusive, of the Revised Code of Ohio) there is hereby created a community college district consisting of the whole territory of Cuyahoga County to be known as the Cuyahoga Community College District.

**Section 4:**  That pursuant to Section 3354.04 of the Revised Code, the Clerk of this Board is hereby directed forthwith to certify a copy of this resolution to the Secretary of State of the State of Ohio.

On Motion of Commissioner Speeth, seconded by Commissioner Gorman, the

foregoing resolution was duly adopted.

     Ayes:     Gorman,    Speeth,    Day.

     Nays:     None.

     Resolution Adopted.

WM. F. CHINNOCK, Clerk

Journal 135

Date:  October 23, 1961.

-2-

Exhibit A

DOC ID ----> B234_0311

# B 234   313

### R E S O L U T I O N

Appointing William F. Chinnock as Statutory
Agent of the Cuyahoga Community College District
created by the Board of County Commissioners of
Cuyahoga County, Ohio, by resolution adopted
October 23, 1961, Journal 135; directing the
Clerk of the Board to transmit a certified copy
of this resolution to the Secretary of State of
the State of Ohio.
- - - - - - - - - - - - - - - - - - - - - - - -

BE IT RESOLVED by the Board of County Commissioners of
Cuyahoga County, Ohio, that William F. Chinnock be, and he is, hereby
appointed as Statutory Agent of the Cuyahoga Community College District
created by said Board by resolution adopted October 23, 1961, Journal
135.

BE IT FURTHER RESOLVED that the Clerk of the Board be, and
he is, hereby directed to transmit a certified copy of this resolution to
the Secretary of State of the State of Ohio.

On Motion of Commissioner Gorman, seconded by Commissioner

Speeth, the foregoing resolution was duly adopted.

Ayes:       Gorman,     Speeth,    Day.

Nays:       None.

Resolution Adopted.

Wm. F. Chinnock, Clerk

Journal 135

October 30, 1961.

Exhibit A

DOC ID ----> B234_0311

Form C-103

# B 234  314
# Original Appointment of Agent

The undersigned, being at least a majority of the incorporators of **Cuyahoga Community**
(Name of Corporation)

**College District, created by the Board of County Commissioners by resolution**

adopted on October 23, 1961, Journal 135,

hereby appoint _____ **Wm. F. Chinnock** _____
(Name of Agent)

a natural person resident in the county in which the corporation has its principal office, a corporation
having a business address in the county in which ____ **Cuyahoga Community College District** ____
(Name of Corporation)

has its principal office (strike out phrase not applicable), upon whom (~~which~~) any process, notice or
demand required or permitted by statute to be served upon the corporation may be served. His (~~her~~)

complete address is  **436 County Administration Building,**
**1219 Ontario Street,**  **Cleveland 13, Ohio**
(Street or Avenue)  (City or Village)

_____ **Cuyahoga** _____ County, Ohio.

**Cuyahoga Community College District**
(Name of Corporation)

**Wm. P. Day, President**

**Frank M. Gorman**

**Henry W. Speeth**

**Board of County Commissioners of Cuyahoga County, Ohio.**
(INCORPORATORS NAMES SHOULD BE TYPED OR PRINTED BENEATH SIGNATURES)

**Cleveland** _____, Ohio

**October 30th,** _____, 19**61**

**Cuyahoga Community College District**
(Name of Corporation)

Gentlemen: I, ~~It~~ (strike out word not applicable) hereby accept(s) appointment as agent of your
corporation upon whom process, tax notices or demands may be served.

**Cuyahoga Community College District**
(Signature of Agent or Name of Corporation)

By _____  **Statutory Agent**
(Signature of Officer Signing and Title)

**Remarks:** All articles of incorporation must be accompanied by an original appointment of agent. There is no
filing fee for this appointment.

Exhibit A

# EXHIBIT E

# THE NEW PURITANS

~~~~~~~~~~

A growing illiberalism, fueled by social media, is trampling democratic discourse. The result is ruined lives and a chilling atmosphere in which mob justice has replaced due process and forgiveness is impossible.

**BY ANNE APPLEBAUM**

ILLUSTRATIONS BY NICOLAS ORTEGA

A

Exhibit A



Exhibit A

"It was no great distance, in those days, from the prison-door to the market-place. Measured by the prisoner's experience, however, it might be reckoned a journey of some length." So begins the tale of Hester Prynne, as recounted in Nathaniel Hawthorne's most famous novel, *The Scarlet Letter*. As readers of this classic American text know, the story begins after Hester gives birth to a child out of wedlock and refuses to name the father. As a result, she is sentenced to be mocked by a jeering crowd, undergoing "an agony from every footstep of those that thronged to see her, as if her heart had been flung into the street for them all to spurn and trample upon." After that, she must wear a scarlet *A*—for adulterer—pinned to her dress for the rest of her life. On the outskirts of Boston, she lives in exile. No one will socialize with her—not even those who have quietly committed similar sins, among them the father of her child, the saintly village preacher. The scarlet letter has "the effect of a spell, taking her out of the ordinary relations with humanity, and enclosing her in a sphere by herself."

We read that story with a certain self-satisfaction: *Such an old-fashioned tale!* Even Hawthorne sneered at the Puritans, with their "sad-colored garments and grey steeple-crowned hats," their strict conformism, their narrow minds and their hypocrisy. And today we are not just hip and modern; we live in a land governed by the rule of law; we have procedures designed to prevent the meting-out of unfair punishment. Scarlet letters are a thing of the past.

Except, of course, they aren't. Right here in America, right now, it is possible to meet people who have lost everything—jobs, money, friends, colleagues—after violating no laws, and sometimes no workplace rules either. Instead, they have broken (or are accused of having broken) social codes having to do with race, sex, personal behavior, or even acceptable humor, which may not have existed five years ago or maybe five months ago. Some have made egregious errors of judgment. Some have done nothing at all. It is not always easy to tell.

Yet despite the disputed nature of these cases, it has become both easy and useful for some people to put them into larger narratives. Partisans, especially on the right, now toss around the phrase *cancel culture* when they want to defend themselves from criticism, however legitimate. But dig into the story of anyone who has been a genuine victim of modern mob justice and you will often find not an obvious argument between "woke" and "anti-woke" perspectives but rather incidents that are interpreted, described, or remembered by different people in different ways, even leaving aside whatever political or intellectual issue might be at stake.

There is a reason that the science reporter Donald McNeil, after being asked to resign from *The New York Times*, needed 21,000 words, published in four parts, to recount a series of conversations he had had with high-school students in Peru, during which he may or may not have said something racially offensive, depending on whose account you find most persuasive. There is a reason that Laura Kipnis, an academic at Northwestern, required an entire book, *Unwanted Advances: Sexual Paranoia Comes to Campus*, to recount the repercussions, including to herself, of two allegations of sexual harassment against one man at her university; after she referred to the case in an article about "sexual paranoia," students demanded that the university investigate her, too. A full explanation of the personal, professional, and political nuances in both cases needed a lot of space.

There is a reason, too, that Hawthorne dedicated an entire novel to the complex motivations of Hester Prynne, her lover, and her husband. Nuance and ambiguity are essential to good fiction. They are also essential to the rule of law: We have courts, juries, judges, and witnesses precisely so that the state can learn whether a crime has been committed before it administers punishment. We have a presumption of innocence for the accused. We have a right to self-defense. We have a statute of limitations.

By contrast, the modern online public sphere, a place of rapid conclusions, rigid ideological prisms, and arguments of 280 characters, favors neither nuance nor ambiguity. Yet the values of that online sphere have come to dominate many American cultural

Exhibit A

institutions: universities, newspapers, foundations, museums. Heeding public demands for rapid retribution, they sometimes impose the equivalent of lifetime scarlet letters on people who have not been accused of anything remotely resembling a crime. Instead of courts, they use secretive bureaucracies. Instead of hearing evidence and witnesses, they make judgments behind closed doors.

I have been trying to understand these stories for a long time, both because I believe that the principle of due process underpins liberal democracy, and also because they remind me of other times and places. A decade ago, I wrote a book about the Sovietization of Central Europe in the 1940s, and found that much of the political conformism of the early Communist period was the result not of violence or direct state coercion, but rather of intense peer pressure. Even without a clear risk to their life, people felt obliged—not just for the sake of their career but for their children, their friends, their spouse—to repeat slogans that they didn't believe, or to perform acts of public obeisance to a political party they privately scorned. In 1948, the famous Polish composer Andrzej Panufnik sent what he later described as some "rubbish" as his entry into a competition to write a "Song of the United Party"—because he thought if he refused to submit anything, the whole Union of Polish Composers might lose funding. To his eternal humiliation, he won. Lily Hajdú-Gimes, a celebrated Hungarian psychoanalyst of that era, diagnosed the trauma of forced conformity in patients, as well as in herself. "I play the game that is offered by the regime," she told friends, "though as soon as you accept that rule you are in a trap."

But you don't even need Stalinism to create that kind of atmosphere. During a trip to Turkey earlier this year, I met a writer who showed me his latest manuscript, kept in a desk drawer. His work wasn't illegal, exactly—it was just unpublishable. Turkish newspapers, magazines, and publishing houses are subject to unpredictable prosecutions and drastic sentences for speech or writing that can be arbitrarily construed as insulting the president or the Turkish nation. Fear of those sanctions leads to self-censorship and silence.

In America, of course, we don't have that kind of state coercion. There are currently no laws that shape what academics or journalists can say; there is no government censor, no ruling-party censor. But fear of the internet mob, the office mob, or the peer-group mob is producing some similar outcomes. How many American manuscripts now remain in desk drawers—or unwritten altogether—because their authors fear a similarly arbitrary judgment? How much intellectual life is now stifled because of

fear of what a poorly worded comment would look like if taken out of context and spread on Twitter?

To answer that question, I spoke with more than a dozen people who were either victims or close observers of sudden shifts in social codes in America. The purpose here is not to reinvestigate or relitigate any of their cases. Some of those I interviewed have behaved in ways that I, or readers of this article, may well consider ill-judged or immoral, even if they were not illegal. I am not here questioning all of the new social codes that have led to their dismissal or their effective isolation. Many of these social changes are clearly positive.

Still, no one quoted here, anonymously or by name, has been charged with an actual crime, let alone convicted in an actual court. All of them dispute the public version of their story. Several say they have been falsely accused; others believe that their "sins" have been exaggerated or misinterpreted by people with hidden agendas. All of them, sinners or saints, have been handed drastic, life-altering, indefinite punishments, often without the ability to make a case in their own favor. This—the convicting and sentencing without due process, or mercy—should profoundly bother Americans. In 1789, James Madison proposed that the U.S. Constitution ensure that "no person shall be … deprived of life, liberty or property without due process of law." Both the Fifth and the Fourteenth Amendments to the Constitution invoke due process. Nevertheless, these Americans have been effectively deprived of it.

Many of the people described here remain unavoidably anonymous in this essay. This is because they are involved in complicated legal or tenure battles and do not want to speak on the record, or because they fear another wave of social-media attacks. I have tried to describe their current situations—to explain what price they have paid, what kind of punishment they have been handed—without identifying those who did not want to be identified, and without naming their institutions. Necessarily, a lot of important details are therefore excluded. But for some, this is now the only way they dare to speak out at all.

~~~~~

**HOW MUCH INTELLECTUAL LIFE IS NOW STIFLED BECAUSE OF FEAR OF WHAT A POORLY WORDED COMMENT WOULD LOOK LIKE IF TAKEN OUT OF CONTEXT AND SPREAD ON TWITTER?**

~~~~~

HERE IS THE first thing that happens once you have been accused of breaking a social code, when you find yourself at the center of a social-media storm because of something you said or purportedly said. The phone stops ringing. People stop talking to you. You become toxic. "I have in my department dozens of colleagues—I think I have spoken to zero of them in the past year," one academic told me. "One of my colleagues I had lunch with at least once a week for more than a decade—he just refused to speak to me anymore, without asking

Exhibit A

questions." Another reckoned that, of the 20-odd members in his department, "there are two, one of whom has no power and another of whom is about to retire, who will now speak to me."

A journalist told me that after he was summarily fired, his acquaintances sorted themselves into three groups. First, the "heroes," very small in number, who "insist on due process before damaging another person's life and who stick by their friends." Second, the "villains," who think you should "immediately lose your livelihood as soon as the allegation is made." Some old friends, or people he thought were old friends, even joined the public attack. But the majority were in a third category: "good but useless. They don't necessarily think the worst of you, and they would like you to get due process, but, you know, they haven't looked into it. They have reasons to think charitably of you, maybe, but they're too busy to help. Or they have too much to lose." One friend told him that she would happily write a defense of him, but she had a book proposal in the works. "I said, 'Thank you for your candor.'"

Most people drift away because life moves on; others do so because they are afraid that those unproven allegations might imply something far worse. One professor who has not been accused of any physical contact with anybody was astonished to discover that some of his colleagues assumed that if his university was disciplining him, he must be a rapist. Another person suspended from his job put it this way: "Someone who knows me, but maybe doesn't know my soul or character, may be saying to themselves that prudence would dictate they keep their distance, lest they become collateral damage."

Here is the second thing that happens, closely related to the first: Even if you have not been suspended, punished, or found guilty of anything, you cannot function in your profession. If you are a professor, no one wants you as a teacher or mentor ("The graduate students made it obvious to me that I was a nonperson and could not possibly be tolerated"). You cannot publish in professional journals. You cannot quit your job, because no one else will hire you. If you are a journalist, then you might find that you cannot publish at all. After losing his job as editor of *The New York Review of Books* in a #MeToo-related editorial dispute—he was not accused of assault, just of printing an article by

someone who was—Ian Buruma discovered that several of the magazines where he had been writing for three decades would not publish him any longer. One editor said something about "younger staff" at his magazine. Although a group of more than 100 *New York Review of Books* contributors—among them Joyce Carol Oates, Ian McEwan, Ariel Dorfman, Caryl Phillips, Alfred Brendel (and me)—had signed a public letter in Buruma's defense, this editor evidently feared his colleagues more than he did Joyce Carol Oates.

For many, intellectual and professional life grinds to a halt. "I was doing the best work in my life when I heard of this investigation happening," one academic told me. "It all stopped. I have not written another paper since." Peter Ludlow, a philosophy professor at Northwestern (and the subject of Laura Kipnis's book), lost two book contracts after the university forced him out of his job for two alleged instances of sexual harassment, which he denies. Other philosophers would not allow their articles to



Exhibit A

appear in the same volume as one of his. After Daniel Elder, a prizewinning composer (and a political liberal) posted a statement on Instagram condemning arson in his hometown of Nashville, where Black Lives Matter protesters had set the courthouse on fire after the killing of George Floyd, he discovered that his publisher would not print his music and choirs would not sing it. After the poet Joseph Massey was accused of "harassment and manipulation" by women he'd been romantically involved with, the Academy of American Poets removed all of his poetry from its website, and his publishers removed his books from theirs. Stephen Elliott, a journalist and critic who was accused of rape on the anonymous "Shitty Media Men" list that circulated on the internet at the height of the #MeToo conversation—he is now suing that list's creator for defamation—has written that, in the aftermath, a published collection of his essays vanished without a trace: Reviews were canceled; *The Paris Review* aborted a planned interview with him; he was disinvited from book panels, readings, and other events.

For some people, this can result in a catastrophic loss of income. Ludlow moved to Mexico, because he could live more cheaply there. For others, it can create a kind of identity crisis. After describing the various jobs he had held in the months since being suspended from his teaching job, one of the academics I interviewed seemed to choke up. "I am really only good at one thing," he told me, pointing at mathematical formulas on a blackboard behind him: "this."

Sometimes advocates of the new mob justice claim that these are minor punishments, that the loss of a job is not serious, that people should be able to accept their situation and move on. But isolation plus public shaming plus loss of income are severe sanctions for adults, with long-term personal and psychological repercussions—especially because the "sentences" in these cases are of indeterminate length. Elliott contemplated suicide, and has written that "every first-hand account I've read of public shaming—and I've read more than my share—includes thoughts of suicide." Massey did too: "I had a plan and the means to execute it; I then had a panic attack and took a cab to the ER." David Bucci, the former chair of the Dartmouth brain-sciences department, who was named in a lawsuit against the college though he was not accused of any sexual misconduct, did kill himself after he realized he might never be able to restore his reputation.

Others have changed their attitudes toward their professions. "I wake up every morning afraid to teach," one academic told me: The university campus that he once loved has become a hazardous jungle, full of traps. Nicholas Christakis, the Yale professor of medicine and sociology who was at the center of a campus and social-media storm in 2015, is also an expert on the functioning of human social groups. He reminded me that ostracism "was considered an enormous sanction in ancient times—to be cast out of your group was deadly." It is unsurprising, he said, that people in these situations would consider suicide.

The third thing that happens is that you try to apologize, whether or not you have done anything wrong. Robert George, a Princeton philosopher who has acted as a faculty advocate for students and professors who have fallen into legal or administrative difficulties, describes the phenomenon like this: "They have been popular and successful their whole lives; that's how they climbed the ladder to their academic positions, at least in places like the one I teach. And then suddenly there is this terrible feeling of *Everybody hates me* … So what do they do? More often than not, they just cave in." One of the people I spoke with was asked to apologize for an offense that broke no existing rules. "I said, 'What am I apologizing for?' And they said, 'Well, their feelings were hurt.' So I crafted my apology around that: 'If I did say something that upset you, I didn't anticipate that would happen.'" The apology was initially accepted, but his problems didn't end.

This is typical: More often than not, apologies will be parsed, examined for "sincerity"—and then rejected. Howard Bauchner, the editor of the *Journal of the American Medical Association*, apologized for something he'd had nothing directly to do with, after one of his colleagues made controversial comments on a podcast and on Twitter about whether communities of color were held back more by "structural racism" or by socioeconomic factors. "I remain profoundly disappointed in myself for the lapses that led to the publishing of the tweet and podcast," Bauchner wrote. "Although I did not write or even see the tweet, or create the podcast, as editor in chief, I am ultimately responsible for them." He wound up resigning. But this, too, is now typical: Because apologies have become ritualized, they invariably seem insincere. Websites now offer "sample templates" for people who need to apologize; some universities offer advice on how to apologize to students and employees, and even include lists of good words to use (*mistake, misunderstand, misinterpret*).

Not that everyone really wants an apology. One former journalist told me that his ex-colleagues "don't want to endorse the process of mistake/apology/understanding/forgiveness—they don't want to forgive." Instead, he said, they want "to punish and purify." But the knowledge that whatever you say will never be enough is debilitating. "If you make an apology and you know in advance that your apology will not be accepted—that it is going to be considered a move in a psychological or cultural or political game—then the integrity of your introspection is being mocked and you feel permanently marooned in a world of unforgivingness," one person told me. "And that is a truly unethical world." Elder's music publishers asked him to make a groveling apology—they even went so far as to write it for him—but he refused.

Even after the apology is made, a fourth thing happens: People begin to investigate you. One person I spoke with told me he believed he was investigated because his employer didn't want to offer severance compensation and needed extra reasons to justify his termination. Another thought an investigation of him was launched because firing him for an argument over language would have violated the union contract. Long careers almost always include episodes of disagreement or ambiguity. Was that time he hugged a colleague in consolation really something else? Was her joke really a joke, or something worse? Nobody is perfect; nobody is pure; and once people set out to interpret ambiguous incidents in a particular way, it's not hard to find new evidence. Sometimes investigations take place because someone in the community feels that you haven't paid a high enough price for

SEPIA TIMES / GETTY

Exhibit A

whatever it is you have done or said. Last year Joshua Katz, a popular Princeton classics professor, wrote an article critical of a letter published by a group of Princeton faculty on race. In response *The Daily Princetonian*, a student newspaper, spent seven months investigating his past relationships with students, eventually convincing university officials to relitigate incidents from years earlier that had already been adjudicated—a classic breach of James Madison's belief that no one should be punished for the same thing twice. The *Daily Princetonian* investigation looks more like an attempt to ostracize a professor guilty of wrong-think than an attempt to bring resolution to a case of alleged misbehavior.

Mike Pesca, a podcaster for *Slate*, got into a debate with his colleagues on his company's internal Slack message board about whether it is acceptable to pronounce a racial slur out loud when reporting on the use of a racial slur—an action that, he says, was not against any company rules at the time. After a meeting of the editorial staff held soon afterward to discuss the incident—to which Pesca himself was not invited—the company launched an investigation to find out whether there were other things he might have done wrong. (According to a statement by a *Slate* spokesperson, the investigation was prompted by more than just "an isolated abstract argument in a Slack channel.") Amy Chua, the Yale Law professor and author of *Battle Hymn of the Tiger Mother*, told me she believes that investigations into her relationships with students were sparked by her personal connections to Supreme Court Justice Brett Kavanaugh.

Many of these investigations involve anonymous reports or complaints, some of which can come as a total surprise to those being reported upon. By definition, social-media mobs involve anonymous accounts that amplify unverified stories with "likes" and shares. The "Shitty Media Men" list was an anonymous collection of unverified accusations that became public. Procedures at many universities actually mandate anonymity in the early stages of an investigation. Sometimes even the accused isn't given any of the details. Chua's husband, the Yale Law professor Jed Rubenfeld, who was suspended from teaching due to sexual-harassment allegations (which he denies), says he did not know the names of his accusers or the nature of the accusations against him for a year and a half.

Kipnis, who was accused of sexual misconduct because she wrote about sexual harassment, was not initially allowed to know who her accusers were either, nor would anyone explain the rules governing her case. Nor, for that matter, were the rules clear to the people applying them, because, as she wrote in *Unwanted*

---

### THE CENSORIOUSNESS, THE SHUNNING, THE RITUALIZED APOLOGIES, THE PUBLIC SACRIFICES—THESE ARE TYPICAL BEHAVIORS IN ILLIBERAL SOCIETIES WITH RIGID CULTURAL CODES.

---

*Advances*, "there's no established or nationally uniform set of procedures." On top of all that, Kipnis was supposed to keep the whole thing confidential: "I'd been plunged into an underground world of secret tribunals and capricious, medieval rules, and I wasn't supposed to tell anyone about it," she wrote. This chimes with the story of another academic, who told me that his university "never even talked to me before it decided to actually punish me. They read the reports from the investigators, but they never brought me in a room, they never called me on the phone, so that I could say anything about my side of the story. And they openly told me that I was being punished based on allegations. Just because they didn't find evidence of it, they told me, doesn't mean it didn't happen."

Secretive procedures that take place outside the law and leave the accused feeling helpless and isolated have been an element of control in authoritarian regimes across the centuries, from the Argentine junta to Franco's Spain. Stalin created "troikas"—ad hoc, extrajudicial bodies that heard dozens of cases in a day. During China's Cultural Revolution, Mao empowered students to create revolutionary committees to attack and swiftly remove professors. In both instances, people used these unregulated forms of "justice" to pursue personal grudges or gain professional advantage. In *The Whisperers*, his book on Stalinist culture, the historian Orlando Figes cites many such cases, among them Nikolai Sakharov, who wound up in prison because somebody fancied his wife; Ivan Malygin, who was denounced by somebody jealous of his success; and Lipa Kaplan, sent to a labor camp for 10 years after she refused the sexual advances of her boss. The sociologist Andrew Walder has revealed how the Cultural Revolution in Beijing was shaped by power competitions between rival student leaders.

This pattern is now repeating itself in the U.S. Many of those I spoke with told complicated stories about the ways in which anonymous procedures had been used by people who disliked them, felt competitive with them, or held some kind of personal or professional grudge. One described an intellectual rivalry with a university administrator, dating back to graduate school—the same administrator who had played a role in having him suspended. Another attributed a series of problems to a former student, now a colleague, who had long seen him as a rival. A third thought that one of his colleagues resented having to work with him and would have preferred a different job. A fourth reckoned that he had underestimated the professional frustrations of younger colleagues who felt stifled by his organization's hierarchies. All of them believe that personal grudges help explain why they were singled out.

Exhibit A

The motivations could be even more petty than that. The writer Chimamanda Ngozi Adichie recently described how two younger writers she had befriended attacked her on social media, partly, she wrote, because they are "seeking attention and publicity to benefit themselves." Once it becomes clear that attention and praise can be garnered from organizing an attack on someone's reputation, plenty of people discover that they have an interest in doing so.

America remains a safe distance from Mao's China or Stalin's Russia. Neither our secretive university committees nor the social-media mobs are backed by authoritarian regimes threatening violence. Despite the right-wing rhetoric that says otherwise, these procedures are not being driven by a "unified left" (there is no "unified left"), or by a unified movement of any kind, let alone by the government. It's true that some of the university sexual-harassment cases have been shaped by Department of Education Title IX regulations that are shockingly vague, and that can be interpreted in draconian ways. But the administrators who carry out these investigations and disciplinary procedures, whether they work at universities or in the HR departments of magazines, are not doing so because they fear the Gulag. Many pursue them because they believe they are making their institutions better—they are creating a more harmonious workplace, advancing the causes of racial or sexual equality, keeping students safe. Some want to protect their institution's reputation. Invariably, some want to protect their own reputation. At least two of the people I interviewed believe that they were punished because a white, male boss felt he had to publicly sacrifice another white man in order to protect his own position.

But what gives anyone the conviction that such a measure is necessary? Or that "keeping students safe" means you must violate due process? It is not the law. Nor, strictly speaking, is it politics. Although some have tried to link this social transformation to President Joe Biden or House Speaker Nancy Pelosi, anyone who tries to shoehorn these stories into a right-left political framework has to explain why so few of the victims of this shift can be described as "right wing" or conservative. According to one recent poll, 62 percent of Americans, including a majority of self-described moderates and liberals, are afraid to speak their mind about politics. All of those I spoke with are centrist or center-left liberals. Some have unconventional political views, but some have no strong views at all.

Certainly nothing in the academic texts of critical race theory mandates this behavior. The original critical race theorists argued for the use of a new lens to interpret the past and the present. You can dispute whether or not that lens is useful, or whether you want to look through it at all—but you can't blame critical-race-theory authors for, say, Yale Law School's frivolous decision to investigate whether or not Amy Chua gave a dinner party at her house during the pandemic, or for the array of university presidents who have refused to stand by their own faculty members when they are attacked by students.

The censoriousness, the shunning, the ritualized apologies, the public sacrifices—these are rather typical behaviors in illiberal societies with rigid cultural codes, enforced by heavy peer pressure. This is a story of moral panic, of cultural institutions policing or purifying themselves in the face of disapproving crowds. The crowds are no longer literal, as they once were in Salem, but rather online mobs,

organized via Twitter, Facebook, or sometimes internal company Slack channels. After Alexi McCammond was named editor in chief of *Teen Vogue*, people discovered and recirculated on Instagram old anti-Asian and homophobic tweets she had written a decade earlier, while still a teenager. McCammond apologized, of course, but that wasn't enough, and she was compelled to quit the job before starting. She's had a softer landing than some—she was able to return to her previous work as a political reporter at *Axios*—but the incident reveals that no one is safe. She was a 27-year-old woman of color who had been named the "Emerging Journalist of the Year" by the National Association of Black Journalists, and yet her teenage self came back to haunt her. You would think it would be a good thing for the young readers of *Teen Vogue* to learn forgiveness and mercy, but for the New Puritans, there is no statute of limitations.

THIS CENSORIOUSNESS IS related not just to recent, and often positive, changes in attitudes toward race and gender, and to accompanying changes in the language used to discuss them, but to other social changes that are more rarely acknowledged. While most of those who lose their positions are not "guilty" in any legal sense, neither have they been shunned at random. Just as odd old women were once subject to accusations of witchery, so too are certain types of people now more likely to fall victim to modern mob justice. To begin with, the protagonists of most of these stories tend to be successful. Though not billionaires or captains of industry, they've managed to become editors, professors, published authors, or even just students at competitive universities. Some are unusually social, even hyper-gregarious: They were professors who liked to chat or drink with their students, bosses who went out to lunch with their staff, people who blurred the lines between social life and institutional life.

"If you ask anyone for a list of the best teachers, best citizens, most responsible people, I would be on every one of those lists," one now-disgraced faculty member told me. Amy Chua had been appointed to numerous powerful committees at Yale Law School, including one that helped prepare students for clerkships. This was, she says, because she succeeded in getting students, especially minority students, good clerkships. "I do extra work; I get to know them," she told me. "I write extra-good recommendations." Many highly social people who are good at committees also tend to gossip, to tell stories about their colleagues. Some, both male and female, might also be described as flirtatious, enjoying wordplay and jokes that go right to the edge of what is considered acceptable.

Which is precisely what got some of these people into trouble, because the definition of *acceptable* has radically changed in the past few years. Once it was not just okay but admirable that Chua and Rubenfeld had law-school students over to their house for gatherings. That moment has passed. So, too, has the time when a student could discuss her personal problems with her professor or when an employee could gossip with his employer. Conversations between people who have different statuses— employer-employee, professor-student—can now fo only on professional matters, or strictly neutral topic Anything sexual, even in an academic context— example, a conversation about the laws of rap

Exhibit A

now risky. The Harvard Law School professor Jeannie Suk Gersen has written that her students "seem more anxious about classroom discussion, and about approaching the law of sexual violence in particular, than they have ever been in my eight years as a law professor." Akhil Reed Amar, a professor at Yale, told me that he no longer mentions a particular historical incident that he once used in his teaching, because it would force his students to read a case study that revolves around the use of a racial slur.

Social rules have changed too. Professors used to date and even marry their students. Colleagues used to drink together after work, and sometimes go home together. Today that can be dangerous. An academic friend told me that in his graduate school, people who are close to getting their doctorate are wary about dating people just beginning their studies, because the unwritten rules now dictate that you don't date colleagues, especially if there could be any kind of (real or imagined) power differential between you and the person you are dating. This cultural shift is in many ways healthy: Young people are now much better protected from predatory bosses. But it has costs. When jokes and flirtation are completely off-limits, some of the spontaneity of office life disappears too.

It's not just the hyper-social and the flirtatious who have found themselves victims of the New Puritanism. People who are, for lack of a more precise word, *difficult* have trouble too. They are haughty, impatient, confrontational, or insufficiently interested in people whom they perceive to be less talented. Others are high achievers, who in turn set high standards for their colleagues or students. When those high standards are not met, these people say so, and that doesn't go over well. Some of them like to push boundaries, especially intellectual boundaries, or to question orthodoxies. When people disagree with them, they argue back with relish.

That kind of behavior, once accepted or at least tolerated in many workplaces, is also now out of bounds. Workplaces once considered demanding are now described as toxic. The sort of open criticism, voiced in front of other people, that was once normal in newsrooms and academic seminars is now as unacceptable as chewing with your mouth open. The non-sunny disposition, the less-than-friendly manner—these can now be grounds for punishment or ostracism too. A relevant criticism of Donald McNeil turned out to be that he was "kind of a grumpy old guy," as one student on that trip to Peru described him.

What many of these people—the difficult ones, the gossipy ones, the overly gregarious ones—have in common is that they make people uncomfortable. Here, too, a profound generational shift has transpired. "I think people's tolerance for discomfort—people's tolerance for dissonance, for not hearing exactly what they want to hear—has now gone down to zero," one person told me. "*Discomfort* used to be a term of praise about pedagogy—I mean, the greatest discomforter of all was Socrates."

It's not wrong to want a more comfortable workplace, or fewer grumpy colleagues. The difficulty is that the feeling of discomfort is subjective. One person's lighthearted compliment is another person's microaggression. One person's critical remark can be experienced by another person as racist or sexist. Jokes, wordplay, and anything that can have two meanings are, by definition, open to interpretation.

But even though discomfort is subjective, it is also now understood as something that can be cured. Someone who has been made uncomfortable now has multiple paths through which to demand redress. This has given rise to a new facet of life in universities, nonprofits, and corporate offices: the committees, HR departments, and Title IX administrators who have been appointed precisely to hear these kinds of complaints. Anyone who feels discomfort now has a place to go, someone to talk to.

Some of this is, I repeat, positive: Employees or students who feel they have been treated unfairly no longer have to flounder alone. But that comes at a cost. Anyone who accidentally creates discomfort—whether through their teaching methods, their editorial standards, their opinions, or their personality—may suddenly find themselves on the wrong side of not just a student or a colleague but an entire bureaucracy, one dedicated to weeding out people who make other people uncomfortable. And these bureaucracies are illiberal. They do not necessarily follow rules of fact-based investigation, rational argument, or due process. Instead, the formal and informal administrative bodies that judge the fate of people who have broken social codes are very much part of a swirling, emotive public conversation, one governed not by the rules of the courtroom or logic or the Enlightenment but by social-media algorithms that encourage anger and emotion, and by the economy of likes and shares that pushes people to feel—and to perform—outrage. The interaction between the angry mob and the illiberal bureaucracy engenders a thirst for blood, for sacrifices to be offered up to the pious and unforgiving gods of outrage—a story we see in other eras of history, from the Inquisition to the more recent past.

Twitter, the president of one major cultural institution told me, "is the new public sphere." Yet Twitter is unforgiving, it is relentless, it doesn't check facts or provide context. Worse, like the elders of the Massachusetts Bay Colony who would not forgive Hester Prynne, the internet keeps track of past deeds, ensuring that no error, no mistake, no misspoken sentence or clumsy metaphor is ever lost. "It's not that everybody's famous for 15 minutes," Tamar Gendler, the dean of the faculty of arts and sciences at Yale, told me. "It's that everybody gets damned for 15 seconds." And if you have the misfortune to have the worst 15 seconds of your life shared with the world, there is nothing to guarantee that anybody will weigh that single, badly worded comment against all the other things you have done in your career. Incidents "lose their nuance," one university official told me. "So then what you get is all kinds of people with prearranged views, and they come in and use the incident to mean one thing or another."

It can happen very fast. In March, Sandra Sellers, an adjunct professor at Georgetown University Law Center, was caught on camera speaking to another professor about some underperforming Black students in her class. There is no way to know from the recording alone whether her comments represented racist bias or genuine concern for her students. Not that it mattered to Georgetown—she was fired within days of the recording's becoming public. Nor could one know what David Batson, the colleague she was talking to on the recording, really thought either. Nevertheless, he was



DE AGOSTINI PICTURE LIBRARY / GETTY

placed on administrative leave because he seemed, vaguely, to be politely agreeing with her. He quickly resigned.

That conversation was captured inadvertently, but future revelations might not be. This spring, Braden Ellis, a student at Cypress College in California, shared a class Zoom recording of his professor's response when Ellis defended portrayals of police as heroes. Ellis said he did this in order to expose a purported bias against conservative viewpoints on campus. Even though the recording by itself does not prove the existence of long-standing bias, the professor—a Muslim woman who said on the recording that she did not trust the police—became the focus of a Fox News segment, a social-media storm, and death threats. So did other professors at the college. So did administrators. After a few days, the professor was removed from her teaching assignments, pending investigation.

In this incident, the storm came from the right, as it surely will in the future: The tools of social-media mob justice are available to partisans of all kinds. In May, a young reporter, Emily Wilder, was fired from her new job at the Associated Press in Arizona after a series of conservative publications and politicians publicized Facebook posts critical of Israel that she had written while in college. Like so many before her, she was not told precisely why she was fired or which company rules her old posts had violated.

Some have used Wilder's case to argue that the conservative criticism of "cancel culture" has always been fraudulent. But the real, and nonpartisan, lesson is this: No one—of any age, in any profession—is safe. In the age of Zoom, cellphone cameras, miniature recorders, and other forms of cheap surveillance technology, anyone's comments can be taken out of context; anyone's story can become a rallying cry for Twitter mobs on the left or the right. Anyone can then fall victim to a bureaucracy terrified by the sudden eruption of anger. And once one set of people loses the right to due process, so does everybody else. Not just professors but students; not just editors of elite publications but random members of the public. Gotcha moments can be choreographed. Project Veritas, a well-funded right-wing organization, dedicates itself to sting operations: It baits people into saying embarrassing things on hidden cameras and then seeks to get them punished for it, either by social media or by their own bureaucracies.

But while this form of mob justice can be used opportunistically by anyone, for any political or personal reason, the institutions that

Exhibit A

have done the most to facilitate this change are in many cases those that once saw themselves as the guardians of liberal and democratic ideals. Robert George, the Princeton professor, is a longtime philosophical conservative who once criticized liberal scholars for their earnest relativism, their belief that all ideas deserved an equal hearing. He did not foresee, he told me, that liberals would one day "seem as archaic as the conservatives," that the idea of creating a space where different ideas could compete would come to seem old-fashioned, that the spirit of tolerance and curiosity would be replaced by a worldview "that is not open-minded, that doesn't think engaging differences is a great thing or that students should be exposed to competing points of view."

But that kind of thought system is not new in America. In the 19th century, Nathaniel Hawthorne's novel argued for the replacement of exactly that kind of rigidity with a worldview that valued ambiguity, nuance, tolerance of difference—the liberal worldview—and that would forgive Hester Prynne for her mistakes. The liberal philosopher John Stuart Mill, writing at about the same time as Hawthorne, made a similar argument. Much of his most famous book, *On Liberty*, is dedicated not to governmental restraints on human liberty but to the threat posed by social conformism, by "the demand that all other people shall resemble ourselves." Alexis de Tocqueville wrote about this problem, too. It was a serious challenge in 19th-century America, and is again in the 21st century.

Students and professors, editorial assistants and editors in chief—all are aware of what kind of society they now inhabit. That's why they censor themselves, why they steer clear of certain topics, why they avoid discussing anything too sensitive for fear of being mobbed or ostracized or fired without due process. But that kind of thinking takes us uncomfortably close to Istanbul, where history and politics can be discussed only with great care.

Many people have told me they want to change this atmosphere, but don't know how. Some hope to ride it out, to wait for this moral panic to pass, or for an even younger generation to rebel against it. Some worry about the costs of engagement. One person who was the focus of a negative social-media campaign told me that he doesn't want this set of issues to dominate his life and his career; he cited other people who have become so obsessed with battling "wokeness" or "cancel culture" that they now do nothing else.

Others have decided to be vocal. Stephen Elliott wrestled for a long time with whether or not to describe what it feels like to be wrongly accused of rape—he wrote something and abandoned it because "I decided that I wouldn't be able to handle

---

THE INTERACTION BETWEEN THE ANGRY MOB AND THE ILLIBERAL BUREAUCRACY ENGENDERS A THIRST FOR BLOOD, FOR SACRIFICES TO BE OFFERED UP TO THE PIOUS AND UNFORGIVING GODS OF OUTRAGE.

---

the blowback"—before finally describing his experiences in a published essay. Amy Chua ignored advice to remain silent and instead has talked as much as possible. Robert George has created the Academic Freedom Alliance, a group that intends to offer moral and legal support to professors who are under fire, and even to pay for their legal teams if necessary. George was inspired, he told me, by a nature program that showed how elephant packs will defend every member of the herd against a marauding lion, whereas zebras run away and let the weakest get killed off. "The trouble with us academics is we're a bunch of zebras," he said. "We need to become elephants." John McWhorter, a Columbia linguistics professor (and *Atlantic* contributing writer) who has strong and not always popular views about race, told me that if you are accused of something unfairly, you should always push back, firmly but politely: "Just say, 'No, I'm not a racist. And I disagree with you.'" If more leaders—university presidents, magazine and newspaper publishers, CEOs of foundations and companies, directors of musical societies—took that position, maybe it would be easier for more of their peers to stand up to their students, their colleagues, or an online mob.

The alternative, for our cultural institutions and for democratic discourse, is grim. Foundations will do secret background checks on their potential grantees, to make sure they haven't committed crimes-that-are-not-crimes that could be embarrassing in the future. Anonymous reports and Twitter mobs, not the reasoned judgments of peers, will shape the fate of individuals. Writers and journalists will fear publication. Universities will no longer be dedicated to the creation and dissemination of knowledge but to the promotion of student comfort and the avoidance of social-media attacks.

Worse, if we drive all of the difficult people, the demanding people, and the eccentric people away from the creative professions where they used to thrive, we will become a flatter, duller, less interesting society, a place where manuscripts sit in drawers for fear of arbitrary judgments. The arts, the humanities, and the media will become stiff, predictable, and mediocre. Democratic principles like the rule of law, the right to self-defense, the right to a just trial—even the right to be forgiven—will wither. There will be nothing to do but sit back and wait for the Hawthornes of the future to expose us. *A*

*Anne Applebaum is a staff writer at* The Atlantic.

Exhibit A

© 2021 The Atlantic Monthly Group, LLC. All rights reserved.

Exhibit A

# EXHIBIT F

**Cuyahoga Community College**
**Faculty Colloquium – January 12, 2021**
**Chat Transcript**

If you have any questions during the presentation, please ask them here and I will make our presenters aware of your question.

to Nancy Doherty (internal) (privately):   11:20 AM

from Rania Assily (internal) to everyone:   11:28 AM
You mentioned we won't be looking at individuals. Once we take the individual out of the equation, we now blame the society or the system which is always broken. The individual is the marker of American democracy as it enables individual choice making. What role do poor choices and poor decision making play in current economic problems. Perfect example, Clarence Thomas, who grew up in the segregated South and now is a Supreme Court justice.

from Kim Johnson (internal) to everyone:   11:36 AM
I would say that a possible answer to that question is to look at research that indicates that African Americans and other people of color, regardless of their level of attainment, continue to be affected by institutional racism. For example, the wealth gap between black and white people widens for African Americans the more education they have. College educated black folks make 59 cents on the dollar as compared to their white counterparts. That means that looking at individuals, as opposed to systems, won't aid progress. I have a document that details how systemic racism (society) affects African Americans in all aspects of their lives despite their achievements. Let me know if you'd like me to email it to you.

from Rania Assily (internal) to everyone:   11:37 AM
Also you mention family dynamics. What role does the lack of a father figure and role model play in family dynamics? Children need strong fathers in the family are proof of ensuring successful young men and women as fathers form and affirm the identity of young children. Why not focus on this psychological issue as well?

from Kim Johnson (internal) to everyone:   11:39 AM
I think this is probably based on assumptions about African Americans growing up in single parent homes. 42% of white households are single parent homes.

from Kim Johnson (internal) to everyone:   11:39 AM
I have a link I can email you if youd like more information.

from Rania Assily (internal) to everyone:   11:42 AM
https://datacenter.kidscount.org/data/tables/107-children-in-single-parent-families-by-race#detailed/1/any/false/1729,37,871,870,573,869,36,868,867,133/10,11,9,12,1,185,13/432,431

from Serita McGunia (internal) to everyone:   11:43 AM
Excellent points!!

from Serita McGunia (internal) to everyone:   11:45 AM



Exhibit A

# EXHIBIT G

Exhibit A

POLITICO

# POLITICO

## Text of Obama's fatherhood speech

By POLITICO STAFF | 06/15/2008 01:40 PM EDT

Here is the prepared text of the Father's Day speech by Sen. Barack Obama (D-Ill.) to Apostolic Church of God in Chicago, as released by his campaign:

Good morning. It's good to be home on this Father's Day with my girls, and it's an honor to spend some time with all of you today in the house of our Lord.

At the end of the Sermon on the Mount, Jesus closes by saying, "Whoever hears these words of mine, and does them, shall be likened to a wise man who built his house upon a rock: and the rain descended, and the floods came, and the winds blew, and beat upon that house, and it fell not, for it was founded upon a rock." [Matthew 7: 24-25]

Here at Apostolic, you are blessed to worship in a house that has been founded on the rock of Jesus Christ, our Lord and Savior. But it is also built on another rock, another foundation — and that rock is Bishop Arthur Brazier. In 48 years, he has built this congregation from just a few hundred to more than 20,000 strong — a congregation that, because of his leadership, has braved the fierce winds and heavy rains of violence and poverty; joblessness and hopelessness. Because of his work and his ministry, there are more graduates and fewer gang members in the neighborhoods surrounding this church. There are more homes and fewer homeless. There is more community and less chaos because Bishop Brazier continued the march for justice that he began by Dr. King's side all those years ago. He is the reason this house has stood tall for half a century. And on this

Exhibit A

Father's Day, it must make him proud to know that the man now charged with keeping its foundation strong is his son and your new pastor, Reverend Byron Brazier.

Of all the rocks upon which we build our lives, we are reminded today that family is the most important. And we are called to recognize and honor how critical every father is to that foundation. They are teachers and coaches. They are mentors and role models. They are examples of success and the men who constantly push us toward it.

But if we are honest with ourselves, we'll admit that what too many fathers also are is missing — missing from too many lives and too many homes. They have abandoned their responsibilities, acting like boys instead of men. And the foundations of our families are weaker because of it.

You and I know how true this is in the African-American community. We know that more than half of all black children live in single-parent households, a number that has doubled — doubled — since we were children. We know the statistics — that children who grow up without a father are five times more likely to live in poverty and commit crime; nine times more likely to drop out of schools and 20 times more likely to end up in prison. They are more likely to have behavioral problems, or run away from home or become teenage parents themselves. And the foundations of our community are weaker because of it.

How many times in the last year has this city lost a child at the hands of another child? How many times have our hearts stopped in the middle of the night with the sound of a gunshot or a siren? How many teenagers have we seen hanging around on street corners when they should be sitting in a classroom? How many are sitting in prison when they should be working, or at least looking for a job? How many in this generation are we willing to lose to poverty or violence or addiction? How many?

Yes, we need more cops on the street. Yes, we need fewer guns in the hands of people who shouldn't have them. Yes, we need more money for our schools, and more outstanding teachers in the classroom, and more after-school programs for our children. Yes, we need more jobs and more job training and more opportunity in our communities.

But we also need families to raise our children. We need fathers to realize that responsibility does not end at conception. We need them to realize that what makes you a man is not the ability to have a child — it's the courage to raise one.

We need to help all the mothers out there who are raising these kids by themselves; the mothers who drop them off at school, go to work, pick up them up in the afternoon, work another shift, get dinner, make lunches, pay the bills, fix the house, and all the other things

Exhibit A

it takes both parents to do. So many of these women are doing a heroic job, but they need support. They need another parent. Their children need another parent. That's what keeps their foundation strong. It's what keeps the foundation of our country strong.

I know what it means to have an absent father, although my circumstances weren't as tough as they are for many young people today. Even though my father left us when I was 2 years old, and I only knew him from the letters he wrote and the stories that my family told, I was luckier than most. I grew up in Hawaii, and had two wonderful grandparents from Kansas who poured everything they had into helping my mother raise my sister and me — who worked with her to teach us about love and respect and the obligations we have to one another. I screwed up more often than I should've, but I got plenty of second chances. And even though we didn't have a lot of money, scholarships gave me the opportunity to go to some of the best schools in the country. A lot of kids don't get these chances today. There is no margin for error in their lives. So my own story is different in that way.

Still, I know the toll that being a single parent took on my mother — how she struggled at times to the pay bills; to give us the things that other kids had; to play all the roles that both parents are supposed to play. And I know the toll it took on me. So I resolved many years ago that it was my obligation to break the cycle — that if I could be anything in life, I would be a good father to my girls; that if I could give them anything, I would give them that rock — that foundation — on which to build their lives. And that would be the greatest gift I could offer.

I say this knowing that I have been an imperfect father — knowing that I have made mistakes and will continue to make more; wishing that I could be home for my girls and my wife more than I am right now. I say this knowing all of these things because even as we are imperfect, even as we face difficult circumstances, there are still certain lessons we must strive to live and learn as fathers — whether we are black or white; rich or poor; from the South Side or the wealthiest suburb.

The first is setting an example of excellence for our children — because if we want to set high expectations for them, we've got to set high expectations for ourselves. It's great if you have a job; it's even better if you have a college degree. It's a wonderful thing if you are married and living in a home with your children, but don't just sit in the house and watch "Sports Center" all weekend long. That's why so many children are growing up in front of the television. As fathers and parents, we've got to spend more time with them, and help them with their homework, and replace the video game or the remote control with a book once in awhile. That's how we build that foundation.

Exhibit A

We know that education is everything to our children's future. We know that they will no longer just compete for good jobs with children from Indiana, but children from India and China and all over the world. We know the work and the studying and the level of education that requires.

You know, sometimes I'll go to an eighth-grade graduation and there's all that pomp and circumstance and gowns and flowers. And I think to myself, it's just eighth grade. To really compete, they need to graduate high school, and then they need to graduate college, and they probably need a graduate degree, too. An eighth-grade education doesn't cut it today. Let's give them a handshake and tell them to get their butts back in the library!

It's up to us — as fathers and parents — to instill this ethic of excellence in our children. It's up to us to say to our daughters, don't ever let images on TV tell you what you are worth, because I expect you to dream without limit and reach for those goals. It's up to us to tell our sons, those songs on the radio may glorify violence, but in my house we give glory to achievement, self-respect and hard work. It's up to us to set these high expectations. And that means meeting those expectations ourselves. That means setting examples of excellence in our own lives.

The second thing we need to do as fathers is pass along the value of empathy to our children. Not sympathy, but empathy — the ability to stand in somebody else's shoes; to look at the world through their eyes. Sometimes it's so easy to get caught up in "us," that we forget about our obligations to one another. There's a culture in our society that says remembering these obligations is somehow soft — that we can't show weakness, and so therefore we can't show kindness.

But our young boys and girls see that. They see when you are ignoring or mistreating your wife. They see when you are inconsiderate at home; or when you are distant; or when you are thinking only of yourself. And so it's no surprise when we see that behavior in our schools or on our streets. That's why we pass on the values of empathy and kindness to our children by living them. We need to show our kids that you're not strong by putting other people down — you're strong by lifting them up. That's our responsibility as fathers.

And by the way — it's a responsibility that also extends to Washington. Because if fathers are doing their part; if they're taking our responsibilities seriously to be there for their children, and set high expectations for them, and instill in them a sense of excellence and empathy, then our government should meet them halfway.

Exhibit A

But now, my life revolves around my two little girls. And what I think about is what kind of world I'm leaving them. Are they living in a country where there's a huge gap between a few who are wealthy and a whole bunch of people who are struggling every day? Are they living in a country that is still divided by race? A country where, because they're girls, they don't have as much opportunity as boys do? Are they living in a country where we are hated around the world because we don't cooperate effectively with other nations? Are they living a world that is in grave danger because of what we've done to its climate?

And what I've realized is that life doesn't count for much unless you're willing to do your small part to leave our children — all of our children — a better world. Even if it's difficult. Even if the work seems great. Even if we don't get very far in our lifetime.

That is our ultimate responsibility as fathers and parents. We try. We hope. We do what we can to build our house upon the sturdiest rock. And when the winds come, and the rains fall, and they beat upon that house, we keep faith that our Father will be there to guide us, and watch over us, and protect us, and lead His children through the darkest of storms into light of a better day. That is my prayer for all of us on this Father's Day, and that is my hope for this country in the years ahead. May God bless you and your children. Thank you.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Exhibit A

# EXHIBIT H

Subscribe

Sign in

Advertisement

Cleveland Heights

## Program at Cleveland Heights' Noble Elementary School shows boys how to behave as gentlemen

Updated: Jan. 11, 2019, 8:40 p.m. | Published: Feb. 19, 2016, 10:26 p.m.

By **Jeff Piorkowski/special to cleveland.com**

Noble school.JPG

Noble Elementary School in Cleveland Heights is home to the 'Gents to Gentlemen' program, in which fourth and fifth grade boys who may not have an adult male in their lives, learn from men who volunteer their time.

*(Jeff Piorkowski/Special to cleveland.com)*

Exhibit A



Young Nehemiah Crosby gets instructions on how to tie his tie from Noble School's Khaz Finley.

Exhibit A

CLEVELAND HEIGHTS, Ohio -- Noble Elementary School Principal Rachael Coleman said that late last school year she had three boys in her office for disciplinary reasons when she decided to ask them all a question.

Advertisement

"I asked them where are their dads?" Coleman said. "I don't even know what made me ask them that."

Coleman learned that the father of one of the boys lived at home with him. As for the other two, one dad was in prison and the other was simply not a part of his son's life.

The responses prompted Coleman to state in a year-end staff meeting that some type of program should be started at the school to lend male guidance to the school's boys.

The resulting initiative began in December and was called "Noble Gents to Gentlemen."

Coleman enlisted the help of Noble Intervention Specialist Bambi Vargo, who went about recruiting men from the community who would agree to come to the school twice monthly, for about a half-hour, to discuss with fourth and fifth grade boys things taking place in the youngsters' lives.

In the end, Vargo came up with a roster of 11 men, one of them Derrick Williams.

"Mr. Williams is a dad of a kindergartner at the school, and he's a (Cuyahoga Community College) professor in communications," Vargo said. "It turned out that he also has experience in designing curriculum for mentoring programs, so he's been quite a help to us."

Vargo also retained the volunteer services of local men from the Noble Neighbors community group, the Cleveland Heights police and fire departments, Noble School, and a student from Notre Dame College.

Advertisement

The curriculum Williams designed, through the program's first eight weeks, has centered on the boys' heroes, both superheros they might see in movies, and those they encounter in their lives. Specifically, it involves the traits in these heroes the boys most admire.

"A lot of time, they'll say their hero is their mom or their aunt," said Khaz Finley, director of mentors at Noble School. "(The boys) talk about the things they do for them.

Exhibit A

"A couple of times they mention dads, but for the most part, it's their mothers."

Finley, who sits in on each session conducted by the 10 other men in the program, said the youngsters don't need prodding to begin talking.

"I'll ask how they're doing and they'll talk for the next 10-15 minutes," he said. "They'll just start talking about what's going on in their lives."

In all, 26 fourth grade boys and 10 from the fifth grade take part. Coleman estimates that about 50 percent of the students at Noble do not have a relationship with a father, making the program beneficial to many boys in need of an adult male in their lives.

Finley said the boys, who meet in groups of four or five and who must wear ties to participate, are eager to join in.

"Sometimes they'll ask me three or four times a day if their session is today," he said.

Even if a boy isn't scheduled to be part of a session held that day, Finley said he lets them sit in.

"They'll come to me and ask, with their ties on, and I'll say, 'You can (participate)," he said.

Advertisement

As expected, some of the boys are buying into the program more than others.

"I had one kid who said he didn't have any heroes," Finley said. "And another kid, who's been in some trouble himself before, started saying to him, 'You've got to have one hero. There's got to be someone.'"

Fourth grader Nehemiah Crosby, 10, said the program has already made a difference in his life.

The boys who participate in the program do so because they volunteer to do so. Crosby said, when asked why he wanted to take part, "I want to be a gentleman."

"I've learned to listen, pay attention in class, and to try to be good," he said. "And, not to be with others who get you in trouble."

Crosby said he has applied what he learned to become this year a straight A student.

In planning the program, Coleman looked at last year's third grade boys and their behavioral problems. She plans to look at the same class this year -- now the fourth grade boys taking part in Gents to Gentleman -- to determine how the program may have helped them.

Advertisement

Exhibit A

Finley said some of the men involved have gone above and beyond what was expected of them. Cleveland Heights Fire Department Chief David Freeman is a mentor and, Finley said, he'll call to check on a certain boy who has experienced problems in the past and visits once a week to have lunch at Noble with the boy.

"That's a relationship that will help (that boy), and it's one that he can have for years to come if chooses to cultivate it," Finley said.

Finley is also planning to start soon a "Real Men Read" program at Noble, in which he will invite men to read to students, kindergartners to second graders, both boys and girls.

After the heroes portion of the curriculum ends, the boys will learn lessons from a book, "Testing the Ice," about the first black to play Major League Baseball, Jackie Robinson.

The hope is that the program will teach the boys self control, the proper ways to deal with peers, coping skills and respect for others. In other words, the principles of being a Gentleman.

Note to readers: if you purchase something through one of our affiliate links we may earn a commission.

Sponsor Content

**Cleveland families' Christmas wish: A safe home for the holidays**

Rising costs, low wages cause housing insecurity.

The City Mission



# Around the Web

## Mature Trainer: This Is What "Ripped" Old Guys Do Differently (Genius!)

Power Life | Sponsored

## Unsold Alaska Cruise Cabins Are Almost Being Given Away

Alaska Cruise Deals | sponsored searches | Sponsored

Exhibit A

| From: | Gomez, Magda |
|---|---|
| To: | Williams, Derrick L |
| Cc: | Estes, Meghan; Brazile, Shari |
| Subject: | Re: Incident in colloquium session |
| Date: | Wednesday, January 13, 2021 12:41:58 PM |
| Attachments: | Outlook-pcbb334u.png |
| | Outlook-h4t25yqu.png |
| | Outlook-mkSd5xbb.png |

Good afternoon Dr. Williams,

Thank you for sharing this information.

I will consult with our colleagues Shari Brazile in HR and Meghan Estes in our Equity Compliance/Legal Division as to the best approach for addressing this matter.

Bob Searson and or others may have already approached our colleagues.

Sincerely,

Please visit www.tri-c.edu/bienvenidosacle for community-based resources welcoming individuals and families to Northeast Ohio.

Magda Gómez, Ed.D.
Director, Diversity & Inclusion
Cuyahoga Community College – Jerry Sue Thornton Center
2500 East 22nd Street
Cleveland, OH  44115
P: 216-987-0204
F: 216-987-0209

Tri-C® Where futures begin SM
www.tri-c.edu

**Pronouns: She, Her, Hers**

SafeZone Ally

*"Diversity is about all of us, and about us having to figure out how to walk through this world together."*
-Jacqueline Woodson

    

**From:** Williams, Derrick L <Derrick.Williams2@tri-c.edu>
**Sent:** Wednesday, January 13, 2021 12:21 PM
**To:** Gomez, Magda <Magda.Gomez@tri-c.edu>
**Subject:** Fw: Incident in colloquium session

Hello Magda:

Exhibit A

# EXHIBIT I



[illegible]

Like Comment Share

[illegible]

Exhibit A

# EXHIBIT J

Exhibit A

**From:** Kim Johnson <Kim.Johnson@tri-c.edu>
**Date:** Tuesday, January 12, 2021 at 5:41 PM
**To:** "Searson, Robert" <Robert.Searson@tri-c.edu>
**Cc:** "Cunion, William" <William.Cunion@tri-c.edu>, "Pope, Terri" <Terri.Pope@tri-c.edu>, "Williams, Lisa" <Lisa.Williams@tri-c.edu>
**Subject:** Incident in colloquium session

Bob,

Bill asked me to let you know about a situation that began in a colloquium session this morning, *A Tale of Two Cities and One Community College: How Cleveland's Dual Economy Widens Digital Inequalities and Threatens Educational Access.* Two presenters, Jovan Gathings and Benjamin Smith, are external to the college, and Derrick Williams is a Professor at the Metro campus.

During the presentation, Professor Rania Assily made some comments that align with the rhetoric of those who believe that African Americans are fundamentally inferior. I've pasted her chat and my responses below, but she also made some remarks over voice at the end of the session and engaged aggressively with the presenters. She said that

African Americans underachieve because they aren't raised by "good people" and that she was presenting an "alternative viewpoint." She attributed the impacts of systemic racism to "poor choices" and "poor decision making". Her comments were hurtful to her colleagues, inappropriate in a professional setting, embarrassing to the institution, disrespectful to the presenters and attendees, and not in line with the College's culture and values.

I asked Kara DePaul for a recording of the session, but it looks like it wasn't recorded. She said she can have ITS dig more deeply into it if someone indicates they want a recording or transcript.

Exhibit A

I'm telling you about this because 1) I think that Professor's Assily's willingness to say such comments in a public forum call into question how her bias may affect her interactions with students, 2) today's colloquium was open to the public and employees are called upon to be ambassadors of the institution, 3) one of the presenters was upset by her comments and posted her name and place of employment on Facebook (he has about 1300 friends). His description of the comments is much more eloquent than mine.

You can see Professor Assily's chat and my responses below, as well as a screen shot of Benjamin Smith's Facebook post in case this link doesn't work: https://www.facebook.com/benjamin.p.smith.5 Other participants raised concerns in chat later on, but I didn't save their comments.

from Rania Assily (internal) to Everyone:   11:28 AM
You mentioned we won't be looking at individuals. Once we take the individual out of the equation, we now blame the society or the system which is always broken. The individual is the marker of American democracy as it enables individual choice making. What role do poor choices and poor decision making play in current economic problems. Perfect example, Clarence Thomas, who grew up in the segregated South and now is a Supreme Court justice.
from Kim Johnson (internal) to Everyone:   11:36 AM
I would say that a possible answer to that question is to look at research that indicates that African Americans and other people of color, regardless of their level of attainment, continue to be affected by institutional racism. For example, the wealth gap between black and white people widens for African Americans the more education they have. College educated black folks make 59 cents on the dollar as compared to their white counterparts. That means that looking at individuals, as opposed to systems, won't aid progress. I have a document that details how systemic racism (society) affects African Americans in all aspects of their lives despite their achievments. Let me know if you'd like me to email it to you.
from Rania Assily (internal) to Everyone:   11:37 AM
Also you mention family dynamics. What role does the lack of a father figure and role model play in family dynamics? Children need strong fathers in the family are proof of ensuring successful young men and women as fathers form and affirm the identity of young children. Why not focus on this psychological issue as well?
from Kim Johnson (internal) to Everyone:   11:39 AM
I think this is probably based on assumptions about African Americans growing up in single parent homes. 42% of white housholds are single parent homes.
from Kim Johnson (internal) to Everyone:   11:39 AM
I have a link I can email you if youd like more information.
from Rania Assily (internal) to Everyone:   11:42 AM https://datacenter.kidscount.org/data/tables/107-children-in-single-parent-families-by-race/detailed/1/any/false/1729,37,871,870,573,869,36,868,867,133/10,11,9,12,1,185,13/432,431



Exhibit A

1 hr · 🕒

I want to thank Dr. Derrick L. Williams for allowing me to co-facilitate his workshop today entitled "A Tale of Two Cities and One Community College: how Clevelands Dual Economy widens digital inequalities and threatens educational access". It was refreshing to once again be able to present with you in such a rich academic environment.

Unfortunately, in a time where conservative white supremacist remained dormant; they are now finding the courage to be arrogantly overt about their beliefs. Rania Assily, a Tri-C history professor, used our session as an opportunity to reach into the bag of already disproven conservative rhetoric in order to shift our messaging to bend toward whiteness rather than injustice.

The professor raved on about the impact fatherlessness in Black households contribute to the wealth gap and how Black peoples individual choices explain their lack of wealth rather than the historical legacy of racism that is woven within our country. As if the system created by rich white men does not inform and direct the choices that Black people are able to make. As if assumptions made about fatherlessness cannot be adequately addressed without aknowledging the ways in which racism has destroyed the Black family dating back from Slavery to Mass Incarceration.

I thank Dr. Williams for appropriate addressing this professor who insisted on cutting him off and aggressively demanding that he provide her with data. As if Black people are responsible for doing research on her behalf as if she is unable to do it on her own. It was plain that the professor had no response to Dr. Williams successful attempt at repairing the attempted derailment of whiteness.

The session

Exhibit A

The session reminded me that for the students I serve, these are beliefs that people have who have significant influence on their lives. Whether a president whose words and beliefs incite insurrection and violence to a professor at a community college who is responsible for nurturing the minds of a majority Black student campus. These beliefs are dangerous and should not be allowed on a college campus.

Let me know if you have questions or need further information.

Sincerely,

Kim Johnson

Exhibit A

# EXHIBIT K

**JOSEPH BANCSI**
ATTORNEY AT LAW
Suburban West Office Building
20800 Center Ridge Road, Suite 400
Rocky River, Ohio 44116
(216) 406-8177
JOSEPH.BANCSI@GMAIL.COM

May 18, 2021

Ms. Lillian Welch
Vice-President of Human Resources
Cuyahoga Community College
2500 East 22nd Street
Cleveland, Ohio 44115

Via Email Only to Lillian.welch@tri-c.edu

# FORMAL COMPLAINT OF PROFESSOR RANIA ASSILY AGAINST THE FOLLOWING:

**Alex Johnson, President**
**Megan Estes, Employee, Human Resource Department**
**Benjamin Smith, Business Invitee of Tri-C**
**Dr. Kim Johnson, Employee of Tri-C**
**Vincent Briley, Employee of Tri-C**
**Professor Derrick Williams**

## COMPLAINTS:

1. **CENSURE OF ACADEMIC FREEDOM OF PROFESSOR ASSILY AND PROTECTED ACTIVITY OF PROFESSOR RANIA ASSILY**

2. **RETRIBUTION AND RETALIATION FOR THE EXERCISE OF ACADEMIC FREEDOM AND PROTECTED ACTIVITY BY RANIA ASSILY**

3. **VIOLATION OF 3354:1-42-01, 3354:1-42-01.2, and 3354:1-43-02**

4. **SPECIFIC VIOLATION OF 3354:1-42-01.2(H) AND 3354:1-43-02(C)**

5. **FAILURE OF THE ADMINISTRATION OF TRI-C OF ITS DUTY TO REPRIMAND ITS EMPLOYEES REGARDING THEIR BREACH OF PROTECTED ACADEMIC ACTIVITIES AND PERSONNEL, PROFESSOR RANIA ASSILY**

Exhibit A

6.   DISSEMINATION BY EMPLOYEES OF TRI-C OF LIBELOUS AND
     DEFAMATORY PUBLICATIONS REGARDING PROTECTED ACTIVITY
     AND ACADEMIC PERSONNEL OF PROFESSOR RANIA ASSILY

7.   FAILURE OF THE DEPARTMENT OF HUMAN RESOURCES OF TRI-C
     TO HANDLE THE INCIDENT SUBJECT OF THIS COMPLAINT IN A
     UNBIASED AND EQUITABLE MANNER

8.   FAILURE TO EXTEND DUE PROCESS AND EQUITABLE PROTECTION
     TO ACADEMIC PERSONNEL, PROFESSOR RANIA ASSILY

9.   HARRASSMENT OF PROFESSOR RANIA ASSILY BY EMPLOYEES OF TRI-C

10.  RACIAL DISCRIMINATION AND CULTURAL INSENSITIVITY  BY
     EMPLOYEES OF TRI-C

**IN SUPPORT OF THE FOREGOING COMPLAINT OF PROFESSOR RANIA ASSILY
SHE ATTACHES THE FOLLOWING:**

A.   Four page Statement of Professor Rania Assily

B.   Power Point Presentation, of chronology, to be viewed in *Slide Show Mode*, in time
     frames for proper review and reading.

Respectfully submitted,

Assistant Professor, Rania Assily                          JOSEPH BANGSI
COMPLAINANT                                                Attorney For Complainant

cc:   Brad Lipinski, Esquire
      Jason Carter, Esquire

Exhibit A

On Tuesday, January 12 2021, I as a tenure-track professor at Tri-C attended the faculty colloquium entitled "Tri-C, the Classroom, and the Cleveland Community: Bridging the Educational Gap Across Social Inequalities". One particular session that I attended was the breakout session, "Tale of Two Cities and One Community College: How Cleveland's Dual Economy Widens Digital Inequalities and Threatens Educational Access". Before I delve into the intricacies of what happened in this session I would like to make some points very clear.

**Background on Professor Assily:**

I am a tenure-track professor in history and have served the Westshore Campus for the past five academic years in several capacities—as an instructor, as a coordinator for history, political science, geography, and urban studies courses, and as a presenter for community lectures and panel discussions. I have been nominated three years in a row for the Ralphe M. Besse Excellence in Teaching award by my students. I have served as a friend and colleague to Westshore faculty and administrators. I have worked with the Cleveland Municipal Court Veterans' Treatment Docket, requesting veterans share their stories with students. I work tirelessly for all of my students, training them to think critically about various topics in history as well as be good model citizens for the future. I have always taught with integrity, passion, and purpose and continue to believe that sound education is the pathway to success and part of that sound education is asking questions and challenging perceptions that have either been taught to us or presented to us through various media forms. I am also an Arab-American woman. I grew up in an immigrant household by two parents who struggled to raise Arab children in Lorain County. I have experienced feeling different than other kids at various times in my life and have always had to educate people on what it means to be 'Palestinian'. Looking back I can see that it was my family background and experience with American ignorance that enabled me to push myself to become who I am today.

**What Happened on Jan. 12:**

When I attended the session on Jan. 12, I had no intention to ask questions or speak up during the session. I planned to listen attentively to what was being said. After the moderator had explained that questions and comments would be entertained in the chat, the session began. One of the moderators mentioned that firstly, they were not going to look at people as individuals, but rather as groups. His intention was to explain how different groups experience life in America differently and that some groups are more privileged than others. I had made a comment in the chat that once we no longer look at people as individuals, with the ability to make individual choices, we then no longer can claim ourselves members of a true democracy. I also asked the question, 'To what extent do poor choices play in impacting an individual's life?' I was trying to explain that as individuals we are responsible to a degree and that sometimes our choices may also influence the outcome of what happens to us.

The next point in the chat was related to 'family dynamics' which was brought up by the panelists. However, not much about the family was discussed. It was then when I asked the question regarding the role of fathers in the lives of children and how fathers form the identity of young children. To what extent does father absence impact the success or failure of children? Although my questions were aimed at the panel, Kim Johnson took it upon herself to address my question. She responded in the chat that this situation did not only happen in Black communities but in white communities too. She mentioned that 42% of white communities experienced father absence. I responded with poll data from

Exhibit A

the Annie E. Casey Foundation proving that in 2019 64% of African American kids grow up in a single-parent household, 42% Hispanic, and 24% White. While I was hoping that my questions would be addressed by the panel come the end of the presentation, Vincent Briley came on video calling out my questions as 'falling in line with racism'.  This led me to get on the WebEx to allow my voice to be heard so as to defend myself in relation to my questions.

**Response to the Chat:**

I was very surprised by Vincent's interpretation of my questions in the chat and was very hurt that faculty would interpret my questions as racist or in tandem with white supremacy.  More so, my intuition as an academic whose purpose is to ask compelling questions and help to engage sound discussion, was muzzled. In fact the word colloquium means 'discussion'. If I was attending a colloquium, why were my questions not valid or worthy of introspection and analysis?

As a professor of history, I am familiar with the changing dynamics of the family and its impact on young people. I know the problems our students face in the 21st century and most of these problems stem from poor mental health. My students have opened up to me about parental divorces, depression, losing a parent, confusion, anxiety, and drug and alcohol addiction. My students are of all races, all ethnic and social backgrounds, and I have given them my full attention and sincere compassion. I want to get to the root of the problems of my students and I know that broken families and dysfunctional dependencies are a big part of the root as they have shared with me. I was hoping that we as an academic community could discuss these pertinent issues, but I was sadly mistaken. Instead of the attention focusing on the youth and their struggles to achieve success, the attention was turned to me and I was labeled a person's whose views line up with 'white supremacy'.

**President Johnson's Statement:**

On February 1, 2021 President Alex Johnson sent out an email to the whole college entitled "An Important Message". In his email he states, "As a nation, we cherish our fundamental right to freedom of speech and expression. As an institution, we uphold these rights and ardently support academic freedom as the foundation of education, scholarship, and discovery." He goes onto say, "In recent weeks, we have witnessed—within our nation and at our institution—the impact of exercising rights without an equal measure of responsibility.  Even as we champion freedom of speech, we cannot condone the perpetuation of stereotypes and misinformation or aggressive language that attacks or demeans others."

**The FACTS:**

I am not sure to whom he is attributing stereotypes to. I do not engage in stereotypes, but rather I am moved by facts. The facts are that in 2005, 70% of black children were born to single mothers. (Hymowitz, Kay S.) According to Armstrong Williams, talk show radio host on Sirius/XM Power 169, "The out-of-wedlock birthrate among Black Americans has increased nearly sixfold over the last 35 years. Blacks are also less likely to be married than non-Hispanic Whites. As the nuclear family goes boom, so do our communities—72% of adolescent murderers come from homes without fathers." (Williams, Armstrong)

Exhibit A

In 2008, President Barack Obama made a speech entitled The Father's Day Speech. In this speech, he detailed the importance of fatherhood and how the absent father has contributed to many of the socio-economic problems in various communities, specifically the African-American one. He stated,

"But if we are honest with ourselves, we'll admit that what too many fathers also are Is missing — missing from too many lives and too many homes. They have abandoned their responsibilities, acting like boys instead of men. And the foundations of our families are weaker because of it. You and I know how true this is in the African-American community. We know that more than half of all black children live in single-parent households, a number that has doubled — doubled — since we were children. We know the statistics — that children who grow up without a father are five times more likely to live in poverty and commit crime; nine times more likely to drop out of schools and 20 times more likely to end up in prison. They are more likely to have behavioral problems, or run away from home or become teenage parents themselves. And the foundations of our community are weaker because of it." (Politico)

In a 2016 article in Crisis Magazine by Lottie L. Joiner entitled "Hurt: The Impact of Father-Absence on the Mental Health of Black Boys", Joiner quotes Ron Quincy of Columbia University's School of Social Work. Mincy explains that a father sets boundaries—discipline and training—as well as provides a sense of protection. Boys without fathers lack the paternal support they need to respond to the things that life brings them. There are certain questions a boy would never as a female. (Joiner, 21)

Wizdom Powell, associate professor of health behavior at the University of North Carolina's Gillings School of Global Public Health explains that there is no denying that a healthy male influence can play a significant role. (Joiner, 21)

In 2019, Cleveland.com featured an article by Jeff Piorkowski highlighting a program at Noble Elementary School called 'Noble Gents to Gentlemen' that enables father-figures to mentor young boys to be gentlemen. The Principal of the school created this program after she had asked three boys with disciplinary issues, "Where are your dads?" Finding out that one of the boys had a father in prison and another's was not part of his life. The Principal also stated that about 50% of the students at Noble do not have a relationship with their father.  I also found out that Professor Derrick Williams' helps design curriculum for the father-figure mentoring program at Noble.

To completely avoid discussing the issue of father absence as part of family dynamics in the African American community and the American community-at-large, is to avoid discussing the root of a wound, unable to heal if never acknowledged.

Furthermore, I am not sure what sort of 'aggressive language' President Johnson was referring to either. I did not use any aggressive language, but was passionate in my response to Vincent Briley's labeling my questions in 'line with racism'.  To me, Briley's association of my questions as 'in line with racism' were aggressive. I simply could not let his comment go without giving my questions context and explanation.

President Johnson also mentions in his email, "We have a responsibility to respect and seek to understand the viewpoints of others, though they may not be our own." I believe that I was acting responsibly, listening to the panelists and offering new insights to discuss ways to help elevate our

Exhibit A

African American communities amidst unfair systems that may aim to perpetuate the cycle of poverty and broken families.

**Human Resources Response to My Reaching Out:**

Since the event of Jan. 12 occurred, I have reached out to Human Resources to try to express what my side of the story was. I was told by Meghan Estes, that I would have that chance on Friday, Jan. 22. We set up an appointment for 11 a.m. and when the time came for the meeting, 15 minutes before the meeting was to commence, the meeting was canceled. I was not notified by an email from HR as to why it was canceled until I reached out and asked for clarification. I was told later that day, that the college was hiring an external investigator to look into the situation.

The office of diversity, equity, and inclusion seems to be only protecting those who are racial, sexual, and religious minorities. But what about those whose diverse opinions deserve attention? What about diversity of thought and philosophy? As an Arab American woman I am a minority in this institution, but my conservative opinions on the values of family and the importance of fatherhood have not been taken seriously.

**Conclusion:**

I feel that the college has treated me very poorly in this situation. I was never able to share my side of the story with HR, I have been wrongly accused of racism and white supremacy, and no one from the higher administration has spoken up on my behalf publicly to protect my reputation and no administrator has reached out to me to check on me and to ensure that my side of the story has been acknowledged and reported. In the meantime, the precepts of higher education and academic freedom have been stifled and silenced. I fear that the current polarizing political climate has crept into higher education and caused many to remain silent and complacent for fear of collegiate retribution.

Exhibit A



Exhibit A



Important: President Barack Obama, the NAACP, Iyanla Vanzant, and apparently Derrick Williams share my view on the importance of fatherhood for the mental health and success of children.
I type questions in the chat to the panel regarding individuals and family dynamics—referencing information spoken by the panelists.
Kim Johnson takes it upon herself to respond in the chat to my questions.
Derrick Williams explains that he has done research on male absence in the family and makes the claim that father absence is a major problem in both black and white communities equally. I mention that I would like to see the research on that.
Noble Elementary Gents to Gentlemen program
Vincent Briley interrupts the presentation during the question-and-answer period, showing his video, and accuses me of statements and questions in line with racism and white supremacy.
I respond in defense of my questions and comments by explaining the importance of fatherhood on mental health in support of my students and my hope that the panelists would expand on family dynamics.



Jan. 12: Benjamin PianoMan Smith types out a post on Facebook mentioning my name and Tri-C to over 1300 people, that I have dangerous beliefs that do not belong on a college campus and he alludes to me being at the insurrection on Jan. 6 in his comment

Robert Searson, Dean of Learning and Engagement, Westshore campus

Dr Terri Pope, President, Westshore campus

Jan. 12: Kim sends email to all of the following with Ben Smith's facebook post and calls it 'eloquent'

Bill Cunion, Dean of Learning & Engagement, Eastern campus

Lisa Williams, President, Eastern campus

3

Exhibit A



4

Exhibit A



Exhibit A



"As a nation, we cherish our fundamental right to freedom of speech and expression. As an institution, we uphold these rights and ardently support academic freedom as the foundation of education, scholarship and discovery.
**But we must acknowledge that no right is absolute; that with all rights come responsibilities.**
In recent weeks, we have witnessed — within our nation and **at our institution** — the impact of exercising rights without an equal measure of responsibility. **Even as we champion freedom of speech, we cannot condone the perpetuation of stereotypes and misinformation or aggressive language that attacks or demeans others.**"

*-Tri-C President Alex Johnson delivers an email to the entire college entitled "An Important Message", Feb. 1, 2021*

Important: Dr. Alex Johnson is the father of the complainant, Dr. Kim Johnson.

6

Exhibit A



7



**April 6**

My lawyer sends a letter to Josh Nolan, Esq. demanding to see the complaints, names of witnesses and their statements, and chat transcript.

Bradley Lipinski, assist. professor of philosophy and VP of the AAUP Westshore campus, reaches out to me to tell me that Mike Boyko has discussed with Vice President Karen Miller, possible suspension of my tenure portfolio if I do not cooperate with the interview process.

I reaffirm that I have been cooperating since the beginning but that I need copies of all complaints and the chat transcript.

**April 7**

Josh Nolan shares complaints and emails from Kim and Derrick alongside a copy of the chat transcript. All files cannot be downloaded or printed out.

**April 11**

My lawyer, Joseph Bancs, types and sends a letter to Megan Estes, Director of Institutional Equity and Title IX coordinator with exhibits proving my consistent cooperation and the lack of due process on part of HR.

**April 16**

Investigation: All but one of the witnesses investigated were on the side of Kim Johnson and Derrick Williams. No one mentions Vincent Briley. Vincent refuses to be interviewed. Witnesses referred to my questions/comments as 'aggressive', 'destructive', 'hurtful', and 'inappropriate'.

I give names of four people who know me to be interviewed for the investigation.

8

Exhibit A



**Important:** Dr. Kim Johnson was not reprimanded by the administration for her email to the multiple deans and presidents on Jan. 12 regarding me. My reputation at the college has been slandered by Dr. Kim Johnson, Dr. Derrick Williams, Vincent Briley, and Benjamin Smith.

No one has spoken up at the college in my defense publicly, which leads me to believe that the members of the college administration are in agreement with Dr. Johnson and Dr. Williams' views of me.

9



Common Pleas Court of Cuyahoga County, Ohio

## DESIGNATION FORM TO BE USED TO INDICATE THE CLASSIFICATION OF THE CAUSE

RANIA ASSILY                                    2022 JAN 11  A 11: 06        Judge: STEVEN E GALL

**Plaintiff**                                                                        CV 22 958137

Vs.                                             CLERK OF COURTS
                                                CUYAHOGA COUNTY
CUYAHOGA COMMUNITY COLLEGE, ET AL.

**Defendant**

| | |
|---|---|
| Has this case been previously filed and dismissed? Yes ☐ No ■ | |
| Case #: _____ | Judge: _____ |
| Is this case related to any new cases now pending or previously filed? Yes ☐ No ■ | |
| Case #: _____ | Judge: _____ |

### CIVIL CLASSIFICATIONS: *Place an (X) In ONE Classification Only.*

**Professional Torts:**
☐ 1311 Medical Malpractice
☐ 1315 Dental Malpractice
☐ 1316 Optometric Malpractice
☐ 1317 Chiropractic Malpractice
☐ 1312 Legal Malpractice
☐ 1313 Other Malpractice

**Product Liability:**
☐ 1330 Product Liability

**Other Torts:**
☐ 1310 Motor Vehicle Accident
☐ 1314 Consumer Action
■ 1350 Misc. Tort

**Workers Compensation:**
☐ 1550 Workers Compensation
☐ 1531 Workers Comp. Asbestos

**Foreclosures:**
☐ Utilize Separate Foreclosure Designation Form

**Commercial Docket:**
☐ 1386 Commercial Docket
☐ 1387 Commercial Docket with Foreclosure

**Administrative Appeals:**
☐ 1540 Employment Services
☐ 1551 Other

**Other Civil:**
☐ 1500 Replevin/Attachment
☐ 1382 Business Contract
☐ 1384 Real Estate Contract
☐ 1388 Consumer Debt
☐ 1390 Cognovit
☐ 1391 Other Contracts
☐ 1490 Foreign Judgment
☐ 1491 Stalking Civil Protection Order
☐ 1501 Misc. Other
☐ 1502 Petition to Contest Adam Walsh Act
☐ 1503 Certificate of Qualification for Employment

**Amount of Controversy:**
■ None Stated
☐ Less than $25,000
■ Prayer Amount IN EXCESS OF $25,000.00 _____

**Parties have previously attempted one of the following prior to filing:**
☐ Arbitration
☐ Early Neutral Evaluation
☐ Mediation
■ None

*I certify that to the best of my knowledge the within case is not related to any now pending or previously filed, expect as noted above.*

JOSEPH BANCSI                                   JOSEPH BANCSI
Firm Name (Print or type)                       Attorney of Record (Print or Type)
20800 Center Ridge Rd.                          0025450
Address                                         Supreme Court #
Rocky River, Ohio 44116                         Joseph.bancsi @ gmail.com
Address                                         Email Address
(216) 406-8177                                  _____
Phone                                           Signature

Exhibit A



Common Pleas Court of Cuyahoga County, Ohio
**Nailah K. Byrd, Clerk of Courts**

 **INSTRUCTIONS FOR SERVICE**

RANIA ASSILY

Judge: STEVEN E GALL

_____
Plaintiff(s)

CV 22 958137

Judge: _____

Vs.

CUYAHOGA COMMUNITY COLLEGE
_____
Defendants(s)

Date: _____

Method of Service Requested:

Certified Mail Service ☑  Ordinary Mail Service ☐

Personal Service by the Sheriff of _____ County ____

Residence Service by the Sheriff of _____ County ____

Personal Service By Process Server ____

Residence Service by Process Server ____

Civ.R. 4.7 Waiver Requested ____

Name(s) and Address(es) of Parties to Serve:

PLEASE SERVE ALL DEFENDANTS BY CERTIFIED MAIL AT THE ADDRESSES
ON THE COMPLAINT
_____
_____
_____

Additional Instructions:
_____
_____
_____

Filing Party Name: JOSEPH BANCSI    Supreme Court ID if applicable: 0025450

Phone Number: 216-406-8177

*For Use by Sheriff or Process Server Only*

Number of Service Attempts: _____

Address for Service if Different from address included above: _____

Exhibit A